Lot 84, 133 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 84 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 85, N 78° 05' 42" E a distance of 115.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 24.00' to a point thence, along Lot 83, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 85, 131 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 85 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 86, N 78° 05' 42" E a distance of 115.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 24.00' to a point thence, along Lot 84, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 86, 129 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 86 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 87, N 76° 33' 26" E a distance of 118.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 38.48 to a point; thence, along Lot 85, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 1.07' to a point on the eastern right-of-way line Scully Place; thence along said right-of-way line, by a curve to the left, having a radius of 200.00 a length of 34.42 having a chord bearing N 16° 50' 07" W a distance of 34.38' to a point and the place of BEGINNING.

Containing 4,282 sq. ft. (0.10 acres) more or less

Account No

Lot 87, 127 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 87 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 88, N 65° 06' 18" E a distance of 115.72' to a point; thence, along Tract #3R, S 24° 53' 42" E a distance of 55.47' to a point; thence, along Lot 86, S 76° 33' 26" W a distance of 118.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way, by a curve to the left having a radius of 200.00' a length of 14.77', and having a chord bearing N 23° 52' 50" W a distance of 14.76' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 17.29' to a point and the place of BEGINNING.

Containing 5,056 sq. ft. (0.12 acres) more or less

Account No.

Lot 88, 125 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 88 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 89, N 65° 06' 18" E a distance of 116.18' to a point; thence, along Tract #3R, S 24° 53' 42" E a distance of 24.00' to a point thence, along Lot 87, S 65° 06' 18" W a distance of 115.72' to a point on the eastern right-of-way line Scully Place; thence, along said righ-of-way line, N 25° 59' 45" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,783 sq. ft. (0.06 acres) more or less

Account No

Lot 89, 123 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 89 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 90, N 65° 06' 18" E a distance of 116.64' to a point; thence, along Tract #3R, S 24° 53' 42" E a distance of 24.00' to a point thence, along Lot 88, S 65° 06' 18" W a distance of 116.18' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,794 sq. ft. (0.06 acres) more or less

Account No

Lot 90, 121 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 90 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, S 76° 57' 37" E a distance of 107.44' to a point; thence, along the same, S 24° 53' 42" E a distance of 24.00' to a point; thence, along Lot 89, S 65° 06' 18" W a distance of 116.64' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 3.64' to a point on the eastern right-of-way

line of Scully Place; thence, along said right-of-way, by a curve to the right, having a radius of 125.00 a length of 85.16, with a chord bearing N 06° 28' 41" W a distance of 83.52' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 13° 02' 23" E a distance of 9.08' to a point and the place of BEGINNING.

Containing 6,859 sq. ft. (0.16 acres) more or less

Account No

Lot 91, 111 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 91 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 92, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 35.00' to a point; thence, along the same, S 81° 28' 30" W a distance of 35.00' to a point and the place of BEGINNING.

Containing 4,025 sq. ft. (0.09 acres) more or less

Account No

Lot 92, 109 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 92 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 93, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point ; thence, along Lot 91, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 93, 107 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 93 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 94, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point thence, along Lot 92, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 94, 105 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 94 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 95, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E  a distance of 24.00' to a point thence, along Lot 93, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 95, 103 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 95 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 96, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point thence, along Lot 94, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 96, 101 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 96 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, N 81° 28' 30" E a distance of 115.00' to a point; thence, along the same, S 08° 31' 30" E a distance of 35.00' to a point; thence along Lot 95, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 35.00' to a point and the place of BEGINNING.

Containing 4, 025 sq. ft. (0.09 acres) more or less

Account No.

# LOAN AND SECURITY AGREEMENT

### Between

## LEWISBERRY PARTNERS LLC
### a Pennsylvania limited liability company
### as Borrower,

### AND

## LOAN FUNDER LLC, SERIES 7693

Date:  as of **June 26, 2019**

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP
Loan and Security Agreement

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | The Loan | 3 |
| 3. | The Note | 5 |
| 4. | Grant of Security Interest | 5 |
| 5. | Conditions Precedent to Lender's Obligations | 6 |
| 6. | Representations and Warranties of Borrower | 6 |
| 7. | Survival of Representations and Warranties | 13 |
| 8. | Affirmative Covenants | 13 |
| 9. | Negative Covenants of Borrower | 17 |
| 10. | Events of Default | 19 |
| 11. | Remedies | 20 |
| 12. | Payment of Expenses | 21 |
| 13. | Lender's Right to Assign | 22 |
| 14. | Default Interest Rate | 22 |
| 15. | Usury Savings | 23 |
| 16. | Notices | 24 |
| 17. | No Waiver | 23 |
| 18. | Failure to Exercise Rights | 23 |
| 19. | Prohibition Against Exercise of Rights Applicable Only to Individual Lenders | 23 |
| 20. | Miscellaneous | 23 |
| 21. | Successors and Assigns | 25 |
| 22. | Waiver of Jury Trial | 25 |
| 23. | Releases of Collateral | 26 |

