(b)     Without Mortgagee's prior consent, which may be granted or withheld in Mortgagee's sole discretion, Mortgagor shall make or permit no use of the Property that would involve the generation, storage, treatment, discharge, handling, refining, release or disposal of any Hazardous Substances.

(c)     At its sole cost and expense, Mortgagor shall, and shall cause any tenant or occupant of the Property to, comply with all applicable federal, state and local laws, rules, regulations and orders with respect to the discharge, generation, removal, transportation, storage, treatment and handling of Hazardous Substances, including but not limited to the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended by the Superfund Amendment and Reauthorization Act of 1986, the federal Resource Conservation and Recovery Act, as amended, the Federal Water Pollution Control Act, the Federal Clean Air Act, the federal regulations promulgated pursuant to any of the foregoing, and any and all environmental, health, or safety laws of the State, as amended from time to time, and any regulations promulgated thereunder, pay immediately when due the cost of removal of Hazardous Substances, and keep the Property free and clear of any lien imposed pursuant to such laws, rules, regulations or orders. In the event Mortgagor fails to do so, Mortgagee may declare this Mortgage to be in default.

(d)     Mortgagor shall indemnify Mortgagee and hold Mortgagee harmless from and against all loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Mortgagee may incur as a result of or in connection with the assertion against Mortgagee or the Property of any claim relating to the presence or removal of any hazardous waste or substance referred to in this paragraph, or compliance with any federal, state or local laws, rules, regulations or orders relating thereto unless such claim arises solely from Mortgagee's gross negligence or willful misconduct.

(e)     The term "Hazardous Substances" or "Hazardous Materials" as used in this Mortgage shall include, without limitation, gasoline, petroleum products, explosives, radioactive materials, polychlorinated biphenyls or related or similar materials, or any other substance or material defined as a hazardous or toxic substance or material by any federal, state or local law, ordinance, rule, or regulation.

(f)     Mortgagor shall notify Mortgagee immediately in writing upon learning of:

(i)     any spill, discharge or release of any Hazardous Substances on or near the Property that may involve a cleanup cost of One Thousand and 00/100 ($1,000.00) Dollars or more;

(ii)    any circumstances that may result in a violation of this Section 6.17;

(iii)   any governmental inquiry or inspection is undertaken or notice issued by any governmental agency or any source whatsoever with respect to Hazardous Materials on, from, affecting, or used, stored or discharged by any occupant of, the Property.

(g)     If any investigation, environmental report or governmental investigation or order indicates that there may exist any damage or risk to the Property, or any liability of Mortgagor relating to any Hazardous Materials, or other environmental conditions with respect to the Property, then Mortgagee may require Mortgagor to furnish immediately an indemnity bond in an amount determined by Mortgagee, in its discretion, to be sufficient to pay all actual and estimated cleanup costs and to protect against any liens that may arise with respect to such potential cleanup costs. Mortgagee's demand that

32

Mortgagor post any bond or other security shall not be a waiver of any default or of any other right or remedy available to Mortgagee.

(h) The obligations and liabilities of Mortgagor under this Section 6.17 shall survive any entry of a judgment of foreclosure or the delivery of a deed in lieu of foreclosure of this Mortgage.

Section 6.18    Asbestos.

(a) Mortgagor represents and warrants that, to the actual knowledge of Mortgagor, there is no friable asbestos or any material containing asbestos and deemed hazardous by federal, state or local laws, rules, regulations or orders respecting such material ("Asbestos") on the Property.

(b) Mortgagor shall not install or permit to be installed Asbestos in the Property. With respect to any such material currently present in the Property, Mortgagor shall promptly comply with such federal, state or local laws, rules, regulations or orders at Mortgagor's sole cost and expense. If Mortgagor shall fail to comply with any such law, rule, regulation or order such failure shall constitute an Event of Default.

(c) Mortgagor (x) shall protect, defend, indemnify and hold Mortgagee harmless from and against all loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Mortgagee may incur as a result of or in connection with the assertion against Mortgagee or the Property of any claim relating to (i) the presence or removal of any asbestos or asbestos containing substance, including, without limitation, the cost of such removal, or (ii) compliance with any federal, state or local laws, rules, regulations or orders relating thereto, and (y) guarantees to Mortgagee the payment of all costs and expenses which may be incurred by Mortgagee in performing any Asbestos remedial action not performed (or caused to be performed) by Mortgagor as required under this Mortgage.

(d) The obligations and liabilities of Mortgagor under this Section 6.18 shall survive any entry of a judgment of foreclosure or the delivery of a deed in lieu of foreclosure of this Mortgage.

Section 6.19    Modifications. This Mortgage, the Note and all other Obligations are subject to Modification (as defined below). To the extent permitted by law, this Mortgage secures all Modifications from the date upon which this Mortgage was originally recorded, including future loans and extensions of credit and changes in the interest rate, due date, amount or other terms and conditions of any Obligations.

"Modification" shall have the meaning set forth in N.J.S.A. 46:9-8.2 et seq., which statute relates, inter alia, to changes in the interest rate, due date or other terms or conditions of a "mortgage loan," or future advances pursuant to a "line of credit," as defined in that statute.

Section 6.20    No Cooperative or Condominium. Mortgagor shall not operate the Property, or permit same to be operated as a cooperative or condominium building(s) in which the tenants or occupants participate in the ownership, control, or management of the Property or any part thereof, as tenants, stockholders or otherwise.

