# Exhibit "D"

## UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **LEWISBERRY PARTNERS, LLC,** | **Case No. 21-10327 (ELF)** |
| **Debtor.** | |

### COMBINED MOTION OF DEBTOR LEWISBERRY PARTNERS, LLC, FOR (i) EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE; (ii) FOR AUTHORITY TO SELL REAL PROPERTIES AT PRIVATE SALES, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363 (b), (f), AND (m); AND (iii) TO ASSUME CERTAIN PREPETITION SALES AGREEMENTS PURSUANT TO 11 U.S.C. § 365(a)

Lewisberry Partners, LLC, as Debtor and Debtor-in-Possession (the "Debtor"), by and through its proposed undersigned counsel, Obermayer Redman Maxwell & Hippel LLP, hereby moves this Court for the entry of an Order: (i) granting expedited consideration, shortened time and limited notice; (ii) granting the Debtor authority to sell the properties located at 2 Kingswood Drive, Lewisberry, PA 17339, 8 Kingswood Drive, Lewisberry, PA 17339, and 16 Kingswood Drive, Lewisberry, PA 17339 (the "Real Properties") at private sales, pursuant to 11 U.S.C. § 363(b), (f) and (m); and (iii) to assume certain Prepetition Agreements of Sale (the "Prepetition Agreements of Sale") pursuant to 11 U.S.C. § 365(a), for the following Real Properties and purchasers: (a) 2 Kingswood Drive, Lewisberry, PA 17339 to Andrew J. Kaehler and Peggy A. Kaehler; (b) 8 Kingswood Drive, Lewisberry, PA 17339 to Kristine Fischer and Jamie T. Fischer; and (c) 16 Kingswood Drive, Lewisberry, PA 17339 to Bobby Hile and Sara Hile (the "Motion"). Debtor requests, in the Motion, that the Court approve the sales (the "Sales"), free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(b), (f) and (m). Debtor further seeks authority to assume the Prepetition Agreements of Sale pursuant

1

to Section 365(a) of the Bankruptcy Code, 11 U.S.C. 101, *et seq,* (the Bankruptcy Code") and in

support thereof avers as follows:

## I.    **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The legal predicates for

the relief sought herein are Section 363(b), (f) and (m) and Section 365(a) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules

2002(a)(2), (c)(1), (k), 6004(a) and 9007 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Local Rules 2002-1, 6004-1, and 9014-3 of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the

"Local Rules").

## II.    **BACKGROUND**

3.      On February 9, 2021 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), and has continued in possession of its property and is operating its business

as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No creditors' committee has been appointed in this Chapter 11 case by the United

States Trustee.  No Trustee or examiner has been sought or appointed in the Debtor's Chapter 11

case.

5.      The Debtor's Application to employ Obermayer Rebmann Maxwell & Hippel

LLP as Debtor's bankruptcy counsel is currently pending before this Court.

6.      Since 2018, the Debtor, a Pennsylvania limited liability company, has been in the

business of buying, leasing, and selling single-family residential real property located in

Lewisberry, Pennsylvania.

7.      On June 26, 2019, the Debtor acquired thirty (30) improved townhomes located in

Lewisberry, York County, Pennsylvania (the "Lewisberry Properties") in the community

commonly known as Glenbrook Townhomes at Pleasant View ("Glenbrook").[3]

8.      Debtor acquired the Lewisberry Properties from Eastern Development &

Planning, Inc., for a purchase price of Four Million Dollars ($4,000,00.00).

9.      The Lewisberry Properties were approved for development in the Final

Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development,

recorded in the Office of the Recorder of Deeds in and for York County, Pennsylvania in Plan

Book SS, Page 709. The Real Properties are part of the Lewisberry Properties.

10.     Each of the lots contained within the Project consists of a residential dwelling.

11.     In addition to offering the residential dwellings for sale, Debtor also leases certain

of the Lewisberry Properties.

12.     Prior to the Petition Date, on June 26, 2019, and in order to fund the purchase of

the Lewisberry Properties, Debtor borrowed funds from Loan Funders LLC, Series 7693 (the

"Lender") in the original principal amount of Eight Million Twenty Five Thousand dollars

($8,025,000.00) (the "Loan") as memorialized in that certain Commercial Promissory Note (the

---

[3] The Lewisberry Properties are individually identified as follows: Lot 47, 2 Kingswood Drive; Lot 48, 4 Kingswood
Drive; Lot 49, 6 Kingswood Drive; Lot 50, 8 Kingswood Drive; Lot 51, 10 Kingswood Drive; Lot 52, 12
Kingswood Drive; Lot 53, 14 Kingswood Drive; Lot 54, 16 Kingswood Drive; Lot 55, 18 Kingswood Drive; Lot 56,
20 Kingswood Drive; Lot 57, 22 Kingswood Drive; Lot 58, 24 Kingswood Drive; Lot 79, 142 Scully Place; Lot 80,
144 Scully Place; Lot 81, 146 Scully Place; Lot 82, 148 Scully Place; Lot 83, 135 Scully Place; Lot 84, 133 Scully
Place; Lot 85, 131 Scully Place; Lot 86, 129 Scully Place; Lot 87, 127 Scully Place; Lot 88, 125 Scully Place; Lot
89, 123 Scully Place; Lot 90, 121 Scully Place; Lot 91, 111 Scully Place; Lot 92, 109 Scully Place; Lot 93, 107
Scully Place; Lot 94, 105 Scully Place; Lot 95, 103 Scully Place; Lot 96, 101 Scully Place.

"Note") and that certain Loan and Security Agreement (the "Security Agreement") each dated June 26, 2019. A true and correct copy of the Security Agreement and Note are attached hereto as Exhibits "A" & "B" respectively.

13.     As security for the Debtor's obligations to the Lender, also on June 26, 2019, Debtor, as mortgagor, executed and delivered a Purchase Money Mortgage (the "Lewisberry Mortgage") to the Lender, as mortgagee, in which the Debtor granted the Lender a first mortgage on the Lewisberry Properties as well as a security interest, *inter alia*, in and to all of its present and future fixtures, rents, profits, and income from the Lewisberry Properties (the "Lewisberry Collateral") and to the extent that it is determined after trial on the Debtor's claims, that Lender holds a valid, perfected and non-avoidable security interest, which the Debtor disputes, Lender's security interest in the Lewisberry Collateral or in the proceeds thereof constitutes the cash collateral of Lender (the "Cash Collateral"). A true and correct copy of the Lewisberry Mortgage is attached hereto as Exhibit "C".

14.     In addition to the Lewisberry Mortgage and as additional security for the Debtor's obligation to Lender, and also on June 26, 2019, certain members of the Debtor, Richard J. Puleo and Lorraine B. Puleo (collectively the "Puleos"), as mortgagors, executed and delivered a Purchase Money Mortgage to the Lender, as mortgagee, in which the Puleos pledged a first priority mortgage (the "Puleo Mortgage" or together with the Note, the Security Agreement, the Lewisberry Mortgage and all other loan documents, the "Loan Documents") on twenty (20) improved townhomes located in Lewisberry, Pennsylvania (collectively, the "Puleo Properties") also located in Glenbrook, but owned solely in the name of the Puleos. The Puleo Properties are located at Lots 59 through 78 Scully Place, Fairview Township, York County, PA. A true and correct copy of the Puleo Mortgage is attached hereto as Exhibit "D".