## Schedules

Schedule A  - Description of the Collateral
Schedule B  - Representations And Warranties With Respect To Purchased Mortgage Loans
Exhibit B  - Certain Definitions
Exhibit C  - Exceptions To Representations And Warranties In Section 2
Exhibit D  - Tenant Direction Letter

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement"), dated as of June 26, 2019, between **LEWISBERRY PARTNERS LLC**, a Pennsylvania limited liability company  having its principal place of business at **27 Nutt Road, Phoenixville, PA 19460** ("Borrower"), and **LOAN FUNDER LLC, SERIES 7693**, a Delaware limited liability company having its principal place of business at **645 Madison Avenue, Floor 19, New York, NY 10022** ( "Lender").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower in the amount of **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** (the "Loan"), subject to and upon the terms and conditions hereinafter contained, which Loan shall be evidenced by a Promissory Note as of even date herewith from Borrower to Lender (as may be amended, restated or modified from time to time, the "Note");

**WHEREAS**, the Loan is to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Principal Loan Documents and made a part hereof, and payment and performance of the Loan is to be guaranteed pursuant to that certain guaranty of even date herewith from Guarantor (as hereinafter defined) to Lender (as may be amended, restated or modified from time to time, the "Guaranty");

**WHEREAS**, capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents (as hereinafter defined); and

**WHEREAS**, Lender has agreed to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower and Lender hereby agree as follows (all initial capitalized terms used herein, but not defined herein shall have the meaning on Exhibit "B" attached hereto)::

1.  **Definitions.** As used herein:

    (a)  "Account" or "Accounts Receivable" means, in addition to the definition of account as contained in the Uniform Commercial Code, the right of Borrower to receive payment for goods sold or leased or for services rendered which are not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

    (b)  "Account Debtor" means, in addition to the definition of account debtor as contained in the Uniform Commercial Code, the person or persons obligated to Borrower on an Account, or who is represented by Borrower to be so obligated.

    (c)  "Affiliate" of any Person (as hereinafter defined) shall mean any other Person which, directly or indirectly, controls or is controlled by, or is under common control with such Person. For the purposes of this definition, "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(d)  "Business Day" shall mean any day upon which banks located in the State of New York generally are open to conduct regular banking business.

(e)  "Closing Date" shall mean the date on which this Agreement is executed by the parties hereto and the conditions set forth in Paragraph 5 are fulfilled to the satisfaction of Lender.

(f)  the "Collateral" shall mean the Real Property Collateral, the Collateral described in Paragraph 4 hereof, any other collateral described in any Loan Document and any other property of Borrower and/or Guarantor now or hereafter subject to a security agreement, mortgage, pledge, assignment or other document granting Lender a security interest therein and/or securing the Loan.

(g)  the "Default Rate" shall have the meaning ascribed thereto in the Note.

(h)  "Dollar" or "$" or "dollar" or any other terms of similar import shall mean United States Dollars, it being understood and agreed that all advances of the Loan shall be made in U.S. Dollars and repaid or reimbursed in U.S. Dollars without reduction for currency exchange fluctuation.

(i)  "Environmental Laws" shall mean a collective reference when and as applicable to (i) the Comprehensive Environmental Response, Compensation & Liability Act, as amended, 42 U.S.C. Section 9601 et seq., (ii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., and (iii) any and all other federal, state and local statutes, laws, rules, ordinances, regulations and executive orders pertaining to environmental matters applicable to the Borrower's business and/or properties, as the same may be amended or supplemented from time to time.

(j)  "Governmental Authority" or "Governmental Authorities" shall mean any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over Borrower, the Guarantor (as hereinafter defined) or the Collateral.

(k)  the "Guarantor" shall mean **Richard J Puleo.**.

(l)  the "Indemnified Party" and "Indemnified Parties" shall mean Agent and Lender as well as their directors, officers, trustees, partners, employees, agents, attorneys and shareholders.

(m)  "Independent Director" or "Independent Manager" shall mean a Person, acceptable to Lender in its sole discretion, who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, manager, contractor or attorney of the Borrower or any Affiliate of any of them; (b) a customer, creditor or other person who derives any of its purchases or revenues from its activities with the Borrower or any Affiliate; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, manager, contractor, customer, creditor, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, contractor, customer, creditor or other Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

2

(n)     the "Loan Documents" shall mean this Agreement, the Note, the Mortgage (as hereinafter defined), the Guaranty and any other documents or agreements given to Lender by Borrower or the Guarantor in connection with the Loan whether or not specifically set forth herein, as each may be amended, restated or modified from time to time.

(o)     "Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against the Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to the Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of the Borrower, to admit in writing the Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(p)     "Mortgage" shall mean that certain Mortgage and Security Agreement of even date herewith, as may be amended, restated or modified from time to time, given by Borrower (as such term is defined therein), as mortgagor, in favor of Lender, as mortgagee, in connection with the Mortgaged Property, which Mortgage is given as security for the due payment of Borrower's obligations under the Note.

(q)     "Person" or "Persons" shall mean any one or more individuals, partnerships, corporations (including a business trust), joint stock companies, limited liability company, trusts, unincorporated associations, joint ventures or other entities, or a foreign state or political subdivision thereof or any agency of such state of subdivision.