Section 6.21    Severability. If any provision of this Mortgage or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Mortgage nor the application of such provision to any other person or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law. If the rights and liens created by this Mortgage shall be held by a court of competent jurisdiction to be invalid or

33

unenforceable as to any part of the Obligation, the portion of the Obligation which as the result of such invalidity or unenforceability is no longer secured by the liens and security interests herein granted shall be completely paid prior to the payment of the portion, if any, of the Obligation which shall continue to be secured hereunder, and all payments made on the Obligation shall be considered to have been paid on and applied first to the complete payment of the unsecured portion of the Obligation.

Section 6.22    Headings; Construction.   The headings which have been used throughout this Mortgage have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Mortgage. Words of any gender used in this Mortgage shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.   The words "herein," "hereof," "hereunder" and other similar compounds of the words "here" when used in this Mortgage shall refer to the entire Mortgage and not to any particular provision or section.

Section 6.23    Counterparts.   This Mortgage has simultaneously been executed in a number of identical counterparts, each of which, for all purposes, shall be deemed an original. If any Mortgagor is a corporation, this instrument is executed, acknowledged and delivered by Mortgagor's officers hereunto duly authorized.

Section 6.24    GOVERNING LAW.   THIS MORTGAGE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS CONSIDERATIONS AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE MORTGAGED PROPERTY UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE OF Pennsylvania, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF THE STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER (BUT THE FOREGOING SHALL NOT BE CONSTRUED TO LIMIT LENDER'S RIGHTS WITH RESPECT TO SUCH SECURITY INTEREST CREATED IN THE STATE OF Pennsylvania).

Section 6.25    JURISDICTION.   AT MORTGAGEE'S ELECTION, TO BE ENTERED IN ITS SOLE DISCRETION, ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST MORTGAGOR OR MORTGAGEE ARISING OUT OF OR RELATING TO THIS MORTGAGE (OTHER THAN AN ACTION FOR JUDICIAL FORECLOSURE OR TO APPOINT A RECEIVER), THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND MORTGAGOR WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND MORTGAGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. MORTGAGOR DOES HEREBY DESIGNATE AND APPOINT AN AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE OF MORTGAGOR MAILED OR DELIVERED TO MORTGAGOR IN THE MANNER PROVIDED IN THE MORTGAGE, SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON MORTGAGOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW

34

YORK. MORTGAGOR SHALL GIVE PROMPT NOTICE TO MORTGAGEE OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

Section 6.26    PROVISIONAL REMEDIES: FORECLOSURE AND INJUNCTIVE RELIEF. Nothing shall be deemed to apply to limit the right of Lender to: (a) exercise self-help remedies, (b) foreclose judicially or non-judicially against any real or personal property collateral, or to exercise judicial or non-judicial power of sale rights, (c) obtain from a court provisional or ancillary remedies (including, but not limited to, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver) or (d) pursue rights against Borrower or any other party in a third party proceeding in action bought against Lender (including, but not limited to, actions in bankruptcy court). Lender may exercise the rights set forth in the foregoing clauses (a) through (d), inclusive, before, during, or after the pendency of any proceeding.

Section 6.27    WAIVER OF JURY TRIAL. MORTGAGOR AND MORTGAGEE HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULL TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH -REGARD TO THE NOTE, THIS MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR AND MORTGAGEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. MORTGAGEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.

Section 6.28    Copy of Mortgage. Mortgagor hereby declares and acknowledges that it has received, without charge, a true copy of this Mortgage.

Section 6.29    PENNSYLVANIA POWER OF ATTORNEY PROVISION. If this Mortgage includes any provision which is deemed to be a power of attorney subject to Section 5601.3 of Chapter 56 of the Pennsylvania Probate, Estates and Fiduciaries Code (a "POA Provision"), each POA Provision is hereby modified to include an irrevocable waiver by each principal of the agent's duties set forth in Section 5601.3(b) of said chapter. Without further modifying any POA Provision, each undersigned party hereby acknowledges that in view of the commercial nature of the relationship between the parties hereto, there is no expectation that the agent shall have a duty under any POA Provision to act in the best interest of any principal thereunder, and it is agreed that the agent shall have no such duty.

Section 6.30    Reinstatement Period. Mortgagor's time to reinstate shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage.

Section 6.31    Purchase Money Mortgage. If any of the debt secured by this Mortgage is lent to Mortgagor to acquire title to the Property, this Mortgage shall be a purchase money mortgage.

35

Section 6.32    Interest Rate After Judgment. Mortgagor agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

**MORTGAGOR HEREBY ACKNOWLEDGES THAT IT HAS RECEIVED WITHOUT CHARGE A TRUE COPY OF THIS MORTGAGE.**

[Signatures follow on the next page.]

36

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage and Security Agreement as of the date first above written.

Name: WILLIAM B. STULL

Name:

MORTGAGOR:
**LEWISBERRY PARTNERS LLC**

By:

Name: Richard J Puleo
Title:    Managing Member

STATE OF (PA)
            )ss.:
COUNTY OF (LANC)

I certify that on June 26, 2019, Richard J Puleo came before me in person and stated to my satisfaction that he/she:

(a) made the attached instrument; and

(b) was authorized to and did execute this instrument on behalf of and as Managing Member of LEWISBERRY PARTNERS LLC (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and its members.

NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557

37

STATE OF PA)
                )ss.:
COUNTY OF LANC)    26

   I certify that on June ___, 2019, Richard J Puleo came before me in person and stated to my
satisfaction that he/she:

   (a) made the attached instrument; and

   (b) was authorized to and did execute this instrument on behalf of and as Managing Member of
LEWISBERRY PARTNERS LLC (the "Company"), the entity named in this instrument, as the free act
and deed of the Company, by virtue of the authority granted by its operating agreement and its members.