15.     As of the petition date, Lender had asserted a secured claim against the Debtor in the amount of eight million, six hundred thousand dollars ($8,600,000.00).   The Debtor disputes the liens and claims of the Lender and will be scheduling the claim of the Lender as "Disputed" in its Schedules of Assets and Liabilities.  The Debtor intends to immediately institute an Adversary Proceeding asserting claims against the Lender and its servicer Fay for, *inter alia*, breach of the Duty of Good Faith and Fair Dealing, Breach of Contract, and for Equitable Subordination pursuant to Section 510 of the Bankruptcy Code.

16.     Since the date of the Note, Lender has turned over servicing of the Loan Documents to Fay Servicing, LLC ("Fay"), which has repeatedly and intentionally interfered with the operations and contracts of the Debtor in violation of the Loan Documents and applicable law by, *inter alia*, attempting to change the agreed-upon release prices to the sale of certain of the Lewisberry Properties, thereby preventing the closing on the sale of the Real Properties.

17.     Pursuant to Section 2.21(d)(vii) of the Lewisberry Mortgage, the release price for the sale of any of the individual Lewisberry Properties equals one hundred twenty percent (120%) of the allocated loan amount for each of the Released Properties identified on Exhibit "C" to the Lewisberry Mortgage.  See Exhibit "C."

18.     The Release Prices for the Real Properties are calculated as:

   a.   2 Kingswood Drive - $223,177.57;

   b.   8 Kingswood Drive - $218,714.01; and

   c.   16 Kingswood Drive - $223,177.57.

19.     The release prices demanded by Fay would have resulted in closing costs in
excess of the purchase price for the Real Properties; therefore closings had to be canceled as a
result of Fay's unlawful actions.

20.     In the administration of the Loan, Fay has been impossible to deal with, refusing
to communicate with the Debtor regarding the closings on the Real Properties, and causing the
Debtor to experience significant financial issues.

21.     Fay has developed a course of dealing of repeatedly demanding documents that
have already been provided by the Debtor to both Fay and the Lender, otherwise breaching its
duty of good faith and fair dealing, and committing acts of lender liability, thereby forcing the
Debtor to seek bankruptcy protection.  The Lender has demanded all proceeds of Sales from
closing on the Real Properties, in violation of its agreements with the Debtor and the Loan
Documents.  At the risk of losing the Sales and facing financial collapse, the Debtor was forced
to seek protection under Chapter 11 of the Bankruptcy Code.

22.     In one such example, the Lender claimed and attempted to obtain forced placed
insurance despite receiving evidence of the existence of insurance from the Debtor. Even now,
Fay continues to falsely claim the absence of insurance, claiming a default exists, in order to
overcharge the Debtor for insurance. Insurance has continuously been in place and
documentation has been provided by the Debtor to Fay and the Lender on multiple occasions.

23.     This is not the first violation of the Loan Agreement or occurrence of bad faith
behavior by the Lender through its agent Fay.  Fay has established a long track record of poor
communion with the Debtor, often leaving the Debtor's critical requests unanswered for weeks.
The Debtor has continually been delivered a dizzying explanation of who is in charge at Fay, and
who is making decisions, at one point being told that only one person was making decisions.

After weeks of delay, the Debtor was then told "committee" review was being undertaken, which the Debtor believes was and is false.  The repeated delays have frustrated and prejudiced any efforts of the Debtor to sell the Real Properties and to refinance the Loan.

24.     Debtor avers that Fay administers loans with the purpose of manufacturing and/or forcing a default.  In this instance, Fay refuses to allow the Debtor to settle on the Sales of the Real Properties, delaying approvals for so long that the Debtor had to enter into a Pre-Settlement Possession Addendum to Agreement of Sale with the proposed purchasers of 8 Kingswood who sold their house and moved from Ohio to Pennsylvania in reliance on their ability to obtain possession of the Real Property, which they are now forced to live in temporarily in order to preserve the sale opportunity.

25.     The Lender's refusal to accept the agreed-upon Release Price is a breach of the Loan Documents, its duty of Good Faith And Fair Dealing, implied in every contract under Pennsylvania law, and being taken in bad faith.

26.     The Debtor has had a number of opportunities to refinance, to which Fay and the Lender have never responded.  On one occasion, a prospective lender was put on the phone with Fay, at which time the Debtor and its prospective lender explained in detail the terms of a refinance.  The Debtor was told Fay would respond in a week.  Fay never responded and the lender lost interest.  The Debtor does not believe it can regain a commitment to lend from this lender.

27.     As a consequence, the Debtor avers that the lien and claim of the Lender are subject to a bonafide dispute.

28.     Prior to the filing of the Petition, the Debtor had the Real Properties under Prepetition Agreements of Sale at private sales as follows:

  a.  2 Kingswood Drive, Lewisberry, PA 17339 to Andrew J. Kaehler and

Peggy A. Kaehler (the "2 Kingswood");

  b.  8 Kingswood Drive, Lewisberry, PA 17339 to Kristine Fischer and Jamie

T. Fischer (the "8 Kingswood"); and

  c.  16 Kingswood Drive, Lewisberry, PA 17339 to Bobby Hile and Sara Hile

(the "16 Kingswood").

**(a) <u>2 Kingswood Sale</u>**

29. The Debtor first put 2 Kingswood on the market in September 2020 and negotiated

with Andrew J. Kaehler and Peggy A. Kaehler (the "Kaehlers"), for the sale of 2 Kingswood by

private sale.

30. Prior to the Petition date Debtor was able to reach an agreement in principle for the

sale of 2 Kingswood for Two Hundred Fifty-Seven Thousand Dollars ($257,000.00) without

contingencies as set forth in greater detail in the Agreement of Sale (the "2 Kingswood

Agreement"). A true and correct copy of the 2 Kingswood Agreement is attached hereto as

Exhibit "E".

31. The Debtor believes that a sale of 2 Kingswood, was negotiated in the ordinary

course of business, at full price, and will best serve the interests of creditors by procuring the

almost instant cash infusion of Two Hundred Fifty-Seven Thousand Dollars ($257,000.00), and by

preventing the further loss and diminution in value to 2 Kingswood by continued operation in an

undercapitalized state.

**(b) 8 Kingswood Sale**

32.     The Debtor first put 8 Kingswood on the market in September 2020 and negotiated with Kristine Fischer and Jamie T. Fischer (the "Fischers"), for the sale of 8 Kingswood by private sale.

33.     Prior to the Petition Date, the Debtor was able to reach an agreement in principle for the sale of 8 Kingswood for Two Hundred Sixty-Five Thousand Dollars ($265,000.00) without contingencies as set forth in greater detail in the Agreement of Sale (the "8 Kingswood Agreement"). A true and correct copy of the 8 Kingswood Agreement is attached hereto as Exhibit "F".

34.     The Debtor believes that a sale of 8 Kingswood was negotiated in the ordinary course of business, at full price, and will best serve the interests of creditors by procuring the almost instant cash infusion of Two Hundred Sixty-Five Thousand Dollars ($265,000.00), and by preventing the further loss and diminution in value to 8 Kingswood by continued operation in an undercapitalized state.

35.     As indicated above, in order to preserve the sale of 8 Kingswood, the Debtor had to offer the Fischers a Pre-Settlement Possession Addendum to Agreement of Sale because the Fischers sold their prior house and moved from Ohio to Pennsylvania in reliance on their ability to obtain possession of 8 Kingswood.

**(c)  16 Kingswood Sale**

36.     The Debtor first put 16 Kingswood on the market in September 2020 and negotiated with Bobby Hile and Sara Hile (the "Hiles"), for the sale of 16 Kingswood by private sale.