(r)     "Personalty" shall mean all Accounts, Accounts Receivable, Equipment, Inventory, Goods (as such terms are defined in the Uniform Commercial Code) and other personal property of the Borrower, as more particularly described herein.

(s)     "Project" shall mean the project at the Mortgaged Property known as Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA, consisting of townhomes other related improvements and amenities.

(t)     "Real Property Collateral" or "Mortgaged Property" shall mean that certain real property owned or leased by Borrower, situated in York County, Pennsylvania as more particularly described in Schedule A attached hereto and made a part hereof.

(u)     "Uniform Commercial Code" shall mean the Uniform Commercial Code, as enacted in the State of New York and the jurisdiction in which the Mortgaged Property is located, as applicable, as in effect from time to time.

2.     **The Loan.**

(a)     Provided that no default shall have occurred and be continuing hereunder, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** .

3

(b)       The initial Loan term shall be until June 26, 2049 ("Loan Maturity Date"), such date being three hundred sixty (360) months from the date of Closing.

(c)       Subject to a final closing statement prepared by Lender's counsel and executed by Borrower (the "Closing Statement"), the Loan proceeds shall be disbursed as follows and used only for the following purposes:

(1)       The sum of **One Hundred Thousand Three Hundred Twelve and 50/100 dollars ($100,312.50)** shall be disbursed on behalf of Borrower on the Closing Date and simultaneously paid to Lender as a fully earned, non-refundable fee (the "Fee") in consideration of Lender's commitment to make the Loan on the terms and conditions stated herein. In no event shall the Fee be applied or credited in reduction of any principal, interest or other sum payable hereunder; and

(2)       The sum of **Eight Thousand Nine Hundred Sixteen and 67/100 dollars ($8,916.67)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Prepaid Interest") which shall be credited against interest payments due under the terms of the Note, as such interest payments become due; and

(3)       The sum of **Four Thousand and 00/100 dollars ($4,000.00)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to LaRocca, Hornik, Rosen & Greenberg LLP, in payment of its legal fees; and

(4)       The sum of **Sixteen Thousand Three Hundred Fifty Two and 56/100 dollars ($16,352.56)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Due Diligence Expenses").

(5)       The advance to the Borrower upon closing shall **Seven Million Nine Hundred Twenty Thousand Four Hundred Eighteen and 27/100 dollars ($7,920,418.27).** Payments shall be due from Borrower on the first day of each and every month commencing on August 01, 2019 and running through the Maturity Date of **June 26, 2049** as more particularly set forth in the Note. In the event Borrower fails to make a payment within ten (10) days of the date such payment becomes due, Lender shall have the option, exercisable in its sole discretion, to require interest payments to be paid weekly, in arrears, on the Wednesday of each week during the term of the Loan Payments of interest only, in arrears, on the Principal Amount, shall be due from Borrower on the first day of each and every month commencing on **August 01, 2019**, as more particularly set forth in the Note. Interest calculations shall be based on a 360 day year.

(d)       The foregoing disbursements may be made, notwithstanding contrary directions from Borrower , and for such purpose Borrower agrees that:

A.       The foregoing constitutes an irrevocable direction or authorization to so disburse the funds (said authorization being coupled with an interest) and no further direction or authorization from Borrower shall be necessary to warrant any such disbursements; and

B.       All such disbursements shall satisfy the obligations of Lender to advance funds to Borrower notwithstanding any other agreement or document to the contrary and shall be secured by the Mortgage as fully as if made by Borrower, regardless of the disposition by the party to whom such disbursements are so made.

(e)    Prepaid Interest.  So long as no Event of Default and no event which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Documents shall have occurred, Lender shall credit Borrower from Prepaid Interest to the extent of amounts not so credited for payments of interest under the Note, it being understood, however, that the Prepaid Interest does not in any way limit Borrower's obligations to make payments of interest under the Note.  Any amounts not so credited from Prepaid Interest on the Maturity Date (as defined in the Note) shall be credited to the payment of the Loan, and any remaining Prepaid Interest after payment in full of the Loan shall be disbursed to Borrower.  Upon an Event of Default (as hereinafter defined), the Lender may credit to the extent of amounts not so credited from the Prepaid Interest any amounts then due hereunder and under the Loan Documents.