                                              _____
                                              NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557

38

**EXHIBITS:**

A - Property Description

B - Permitted Encumbrances

C- Allocated Loan Amounts

39

## EXHIBIT B

### PERMITTED ENCUMBRANCES

As outlined on Schedule B of the Lender's title policy

## EXHIBIT "C"

## ALLOCATED LOAN AMOUNTS

## LEGAL DESCRIPTION OF THE PROPERTY

ALL THOSE CERTAIN TRACTS of land situated in Fairview Township, York County, Pennsylvania, known and numbered as Lots 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 79, 80, 81, 82 ,83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, and 96 on a final plan of lots for Phases 2 & 3 of Revised Pleasant View Planned Residential Development recorded in the Office of the Recorder of Deeds in and for York County, Pennsylvania in Plan Book SS, Page 709, more particularly bounded and described as follows:

Lot 47, 2 KINGSWOOD DRIVE

. ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 47 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 45.00' to a point; thence, along Lot 48, N 12° 05' 44" W a distance of 110.00' to a point; thence, along the Lot OSR-2, N 77° 54' 16" E a distance of 29.04' to a point; thence, along the same, S 74° 37' 22" E a distance of 17.98' to a point; thence, along the same, S 12° 05' 44" E a distance of 101.70' to a point and the place of BEGINNING.

Containing 4,884 sq. ft. (0.11 acres) more or less

Account Number:

Lot 48, 4 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 48 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 30.00' to a point; thence , along Lot 49, N 12° 05' 44" W a distance of 110.00' to a point; thence, along the Lot OSR-2, N 77° 54' 16" E a distance of 30.00' to a point; thence, along Lot 47, S 12° 05' 44" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No

Lot 49, 6 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 49 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 30.00' to a point; thence , along Lot 50, N 12° 05' 44 W a distance of 110.00' to a point; thence, along the Lot OSR-2, N 77° 54' 16" E a distance of 30.00' to a point; thence, along the lot 48, S 12° 05' 44" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account N

Lot 50, 8 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 50 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 30.00' to a point; thence, along Lot 51, N 12° 05' 44" W a distance of 110.00' to a point; thence, along the Lot OSR-2, N 77° 54' 16" E a distance of 30.00' to a point; thence, along the Lot 49, S 12° 05' 44" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No.

Lot 51, 10 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 51 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 39.04' to a point; thence, along Lot 52, N 12° 05' 44" W a distance of 110.00' to a point; thence, along the Lot OSR-2, N 77° 54' 16" E a distance of 30.00' to a point; thence, along the Lot 50, S 12° 05' 44" E a distance of 110.00' to a point and the place of BEGINNING.

Containing:  3,300 sq. ft. (0.08 acres) more or less

Account No

Lot 52, 12 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 52 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern line of Kingswood Drive (private access drive), S 77° 54' 16" W a distance of 39.04' to a point; thence, along Lot 53, N 21° 36' 20" W a distance of 108.98' to a point; thence, along Lot OSR-2, N 72° 35' 18" E a distance of 27.16' to a point; thence, along the same, N 77° 54' 16" E a distance of 30.00' to a point; thence, along Lot 51, S 12° 05' 44" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 5,273 sq. ft. (0.12 acres) more or less

Account No.

Lot 53, 14 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 53 as shown on the "Final Subdivision Plan of Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along northern right-of-way line of Kingswood Drive (private access drive), S 64° 43' 59" W a distance of 36.17' to a point; thence, along Lot

54, N 37° 22' 42" W a distance of 110.00' to a point; thence, along Lot OSR-2, N 52° 38' 18" E a distance of 30.00' to a point, thence, along the same, N 72° 35' 18" E a distance of 37.22' to a point; thence, along Lot 52, S 21° 36' 20" E a distance of 108.98' to a point and the place of BEGINNING.

Containing: 5,732 sq. ft. (0.13 acres) more or less

Account No ██████████████

Lot 54, 16 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 54 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Kingswood Drive (private access drive), S 52° 37' 18" W a distance of 30.00' to a point; thence along Lot 55, N 37° 22' 42" W a distance of 110.00' to a point; thence, along Lot OSR-2, N 52° 37' 18" E a distance of 30.00' to a point; thence, along Lot 53, S 37° 22' 42" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No ██████████████

Lot 55, 18 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 55 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Kingswood Drive (private access drive), S 52° 37' 18" W a distance of 30.00' to a point; thence, along Lot 56, N 37° 22' 42" W a distance of 110.00' to a point; thence, along Lot OSR-2, N 52° 37' 18" E a distance of 30.00' to a point; thence, along Lot 54, S 37° 22' 42" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No ██████████████

Lot 56, 20 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 56 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Kingswood Drive (private access drive), S 52° 37' 18" W a distance of 30.00' to a point; thence, along Lot 57, N 37° 22' 42" W a distance of 110.00' to a point, thence, along Lot OSR-2, N 52° 37' 18" E a distance of 30.00' to a point; thence, along Lot 55, S 37° 22' 42" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No. ██████████████

Lot 57, 22 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 57 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Kingswood Drive (private access drive), S 52° 37' 18" W a distance of 30.00' to a point; thence, along Lot 58, N 37° 22' 42" W a distance of 110.00' to a point; thence, along Lot OSR-2, N 52° 37' 18" E a distance of 30.00' to a point; thence, along Lot 56, S 37° 22' 42" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 3,300 sq. ft. (0.08 acres) more or less

Account No.