37.     Prior to the Petition Date, the Debtor was able to reach an agreement in principle
for the sale of 16 Kingswood for Two Hundred Seventy Thousand Dollars ($270,000.00) without
contingencies as set forth in greater detail in the Agreement of Sale (the "16 Kingswood
Agreement"). A true and correct copy of the 16 Kingswood Agreement is attached hereto as
Exhibit "G".

38.     The Debtor believes that a sale of 16 Kingswood was negotiated in the ordinary
course of business, at full price, and will best serve the interests of creditors by procuring the
almost instant cash infusion of Two Hundred Sixty Thousand Dollars ($270,000.00), and by
preventing the further loss and diminution in value to 16 Kingswood by continued operation in an
undercapitalized state.

39.     The Debtor now seeks to sell by private sale the Real Properties under Section
363(b),(f), and (m), and to assume at settlement, the Prepetition Sales Agreements pursuant to
Section 365(a).

## III.    THE PROPOSED SALES AND RELIEF REQUESTED

40.     The Debtor believes that there is value in the Real Properties, which can be
recovered for the benefit of its Creditors.  It is the Debtor's intention to assume and perform on
the Prepetition Agreements of Sale.

41.     The Debtor is seeking to sell the Real Properties, free and clear of all liens claims
and encumbrances, with all respective liens attaching to the proceeds of the Sale under and
pursuant to Section 363(b), (f), and (m) of the Bankruptcy Code.

42.     The Real Properties are in good condition and Debtor has invested in the
maintenance and upkeep of the residences on the Real Properties, but the Debtor seeks approval
of a sale of the Real Properties at private sales, on an "as-is" and "where-is" basis, without any

warranty, either express or implied, with all defects, except that the Real Properties are to be sold

free and clear of all liens, claims, and encumbrances, with liens, if any are ultimately allowed,

tracing to the proceeds.  In other words, the Real Properties are being sold subject to all known

and unknown conditions.

43.     The Debtor intends to retain all net proceeds from the sale of the Real Properties

until such time as the Lien of the Lender is deemed Allowed and the value of the Debtor's real

property can be determined.  The Debtor avers that the Lender is undersecured.

## IV.     THE DEBTOR HAS COMPLIED WITH § 363 OF THE BANKRUPTCY CODE

44.     By this Motion, the Debtor seeks the entry of an Order by authorizing the private

sales of the Real Properties to the Kaehlers, Fischers, and Hiles (collectively the "Purchaser")

free and clear of all liens, claims, and encumbrances, subject to Bankruptcy Court approval.

45.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy

Code, in turn, provides, in relevant part, that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §

105(a).

46.     Section 363 of the Bankruptcy Code does not set forth a standard for determining

when it is appropriate for a court to authorize the sale or disposition of a debtor's assets.  Courts

hold that the sale or use of property outside the ordinary course of business should be approved

where the debtor or trustee can articulate a business justification for the transaction.  See

Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986);  Comm. of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983);  In re CPJFK,

LLC, No. 10- 50566-CEC, 2011 WL 1257208, at *10-13 (Bankr. E.D.N.Y. Mar. 30, 2011); In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Ionosphere Clubs, Inc.,

100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989). Accordingly, even the entirety of a debtor's

business may be sold prior to plan confirmation "where there is a good business reason to do so."

In re General Motors Corp., 407 B.R. 463, 489-90 (Bankr. S.D.N.Y. 2009) (discussing Lionel).

47.     In determining whether a sound business justification exists, courts have

considered the following factors: (i) whether a sound business reason exists for the proposed

transaction; (ii) whether fair and reasonable consideration has been provided; (iii) whether the

transaction has been proposed and negotiated in good faith; and (iv) whether adequate and

reasonable notice has been provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound

business purpose" test); In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 145-47 (3d Cir. 1986)

(implicitly adopting the articulated business justification test of Lionel and adding the "good

faith" requirement); Stroud Ford. Inc., 163 B.R. 730 (Bankr. M.D.Pa. 1993). Here, the proposed

private sales of the Real Properties meet each of these four factors.

**(a)     The proposed sales are supported by sound business reasons.**

48.     Courts have made it clear that a trustee or Debtor's showing of a sound business

justification need not be exhaustive, but rather a trustee is "simply required to justify the

proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 898,

906 (Bankr. S.D.Ohio 1984). Whether or not there are sufficient business reasons to justify a

sale depends upon the facts and circumstances of each case. Lionel, 722 F.2d  at 1071; see

Industrial Valley Refrig. & Air Conditioning Supplies, Inc., 77 B.R. 15 (Bankr. E.D.Pa 1987)

(adopting Lionel reasoning).

49.     When considering whether a trustee has demonstrated a sound business justification for a proposed sale of assets under § 363(b) of the Bankruptcy Code, a court "should consider all salient factors pertaining to the proceeding." Lionel, 722 F.2d at 1071.  In evaluating these and other pertinent factors, the court should bear in mind that the overriding goal is "to further the diverse interests of the debtor, creditors and equity holders, alike." Id.

50.     The Debtor believes that a sale of the Real Properties through private sales will realize the most cash for the Debtor's estate.

51.     The sales are part of Debtor's business, negotiated in the ordinary course, are for the full value, and will generate much-needed proceeds for the estate.

52.     Accordingly, as the foregoing discussion demonstrates, the Debtor believes that a sale of the Real Properties as set forth herein is justified by sound business reasons and is necessary to preserve and maximize the return to the Debtor's creditors.

**(b)     The Sales has been proposed in good faith.**

53.      "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." Abbotts Dairies, 788 F.2d at 147. "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id.

54.     Debtor has no connection to the Purchasers.

55.     Debtor employed Valerie Taylor designated agent of Keller Williams of Central PA as the broker for the Real Properties.

56.     Purchasers employed brokers to facilitate the sale of the Real Properties as follows:

13

a.      Kaehlers employed George Park and Shawn McGeehan of BHHS
Homesale Realty for the purchase of 2 Kingswood,

b.      Fischers employed David Leister of Country Home Real Estate Inc. for the
purchase of 8 Kingswood, and

c.      Hiles employed Kelly Kosh of Century 21 Realty Services for the
purchase of 16 Kingswood.

57.     The names and addresses of the brokers were disclosed to both the Debtor and
Purchasers prior to the signing of the Agreement of Sale.

58.     The Sales were made in the ordinary course of the Debtor's business, at prices
equal to the value of the Real Properties.

59.     The Debtor respectfully submits the offers to purchase the Real Properties by the
Purchasers were made and accepted at arm's length that the aforementioned efforts will ensure
that the sales have been proposed in good faith and that Purchasers will have acted in good faith.

**(c)     The purchase prices are fair and reasonable.**

60.     The Debtor believes private sales of the Real Properties will result in a sale price
that is fair and reasonable.

61.     The Real Properties were put on the market in September 2020.

62.     The Real Properties were marketed, shown to prospective buyers, and the offers
accepted by the Debtor for the Real Properties are the highest and best offers received to date for
each of the three (3) Real Properties.

63.     The Debtor respectfully represents that the purchase prices are fair and
reasonable.

**(d) Accurate and reasonable notice of the sale will be provided.**

64.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction.  See Fed. R. Bankr. P. 6004(f)(1).

65.     Pursuant to Bankruptcy Rule 6004, notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the terms and conditions of any private sale, and the time fixed for filing objections.  See Fed. R. Bankr. P. 2002(c)(1). Moreover, notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property.