3.    **The Note.**  The obligation of the Borrower to repay all monies advanced by Lender to Borrower in connection with the Loan shall be evidenced by this Agreement and the Note.  The Loan shall bear interest at the rate(s) set forth in the Note and shall be payable as provided in the Note with final payment due on the Maturity Date.  All of Borrower's obligations hereunder and under the Note are secured by the Mortgage and the other Loan Documents.  Should the principal of or interest on the Loan become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

4.    **Grant of Security Interest.**

(a)    Borrower hereby assigns and pledges to Lender, and hereby grants to Lender a security interest in all property of the following types, wherever located and whether now owned or hereafter owned or acquired by Borrower, whether or not affixed to the Mortgaged Property, in all proceeds (including, without limitation, amounts payable under any policies of insurance with respect thereto), and Products (as such term is defined in the Uniform Commercial Code) thereof in any form, in all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions thereto or therefor, and in all increases or profits received therefrom:

(1)    all Accounts, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(2)    all Equipment (as such term is defined in the Uniform Commercial Code), and in all of Borrower's machinery and equipment of every kind, nature and description, as well as trucks and vehicles of every kind and description, including, but not limited to, trailers, cranes and hoisting equipment, whether presently owned by Borrower or hereafter acquired, and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(3)    all Inventory (as such term is defined in the Uniform Commercial Code);

(4)    all General Intangibles (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(5)    all deposit accounts of Borrower with Lender, now or hereafter existing, and all money, instruments, securities, documents, chattel paper, credits, claims, performance bonds, payment bonds, all other forms of surety to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, and other property of Borrower now or hereafter in the possession or custody of Lender or any of its agents;

5

(6)    all Chattel Paper (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Chattel Paper now or hereafter left in the possession of Lender for any purpose;

(7)    all Instruments (as such term is defined in the Uniform Commercial Code), including any negotiable instruments or a securities, or any other writing which evidences a right to the payment of money and is of the type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Instruments now or hereafter left in the possession of Lender for any purpose;

(8)    all Documents (as such term is defined in the Uniform Commercial Code);

(9)    all Goods (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property whether presently owned by Borrower or hereafter acquired; and

(10)    all books and records, including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records of Borrower pertaining to all of the Collateral.

(b)    Borrower will perform any and all steps requested by Lender to create and maintain in Lender's favor a first and valid lien on and security interest in the Collateral or pledges of Collateral, including, without limitation, the execution, delivery, filing and recording of financing statements and continuation statements, supplemental security agreements, notes, filings with federal government offices and any other documents necessary, in the opinion of Lender, to protect its interest in the Collateral which liens shall be exclusive except for those liens expressly permitted elsewhere herein. Lender and its designated officer are hereby appointed Borrower's attorney-in-fact to do all acts and things which Lender may deem necessary to perfect and continue perfected the security interests and Liens provided for in this Agreement, including, but not limited to, executing financing statements on behalf of Borrower.

5.    **Conditions Precedent to Lender's Obligations.** Lender shall not be obligated to make the Loan hereunder unless Lender shall have received the following, all in form and substance satisfactory to the Lender in all respects:

   i.    the Note, duly executed by Borrower;

   ii.    the Mortgage(s), duly executed by Borrower; one as to Lots 47 through 58 and Lots 79 through 96 with Lewisberry Partners LLC as the mortgagor; and one as to Lots 59 through 78 with Richard J. Puleo and Lorraine B. Puleo as the mortgagor;

   iii.    this Agreement, duly executed by Borrower;

   iv.    the Guaranty, duly executed by the Guarantor;

6

    v.  the Collateral Assignment of Leases and Rents on the Premises, duly executed by Borrower;

    vi.  the Collateral Assignment of Contracts, Plans, Permits, & Approvals on the Premises, duly executed by Borrower;

    vii.  the Environmental Indemnity Agreement on the Premises, duly executed by Borrower and Guarantor;

    viii.  the Document Re-Execution Agreement, duly executed by Borrower and Guarantor;

    ix.  the Closing Statement, duly executed by Borrower;

    x.  certificates of insurers, or other evidence satisfactory to Lender, indicating that Borrower and Guarantor have obtained the policies of insurance as are required under the terms of the Mortgage(s);

    xi.  a paid title insurance policy (without survey exception) in the full amount of the Loan issued by a title insurance company acceptable to Lender ("Title Insurance Company") and insuring the Mortgage(s) as a valid first lien on the Premises, with such endorsements as Lender shall require and subject to the permitted exceptions identified in the Mortgage(s);

    xii.  UCC-1 financing statements required to evidence or perfect Lender's security interest in the personal property affixed to the Premises;

    xiii.  an appraisal of the Premises;

    xiv.  intentionally deleted.

    xv.  evidence of a search of the public records which discloses no conditional sales contracts, chattel Mortgage(s), leases of personality, financing statements or title retention agreements filed or recorded against the Borrower or the Premises;

    xvi.  if requested by Lender, a survey of the Premises prepared in accordance with the "Minimum Standard Detail Requirements for ALTA and ACSM Land Title Surveys" jointly established by ALTA and ACSM in 2011, as updated, and certified to Lender by a registered land surveyor acceptable to the Lender ("Survey");

    xvii.  copies of all permits or approvals required by any governmental authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises;

    xviii.  if requested by Lender, an environmental audit of the Premises (Phase I and, if necessary Phase II);

    xix.  if the Borrower is a legal entity, operating agreement of Borrower certified by the Executive Manager of Borrower;

xx. if the Borrower is a legal entity, an incumbency certificate of Borrower which shall certify the names and titles of the officers/members of the Borrower authorized to sign, in the name and on behalf of Borrower this Agreement and each other Loan Document to be delivered pursuant to this Agreement by Borrower, together with the true signatures of such officers, upon which certificate the Lender may conclusively rely;