Lot 58, 24 KINGSWOOD DRIVE

ALL THAT CERTAIN tract of land situate in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 58 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Kingswood Drive (private access drive), S 52° 37' 18" W a distance of 40.00' to a point; thence, along Lot OSR-2, N 37° 22' 42" W a distance of 110.00' to a point; thence, along the same, N 52° 37' 18" E a distance of 40.00' to a point; thence, along Lot 57, S 37° 22' 42" E a distance of 110.00' to a point and the place of BEGINNING.

Containing 4,400 sq. ft. (0.10 acres) more or less

Account No.

Lot 79, 142 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northeast corner of Lot 79 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 80, S 11° 54' 18" E a distance of 105.00' to a point; thence, along Tract #3R, S 78°05' 42" W a distance of 29.00' to a point; thence, along the same, N 11° 54' 18" W a distance of 105.00' to a point on the northern right-of-way line of Scully Place; thence, along said right-of-way line, N 78° 05' 42" E a distance of 29.00' to a point and the place of BEGINNING.

Containing 3, 045 sq. ft. (0.07 acres) more or less

Account No.

Lot 80, 144 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northeast corner of Lot 80 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 81, S 11° 54' 18" E a distance of 105.00' to a point; thence, along Tract #3R, S 78° 05' 42" W a distance of 24.00' to a point;

thence, along Lot 79, N 11° 54' 18" W a distance of 105.00' to a point on the northern right-of-way line of Scully Place; thence, along said right-of-way line, N 78°05'42" E a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,520 sq. ft. (0.06 acres) more or less

Account No ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Lot 81, 146 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northeast corner of Lot 81 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 82, S 11° 54' 18" E a distance of 105.00' to a point; thence, along Tract #3R, S 78° 05' 42" W a distance of 24.00' to a point; thence along Lot 80, N 11° 54' 18" W a distance of 105.00' to a point on the northern right-of-way line of Scully Place; thence, along said right-of-way line, N 78° 05' 42" E a distance of 24.00' to a point and the place of BEGINNING.

Containing 2, 520 sq. ft. (0.06 acres) more or less

Account No ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Lot 82, 148 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northeast corner of Lot 82 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, S 11° 54' 18" E a distance of 105.00' to a point; thence, along the same, S 78° 05' 42" W a distance of 29.00' to a point thence, along Lot 81, N 11° 54' 18" W a distance of 105.00' to a point on the northern right-of-way line of Scully . Place; thence, along said right-of-way, N 78° 05' 42" E a distance of 29.00' to a point and the place of BEGINNING.

Containing 3,045 sq. ft. (0.07 acres) more or less

Account No ▓▓▓▓▓▓▓▓▓▓▓▓▓

Lot 83, 135 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:
BEGINNING at a point said point being the northwest corner of Lot 83 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 84, N 78° 05' 42" E a distance of 115.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 29.00' to a point thence, along the same, S 24° 48' 20" W a distance of 12.47' to a point; thence, along the same S 78° 05' 42" W a distance of 98.31' to a point; thence, along the same, N 46° 24' 14" W a distance of 16.31' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 25.56' to a point and the place of BEGINNING.

Containing 4,385 sq. ft. (0.10 acres) more or less

Account No. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Lot 84, 133 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 84 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 85, N 78° 05' 42" E a distance of 115.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 24.00' to a point thence, along Lot 83, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 85, 131 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 85 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 86, N 78° 05' 42" E a distance of 115.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 24.00' to a point thence, along Lot 84, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 86, 129 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 86 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 87, N 76° 33' 26" E a distance of 118.00' to a point; thence, along Tract #3R, S 11° 54' 18" E a distance of 38.48 to a point; thence, along Lot 85, S 78° 05' 42" W a distance of 115.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 11° 54' 18" W a distance of 1.07' to a point on the eastern right-of-way line Scully Place; thence along said right-of-way line, by a curve to the left, having a radius of 200.00 a length of 34.42 having a chord bearing N 16° 50' 07" W a distance of 34.38' to a point and the place of BEGINNING.

Containing 4,282 sq. ft. (0.10 acres) more or less

Account No

Lot 87, 127 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 87 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 88, N 65° 06' 18" E a distance of 115.72' to a point; thence, along Tract #3R, S 24° 53' 42" E a distance of 55.47' to a point; thence, along Lot 86, S 76° 33' 26" W a distance of 118.00' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way, by a curve to the left having a radius of 200.00' a length of 14.77', and having a chord bearing N 23° 52' 50" W a distance of 14.76' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 17.29' to a point and the place of BEGINNING.

Containing 5,056 sq. ft. (0.12 acres) more or less

Account No.

Lot 88, 125 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 88 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 89, N 65° 06' 18" E a distance of 116.18' to a point; thence, along Tract #3R, S 24° 53' 42" E  a distance of 24.00' to a point thence, along Lot 87, S 65° 06' 18" W a distance of 115.72' to a point on the eastern right-of-way line Scully Place; thence, along said righ-of-way line, N 25° 59' 45" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,783 sq. ft. (0.06 acres) more or less

Account No

Lot 89, 123 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 89 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 90, N 65° 06' 18" E a distance of 116.64' to a point; thence, along Tract #3R, S 24° 53' 42" E a distance of 24.00' to a point thence, along Lot 88, S 65° 06' 18" W a distance of 116.18' to a point on the eastern right-of-way line Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,794 sq. ft. (0.06 acres) more or less

Account No

Lot 90, 121 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 90 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, S 76° 57' 37" E a distance of 107.44' to a point; thence, along the same, S 24° 53' 42" E a distance of 24.00' to a point; thence, along Lot 89, S 65° 06' 18" W a distance of 116.64' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 25° 59' 45" W a distance of 3.64' to a point on the eastern right-of-way

line of Scully Place; thence, along said right-of-way, by a curve to the right, having a radius of 125.00 a length of 85.16, with a chord bearing N 06° 28' 41" W a distance of 83.52' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 13° 02' 23" E a distance of 9.08' to a point and the place of BEGINNING.