66.     Bankruptcy Rule 2002 permits this Court to shorten the notice period on the proposed sale of property of the estate other than in the ordinary course of business and to direct "another method of giving notice."  Fed. R. Bankr. P. 2002(a)(2); see also Fed. R. Bankr. P. 9007 ("[w]hen notice is to be given under these rules, the court shall designate, if not otherwise specified herein, the time within which, the entities to whom, and the form and manner in which the notice shall be given").

67.     The Debtor submits that the notice contained in the proposed Order Granting Expedited Consideration, Shortened Time and Limited Notice (the "Order") meets all of the above-requirements.  The Order includes the purchase prices, that there are no contingencies, and discloses the name of the Purchasers.

**(e)     The Requirements of 11 U.S.C. § 363(f).**

68.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(1)     applicable nonbankruptcy law permits sale of such
property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property
is to be sold is greater than the aggregate value of all liens
on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

69.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its

five (5) requirements will suffice to warrant approval of the proposed sales of the Properties.

See, Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d. Cir 2000)

(discussing how section 363(f) authorizes the sale of debtor's assets free and clear of all liens,

claims, and interests if "anyone of [the] five prescribed conditions" is met); In re Kellstrom

Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (stating that a court may approve a sale

"free and clear" provided at least one of the subsections of 363(f) is met). See also, In re DVI

Inc., 306 B.R. 496, 503 (Bankr. D. Del. 2004) (providing that the debtor could sell the subject

property free and clear of liens if it met the requirements of a single subsection of section

363(f)).

70.     With respect to each current or prospective lien, claim, encumbrance, or other

interest in the real estate at issue here, the Debtor can satisfy at least one (1) of the five (5)

conditions set forth in Section 363(f).

71.     For instance, Section 363(f)(4) is satisfied because the liens at issue are in bona

fide dispute. See 365(f)(4).  The phrase "bona fide dispute" is not defined in the Bankruptcy

Code. Nonetheless, courts applying § 363(f)(4) have developed a standard for determining

whether a "bona fide dispute" exists; that is, courts will inquire "whether there is an objective

basis for either a factual or legal dispute as to the validity of the asserted interest." In re

Taylor, 198 B.R. 142, 162 (Bankr. D.S.C. 1996).

72.    Courts inquiring over the existence of a bona fide dispute, "have held the parties

to an evidentiary standard; evidence must be provided to show factual grounds that there is an

'objective basis' for the dispute." Id. (citing In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va.

1995)). There must be an "objective basis" – either in law or fact to cast doubt on the legal

rights of the lender factually or legally. See Revel AC v. IDEA Boardwalk, LLC, 802 F.3d 558

(3rd Cir 2015).

73.    Some courts note that the evidentiary record required to support a finding of a

"bona fide dispute" for purposes of § 363(f)(4) depends upon a case-by-case consideration of the

following: i) the procedural posture of the case; ii) the need to expedite the sale, and iii) the

nature of the basis for determining that a dispute exists. In re Robotic Vision Sys., Inc., 322 B.R.

502, 506 (Bankr. D.N.H. 2005).

74.    "At a minimum, a party must articulate in a pleading or in an argument an

objective basis sufficient under the facts and circumstances of the case for the court to determine

that a bona fide dispute exists." See Milford Group, Inc. v. Concrete Step Units, Inc. (In re

Milford Group, Inc.), 150 B.R. 904, 906-07 (Bankr. M.D. Pa. 1992) (holding that the testimony

of the debtor as to the existence of a "bona fide dispute" was sufficient to allow the court to make

a finding of the existence of such a dispute for purposes of § 363(f)(4)).

75.    Importantly. this standard does not require the Court to resolve the

underlying dispute or determine the probable outcome of the dispute prior to authorizing a sale

pursuant to § 363(f)(4), but merely whether such a dispute exists.  The Trustee bears the burden

of showing that a bona fide dispute exists for purposes of Section 363(f)(4) of the Bankruptcy

Code.  See In re Gulf States Steel, Inc., 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002).  In this case,

the Lender refused to accept the Release price contractually agreed to, claiming moneys due

under an alleged forbearance, which is not in writing.

76.     The Debtor never entered into a written forbearance, nor did it agree to amend its

Loan Agreement with the Lender.  Fay therefore, on its own frolic and detour, ignored the

Lender's obligations to close, and forced the Debtor's Chapter 11 filing.  The Debtor avers that

the Lender and Fay's behavior were the sole impetus for the instant filing.  Faced with

unreasonable and unsupported claims by the Lender, the Debtor risked losing the Sales unless it

filed Chapter 11 to preserve and complete the sales inside of this proceeding.

77.     While it is the ordinary case that a Lender has the opportunity to credit bid its

entire claim in a sale under Section 363(b) of the Bankruptcy Code, Section 363(k) gives the

court discretion to deny the ability to credit bid for "cause." See In re 222 Liberty

Associates, 108 B.R. 971, 979 (Bankr. E.D. Pa. 1990) (noting that the language of § 363(k) does

not expressly provide, a creditor has the right to credit bid when property is being sold pursuant

to a reorganization plan); Aetna Realty Invs., Inc. v. Monarch Beach Venture, Ltd. (In re

Monarch Beach Venture, Ltd.), 166 B.R. 428, 433 (C.D.Cal 1993) (recognizing the

"discretionary language of § 363(k)"). The term "cause" is not defined in § 363 of the

Bankruptcy Code, but it is intended to be a flexible concept enabling a court to fashion an

appropriate remedy on a case-by-case basis. Further, the language of Section 363(k) of the

Bankruptcy Code does not prohibit a bankruptcy court from placing conditions upon a Lender's

ability to credit bid.

78.     In this instance, a credit bid would deprive the prepetition purchasers of the

benefit of the bargain, and would expose the Debtor to liability for the Prepetition Agreements of

Sale.

79.     Furthermore, pursuant to Section 363(f)(1) of the Bankruptcy Code, the Debtor

can sell free and clear of the Lender's interests in the Property if "applicable nonbankruptcy law

permits sale of such property free and clear of such interest".  11 U.S.C. § 363(f)(1).

80.     Pursuant to the Pennsylvania Assignment for the Benefit of Creditor statute, 39

PA Cons. Stat. §§ 1 *et seq.* (the "ABC") includes three (3) provisions that are applicable and

would permit the sale of the Real Property free and clear of the Lender's Interests.

81.     First, the ABC provides at Section 77 that:

> [w]here any realty is subject to liens or claims which under existing laws
> would be discharged by a judicial sale, such liens and claims shall be
> unaffected by a private sale of such realty;  but a public sale may be made
> thereof, freed and clear of such liens or claims, by leave of court, after
> notice to the claimants;  and the fund realized shall take the place of the
> liens or claims, and be distributed on the settlement of the account of the
> assignee or receiver, to the parties found entitled thereto.   Executions
> issued on such liens or claims may be stayed by the court, to enable the
> property to be sold by the assignee or receiver.

39 P.S. § 77.

82.     Under this provision from the most recent ABC, property can be sold free and

clear of liens or claims, even where a property is undersecured, if the property is sold at a public

sale and the lien would be discharged by a "judicial sale."

83.     Here, the ABC would permit the tax sale of the Real Properties free and clear of

liens and claims on a real estate tax lien pursuant to 53 P.S. § 7102 imposed by the local

government which would prime the Lender's first mortgage, then divest that mortgage upon

sale.  Section 363(f)(1) of the Bankruptcy Code clearly permits the Debtor to sell the Real

Properties free and clear of the Lender's interest in that property to access the ABC's power to

sell free and clear in a public sale.