xxi. if the Borrower is a legal entity, resolutions/consents of the Borrower authorizing the transactions to be entered into by Borrower in connection with this Agreement;

xxii. evidence that the Premises is not located in a federal or state flood hazard area;

xxiii. certification regarding debts and liens, executed by the owner of the Premises;

xxiv. payment of a Loan Origination Fee of **Twelve Thousand Three Hundred Eighty Two and 22/100 dollars ($12,382.22)** and other fees and expenses required to be paid to or on behalf of Lender in connection with the Loan;

xxv. evidence demonstrating current full compliance with all applicable zoning, health, environmental and safety laws, ordinances and regulations (including, without limitation, approval of local, private or public sewage or water utility);

xxvi. certification from Borrower that Borrower is not a party to any existing or pending or threatened litigation, except as previously disclosed to Lender;

xxvii. evidence demonstrating receipt of all appropriate approvals meeting all applicable requirements of any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction including, but not limited to, subdivision and site plan approvals, potable water supply, sewage discharge and sewage connection, use of septic tanks or alternatives, if any;

xxviii. satisfactory evidence that all roads and utilities necessary for the full utilization of the Premises for its intended purposes have been completed or the presently installed and proposed roads and utilities will be sufficient for the full utilization of Premises for its intended purposes; and

xxix. such other agreements, certificates or other documents as Lender or Title Insurance Company may reasonably request.

xxx. If the Premises is currently leased, evidence that the Premises is occupied by an Eligible Tenant pursuant to an Eligible Lease.

8

6.    **Representations and Warranties of Borrower.**  To induce Lender to make the Loan pursuant to this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    By its acceptance of Lender's funds and execution of the Loan Documents, Borrower acknowledges, agrees and confirms that it has no defense, offset or counterclaim for any occurrence in relation to this Loan and Borrower acknowledges that Lender has complied with all of its obligations under the Loan Documents as of the date hereof.

(b)    Borrower is a limited liability company , duly organized under the laws of the State of Pennsylvania and has all requisite power and authority and legal right to own its property, to carry on its business as it is now being conducted, to enter into this Agreement and the other Loan Documents entered into by it and to perform all of its obligations hereunder and thereunder.

(c)    The execution and delivery by Borrower of the Loan Documents, and the performance of its obligations thereunder, have been duly authorized by all necessary action, corporate or otherwise, and do not and will not: (i) require any further action, consent or approval on the part of the Managing Member of Borrower; (ii) violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower, or the Managing Member of Borrower; or (iii) result in any breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or affected, and the Borrower is not in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument.

(d)    The Loan Documents have been duly executed and delivered by Borrower and are legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(e)    Except as previously disclosed to Lender, there is no material action, suit, proceeding, inquiry or investigation, at law or in equity, or before any court, governmental instrumentality, public board or arbitrator pending or threatened against or affecting Borrower or any of its properties or rights, wherein an unfavorable decision, ruling or finding would (i) to the extent not covered by insurance as to which the insurer has not disclaimed coverage, result in any material adverse change in the financial condition, business, properties or operations of Borrower; (ii) materially or adversely effect the transactions evidenced by the Loan Documents; (iii) materially impair the right of either to carry on its business substantially as now conducted; or (iv) adversely effect the validity or enforceability of the Loan Documents.

(f)    To the best of Borrower's knowledge, Borrower is in compliance with all laws applicable to Borrower or its properties or assets.

(g)    Borrower is a pre-existing corporation/limited liability company and is actively engaged in the operation of its business and has not been created as a vehicle to obtain the Loan.  The proceeds of the Loan will be used by Borrower for the purposes set forth in Paragraph 6(o) in connection with the operation of Borrower's business, and the proceeds of the Loan will not be paid over or diverted by Borrower to any member, manager, officer, director, trustee, shareholder of Borrower, any Guarantor or any other person.

(h)     The following persons constitute the shareholders/members of Borrower and their respective ownership interest in Borrower is set forth opposite their names:

Richard J Puleo
_____

_____

_____

(i)     There has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of its financial statements furnished to Lender.

(j)     Borrower's properties and assets reflected on its financial statements referred to above, and all such properties and assets are free and clear of all mortgages, pledges, liens, charges or other encumbrances, except as reflected on such financial statements which have been previously provided to Agent.

(k)     Borrower and the Guarantor have each filed all federal, state and other income or franchise tax returns which are required to be filed and have paid all taxes due or which may become due pursuant to such returns or pursuant to any assessment received by it.

(l)     All timely authorizations, permits, approvals and consents of Governmental Authorities which may be required in connection with the valid execution and delivery of this Agreement and the other Loan Documents and the carrying out or performance of any of the activities or transactions required or contemplated hereunder or thereunder have been obtained (and remain in full force and effect).