Containing 6,859 sq. ft. (0.16 acres) more or less

Account No

Lot 91, 111 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 91 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 92, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 35.00' to a point; thence, along the same, S 81° 28' 30" W a distance of 35.00' to a point and the place of BEGINNING.

Containing 4,025 sq. ft. (0.09 acres) more or less

Account No

Lot 92, 109 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 92 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 93, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point ; thence, along Lot 91, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 93, 107 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 93 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 94, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point thence, along Lot 92, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 94, 105 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 94 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 95, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point thence, along Lot 93, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No.

Lot 95, 103 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 95 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 96, N 81° 28' 30" E a distance of 115.00' to a point; thence, along Tract #3R, S 08° 31' 30" E a distance of 24.00' to a point thence, along Lot 94, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 24.00' to a point and the place of BEGINNING.

Containing 2,760 sq. ft. (0.06 acres) more or less

Account No

Lot 96, 101 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the northwest corner of Lot 96 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, N 81° 28' 30" E a distance of 115.00' to a point; thence, along the same, S 08° 31' 30" E a distance of 35.00' to a point; thence along Lot 95, S 81° 28' 30" W a distance of 115.00' to a point on the eastern right-of-way line of Scully Place; thence, along said right-of-way line, N 08° 31' 30" W a distance of 35.00' to a point and the place of BEGINNING.

Containing 4, 025 sq. ft. (0.09 acres) more or less

Account No.

# LOAN AND SECURITY AGREEMENT

**Between**

**LEWISBERRY PARTNERS LLC**
**a Pennsylvania limited liability company**
**as Borrower,**


**AND**


**LOAN FUNDER LLC, SERIES 7693**


Date: as of **June 26, 2019**

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP
Loan and Security Agreement

# TABLE OF CONTENTS

**Page**

1.  Definitions ........................................................................................................... 1
2.  The Loan.............................................................................................................. 3
3.  The Note ............................................................................................................. 5
4.  Grant of Security Interest. ................................................................................. 5
5.  Conditions Precedent to Lender's Obligations.................................................. 6
6.  Representations and Warranties of Borrower ................................................... 6
7.  Survival of Representations and Warranties ................................................... 13
8.  Affirmative Covenants ..................................................................................... 13
9.  Negative Covenants of Borrower .................................................................... 17
10. Events of Default.............................................................................................. 19
11. Remedies. ......................................................................................................... 20
12. Payment of Expenses........................................................................................ 21
13. Lender's Right to Assign ................................................................................. 22
14. Default Interest Rate ........................................................................................ 22
15. Usury Savings .................................................................................................. 23
16. Notices.............................................................................................................. 24
17. No Waiver ........................................................................................................ 23
18. Failure to Exercise Rights ............................................................................... 23
19. Prohibition Against Exercise of Rights Applicable Only to Individual
    Lenders ............................................................................................................. 23
20. Miscellaneous. ................................................................................................. 23
21. Successors and Assigns. ................................................................................... 25
22. Waiver of Jury Trial ........................................................................................ 25
23. Releases of Collateral. ..................................................................................... 26

## Schedules

Schedule A  - Description of the Collateral
Schedule B  - Representations And Warranties With Respect To Purchased Mortgage
Loans
Exhibit B   - Certain Definitions
Exhibit C   - Exceptions To Representations And Warranties In Section 2
Exhibit D   - Tenant Direction Letter

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement"), dated as of June 26, 2019, between **LEWISBERRY PARTNERS LLC,** a Pennsylvania limited liability company   having its principal place of business at **27 Nutt Road, Phoenixville, PA 19460** ("Borrower"), and **LOAN FUNDER LLC, SERIES 7693,** a Delaware limited liability company having its principal place of business at **645 Madison Avenue, Floor 19, New York, NY 10022** ( "Lender").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower in the amount of **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** (the "Loan"), subject to and upon the terms and conditions hereinafter contained, which Loan shall be evidenced by a Promissory Note as of even date herewith from Borrower to Lender (as may be amended, restated or modified from time to time, the "Note");

**WHEREAS**, the Loan is to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Principal Loan Documents and made a part hereof, and payment and performance of the Loan is to be guaranteed pursuant to that certain guaranty of even date herewith from Guarantor (as hereinafter defined) to Lender (as may be amended, restated or modified from time to time, the "Guaranty");

**WHEREAS**, capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents (as hereinafter defined); and

**WHEREAS**, Lender has agreed to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower and Lender hereby agree as follows (all initial capitalized terms used herein, but not defined herein shall have the meaning on Exhibit "B" attached hereto)::

1.     **Definitions.**  As used herein:

(a)     "Account" or "Accounts Receivable" means, in addition to the definition of account as contained in the Uniform Commercial Code, the right of Borrower to receive payment for goods sold or leased or for services rendered which are not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

(b)     "Account Debtor" means, in addition to the definition of account debtor as contained in the Uniform Commercial Code, the person or persons obligated to Borrower on an Account, or who is represented by Borrower to be so obligated.

(c)     "Affiliate" of any Person (as hereinafter defined) shall mean any other Person which, directly or indirectly, controls or is controlled by, or is under common control with such Person. For the purposes of this definition, "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(d)       "Business Day" shall mean any day upon which banks located in the State of New York generally are open to conduct regular banking business.