84. Furthermore, the ABC states at Section 167:

In all assignments for the benefit of creditors it shall and may be lawful for the several courts of common pleas of this commonwealth, upon application of the assignees of insolvent debtors, setting forth that the personal estate is insufficient for the payment of the debts, and **the real estate encumbered with liens to such an extent as to render it difficult to determine whether the same can be sold for enough to pay all the liens as aforesaid, to grant an order, where the said court shall deem it for the manifest interest of all parties authorizing and empowering the said assignees to make public sale of such real estate, or so much thereof as shall be deemed necessary, at such place and upon such terms as the said court shall direct**; of which sale notice shall be given twenty days prior thereto, by hand bills and publication in at least two newspapers in the county where said lands are situated, should two newspapers be published in said county, one of which may be German, if such be published in the county; **which sale or sales, after being confirmed by said court, shall discharge all liens against the real estate so sold, excepting that where the lien of a mortgage upon real estate is or shall be prior to all other liens upon the same property, except other mortgages, ground rents, and the purchase money due the commonwealth, the lien of such mortgages shall not be destroyed or in any way affected by any sale made by virtue or authority of any sale made under the provisions of this act**; and the proceeds arising therefrom shall be appropriated to liens extinguished by virtue of such sale according to their priority: Provided, Before said sale is authorized the assignee or assignees shall file a bond with two approved sureties, in double the estimated value of said real estate, conditioned for a faithful appropriation of the proceeds thereof: And provided further, That the court shall require such proof of notice of such intended application to have been given to the lien creditors or their attorneys, as said court shall deem sufficient to give said lien creditors an opportunity to be heard touching said order of sale.

39 P.S. § 167 (emphasis added).

85. The ABC goes on to state at Section 167 that:

It shall and may be lawful for the several courts of common pleas of this commonwealth, in all cases where under existing laws the court has power to order the public sale of real estate assigned for the benefit of creditors, may decree and approve a private sale, or may confirm a private sale returned under an order for a public sale if, in the opinion of the court,

under all the circumstances, as good or a better price can be obtained at
private than at public sale upon such notice being given to all lien creditors
in such manner as the court may direct.

39 P.S. § 169.

86.     Under these provisions, an ABC can sell real property free and clear in

appropriate circumstances at public sale, and that sale will divest liens unless the lien is a first

mortgage that "is or shall be prior to all other liens." A first mortgage "is or shall be prior to all

other liens" in actuality when there are no liens ahead of it.  However, because priming liens

exist, it cannot be safely said that the first mortgage of the Lender "shall always be prior to all

other liens."  Therefore the Debtor can sell free and clear of any first mortgage.

87.     Accordingly, the Debtor avers that cause exists for the entry of an Order

authorizing the sale of the Real Properties pursuant to Section 363(b), (f), and (m) of the

Bankruptcy Code.

**(f)     Finding of Purchasers' Good Faith under Section 363 (m)**

88.     The Purchasers, and each of them, are good faith purchasers under Section

363(m) of the Bankruptcy Code and are therefore entitled to the protections of Section 363(m) of

the Bankruptcy Code in the event of an appeal or reversal of any Sale Order entered by this

Court.

**(g)     Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules
6004(h)**

89.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  The Debtor hereby requests that the Sale Order be effective

immediately by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) is

waived.

90.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶ 6064.09 (Lawrence P. King, 15th ed. rev.).  Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. Id.

91.     The Debtor believes with good cause that consummating the sale of the Real Properties so that the Debtor can comply with the settlement dates will benefit the bankruptcy estate. Further, it will allow the Debtor to receive an influx of cash that will allow Debtor to continue its operations. Accordingly, the Debtor hereby requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h).

**(h)     Motion to Approve Assumption of Prepetition Sales Agreements pursuant to 11 U.S.C. Section 365.**

92.     Pursuant to Section 365(a) of the Bankruptcy Code, the Debtor may assume any executory contract existing prepetition.

93.     In order to close the Sales pursuant to the Prepetition Agreements of Sale, the Debtor must assume the contracts.

94.     The Debtor will cure any default in the Prepetition Agreements of Sale by closing on the Sales, and delivery of the Real Properties free and clear of any lien, claim, or encumbrance.

22

95.     The Decision to assume a contract is subject to the Debtor's business judgment

See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir.

1989); In re Fed. Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003); Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir.

1993); Robertson v. Pierce (In re Chi-Feng Huang), 23 B.R. 798, 800 (B.A.P. 9th Cir.

1982); Lubrizol Enters. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers,

Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985) (holding that absent bad faith or abuse of discretion,

deference is given to debtor's business judgment); Wheeling-Pittsburgh Steel Corp. v. West Penn

Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987); In

re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).  Courts typically do not disturb

such decision making by the Debtor, absent bad faith by the Debtor or other contract party.  Id.

96.     In this case, the Debtor has, in the valid exercise of business judgment,

determined that the Sales are beneficial to the Debtor's estate, will generate revenue for the

Debtor's continued operation, and make reorganization more likely.

97.     The Debtor will not immediately assume the Agreements of Sale on the date of

the Sale Order, but rather upon Closing.  This will ensure that the Prepetition Agreements of Sale

are assumed only upon an assured Closing.

**V.      REQUEST TO EXPEDITE CONSIDERATION**

98.     In accordance with Local Bankruptcy Rules 5070-1(f) and 9014-1, the Trustee

seeks expedited consideration of the Motion.  Expedited consideration is required in order to

allow the Debtor to sell the Real Properties, to reduce costs associated with the sale as set forth

above.  The Debtor requests approval of the request for expedited consideration pursuant to

Local Bankruptcy Rule 9014-2 on or before on the earliest possible date available to the Court.

99.     The purchaser of 16 Kingswood, the Hiles, have demanded that the closing of the property occur on or before Friday, February 19, 2021.  In addition, each of the purchasers has locked into interest rates that will expire in the near future exposing the purchasers to higher interest rates.

100.    In accordance with L.B.R. 5070-1(f) and 9014-1, the Debtor also seeks expedited consideration of the Motion.  The Debtor requests approval of the request for expedited consideration pursuant to L.B.R. 9014-2.

101.    Pursuant to L.B.R. 5070-1(f)(3), this request for expedited consideration may be stated as part of the Motion.

102.    The Debtor requires a hearing on the Motion on an expedited basis because the original settlement dates for each of the Real Properties have expired and now must be scheduled as soon as possible:

103.    The undersigned has contacted the office of the United States Trustee, counsel to the Debtor's Lender as required by L.B.R. 5070-1(f)(1), none of whom oppose expedited consideration.

104.    The Debtor respectfully requests a hearing as soon as the Court's calendar permits prior to February 19, 2021, 2021, when the Closing must be held for 16 Kingswood.  The Debtor submits that an expedited hearing best serves the interests of all creditors.

105.    The Debtor also requests that the notice period be reduced accordingly to correspond to the hearing date set by the Court.

106.    No party will be prejudiced by the request for an expedited hearing in this case.

107.    The Debtor submits that the Order satisfies the notice requirements of the applicable Bankruptcy Rules and § 363(b) of the Bankruptcy Code, constitutes good and sufficient notice and that no other or further notice is required.

108.    The Debtor also requests that service of the Motion with Exhibits and the Order granting expedited consideration be limited to (i) the Office of the United States Trustee; (ii) the Debtor's Lenders; (iii) taxing authorities; (iv) all parties who have timely filed requests for notice under Bankruptcy Rule 2002.