(m)     All financial statements, information and other financial data furnished by Borrower and the Guarantor to Lender in connection with the Agreement (i) were true, correct and complete in all material respects, as of the date of said financial statements, information and other data, (ii) such financial statements present fairly the financial condition of Borrower and the Guarantor at the respective dates thereof and the results of operations and changes in financial position for the periods to which they apply, and (iii) there have been no material adverse changes in the financial condition of Borrower or any Guarantor since the delivery by Borrower or the Guarantor, as the case may be, to Lender of the most recent financial statements.

(n)     Borrower's assets, at a fair valuation, exceed Borrower's liabilities (including, without limitation, contingent liabilities). Borrower is paying its debts as they become due and Borrower anticipates the continuing ability to pay its debts as they become due. Borrower has capital and assets sufficient to carry on its business.

(o)     Proceeds from the Loan shall be used only as set forth in this Agreement, the Closing Statement, and for other proper corporate/limited liability company purposes. No part of the proceeds of the Loan shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of Regulation U of the Board of Governors of the Federal Reserve System. In particular, without limitation of the foregoing, no part of the proceeds from the Loan are intended to be used to acquire any publicly-held stock of any kind. As used in this subparagraph (o), the terms "margin stock" and "purpose of purchasing or carrying" shall have the meanings assigned to them in the aforesaid Regulation U, and the term "publicly-held," in respect to securities, shall have the meaning assigned to it in Section 220.7(a) of Regulation T of the Board of Governors of the Federal Reserve System.

(p)     Borrower is not in violation of or in default under (nor on the Closing Date is there any waiver in effect which, if not in effect, would result in a violation or default under) any provision of Borrower's bylaws/operating agreement, or under any provision of any agreement, indenture, evidence of indebtedness, loan or financing agreement, certificate, lease or other instrument to which it is a party, or by which it is bound, or of any law, governmental order, rule or regulation, in any such case under this subparagraph (p) so as to affect adversely in any material manner its business, assets or financial conditions.

(q)     All statements, representations and warranties made by Borrower or any other person in this Agreement, any other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by said person to Lender under this Agreement or in connection with the Loan: (i) are and shall be true, correct and complete in all material respects at the time they were made and, in the case of those made prior to the Closing Date, on and as of the Closing Date, (ii) do not and shall not contain any untrue statement of a material fact at the time made, and (iii) do not and shall not omit to state a material fact at the time made necessary in order to make the information contained herein or therein not misleading or incomplete. Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to provide the Loan.

(r)     No person is entitled to receive from Borrower any brokerage commission, finder's fee or similar fee or payment in connection with the consummation of the transactions contemplated by this Agreement except as provided in Section 2 of this Agreement. No brokerage or other fee, commission or compensation is to be paid by Lender by reason of any act, alleged act or omission of Borrower with respect to the transaction contemplated hereby.

(s)     Borrower has no knowledge of any of the following:

(i)     The release or threatened release of any hazardous substance, pollutant or contaminant as each such term is presently defined in any applicable Environmental Laws resulting from any activity by or on behalf of Borrower or any predecessor in interest to the Mortgaged Property, including, without limitation, the generation, handling, storage, treatment, transportation or disposal of any hazardous substance, pollutant or contaminant at any of the past or present business locations and facilities of Borrower; or

(ii)     Any past or future action taken or to be taken by any federal, state, county or municipal Governmental Authority or by any other person under any applicable Environmental Laws concerning the release of any hazardous substance, pollutant or contaminant into the soil, air, surface or subsurface water or the environment in general from any of the past or present business locations and facilities of Borrower; or

(iii)     Any claims or actions brought or which are threatened to be brought by any Person against Borrower for damages occurring at or outside of any of the past or present business locations and facilities of Borrower resulting from the alleged release or threatened release of any hazardous substance, pollutant or contaminant by Borrower or any predecessor in interest, including, without limitation, claims for health effects to Persons, property damage and/or damage to natural resources.

(t)     (A)     Borrower's address set forth above is the location of Borrower's chief executive office, and is the only location where Borrower keeps its records concerning its Accounts, and its inventory and equipment. (B) Within four (4) months of the date of this Agreement, none of

11

Borrower's assets have been moved from any jurisdiction or other locations than the present location of assets set forth above except for inventory or equipment purchased or sold by Borrower in the ordinary course of business from persons or entities customarily selling such inventory or equipment. (C) As of the date hereof, no inventory is now stored with a bailee, warehouseman or similar party. (D) As of the date hereof, Borrower does not hold any goods belonging to third parties or in which other parties have an interest, including any goods sold on a bill and hold basis. (E) Borrower does not presently purchase or otherwise hold goods on a consignment basis. (F) None of Borrower's inventory is of a nature that contains any labels, trademarks, trade names, or other identifying characteristics which are the properties of third parties, and the use of which by Borrower is in violation of the rights of such third parties or under license, royalty or similar agreements with any third parties. (G) No persons hold any goods of Borrower. (H) Borrower has not purchased any inventory or equipment except in the ordinary course of business for value and from persons customarily in the business of selling such inventory or equipment. (I) Borrower does not hold any instrument or chattel paper connected with any Account. (J) Borrower does not own any trademarks, trade names, patents or copyrights. (K) No surety bonds have been issued on behalf of Borrower with respect to any contracts or purchase orders out of which Accounts Receivable have arisen or are expected to arise.