(e)       "Closing Date" shall mean the date on which this Agreement is executed by the parties hereto and the conditions set forth in Paragraph 5 are fulfilled to the satisfaction of Lender.

(f)       the "Collateral" shall mean the Real Property Collateral, the Collateral described in Paragraph 4 hereof, any other collateral described in any Loan Document and any other property of Borrower and/or Guarantor now or hereafter subject to a security agreement, mortgage, pledge, assignment or other document granting Lender a security interest therein and/or securing the Loan.

(g)       the "Default Rate" shall have the meaning ascribed thereto in the Note.

(h)       "Dollar" or "$" or "dollar" or any other terms of similar import shall mean United States Dollars, it being understood and agreed that all advances of the Loan shall be made in U.S. Dollars and repaid or reimbursed in U.S. Dollars without reduction for currency exchange fluctuation.

(i)       "Environmental Laws" shall mean a collective reference when and as applicable to (i) the Comprehensive Environmental Response, Compensation & Liability Act, as amended, 42 U.S.C. Section 9601 et seq., (ii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., and (iii) any and all other federal, state and local statutes, laws, rules, ordinances, regulations and executive orders pertaining to environmental matters applicable to the Borrower's business and/or properties, as the same may be amended or supplemented from time to time.

(j)       "Governmental Authority" or "Governmental Authorities" shall mean any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over Borrower, the Guarantor (as hereinafter defined) or the Collateral.

(k)       the "Guarantor" shall mean **Richard J Puleo.**.

(l)       the "Indemnified Party" and "Indemnified Parties" shall mean Agent and Lender as well as their directors, officers, trustees, partners, employees, agents, attorneys and shareholders.

(m)       "Independent Director" or "Independent Manager" shall mean a Person, acceptable to Lender in its sole discretion, who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, manager, contractor or attorney of the Borrower or any Affiliate of any of them; (b) a customer, creditor or other person who derives any of its purchases or revenues from its activities with the Borrower or any Affiliate; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, manager, contractor, customer, creditor, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, contractor, customer, creditor or other Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

2

(n)     the "Loan Documents" shall mean this Agreement, the Note, the Mortgage (as hereinafter defined), the Guaranty and any other documents or agreements given to Lender by Borrower or the Guarantor in connection with the Loan whether or not specifically set forth herein, as each may be amended, restated or modified from time to time.

(o)     "Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against the Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to the Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of the Borrower, to admit in writing the Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(p)     "Mortgage" shall mean that certain Mortgage and Security Agreement of even date herewith, as may be amended, restated or modified from time to time, given by Borrower (as such term is defined therein), as mortgagor, in favor of Lender, as mortgagee, in connection with the Mortgaged Property, which Mortgage is given as security for the due payment of Borrower's obligations under the Note.

(q)     "Person" or "Persons" shall mean any one or more individuals, partnerships, corporations (including a business trust), joint stock companies, limited liability company, trusts, unincorporated associations, joint ventures or other entities, or a foreign state or political subdivision thereof or any agency of such state of subdivision.

(r)     "Personalty" shall mean all Accounts, Accounts Receivable, Equipment, Inventory, Goods (as such terms are defined in the Uniform Commercial Code) and other personal property of the Borrower, as more particularly described herein.

(s)     "Project" shall mean the project at the Mortgaged Property known as Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA, consisting of townhomes other related improvements and amenities.

(t)     "Real Property Collateral" or "Mortgaged Property" shall mean that certain real property owned or leased by Borrower, situated in York County, Pennsylvania as more particularly described in Schedule A attached hereto and made a part hereof.

(u)     "Uniform Commercial Code" shall mean the Uniform Commercial Code, as enacted in the State of New York and the jurisdiction in which the Mortgaged Property is located, as applicable, as in effect from time to time.

2.     **The Loan.**

(a)     Provided that no default shall have occurred and be continuing hereunder, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** .

3

       (b)     The initial Loan term shall be until June 26, 2049 ("Loan Maturity Date"), such date being three hundred sixty (360) months from the date of Closing.

       (c)     Subject to a final closing statement prepared by Lender's counsel and executed by Borrower (the "Closing Statement"), the Loan proceeds shall be disbursed as follows and used only for the following purposes:

       (1)     The sum of **One Hundred Thousand Three Hundred Twelve and 50/100 dollars ($100,312.50)** shall be disbursed on behalf of Borrower on the Closing Date and simultaneously paid to Lender as a fully earned, non-refundable fee (the "Fee") in consideration of Lender's commitment to make the Loan on the terms and conditions stated herein. In no event shall the Fee be applied or credited in reduction of any principal, interest or other sum payable hereunder; and

       (2)     The sum of **Eight Thousand Nine Hundred Sixteen and 67/100 dollars ($8,916.67)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Prepaid Interest") which shall be credited against interest payments due under the terms of the Note, as such interest payments become due; and

       (3)     The sum of **Four Thousand and 00/100 dollars ($4,000.00)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to LaRocca, Hornik, Rosen & Greenberg LLP, in payment of its legal fees; and

       (4)     The sum of **Sixteen Thousand Three Hundred Fifty Two and 56/100 dollars ($16,352.56)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Due Diligence Expenses").

       (5)     The advance to the Borrower upon closing shall **Seven Million Nine Hundred Twenty Thousand Four Hundred Eighteen and 27/100 dollars ($7,920,418.27).** Payments shall be due from Borrower on the first day of each and every month commencing on August 01, 2019 and running through the Maturity Date of **June 26, 2049** as more particularly set forth in the Note. In the event Borrower fails to make a payment within ten (10) days of the date such payment becomes due, Lender shall have the option, exercisable in its sole discretion, to require interest payments to be paid weekly, in arrears, on the Wednesday of each week during the term of the Loan Payments of interest only, in arrears, on the Principal Amount, shall be due from Borrower on the first day of each and every month commencing on **August 01, 2019**, as more particularly set forth in the Note. Interest calculations shall be based on a 360 day year.