109.    In addition, the Debtor respectfully requests that this Court waive the ten (10) day stay pursuant to Fed. R. Bankr. P. 6004(g).

## VI.    CONCLUSION

110.    The Debtor avers that the sales of the Real Properties to the Purchasers in accordance with the Prepetition Agreements of Sale, are in the best interest of all of the Debtor's creditors.  The Debtor further avers that the sale of the Real Properties satisfies the requirements under the Bankruptcy Code.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order: (i) granting expedited consideration, shortened time, and limited notice; (ii) granting the Debtor authority to sell the Real Properties free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(b) and (f), that the Purchasers be deemed "good faith: purchasers under Section 363(m), (iii) authorizing the assumption of the Prepetition Agreements of Sale pursuant to Section 365(a) as a valid exercise of the Debtor's business judgment; (iv) waiving the fourteen (14) day stay pursuant to Fed. R. Bank. P. 6004(h); and (v) providing such other and further relief as the Court deems just and reasonable under the circumstances.

Respectfully submitted,

Dated:  February 16, 2021             By:     _/s/ Edmond M. George_____
                                              Edmond M. Georg, Esquire
                                              Michael D. Vagnoni, Esquire
                                              OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                              Centre Square West, Suite 3400
                                              1500 Market Street
                                              Philadelphia, PA 19102
                                              P: 215.665.3000
                                              F: 215.665.3165
                                              Attorneys for Debtor

# Exhibit A

Case 21-10327-eff   Doc 715-12   Filed 04/06/21   Entered 04/06/21 16:20:43   Desc
Exhibit D: Motion to Sell Part 2   Page 29 of 39

Page 1 of 47

# LOAN AND SECURITY AGREEMENT

### Between

## LEWISBERRY PARTNERS LLC
### a Pennsylvania limited liability company
### as Borrower,

### AND

## LOAN FUNDER LLC, SERIES 7693

Date:  as of **June 26, 2019**

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP
Loan and Security Agreement

# TABLE OF CONTENTS

**Page**

1.  Definitions ............................................................................................................ 1
2.  The Loan ............................................................................................................... 3
3.  The Note ............................................................................................................... 5
4.  Grant of Security Interest ..................................................................................... 5
5.  Conditions Precedent to Lender's Obligations ..................................................... 6
6.  Representations and Warranties of Borrower ....................................................... 6
7.  Survival of Representations and Warranties ....................................................... 13
8.  Affirmative Covenants ....................................................................................... 13
9.  Negative Covenants of Borrower ....................................................................... 17
10. Events of Default ............................................................................................... 19
11. Remedies. ........................................................................................................... 20
12. Payment of Expenses .......................................................................................... 21
13. Lender's Right to Assign .................................................................................... 22
14. Default Interest Rate .......................................................................................... 22
15. Usury Savings ..................................................................................................... 23
16. Notices ................................................................................................................ 24
17. No Waiver ........................................................................................................... 23
18. Failure to Exercise Rights .................................................................................. 23
19. Prohibition Against Exercise of Rights Applicable Only to Individual
    Lenders ............................................................................................................... 23
20. Miscellaneous. .................................................................................................... 23
21. Successors and Assigns. ..................................................................................... 25
22. Waiver of Jury Trial ........................................................................................... 25
23. Releases of Collateral. ....................................................................................... 26

## Schedules

Schedule A   - Description of the Collateral
Schedule B   - Representations And Warranties With Respect To Purchased Mortgage Loans
Exhibit B    - Certain Definitions
Exhibit C    - Exceptions To Representations And Warranties In Section 2
Exhibit D    - Tenant Direction Letter

Case 21-10327-elf   Doc 715-12   Filed 04/06/21   Entered 04/06/21 16:20:48   Desc
Exhibit D: Exhibit A Self Part 4 of 3   Page 31 of 39

Page 1 of 47

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement"), dated as of June 26, 2019, between **LEWISBERRY PARTNERS LLC,** a Pennsylvania limited liability company   having its principal place of business at **27 Nutt Road, Phoenixville, PA 19460** ("Borrower"), and **LOAN FUNDER LLC, SERIES 7693,** a Delaware limited liability company having its principal place of business at **645 Madison Avenue, Floor 19, New York, NY 10022** ( "Lender").

## W I T N E S S E T H

**WHEREAS,** Borrower has requested that Lender make a loan to Borrower in the amount of **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** (the "Loan"), subject to and upon the terms and conditions hereinafter contained, which Loan shall be evidenced by a Promissory Note as of even date herewith from Borrower to Lender (as may be amended, restated or modified from time to time, the "Note");

**WHEREAS,** the Loan is to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Principal Loan Documents and made a part hereof, and payment and performance of the Loan is to be guaranteed pursuant to that certain guaranty of even date herewith from Guarantor (as hereinafter defined) to Lender (as may be amended, restated or modified from time to time, the "Guaranty");

**WHEREAS,** capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents (as hereinafter defined); and

**WHEREAS,** Lender has agreed to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower and Lender hereby agree as follows (all initial capitalized terms used herein, but not defined herein shall have the meaning on Exhibit "B" attached hereto)::

1.   **Definitions.** As used herein:

(a)   "Account" or "Accounts Receivable" means, in addition to the definition of account as contained in the Uniform Commercial Code, the right of Borrower to receive payment for goods sold or leased or for services rendered which are not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

(b)   "Account Debtor" means, in addition to the definition of account debtor as contained in the Uniform Commercial Code, the person or persons obligated to Borrower on an Account, or who is represented by Borrower to be so obligated.

(c)   "Affiliate" of any Person (as hereinafter defined) shall mean any other Person which, directly or indirectly, controls or is controlled by, or is under common control with such Person. For the purposes of this definition, "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(d)     "Business Day" shall mean any day upon which banks located in the State of New York generally are open to conduct regular banking business.

(e)     "Closing Date" shall mean the date on which this Agreement is executed by the parties hereto and the conditions set forth in Paragraph 5 are fulfilled to the satisfaction of Lender.

(f)     the "Collateral" shall mean the Real Property Collateral, the Collateral described in Paragraph 4 hereof, any other collateral described in any Loan Document and any other property of Borrower and/or Guarantor now or hereafter subject to a security agreement, mortgage, pledge, assignment or other document granting Lender a security interest therein and/or securing the Loan.

(g)     the "Default Rate" shall have the meaning ascribed thereto in the Note.

(h)     "Dollar" or "$" or "dollar" or any other terms of similar import shall mean United States Dollars, it being understood and agreed that all advances of the Loan shall be made in U.S. Dollars and repaid or reimbursed in U.S. Dollars without reduction for currency exchange fluctuation.

(i)     "Environmental Laws" shall mean a collective reference when and as applicable to (i) the Comprehensive Environmental Response, Compensation & Liability Act, as amended, 42 U.S.C. Section 9601 et seq., (ii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., and (iii) any and all other federal, state and local statutes, laws, rules, ordinances, regulations and executive orders pertaining to environmental matters applicable to the Borrower's business and/or properties, as the same may be amended or supplemented from time to time.

(j)     "Governmental Authority" or "Governmental Authorities" shall mean any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over Borrower, the Guarantor (as hereinafter defined) or the Collateral.

(k)     the "Guarantor" shall mean **Richard J Puleo.**.

(l)     the "Indemnified Party" and "Indemnified Parties" shall mean Agent and Lender as well as their directors, officers, trustees, partners, employees, agents, attorneys and shareholders.