(u)     Borrower is the owner and the operator of the Mortgaged Property.

(v)     There is an adequate supply of public utilities (including, without limitation, water, sewer and electric) to support the Project and the Project has access to such public utilities.

(w)     Cross-Default and Cross-Collateralization. Borrower hereby acknowledges and agrees that a default under the terms and conditions of any other loans, obligations, liabilities, or indebtedness of Borrower (whether now existing or hereafter arising) with Lender or any other lender shall be deemed to be a default under the terms and conditions of the Note and this Agreement. Without limited to foregoing, Borrower acknowledges that this Loan is cross-defaulted and cross-collateralized with the Loans identified on Exhibit "A-1", attached hereto, as the same may be updated and amended from time to time by Lender.

(x)     Leasing of the Premises. As of the closing, each Premises shall be either (a) leased by Borrower to an Eligible Tenant pursuant to an Eligible Lease (the "Eligible Lease") that is in full force and effect and is not in default in any material respect or (b) in lease ready condition, meaning that the Premises have been cleaned, no renovations or repairs to the Premises are needed and the Premises is immediately available to be leased to an Eligible Tenant pursuant to an Eligible Lease no later than 120 days after the loan closing (the "120 Day Lease Date"). No Leases (the "Lease") (written or oral) exist for any Premises except for Eligible Leases previously delivered to Lender. No Person (other than Borrower) has any possessory interest in any Premises or right to occupy the same except for the Tenants (the "Tenants") under and pursuant to Eligible Leases. Borrower has delivered to Lender true and complete copies of all Leases, and there are no material oral agreements with respect thereto. No rent for any Premises has been paid more than sixty (60) days in advance of its due date and no right to free rent, partial rate, rebate of rent or other payments, credits, allowances or abatements have been given or are required to be given to any Tenant. To Borrower's knowledge, (a) each Premises is being used exclusively as residential rental property and (b) to Borrower's knowledge, no illegal activity has taken place at the Premises. Borrower shall not permit to exist any Lease (including any renewal or extension of any existing Lease) for any Premises unless such Lease is an Eligible Lease with an Eligible Tenant. Borrower shall, in a commercially reasonable manner, perform the obligations of the lessor under all Leases, and enforce the obligations of the Tenants under such Leases. Borrower shall not collect any Rent more than sixty (60) days in advance of its due date; provided, that the foregoing restriction will not prevent the Borrower from

collecting both the first and last month's rent contemporaneously with the execution of the Lease in accordance with customary residential leasing practices.

(y)    Additional Representations. In addition, Borrower makes all representations and warranties to Lender as set forth on Schedule "B" attached hereto.

7.    **Survival of Representations and Warranties.**  The foregoing representations and warranties shall survive the execution of this Loan Agreement and the closing of the Loan.

8.    **Affirmative Covenants.**  To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding hereunder, Borrower shall comply with the following covenants:

(a)    Borrower shall keep and maintain complete and accurate books, accounts and records.  Borrower shall permit access thereto and examination thereof by Lender and any authorized representatives of Lender, at all reasonable times and places during normal business hours (including the right to make copies thereof at the cost and expense of Borrower).

(b)    Borrower shall comply in all material respects with all applicable federal, state, county and municipal laws, rules, regulations and orders of any Governmental Authority having jurisdiction over Borrower, subject to the limitations expressly set forth in the Mortgage, except to the extent contested in good faith and by proper proceedings or where the failure to so comply would not have a material adverse effect on Borrower, including, without limitation, all Environmental Laws and health and safety laws.

(c)    Borrower shall promptly notify Lender of the occurrence of any Event of Default or an event which, with the giving of notice or passage of time or both, would constitute an Event of Default and of the occurrence of any event or the commencement of any action, suit or proceeding which, if adversely determined, would adversely affect the condition, financial or otherwise, of Borrower or Guarantor.

(d)    Borrower shall indemnify, protect, defend and save harmless the Indemnified Parties from and against (i) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims, or demands, by third parties including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan and the transactions contemplated herein, and (ii) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any environmental sampling or cleanup relating to any properties or assets owned or otherwise used by Borrower in the operation of its business, or mandated by any Environmental Law; provided, however, Borrower shall not be obligated to indemnify, protect, defend and save harmless an Indemnified Party, if the loss, damage, expense or liability was caused by or resulted from the gross negligence or willful misconduct of that Indemnified Party. In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought, shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement. Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the Indemnified Party's cost and expense. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if

13

there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment. The provisions of this subparagraph (d) shall survive the termination of this Agreement and the final repayment of the Loan.

(e)     Leasing Covenant. Borrower shall lease the Premises to Eligible Tenant's at the Loan Closing or by the 120 Day Lease Date in accordance with Section 6 of the Note.