       (d)     The foregoing disbursements may be made, notwithstanding contrary directions from Borrower , and for such purpose Borrower agrees that:

       A.     The foregoing constitutes an irrevocable direction or authorization to so disburse the funds (said authorization being coupled with an interest) and no further direction or authorization from Borrower shall be necessary to warrant any such disbursements; and

       B.     All such disbursements shall satisfy the obligations of Lender to advance funds to Borrower notwithstanding any other agreement or document to the contrary and shall be secured by the Mortgage as fully as if made by Borrower, regardless of the disposition by the party to whom such disbursements are so made.

(e)     Prepaid Interest.  So long as no Event of Default and no event which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Documents shall have occurred, Lender shall credit Borrower from Prepaid Interest to the extent of amounts not so credited for payments of interest under the Note, it being understood, however, that the Prepaid Interest does not in any way limit Borrower's obligations to make payments of interest under the Note.  Any amounts not so credited from Prepaid Interest on the Maturity Date (as defined in the Note) shall be credited to the payment of the Loan, and any remaining Prepaid Interest after payment in full of the Loan shall be disbursed to Borrower.  Upon an Event of Default (as hereinafter defined), the Lender may credit to the extent of amounts not so credited from the Prepaid Interest any amounts then due hereunder and under the Loan Documents.

3.     **The Note.**  The obligation of the Borrower to repay all monies advanced by Lender to Borrower in connection with the Loan shall be evidenced by this Agreement and the Note.  The Loan shall bear interest at the rate(s) set forth in the Note and shall be payable as provided in the Note with final payment due on the Maturity Date.  All of Borrower's obligations hereunder and under the Note are secured by the Mortgage and the other Loan Documents.  Should the principal of or interest on the Loan become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

4.     **Grant of Security Interest.**

(a)     Borrower hereby assigns and pledges to Lender, and hereby grants to Lender a security interest in all property of the following types, wherever located and whether now owned or hereafter owned or acquired by Borrower, whether or not affixed to the Mortgaged Property, in all proceeds (including, without limitation, amounts payable under any policies of insurance with respect thereto), and Products (as such term is defined in the Uniform Commercial Code) thereof in any form, in all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions thereto or therefor, and in all increases or profits received therefrom:

(1)     all Accounts, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(2)     all Equipment (as such term is defined in the Uniform Commercial Code), and in all of Borrower's machinery and equipment of every kind, nature and description, as well as trucks and vehicles of every kind and description, including, but not limited to, trailers, cranes and hoisting equipment, whether presently owned by Borrower or hereafter acquired, and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(3)     all Inventory (as such term is defined in the Uniform Commercial Code);

(4)     all General Intangibles (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(5)     all deposit accounts of Borrower with Lender, now or hereafter existing, and all money, instruments, securities, documents, chattel paper, credits, claims, performance bonds, payment bonds, all other forms of surety to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, and other property of Borrower now or hereafter in the possession or custody of Lender or any of its agents;

(6)    all Chattel Paper (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Chattel Paper now or hereafter left in the possession of Lender for any purpose;

(7)    all Instruments (as such term is defined in the Uniform Commercial Code), including any negotiable instruments or a securities, or any other writing which evidences a right to the payment of money and is of the type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Instruments now or hereafter left in the possession of Lender for any purpose;

(8)    all Documents (as such term is defined in the Uniform Commercial Code);

(9)    all Goods (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property whether presently owned by Borrower or hereafter acquired; and

(10)    all books and records, including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records of Borrower pertaining to all of the Collateral.

(b)    Borrower will perform any and all steps requested by Lender to create and maintain in Lender's favor a first and valid lien on and security interest in the Collateral or pledges of Collateral, including, without limitation, the execution, delivery, filing and recording of financing statements and continuation statements, supplemental security agreements, notes, filings with federal government offices and any other documents necessary, in the opinion of Lender, to protect its interest in the Collateral which liens shall be exclusive except for those liens expressly permitted elsewhere herein. Lender and its designated officer are hereby appointed Borrower's attorney-in-fact to do all acts and things which Lender may deem necessary to perfect and continue perfected the security interests and Liens provided for in this Agreement, including, but not limited to, executing financing statements on behalf of Borrower.

5.    **Conditions Precedent to Lender's Obligations.** Lender shall not be obligated to make the Loan hereunder unless Lender shall have received the following, all in form and substance satisfactory to the Lender in all respects:

    i.    the Note, duly executed by Borrower;

    ii.    the Mortgage(s), duly executed by Borrower; one as to Lots 47 through 58 and Lots 79 through 96 with Lewisberry Partners LLC as the mortgagor; and one as to Lots 59 through 78 with Richard J. Puleo and Lorraine B. Puleo as the mortgagor:

    iii.    this Agreement, duly executed by Borrower;

    iv.    the Guaranty, duly executed by the Guarantor;