(m)     "Independent Director" or "Independent Manager" shall mean a Person, acceptable to Lender in its sole discretion, who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, manager, contractor or attorney of the Borrower or any Affiliate of any of them; (b) a customer, creditor or other person who derives any of its purchases or revenues from its activities with the Borrower or any Affiliate; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, manager, contractor, customer, creditor, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, contractor, customer, creditor or other Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

2

(n) the "Loan Documents" shall mean this Agreement, the Note, the Mortgage (as hereinafter defined), the Guaranty and any other documents or agreements given to Lender by Borrower or the Guarantor in connection with the Loan whether or not specifically set forth herein, as each may be amended, restated or modified from time to time.

(o) "Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against the Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to the Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of the Borrower, to admit in writing the Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(p) "Mortgage" shall mean that certain Mortgage and Security Agreement of even date herewith, as may be amended, restated or modified from time to time, given by Borrower (as such term is defined therein), as mortgagor, in favor of Lender, as mortgagee, in connection with the Mortgaged Property, which Mortgage is given as security for the due payment of Borrower's obligations under the Note.

(q) "Person" or "Persons" shall mean any one or more individuals, partnerships, corporations (including a business trust), joint stock companies, limited liability company, trusts, unincorporated associations, joint ventures or other entities, or a foreign state or political subdivision thereof or any agency of such state of subdivision.

(r) "Personalty" shall mean all Accounts, Accounts Receivable, Equipment, Inventory, Goods (as such terms are defined in the Uniform Commercial Code) and other personal property of the Borrower, as more particularly described herein.

(s) "Project" shall mean the project at the Mortgaged Property known as Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA, consisting of townhomes other related improvements and amenities.

(t) "Real Property Collateral" or "Mortgaged Property" shall mean that certain real property owned or leased by Borrower, situated in York County, Pennsylvania as more particularly described in Schedule A attached hereto and made a part hereof.

(u) "Uniform Commercial Code" shall mean the Uniform Commercial Code, as enacted in the State of New York and the jurisdiction in which the Mortgaged Property is located, as applicable, as in effect from time to time.

2. **The Loan.**

(a) Provided that no default shall have occurred and be continuing hereunder, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** .

3

(b)      The initial Loan term shall be until June 26, 2049 ("Loan Maturity Date"), such date being three hundred sixty (360) months from the date of Closing.

(c)      Subject to a final closing statement prepared by Lender's counsel and executed by Borrower (the "Closing Statement"), the Loan proceeds shall be disbursed as follows and used only for the following purposes:

(1)      The sum of **One Hundred Thousand Three Hundred Twelve and 50/100 dollars ($100,312.50)** shall be disbursed on behalf of Borrower on the Closing Date and simultaneously paid to Lender as a fully earned, non-refundable fee (the "Fee") in consideration of Lender's commitment to make the Loan on the terms and conditions stated herein.  In no event shall the Fee be applied or credited in reduction of any principal, interest or other sum payable hereunder; and

(2)      The sum of **Eight Thousand Nine Hundred Sixteen and 67/100 dollars ($8,916.67)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Prepaid Interest") which shall be credited against interest payments due under the terms of the Note, as such interest payments become due; and

(3)      The sum of **Four Thousand and 00/100 dollars ($4,000.00)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to LaRocca, Hornik, Rosen & Greenberg LLP, in payment of its legal fees; and

(4)      The sum of **Sixteen Thousand Three Hundred Fifty Two and 56/100 dollars ($16,352.56)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Due Diligence Expenses").

(5)      The advance to the Borrower upon closing shall **Seven Million Nine Hundred Twenty Thousand Four Hundred Eighteen and 27/100 dollars ($7,920,418.27).** Payments shall be due from Borrower on the first day of each and every month commencing on August 01, 2019 and running through the Maturity Date of **June 26, 2049** as more particularly set forth in the Note. In the event Borrower fails to make a payment within ten (10) days of the date such payment becomes due, Lender shall have the option, exercisable in its sole discretion, to require interest payments to be paid weekly, in arrears, on the Wednesday of each week during the term of the Loan Payments of interest only, in arrears, on the Principal Amount, shall be due from Borrower on the first day of each and every month commencing on **August 01, 2019**, as more particularly set forth in the Note.   Interest calculations shall be based on a 360 day year.

(d)      The foregoing disbursements may be made, notwithstanding contrary directions from Borrower , and for such purpose Borrower agrees that:

A.      The foregoing constitutes an irrevocable direction or authorization to so disburse the funds (said authorization being coupled with an interest) and no further direction or authorization from Borrower shall be necessary to warrant any such disbursements; and

B.      All such disbursements shall satisfy the obligations of Lender to advance funds to Borrower notwithstanding any other agreement or document to the contrary and shall be secured by the Mortgage as fully as if made by Borrower, regardless of the disposition by the party to whom such disbursements are so made.

(e)    Prepaid Interest.  So long as no Event of Default and no event which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Documents shall have occurred, Lender shall credit Borrower from Prepaid Interest to the extent of amounts not so credited for payments of interest under the Note, it being understood, however, that the Prepaid Interest does not in any way limit Borrower's obligations to make payments of interest under the Note.  Any amounts not so credited from Prepaid Interest on the Maturity Date (as defined in the Note) shall be credited to the payment of the Loan, and any remaining Prepaid Interest after payment in full of the Loan shall be disbursed to Borrower.  Upon an Event of Default (as hereinafter defined), the Lender may credit to the extent of amounts not so credited from the Prepaid Interest any amounts then due hereunder and under the Loan Documents.

3.    **The Note.**  The obligation of the Borrower to repay all monies advanced by Lender to Borrower in connection with the Loan shall be evidenced by this Agreement and the Note.  The Loan shall bear interest at the rate(s) set forth in the Note and shall be payable as provided in the Note with final payment due on the Maturity Date.  All of Borrower's obligations hereunder and under the Note are secured by the Mortgage and the other Loan Documents.  Should the principal of or interest on the Loan become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

4.    **Grant of Security Interest.**

(a)    Borrower hereby assigns and pledges to Lender, and hereby grants to Lender a security interest in all property of the following types, wherever located and whether now owned or hereafter owned or acquired by Borrower, whether or not affixed to the Mortgaged Property, in all proceeds (including, without limitation, amounts payable under any policies of insurance with respect thereto), and Products (as such term is defined in the Uniform Commercial Code) thereof in any form, in all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions thereto or therefor, and in all increases or profits received therefrom:

(1)    all Accounts, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(2)    all Equipment (as such term is defined in the Uniform Commercial Code), and in all of Borrower's machinery and equipment of every kind, nature and description, as well as trucks and vehicles of every kind and description, including, but not limited to, trailers, cranes and hoisting equipment, whether presently owned by Borrower or hereafter acquired, and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(3)    all Inventory (as such term is defined in the Uniform Commercial Code);

(4)    all General Intangibles (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(5)    all deposit accounts of Borrower with Lender, now or hereafter existing, and all money, instruments, securities, documents, chattel paper, credits, claims, performance bonds, payment bonds, all other forms of surety to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, and other property of Borrower now or hereafter in the possession or custody of Lender or any of its agents;

5

(6)    all Chattel Paper (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Chattel Paper now or hereafter left in the possession of Lender for any purpose;

(7)    all Instruments (as such term is defined in the Uniform Commercial Code), including any negotiable instruments or a securities, or any other writing which evidences a right to the payment of money and is of the type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Instruments now or hereafter left in the possession of Lender for any purpose;

(8)    all Documents (as such term is defined in the Uniform Commercial Code);

(9)    all Goods (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property whether presently owned by Borrower or hereafter acquired; and

(10)    all books and records, including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records of Borrower pertaining to all of the Collateral.