(f)     **Premises Management Covenants.**

a. *Management Agreements*. No Person has any right or obligation to manage, lease or collect rent from any of the Premises except the Existing Manager pursuant to the Existing Management Agreement. Borrower has delivered a true and complete copy of the Existing Management Agreement to Lender. All fees and other compensation due and payable for services performed under the Existing Management Agreement have been paid in full.

b. *Premises Management*. Borrower at all times shall provide competent and responsible management for the Properties by a Qualified Manager (the "Qualified Manager") pursuant to the Existing Management Agreement or a Replacement Management Agreement. Without Lender's prior written consent both as to the form of the Management Agreement and the identity of Manager, Borrower shall not enter into, modify, amend or terminate any Management Agreement, or permit any change in the management of the Premises; provided Lender's consent as to the Manager shall not be necessary for any Qualified Manager. Each Management Agreement shall provide (i) that the compensation to the Manager during any calendar month shall not exceed 10% of all Rent collections (unless Lender otherwise approves in writing greater compensation) and (ii) that the Management Agreement shall be terminable at Borrower's option without penalty or premium (including without any transition or termination fees or expenses) on thirty (30) days' notice or if required pursuant to the Loan Documents. Any action or inaction of Manager within the scope of the rights and obligations of Borrower that are delegated to Manager under the Management Agreement shall be deemed attributed to Borrower for purposes of determining compliance with the Loan Documents. Borrower shall (x) in a commercially reasonable manner, perform all of its obligations and enforce all obligations of the Manager under each Management Agreement and (y) promptly notify Lender of any default under any Management Agreement of which it is aware. (b) Lender shall have the right to terminate any Management and require Borrower to replace the Manager and enter into a Replacement Management Agreement with a Qualified Manager selected by Lender if any of the following occurs: (i) an Event of Default, (ii) any default by the Manger under the Management Agreement beyond any applicable cure period, (iii) in connection with any of the Premises, Manager is grossly negligent or commits any act of fraud or willful misconduct, misappropriates funds or violates any criminal law, or (iv) an Event of Bankruptcy occurs with respect to the Manager. Borrower shall enter into a Replacement Management Agreement within the replacement Qualified Manager within thirty (30) days of Lender's demand to replace the Manager. At the time of the Replacement Management Agreement is executed, Borrower shall cause (and Lender shall have the right to cause) the Qualified Manager to execute and deliver any documents as Lender shall require to substance satisfactory to Lender. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest to take the foregoing actions and enter into the foregoing agreements and documents on behalf of Borrower if Borrower fails to do so within five (5) business days of written demand by Lender.

14

c. *Security Deposits.* Borrower shall maintain one or more Eligible Accounts for the safe keeping of security deposits in accordance with applicable Legal Requirements and shall maintain all security deposits therein. Upon Lender's written request during an Event of Default or upon any foreclosure of any Premises or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Debt, except to the extent any security deposits are forfeited by the applicable Tenant pursuant to the terms of the applicable Lease.

(g)    Cash Management Arrangements.

a. *Lockbox.* After the occurrence of an Event of Default, at Lender's option, in addition to all other rights and remedies available to Lender: (i) Lender may require that Borrower deliver to Lender all Collections received by Borrower and Manager within two (2) business days of receipt thereof; (ii) Lender shall be entitled to collect and receive all of the Rents and Other Receipts of the Premises directly from the Tenants thereof; (iii) Lender may require that Borrower direct each current and future Tenant via an instruction letter in the form of Exhibit "D" (a "Tenant Direction Letter") to send all payments of Rent and Other Receipts (whether by cash, check or electronic means) directly to an Eligible Account designated by Lender (a "Lockbox Account"); and (iv) Lender shall be entitled to have a receiver appointed to take possession of and manage the Premises and collect the Rents and Other Receipts derived from the Premises without any showing as to the inadequacy of the Premises as security. Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents and Other Receipts actually received. Neither Borrower nor Manager shall, (i) directly or indirectly, interfere with the collection of Rents and Other Receipts by Lender or any judicially appointed receiver or (ii) without Lender's prior written consent, terminate, amend, revoke or modify any Tenant Direction Letter in any matter whatsoever or direct or cause any Tenant to pay any amount in any matter other than as provided in such Tenant Direction Letter, whether or not an Event of Default is continuing. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to execute and deliver to on a daily basis into the Cash Management Account and applied and disbursed in accordance with this Agreement and the Cash Management Agreement. Lender shall be permitted to apply all Rent and Other Receipts received by the Lockbox reserves account in any manner Lender sees appropriate.

(h)    Investment of Funds in Cash Management Account, Reserves; Expenses. Lender shall have the right to direct Cash Management Account Bank to invest sums on deposit in the Cash Management Account and the Reserves in Permitted Investments. Borrower shall pay for all expenses of opening and maintaining the Cash Management Account and the Lockbox Account.

(i)    Security Interest. As security for the Obligations, Borrower hereby grants to Lender a first-priority security interest in the Cash Management Account, each Reserve, each Rent Deposit Account, the Security Deposit Account and any Lockbox Account and all amounts at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest therein, including executing and delivering to Lender deposit account control agreements and filing UCC-1 financing statements and continuations thereof.

(j)    Tax Funds. Borrower shall escrow Property Taxes in accordance the Mortgage.