6

v. the Collateral Assignment of Leases and Rents on the Premises, duly executed by Borrower;

vi. the Collateral Assignment of Contracts, Plans, Permits, & Approvals on the Premises, duly executed by Borrower;

vii. the Environmental Indemnity Agreement on the Premises, duly executed by Borrower and Guarantor;

viii. the Document Re-Execution Agreement, duly executed by Borrower and Guarantor;

ix. the Closing Statement, duly executed by Borrower;

x. certificates of insurers, or other evidence satisfactory to Lender, indicating that Borrower and Guarantor have obtained the policies of insurance as are required under the terms of the Mortgage(s);

xi. a paid title insurance policy (without survey exception) in the full amount of the Loan issued by a title insurance company acceptable to Lender ("Title Insurance Company") and insuring the Mortgage(s) as a valid first lien on the Premises, with such endorsements as Lender shall require and subject to the permitted exceptions identified in the Mortgage(s);

xii. UCC-1 financing statements required to evidence or perfect Lender's security interest in the personal property affixed to the Premises;

xiii. an appraisal of the Premises;

xiv. intentionally deleted.

xv. evidence of a search of the public records which discloses no conditional sales contracts, chattel Mortgage(s), leases of personality, financing statements or title retention agreements filed or recorded against the Borrower or the Premises;

xvi. if requested by Lender, a survey of the Premises prepared in accordance with the "Minimum Standard Detail Requirements for ALTA and ACSM Land Title Surveys" jointly established by ALTA and ACSM in 2011, as updated, and certified to Lender by a registered land surveyor acceptable to the Lender ("Survey");

xvii. copies of all permits or approvals required by any governmental authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises;

xviii. if requested by Lender, an environmental audit of the Premises (Phase I and, if necessary Phase II);

xix. if the Borrower is a legal entity, operating agreement of Borrower certified by the Executive Manager of Borrower;

7

xx.  if the Borrower is a legal entity, an incumbency certificate of Borrower which shall certify the names and titles of the officers/members of the Borrower authorized to sign, in the name and on behalf of Borrower this Agreement and each other Loan Document to be delivered pursuant to this Agreement by Borrower, together with the true signatures of such officers, upon which certificate the Lender may conclusively rely;

xxi.  if the Borrower is a legal entity, resolutions/consents of the Borrower authorizing the transactions to be entered into by Borrower in connection with this Agreement;

xxii.  evidence that the Premises is not located in a federal or state flood hazard area;

xxiii.  certification regarding debts and liens, executed by the owner of the Premises;

xxiv.  payment of a Loan Origination Fee of **Twelve Thousand Three Hundred Eighty Two and 22/100 dollars ($12,382.22)** and other fees and expenses required to be paid to or on behalf of Lender in connection with the Loan;

xxv.  evidence demonstrating current full compliance with all applicable zoning, health, environmental and safety laws, ordinances and regulations (including, without limitation, approval of local, private or public sewage or water utility);

xxvi.  certification from Borrower that Borrower is not a party to any existing or pending or threatened litigation, except as previously disclosed to Lender;

xxvii.  evidence demonstrating receipt of all appropriate approvals meeting all applicable requirements of any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction including, but not limited to, subdivision and site plan approvals, potable water supply, sewage discharge and sewage connection, use of septic tanks or alternatives, if any;

xxviii.  satisfactory evidence that all roads and utilities necessary for the full utilization of the Premises for its intended purposes have been completed or the presently installed and proposed roads and utilities will be sufficient for the full utilization of Premises for its intended purposes; and

xxix.  such other agreements, certificates or other documents as Lender or Title Insurance Company may reasonably request.

xxx.  If the Premises is currently leased, evidence that the Premises is occupied by an Eligible Tenant pursuant to an Eligible Lease.

8

6.    **Representations and Warranties of Borrower.**  To induce Lender to make the Loan pursuant to this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    By its acceptance of Lender's funds and execution of the Loan Documents, Borrower acknowledges, agrees and confirms that it has no defense, offset or counterclaim for any occurrence in relation to this Loan and Borrower acknowledges that Lender has complied with all of its obligations under the Loan Documents as of the date hereof.

(b)    Borrower is a limited liability company , duly organized under the laws of the State of Pennsylvania and has all requisite power and authority and legal right to own its property, to carry on its business as it is now being conducted, to enter into this Agreement and the other Loan Documents entered into by it and to perform all of its obligations hereunder and thereunder.

(c)    The execution and delivery by Borrower of the Loan Documents, and the performance of its obligations thereunder, have been duly authorized by all necessary action, corporate or otherwise, and do not and will not: (i) require any further action, consent or approval on the part of the Managing Member of Borrower; (ii) violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower, or the Managing Member of Borrower; or (iii) result in any breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or affected, and the Borrower is not in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument.

(d)    The Loan Documents have been duly executed and delivered by Borrower and are legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(e)    Except as previously disclosed to Lender, there is no material action, suit, proceeding, inquiry or investigation, at law or in equity, or before any court, governmental instrumentality, public board or arbitrator pending or threatened against or affecting Borrower or any of its properties or rights, wherein an unfavorable decision, ruling or finding would (i) to the extent not covered by insurance as to which the insurer has not disclaimed coverage, result in any material adverse change in the financial condition, business, properties or operations of Borrower; (ii) materially or adversely effect the transactions evidenced by the Loan Documents; (iii) materially impair the right of either to carry on its business substantially as now conducted; or (iv) adversely effect the validity or enforceability of the Loan Documents.

(f)    To the best of Borrower's knowledge, Borrower is in compliance with all laws applicable to Borrower or its properties or assets.

(g)    Borrower is a pre-existing corporation/limited liability company and is actively engaged in the operation of its business and has not been created as a vehicle to obtain the Loan. The proceeds of the Loan will be used by Borrower for the purposes set forth in Paragraph 6(o) in connection with the operation of Borrower's business, and the proceeds of the Loan will not be paid over or diverted by Borrower to any member, manager, officer, director, trustee, shareholder of Borrower, any Guarantor or any other person.

9