(b)    Borrower will perform any and all steps requested by Lender to create and maintain in Lender's favor a first and valid lien on and security interest in the Collateral or pledges of Collateral, including, without limitation, the execution, delivery, filing and recording of financing statements and continuation statements, supplemental security agreements, notes, filings with federal government offices and any other documents necessary, in the opinion of Lender, to protect its interest in the Collateral which liens shall be exclusive except for those liens expressly permitted elsewhere herein. Lender and its designated officer are hereby appointed Borrower's attorney-in-fact to do all acts and things which Lender may deem necessary to perfect and continue perfected the security interests and Liens provided for in this Agreement, including, but not limited to, executing financing statements on behalf of Borrower.

5.    **Conditions Precedent to Lender's Obligations.**  Lender shall not be obligated to make the Loan hereunder unless Lender shall have received the following, all in form and substance satisfactory to the Lender in all respects:

i.    the Note, duly executed by Borrower;

ii.   the Mortgage(s), duly executed by Borrower; one as to Lots 47 through 58 and Lots 79 through 96 with Lewisberry Partners LLC as the mortgagor; and one as to Lots 59 through 78 with Richard J. Puleo and Lorraine B. Puleo as the mortgagor;

iii.  this Agreement, duly executed by Borrower;

iv.   the Guaranty, duly executed by the Guarantor;

6

    v.  the Collateral Assignment of Leases and Rents on the Premises, duly executed by Borrower;

    vi.  the Collateral Assignment of Contracts, Plans, Permits, & Approvals on the Premises, duly executed by Borrower;

    vii.  the Environmental Indemnity Agreement on the Premises, duly executed by Borrower and Guarantor;

    viii.  the Document Re-Execution Agreement, duly executed by Borrower and Guarantor;

    ix.  the Closing Statement, duly executed by Borrower;

    x.  certificates of insurers, or other evidence satisfactory to Lender, indicating that Borrower and Guarantor have obtained the policies of insurance as are required under the terms of the Mortgage(s);

    xi.  a paid title insurance policy (without survey exception) in the full amount of the Loan issued by a title insurance company acceptable to Lender ("Title Insurance Company") and insuring the Mortgage(s) as a valid first lien on the Premises, with such endorsements as Lender shall require and subject to the permitted exceptions identified in the Mortgage(s);

    xii.  UCC-1 financing statements required to evidence or perfect Lender's security interest in the personal property affixed to the Premises;

    xiii.  an appraisal of the Premises;

    xiv.  intentionally deleted.

    xv.  evidence of a search of the public records which discloses no conditional sales contracts, chattel Mortgage(s), leases of personality, financing statements or title retention agreements filed or recorded against the Borrower or the Premises;

    xvi.  if requested by Lender, a survey of the Premises prepared in accordance with the "Minimum Standard Detail Requirements for ALTA and ACSM Land Title Surveys" jointly established by ALTA and ACSM in 2011, as updated, and certified to Lender by a registered land surveyor acceptable to the Lender ("Survey");

    xvii.  copies of all permits or approvals required by any governmental authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises;

    xviii.  if requested by Lender, an environmental audit of the Premises (Phase I and, if necessary Phase II);

    xix.  if the Borrower is a legal entity, operating agreement of Borrower certified by the Executive Manager of Borrower;

xx.   if the Borrower is a legal entity, an incumbency certificate of Borrower which shall certify the names and titles of the officers/members of the Borrower authorized to sign, in the name and on behalf of Borrower this Agreement and each other Loan Document to be delivered pursuant to this Agreement by Borrower, together with the true signatures of such officers, upon which certificate the Lender may conclusively rely;

xxi.   if the Borrower is a legal entity, resolutions/consents of the Borrower authorizing the transactions to be entered into by Borrower in connection with this Agreement;

xxii.   evidence that the Premises is not located in a federal or state flood hazard area;

xxiii.   certification regarding debts and liens, executed by the owner of the Premises;

xxiv.   payment of a Loan Origination Fee of **Twelve Thousand Three Hundred Eighty Two and 22/100 dollars ($12,382.22)** and other fees and expenses required to be paid to or on behalf of Lender in connection with the Loan;

xxv.   evidence demonstrating current full compliance with all applicable zoning, health, environmental and safety laws, ordinances and regulations (including, without limitation, approval of local, private or public sewage or water utility);

xxvi.   certification from Borrower that Borrower is not a party to any existing or pending or threatened litigation, except as previously disclosed to Lender;

xxvii.   evidence demonstrating receipt of all appropriate approvals meeting all applicable requirements of any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction including, but not limited to, subdivision and site plan approvals, potable water supply, sewage discharge and sewage connection, use of septic tanks or alternatives, if any;

xxviii.   satisfactory evidence that all roads and utilities necessary for the full utilization of the Premises for its intended purposes have been completed or the presently installed and proposed roads and utilities will be sufficient for the full utilization of Premises for its intended purposes; and

xxix.   such other agreements, certificates or other documents as Lender or Title Insurance Company may reasonably request.

xxx.   If the Premises is currently leased, evidence that the Premises is occupied by an Eligible Tenant pursuant to an Eligible Lease.

6. **Representations and Warranties of Borrower.** To induce Lender to make the Loan pursuant to this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    By its acceptance of Lender's funds and execution of the Loan Documents, Borrower acknowledges, agrees and confirms that it has no defense, offset or counterclaim for any occurrence in relation to this Loan and Borrower acknowledges that Lender has complied with all of its obligations under the Loan Documents as of the date hereof.

(b)    Borrower is a limited liability company , duly organized under the laws of the State of Pennsylvania and has all requisite power and authority and legal right to own its property, to carry on its business as it is now being conducted, to enter into this Agreement and the other Loan Documents entered into by it and to perform all of its obligations hereunder and thereunder.

(c)    The execution and delivery by Borrower of the Loan Documents, and the performance of its obligations thereunder, have been duly authorized by all necessary action, corporate or otherwise, and do not and will not: (i) require any further action, consent or approval on the part of the Managing Member of Borrower; (ii) violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower, or the Managing Member of Borrower; or (iii) result in any breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or affected, and the Borrower is not in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument.

(d)    The Loan Documents have been duly executed and delivered by Borrower and are legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(e)    Except as previously disclosed to Lender, there is no material action, suit, proceeding, inquiry or investigation, at law or in equity, or before any court, governmental instrumentality, public board or arbitrator pending or threatened against or affecting Borrower or any of its properties or rights, wherein an unfavorable decision, ruling or finding would (i) to the extent not covered by insurance as to which the insurer has not disclaimed coverage, result in any material adverse change in the financial condition, business, properties or operations of Borrower; (ii) materially or adversely effect the transactions evidenced by the Loan Documents; (iii) materially impair the right of either to carry on its business substantially as now conducted; or (iv) adversely effect the validity or enforceability of the Loan Documents.

(f)    To the best of Borrower's knowledge, Borrower is in compliance with all laws applicable to Borrower or its properties or assets.

(g)    Borrower is a pre-existing corporation/limited liability company and is actively engaged in the operation of its business and has not been created as a vehicle to obtain the Loan. The proceeds of the Loan will be used by Borrower for the purposes set forth in Paragraph 6(o) in connection with the operation of Borrower's business, and the proceeds of the Loan will not be paid over or diverted by Borrower to any member, manager, officer, director, trustee, shareholder of Borrower, any Guarantor or any other person.

9