(h)     The following persons constitute the shareholders/members of Borrower and their respective ownership interest in Borrower is set forth opposite their names:

Richard J Puleo

(i)     There has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of its financial statements furnished to Lender.

(j)     Borrower's properties and assets reflected on its financial statements referred to above, and all such properties and assets are free and clear of all mortgages, pledges, liens, charges or other encumbrances, except as reflected on such financial statements which have been previously provided to Agent.

(k)     Borrower and the Guarantor have each filed all federal, state and other income or franchise tax returns which are required to be filed and have paid all taxes due or which may become due pursuant to such returns or pursuant to any assessment received by it.

(l)     All timely authorizations, permits, approvals and consents of Governmental Authorities which may be required in connection with the valid execution and delivery of this Agreement and the other Loan Documents and the carrying out or performance of any of the activities or transactions required or contemplated hereunder or thereunder have been obtained (and remain in full force and effect).

(m)     All financial statements, information and other financial data furnished by Borrower and the Guarantor to Lender in connection with the Agreement (i) were true, correct and complete in all material respects, as of the date of said financial statements, information and other data, (ii) such financial statements present fairly the financial condition of Borrower and the Guarantor at the respective dates thereof and the results of operations and changes in financial position for the periods to which they apply, and (iii) there have been no material adverse changes in the financial condition of Borrower or any Guarantor since the delivery by Borrower or the Guarantor, as the case may be, to Lender of the most recent financial statements.

(n)     Borrower's assets, at a fair valuation, exceed Borrower's liabilities (including, without limitation, contingent liabilities). Borrower is paying its debts as they become due and Borrower anticipates the continuing ability to pay its debts as they become due. Borrower has capital and assets sufficient to carry on its business.

(o)     Proceeds from the Loan shall be used only as set forth in this Agreement, the Closing Statement, and for other proper corporate/limited liability company purposes. No part of the proceeds of the Loan shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of Regulation U of the Board of Governors of the Federal Reserve System. In particular, without limitation of the foregoing, no part of the proceeds from the Loan are intended to be used to acquire any publicly-held stock of any kind. As used in this subparagraph (o), the terms "margin stock" and "purpose of purchasing or carrying" shall have the meanings assigned to them in the aforesaid Regulation U, and the term "publicly-held," in respect to securities, shall have the meaning assigned to it in Section 220.7(a) of Regulation T of the Board of Governors of the Federal Reserve System.

10

(p)     Borrower is not in violation of or in default under (nor on the Closing Date is there any waiver in effect which, if not in effect, would result in a violation or default under) any provision of Borrower's bylaws/operating agreement, or under any provision of any agreement, indenture, evidence of indebtedness, loan or financing agreement, certificate, lease or other instrument to which it is a party, or by which it is bound, or of any law, governmental order, rule or regulation, in any such case under this subparagraph (p) so as to affect adversely in any material manner its business, assets or financial conditions.

(q)     All statements, representations and warranties made by Borrower or any other person in this Agreement, any other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by said person to Lender under this Agreement or in connection with the Loan: (i) are and shall be true, correct and complete in all material respects at the time they were made and, in the case of those made prior to the Closing Date, on and as of the Closing Date, (ii) do not and shall not contain any untrue statement of a material fact at the time made, and (iii) do not and shall not omit to state a material fact at the time made necessary in order to make the information contained herein or therein not misleading or incomplete. Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to provide the Loan.

(r)     No person is entitled to receive from Borrower any brokerage commission, finder's fee or similar fee or payment in connection with the consummation of the transactions contemplated by this Agreement except as provided in Section 2 of this Agreement. No brokerage or other fee, commission or compensation is to be paid by Lender by reason of any act, alleged act or omission of Borrower with respect to the transaction contemplated hereby.

(s)     Borrower has no knowledge of any of the following:

(i)     The release or threatened release of any hazardous substance, pollutant or contaminant as each such term is presently defined in any applicable Environmental Laws resulting from any activity by or on behalf of Borrower or any predecessor in interest to the Mortgaged Property, including, without limitation, the generation, handling, storage, treatment, transportation or disposal of any hazardous substance, pollutant or contaminant at any of the past or present business locations and facilities of Borrower; or

(ii)     Any past or future action taken or to be taken by any federal, state, county or municipal Governmental Authority or by any other person under any applicable Environmental Laws concerning the release of any hazardous substance, pollutant or contaminant into the soil, air, surface or subsurface water or the environment in general from any of the past or present business locations and facilities of Borrower; or

(iii)     Any claims or actions brought or which are threatened to be brought by any Person against Borrower for damages occurring at or outside of any of the past or present business locations and facilities of Borrower resulting from the alleged release or threatened release of any hazardous substance, pollutant or contaminant by Borrower or any predecessor in interest, including, without limitation, claims for health effects to Persons, property damage and/or damage to natural resources.

(t)     (A)     Borrower's address set forth above is the location of Borrower's chief executive office, and is the only location where Borrower keeps its records concerning its Accounts, and its inventory and equipment. (B) Within four (4) months of the date of this Agreement, none of

11

Borrower's assets have been moved from any jurisdiction or other locations than the present location of assets set forth above except for inventory or equipment purchased or sold by Borrower in the ordinary course of business from persons or entities customarily selling such inventory or equipment. (C) As of the date hereof, no inventory is now stored with a bailee, warehouseman or similar party. (D) As of the date hereof, Borrower does not hold any goods belonging to third parties or in which other parties have an interest, including any goods sold on a bill and hold basis. (E) Borrower does not presently purchase or otherwise hold goods on a consignment basis. (F) None of Borrower's inventory is of a nature that contains any labels, trademarks, trade names, or other identifying characteristics which are the properties of third parties, and the use of which by Borrower is in violation of the rights of such third parties or under license, royalty or similar agreements with any third parties. (G) No persons hold any goods of Borrower. (H) Borrower has not purchased any inventory or equipment except in the ordinary course of business for value and from persons customarily in the business of selling such inventory or equipment. (I) Borrower does not hold any instrument or chattel paper connected with any Account. (J) Borrower does not own any trademarks, trade names, patents or copyrights. (K) No surety bonds have been issued on behalf of Borrower with respect to any contracts or purchase orders out of which Accounts Receivable have arisen or are expected to arise.

        (u)      Borrower is the owner and the operator of the Mortgaged Property.

        (v)      There is an adequate supply of public utilities (including, without limitation, water, sewer and electric) to support the Project and the Project has access to such public utilities.

        (w)      Cross-Default and Cross-Collateralization. Borrower hereby acknowledges and agrees that a default under the terms and conditions of any other loans, obligations, liabilities, or indebtedness of Borrower (whether now existing or hereafter arising) with Lender or any other lender shall be deemed to be a default under the terms and conditions of the Note and this Agreement. Without limited to foregoing, Borrower acknowledges that this Loan is cross-defaulted and cross-collateralized with the Loans identified on Exhibit "A-1", attached hereto, as the same may be updated and amended from time to time by Lender.

        (x)      Leasing of the Premises. As of the closing, each Premises shall be either (a) leased by Borrower to an Eligible Tenant pursuant to an Eligible Lease (the "Eligible Lease") that is in full force and effect and is not in default in any material respect or (b) in lease ready condition, meaning that the Premises have been cleaned, no renovations or repairs to the Premises are needed and the Premises is immediately available to be leased to an Eligible Tenant pursuant to an Eligible Lease no later than 120 days after the loan closing (the "120 Day Lease Date"). No Leases (the "Lease") (written or oral) exist for any Premises except for Eligible Leases previously delivered to Lender. No Person (other than Borrower) has any possessory interest in any Premises or right to occupy the same except for the Tenants (the "Tenants") under and pursuant to Eligible Leases. Borrower has delivered to Lender true and complete copies of all Leases, and there are no material oral agreements with respect thereto. No rent for any Premises has been paid more than sixty (60) days in advance of its due date and no right to free rent, partial rate, rebate of rent or other payments, credits, allowances or abatements have been given or are required to be given to any Tenant. To Borrower's knowledge, (a) each Premises is being used exclusively as residential rental property and (b) to Borrower's knowledge, no illegal activity has taken place at the Premises. Borrower shall not permit to exist any Lease (including any renewal or extension of any existing Lease) for any Premises unless such Lease is an Eligible Lease with an Eligible Tenant. Borrower shall, in a commercially reasonable manner, perform the obligations of the lessor under all Leases, and enforce the obligations of the Tenants under such Leases. Borrower shall not collect any Rent more than sixty (60) days in advance of its due date; provided, that the foregoing restriction will not prevent the Borrower from

collecting both the first and last month's rent contemporaneously with the execution of the Lease in accordance with customary residential leasing practices.

(y)      Additional Representations. In addition, Borrower makes all representations and warranties to Lender as set forth on Schedule "B" attached hereto.

7.      **Survival of Representations and Warranties.**  The foregoing representations and warranties shall survive the execution of this Loan Agreement and the closing of the Loan.

8.      **Affirmative Covenants.**  To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding hereunder, Borrower shall comply with the following covenants:

(a)      Borrower shall keep and maintain complete and accurate books, accounts and records.  Borrower shall permit access thereto and examination thereof by Lender and any authorized representatives of Lender, at all reasonable times and places during normal business hours (including the right to make copies thereof at the cost and expense of Borrower).

(b)      Borrower shall comply in all material respects with all applicable federal, state, county and municipal laws, rules, regulations and orders of any Governmental Authority having jurisdiction over Borrower, subject to the limitations expressly set forth in the Mortgage, except to the extent contested in good faith and by proper proceedings or where the failure to so comply would not have a material adverse effect on Borrower, including, without limitation, all Environmental Laws and health and safety laws.

(c)      Borrower shall promptly notify Lender of the occurrence of any Event of Default or an event which, with the giving of notice or passage of time or both, would constitute an Event of Default and of the occurrence of any event or the commencement of any action, suit or proceeding which, if adversely determined, would adversely affect the condition, financial or otherwise, of Borrower or Guarantor.

(d)      Borrower shall indemnify, protect, defend and save harmless the Indemnified Parties from and against (i) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims, or demands, by third parties including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan and the transactions contemplated herein, and (ii) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any environmental sampling or cleanup relating to any properties or assets owned or otherwise used by Borrower in the operation of its business, or mandated by any Environmental Law; provided, however, Borrower shall not be obligated to indemnify, protect, defend and save harmless an Indemnified Party, if the loss, damage, expense or liability was caused by or resulted from the gross negligence or willful misconduct of that Indemnified Party. In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought, shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement. Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the Indemnified Party's cost and expense. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if

13

there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment. The provisions of this subparagraph (d) shall survive the termination of this Agreement and the final repayment of the Loan.

(e)     Leasing Covenant. Borrower shall lease the Premises to Eligible Tenant's at the Loan Closing or by the 120 Day Lease Date in accordance with Section 6 of the Note.

(f)     **Premises Management Covenants.**

a. *Management Agreements*. No Person has any right or obligation to manage, lease or collect rent from any of the Premises except the Existing Manager pursuant to the Existing Management Agreement. Borrower has delivered a true and complete copy of the Existing Management Agreement to Lender. All fees and other compensation due and payable for services performed under the Existing Management Agreement have been paid in full.

b. *Premises Management*. Borrower at all times shall provide competent and responsible management for the Properties by a Qualified Manager (the "Qualified Manager") pursuant to the Existing Management Agreement or a Replacement Management Agreement. Without Lender's prior written consent both as to the form of the Management Agreement and the identity of Manager, Borrower shall not enter into, modify, amend or terminate any Management Agreement, or permit any change in the management of the Premises; provided Lender's consent as to the Manager shall not be necessary for any Qualified Manager. Each Management Agreement shall provide (i) that the compensation to the Manager during any calendar month shall not exceed 10% of all Rent collections (unless Lender otherwise approves in writing greater compensation) and (ii) that the Management Agreement shall be terminable at Borrower's option without penalty or premium (including without any transition or termination fees or expenses) on thirty (30) days' notice or if required pursuant to the Loan Documents. Any action or inaction of Manager within the scope of the rights and obligations of Borrower that are delegated to Manager under the Management Agreement shall be deemed attributed to Borrower for purposes of determining compliance with the Loan Documents. Borrower shall (x) in a commercially reasonable manner, perform all of its obligations and enforce all obligations of the Manager under each Management Agreement and (y) promptly notify Lender of any default under any Management Agreement of which it is aware. (b) Lender shall have the right to terminate any Management and require Borrower to replace the Manager and enter into a Replacement Management Agreement with a Qualified Manager selected by Lender if any of the following occurs: (i) an Event of Default, (ii) any default by the Manger under the Management Agreement beyond any applicable cure period, (iii) in connection with any of the Premises, Manager is grossly negligent or commits any act of fraud or willful misconduct, misappropriates funds or violates any criminal law, or (iv) an Event of Bankruptcy occurs with respect to the Manager. Borrower shall enter into a Replacement Management Agreement within the replacement Qualified Manager within thirty (30) days of Lender's demand to replace the Manager. At the time of the Replacement Management Agreement is executed, Borrower shall cause (and Lender shall have the right to cause) the Qualified Manager to execute and deliver any documents as Lender shall require to substance satisfactory to Lender. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest to take the foregoing actions and enter into the foregoing agreements and documents on behalf of Borrower if Borrower fails to do so within five (5) business days of written demand by Lender.

14

c. *Security Deposits.* Borrower shall maintain one or more Eligible Accounts for the safe keeping of security deposits in accordance with applicable Legal Requirements and shall maintain all security deposits therein. Upon Lender's written request during an Event of Default or upon any foreclosure of any Premises or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Debt, except to the extent any security deposits are forfeited by the applicable Tenant pursuant to the terms of the applicable Lease.

(g)     Cash Management Arrangements.

a.     *Lockbox.* After the occurrence of an Event of Default, at Lender's option, in addition to all other rights and remedies available to Lender: (i) Lender may require that Borrower deliver to Lender all Collections received by Borrower and Manager within two (2) business days of receipt thereof; (ii) Lender shall be entitled to collect and receive all of the Rents and Other Receipts of the Premises directly from the Tenants thereof; (iii) Lender may require that Borrower direct each current and future Tenant via an instruction letter in the form of Exhibit "D" (a "Tenant Direction Letter") to send all payments of Rent and Other Receipts (whether by cash, check or electronic means) directly to an Eligible Account designated by Lender (a "Lockbox Account"); and (iv) Lender shall be entitled to have a receiver appointed to take possession of and manage the Premises and collect the Rents and Other Receipts derived from the Premises without any showing as to the inadequacy of the Premises as security. Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents and Other Receipts actually received. Neither Borrower nor Manager shall, (i) directly or indirectly, interfere with the collection of Rents and Other Receipts by Lender or any judicially appointed receiver or (ii) without Lender's prior written consent, terminate, amend, revoke or modify any Tenant Direction Letter in any matter whatsoever or direct or cause any Tenant to pay any amount in any matter other than as provided in such Tenant Direction Letter, whether or not an Event of Default is continuing. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to execute and deliver to on a daily basis into the Cash Management Account and applied and disbursed in accordance with this Agreement and the Cash Management Agreement. Lender shall be permitted to apply all Rent and Other Receipts received by the Lockbox reserves account in any manner Lender sees appropriate.

(h)     Investment of Funds in Cash Management Account, Reserves; Expenses. Lender shall have the right to direct Cash Management Account Bank to invest sums on deposit in the Cash Management Account and the Reserves in Permitted Investments. Borrower shall pay for all expenses of opening and maintaining the Cash Management Account and the Lockbox Account.

(i)     Security Interest. As security for the Obligations, Borrower hereby grants to Lender a first-priority security interest in the Cash Management Account, each Reserve, each Rent Deposit Account, the Security Deposit Account and any Lockbox Account and all amounts at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest therein, including executing and delivering to Lender deposit account control agreements and filing UCC-1 financing statements and continuations thereof.

(j)     Tax Funds. Borrower shall escrow Property Taxes in accordance the Mortgage.

(k)      Insurance Funds. Borrower shall escrow Insurance Premiums in accordance with the Mortgage.

(l)      All proceeds of any Account(s) and inventory and other Collateral which are delivered to or otherwise received by Lender for application to the Loan provided for herein shall be deemed received as of the date of actual receipt by Lender, and shall be applied by Lender on account of the Obligations upon Lender's receipt of same; provided, however, that no checks, drafts, or other Instruments received by Lender shall constitute payment to Lender unless and until such item of payment has actually been collected by Lender.  For the sole purpose of calculation of interest due to Lender from Borrower, all such proceeds and other payments on account of the Loan provided for in this Agreement, irrespective of the type or form of payment thereof shall not be considered applied on account of the Obligations until actual clearance of such funds.

(m)      Borrower shall maintain all of its property in good working condition, ordinary wear and tear excepted (including obsolete and abandoned property).

(n)      Borrower shall, within ten (10) days of the end of each month, deliver to Lender an aging of its Accounts and report of its inventory, and an aging of its accounts payable in such form as may be reasonably acceptable to Lender, and within thirty (30) days of the end of each month, a duly completed accounts receivable reconciliation report in such form as may be reasonably acceptable to Lender.

(o)      Borrower will continue to hold all necessary licenses and permits for the operations of their business, including but not limited to contract vendor registrations and account numbers.

(p)      Lender (by any of its officers, employees and agents) shall have the right, at any time or times during Borrower's usual business hours (provided reasonable prior notice is given except if an Event of Default has occurred and is continuing), to inspect the Collateral, all records related thereto (and to make extracts from such records) and the premises upon which any of the Collateral is located, to discuss Borrower's affairs and finances with any person and to verify the amount, quality, quantity, value and condition of, or any other matter relating to, the Collateral.

(q)      (A)      Lender shall have the right at any time and from time to time, without notice, to notify Account Debtors to make payments to Lender, to endorse all items of payment which may come into its hands payable to Borrower, to take control of any cash or non-cash proceeds of Accounts and of any returned or repossessed goods; to compromise, extend or renew any Account or deal with it as it may deem advisable, and to make exchanges, substitutions or surrenders of Collateral, to notify the postal authorities, after an Event of Default, to deliver all mail, correspondence or parcels addressed to Borrower to Lender at such address as Lender may choose. (B) Borrower herewith appoints Lender or its designee as Attorney-in-Fact to endorse Borrower's name on any checks, notes, acceptances, drafts or any other instrument or document requiring said endorsement and to sign Borrower's name on any invoice or bills of lading relating to any Account, or drafts against its customers, or schedules or confirmatory assignment on Accounts, or notices of assignment, financing statements under the Uniform Commercial Code, and other public records, and in verification of Accounts and in notices to Account Debtors. (C) Lender shall have no obligation to preserve any rights against any Person obligated on any Account, chattel paper, instrument or other item of Collateral.  Lender shall not be permitted to exercise the rights granted to it under the foregoing clauses (A) and (B) prior to an Event of Default.

(r) Borrower will furnish Lender with at least ten (10) days' prior written notice of any change in location of or addition to its chief executive office, the office where it keeps its records concerning its Accounts, its location of Inventory, Equipment and other assets, and other business locations.

(s) Pay and discharge, and require its subsidiaries to pay and discharge, when due, all taxes, assessments or other governmental charges imposed on them or any of their respective properties, unless the same are currently being contested in good faith by appropriate proceedings and adequate reserves are maintained therefor.

(t) Operate its properties, and cause those of its subsidiaries to be operated in compliance with all applicable orders, rules and regulations promulgated by the jurisdictions and agencies thereof where such properties are located and duly file or cause to be filed such reports and/or information returns as may be required or appropriate under applicable orders, regulations or law.

(u) Permit the Lender's representatives and/or agents full and complete access to any or all of the Borrower's and its subsidiaries' properties and financial records, to make extracts from and/or audit such records and to examine and discuss the Borrower's properties, business, finances and affairs with the Borrower's officers and outside accountants.

(v) Obtain lien releases and lien waivers, in a statutory standard form, as and when Borrower pays contractors, materialmen, laborers providing labor, equipment, or materials to the Mortgaged Property and submit copies of the same to Lender.

(w) Borrower shall, within ten (10) days of the end of each month, deliver to Lender a report of the Borrower's assets, including without limitation, a report on the status of any development or construction on the Mortgaged Property, in such form as may be acceptable to Lender in its sole discretion.

9. **Negative Covenants of Borrower.** To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding, Borrower shall not:

(a) Except for Permitted Encumbrances as set forth in the Mortgage, at any time: (i) create, incur, assume or suffer to exist any mortgage, deed of trust, pledge, security interest, encumbrance, lien or charge of any nature upon or with respect to Borrower's assets and properties or (ii) sign or file under the Uniform Commercial Code of any jurisdiction a financing statement which names Borrower as a debtor or (iii) sign any security agreement authorizing any secured party thereunder to file such financing statement. Borrower further covenants and agrees not to grant any similar negative pledge to any other lender.

(b) Except as to the sale or disposition of assets which are obsolete or worn out and are no longer used or useful in the conduct of its business, convey, sell, lease, assign, transfer, hypothecate or otherwise dispose of any of its now or hereafter acquired property, business or assets.

(c) Create, incur, suffer to exist, assume, guaranty, endorse, become a surety, or otherwise become liable for the debt or other obligations of any other Person whether directly or indirectly, or make or incur any advance, purchase commitment, other obligation or loan for the direct or indirect purpose of paying or discharging any such obligations.

17

(d)     Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in any Person.

(e)     Enter into any merger or consolidation or liquidate or wind-up or dissolve itself (or suffer any liquidation or dissolution) or convey, sell, lease, assign, transfer or otherwise dispose (directly or indirectly) of all or substantially all of its property, business or assets or make any material change in its present method of conducting business or permit any corporate guarantor to do any of the foregoing.

(f)     Materially change, amend, alter or modify the bylaws/operating agreement or other governing documents of Borrower or permit any corporate guarantor to do any of the foregoing.

(g)     Enter into or permit any Guarantor to enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any officer, director, shareholder or partner of Borrower or any Guarantor or Affiliate of any of the foregoing.

(h)     Declare or pay any dividends on, distributions on or make any payment on account of, or set apart assets or a sinking fund for the purchase, redemption, defeasance, retirement or other acquisition of, any interest, shares or any class of stock or any warrant or option to purchase any such stock whether now or hereafter outstanding or make any other distribution in respect thereof, directly or indirectly whether in cash or property or obligations.

(i)     Create, incur, suffer to exist any indebtedness, except (i) indebtedness in respect of the Loan; and (ii) indebtedness, if any, outstanding as of the date of this Agreement and shown on the financial statements previously delivered to Lender.

(j)     Transfer, sell, lease or otherwise convey (directly or indirectly) any interest or shares of capital stock or membership or ownership interest in any guarantor.

(k)     Purchase any Inventory or Equipment except in the ordinary course of business from persons customarily in the business of selling such Inventory or Equipment.

(l)     Without prior written consent of Lender, remove the Collateral from its present location, except for the removal of Inventory upon its sale.

(m)     Sell or transfer any Inventory to any Affiliate or subsidiary of Borrower except on arms length terms in the ordinary course of business.

(n)     Sell, lease or transfer any of its equipment (except for abandoned or obsolete equipment) or other assets without the prior written consent of Lender except for sales of inventory in the ordinary course of business to good faith purchasers for value.

(o)     Allow its existence of as a corporation/limited liability company to be other than in good standing and will not, without the prior written consent of Lender, dissolve or liquidate, or merge or consolidate with or acquire or affiliate with any other business entity or form any subsidiary.

(p)     Change its name without furnishing to Lender at least ten (10) days' prior written notice thereof.

(q)     Utilize any trade name, and will not in the future utilize any trade name without furnishing to Lender at least ten (10) days prior written notice thereof.

(r)     Change the nature of its business.

(s)     Sell, assign, transfer or dispose of any of its accounts or notes receivable, with or without recourse, except to the Lender.

(t)     Except after notice to Lender and with Lender's prior written consent, partition or subdivide the Mortgaged Property.

(u)     take any Material Action without the prior written consent of the Independent Manager (or Independent Director, as applicable).

10.     **Events of Default.**  The occurrence of any of the following shall constitute an "Event of Default" hereunder:

(a)     failure of Borrower to make any payment of any installment of principal or interest when due under the Note;

(b)     failure of Borrower to pay any other sum when due hereunder or under the Note or any other Loan Document;

(c)     any representation or warranty of Borrower or the Guarantor made herein or in any other Loan Document or in any other writing given to Lender in connection with the Loan shall have been incorrect in any material respect as of the time when the same shall have been made or is nor accurate when a further disbursement is to be made to Borrower;

(d)     the occurrence of an Event of Default under the Mortgage or any other Loan Document;

(e)     the sale, conveyance, assignment, transfer or other disposition or divestiture of Borrower's title to any of the Collateral, or the mortgage or other conveyance of a security interest in, or other encumbrance on any of the Collateral or any interest therein, whether voluntary or involuntary, except as provided herein;

(f)     any merger, consolidation, liquidation or dissolution, or the sale or transfer of all or substantially all of the assets, of the Borrower;

(g)     the transfer (directly or indirectly ) of any of the stock or other ownership interest of Borrower;

(h)     any default in the performance or observance of any term, covenant or agreement to be performed by Borrower or Guarantor in this Loan Agreement or in any Loan Document;

(i)     the use of proceeds of the Loan for any purpose other than the purpose described in Paragraph 6(o);

(j)    any Loan Documents for any reason shall cease to be in full force and effect, the liens on the Collateral purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such Loan Documents, or any Guarantor shall assert that it has no liability under the Guaranty to which it is a party;

(k)    one or more judgments or decrees shall be entered against Borrower or any Guarantor (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(l)    if Borrower or any Guarantor becomes insolvent;

(m)    if Borrower or any Guarantor generally does not pay its debts as they become due and Borrower has failed to make any payment to Lender required by the Loan Documents;

(n)    if Borrower or any Guarantor makes an assignment for the benefit of creditors;

(o)    if Borrower or any Guarantor calls or causes to be called a meeting of creditors for the composition of debts;

(p)    if there shall be filed by or with the consent or authorization of Borrower or any Guarantor a petition in bankruptcy for liquidation or for reorganization, or a custodian, receiver or agent is appointed or authorized to take charge of its properties, or Borrower or any Guarantor authorizes any such action;

(q)    if there shall be filed against Borrower or any Guarantor a petition in bankruptcy, for liquidation, or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties and Borrower or any Guarantor, as the case may be, has not consented to or authorized such action and such action is not dismissed within sixty (60) days; and

(r)    if any license, permit, registration, vendor account or other approval required for the normal operation of Borrower's business or any of the Collateral shall be suspended or shall cease to be in full force and effect.

11.    **Remedies.**

(a)    Upon the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, in addition to any remedies available to Lender under applicable law, Lender may take one or more of the following remedial steps in any order of priority:

(i)    Declare immediately due and payable the outstanding principal balance of the Note, together with all accrued and unpaid interest, fees and other sums or expenses payable thereunder and hereunder and accordingly accelerate payment thereof without presentment, demand, notice of intention to accelerate, notice of acceleration or notice of any other kind, all of which are expressly waived;

(ii)    Take any action at law or in equity against Borrower or the Guarantor (a) to collect the payments then due and thereafter to become due under the Loan Documents, or (b) to enforce performance and observance of any obligation, agreement or covenant of Borrower or such other parties under the Loan Documents;

(iii)    Exercise any and all rights and remedies provided for in the other Loan Documents as they relate to Borrower or any Guarantor.

(iv)    Proceed with or without judicial process to take possession of all or any part of the Collateral provided for herein not already in the possession of Lender and Borrower agrees that upon receipt of notice of Lender's intention to take possession of all or any part of said Collateral, Borrower will do everything reasonably necessary to assemble the Collateral and make same available to Lender at a place to be designated by Lender. Borrower hereby waives any and all rights it may have, by statute, constitution or otherwise to notice from Lender, for Lender to obtain possession, by Court proceedings or otherwise, of the Collateral provided for in this or in any other agreement with Lender;

(v)    So long as Lender acts in a commercially reasonable manner, assign, transfer and deliver at any time or from time to time the whole or any portion of the Collateral or any rights or interest therein in accordance with the Uniform Commercial Code, and without limiting the scope of Lender's rights thereunder, Lender may sell the Collateral at public or private sale, or in any other manner, at such price or prices as Lender may deem best, and either for cash or credit, or for future delivery, at the option of Lender, in bulk or in parcels and with or without having the Collateral at the sale or other disposition. Lender shall have the right to be the purchaser at any public sale. Lender shall have the right to conduct such sales on Borrower's premises or elsewhere and shall have the right to use Borrower's premises without charge for such sales for such time or times as Lender may see fit. Lender is hereby granted license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral and Borrower's rights under all licenses and franchise agreements shall inure to Lender's benefit. Borrower agrees that a reasonable means of disposition of Accounts shall be for Lender to hold and liquidate any and all Accounts. In the event of a sale of the Collateral, or any other disposition thereof, Lender shall apply all proceeds first to all costs and expenses of disposition, including reasonable attorneys' fees, and then to the Obligations of Borrower to Lender;

(vi)    Elect to retain the Collateral or any part thereof in satisfaction of all Obligations due from Borrower to Lender upon notice of such proposed election to Borrower and any other party as may be required by the Uniform Commercial Code; and

(vii)    Lender shall have the right immediately, and without notice or other action to set-off against any of any Borrower's Obligations to Lender any sum owed by Lender in any capacity to any Borrower whether due or not, and Lender shall be deemed to have exercised such right of set-off and to have made a charge against any such sum immediately upon the occurrence of an Event of Default, even though the actual book entries may be made at some time subsequent thereto.

(b)    No remedy conferred in this Agreement or the other Loan Documents is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or equity or by statute or otherwise.

12.    **Payment of Expenses.**

(a)    Borrower agrees that it shall pay, within five (5) days after demand, all out-of-pocket expenses incurred by Lender in connection with this transaction including, without limitation, fees and expenses for any title searches required hereunder, recording and filing fees, and reasonable attorneys' fees incurred by Lender in connection with the Loan (including any amendments and

waivers), the preparation of the Loan Documents, the administration of the Loan, inspection of the Mortgaged Property during the course of the Project and the enforcement Lender's rights and remedies under the Loan Documents.

(b)     If Borrower should fail to perform or observe, or to cause to be performed or observed, any covenant or obligation under this Agreement or any of the other Loan Documents, then the Lender, may (but shall be under no obligation to) take such steps as are necessary to remedy any such nonperformance or nonobservance and provide for payment thereof, if any (which shall include, without limitation, steps necessary to cure any defaults of Borrower under any lease).

(c)     All amounts expended or advanced by the Lender pursuant to this Paragraph 12 shall become part of the outstanding principal balance of the Loan and the Note, shall be secured by, among other things, the Mortgage, shall become due and payable by the Borrower upon demand by Lender, and shall bear interest at the Default Rate (such interest to be calculated from the date of such advance by Lender to the date of repayment thereof by Borrower).

13.     **Lender's Right to Assign**.  Lender shall have the right to sell, assign, participate, transfer or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower or Guarantor.

14.     **Default Interest Rate.**  All sums advanced and all expenses incurred by Lender pursuant to any provision of this Agreement or of the other Loan Documents which are not paid when due shall bear interest at the Default Rate set forth in the Note from the date such sum was due until such sum is paid in full and shall be secured by the Mortgage.

15.     **Usury Savings.**  Notwithstanding anything to the contrary contained herein, under no circumstances shall the aggregate amount paid or agreed to be paid hereunder or under the Note exceed the highest lawful rate permitted under applicable usury law (the "Maximum Rate") and the payment obligations of Borrower under this Agreement and the Note are hereby limited accordingly.  If under any circumstances, whether by reason of advancement or acceleration of the maturity of the unpaid principal balance hereof or otherwise, the aggregate amounts paid hereunder or under the Note shall include amounts which by law are deemed interest and which would exceed the Maximum Rate, Borrower stipulates that payment and collection of such excess amounts shall have been and will be deemed to have been the result of a mistake on the part of both Borrower and Lender or the holder of the Note, and the party receiving such excess payments shall promptly credit such excess (only to the extent such payments are in excess of the Maximum Rate) against the unpaid principal balance hereof and any portion of such excess payments not capable of being so credited shall be refunded to Borrower.

16.     **Notices.**  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and a person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

        If to Lender:        LOAN FUNDER LLC, SERIES 7693,
                                645 Madison Avenue, Floor 19,
                                New York, NY 10022

With a copy to:     LaRocca, Hornik, Rosen, & Greenberg
                    83 South Street
                    Freehold, New Jersey 07728
                    Attention: Jonathan L. Hornik, Esq.
                    Facsimile No.: (201) 409-0350

If to Borrower:     LEWISBERRY PARTNERS LLC
                    27 Nutt Road
                    Phoenixville, PA 19460

With a copy to:

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a business day; or in the case of expedited prepaid delivery and telecopy, upon the first attempted delivery on a business day.

17.    **No Waiver.** No course of dealing between Borrower and Lender or any failure or delay on the part of Lender in exercising any rights or remedies hereunder shall operate as a waiver of any rights or remedies of Lender and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder. In the event any agreement contained in this Agreement or the other Loan Documents should be breached and thereafter waived by Lender, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder or thereunder.

18.    **Failure to Exercise Rights.** Nothing herein contained shall impose upon Lender any obligation to enforce any terms, covenants or conditions contained in this Agreement and the other Loan Documents. Failure of Lender, in any one or more instances, to insist upon strict performance of any terms, covenants or conditions of this Agreement and the other Loan Documents, shall not be considered or taken as a waiver or relinquishment by Lender of its right to insist upon and to enforce in the future, by injunction or other appropriate legal or equitable remedy, strict compliance with all the terms, covenants and conditions of this Agreement and the other Loan Documents. The consent of Lender to any act or omission by Borrower shall not be construed to be a consent to any other or subsequent act or omission or a waiver of the requirement for Lender's consent to be obtained in any future or other instance.

19.    **Prohibition Against Exercise of Rights Applicable Only to Individual Lenders.** Borrower is hereby prohibited from exercising against Lender or Agent any right or remedy which it might otherwise be entitled to exercise against any one or more (but less than all) of the individual parties constituting Lender, including, without limitation, any right of set-off or any defense.

20.    **Miscellaneous.**

(a)    Choice of Law. **THE LOAN WAS NEGOTIATED IN THE STATE OF NEW YORK, THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, WAS EXECUTED AND DELIVERED BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL**

RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE REAL PROPERTY COLLATERAL UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE REAL PROPERTY COLLATERAL IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH JURISDICTION, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.

(b)    <u>Jurisdiction</u>.    AT LENDER'S ELECTION, TO BE ENTERED IN ITS SOLE DISCRETION, ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER OR LENDER ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT AN AUTHORIZED AGENT TO RECEIVE AND FORWARD ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED IN THE MORTGAGE, SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (1) SHALL GIVE PROMPT NOTICE TO THE LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (2) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (3) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(c)    Borrower and/or Guarantor (as applicable) agrees if Borrower and/or Guarantor is required to make any deduction or withholding of foreign taxes (or taxes imposed because Borrower and/or Guarantor is a foreign person or entity) from any payment due to Lender herein, then the amount payable to Lender upon which such deduction or withholding is based, shall be increased to the extent necessary to ensure that, after all deductions or withholdings, Lender is paid a net amount equal to the amount Lender would have been paid in the absence of such deduction or withholding. At Lender's request, Borrower and/or Guarantor shall provide Lender with documentation adequate to demonstrate payment of such deduction or withholding by Borrower and/or Guarantor under this provision.

(d)    The parties hereto agree that, notwithstanding anything contained herein to the contrary, there shall be required the consent of the Agent, Borrower and Lenders holding Fifty Percent (50%) of the outstanding balance or commitment to lend under the Loan to do any of the following:

(1)    Amend or modify the terms of the Note, this Agreement, the Mortgage and the other Loan Documents or execute any waiver of any material event of default under this Agreement or the other Loan Documents.

(2)    Consent to or permit any substitution, withdrawal or release of any collateral, any Guarantor or any other security securing the payment of the Loan except in accordance with the terms of the Note, this Agreement and the Loan Documents.

(e)    Any condition of this Agreement or any other Loan Document which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts, and Lender shall, at all times, be free independently to establish to its reasonable satisfaction and in its absolute discretion such existence or non-existence.

(f)    Borrower and each Guarantor, as the case may be, shall execute and deliver, or cause to be executed and delivered to Lender, all other instruments, certificates and agreements as Lender or Lender's counsel may reasonably require, including, but not limited to, estoppel certificates stating that the Loan is in full force and effect and that there are no defenses or offsets thereto, to effect, confirm or assure the rights, remedies and liens intended to be granted or conveyed to Lender under this Agreement or any other Loan Document.

(g)    A determination that any portion of this Agreement or any of the Loan Documents is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provisions of this Agreement or any Loan Document to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provisions it may apply to other persons or circumstances.

(h)    Without the consent of, or notice to Borrower, Lender may add one or more additional co-agents to this Loan.

(i)    This Agreement supersedes in all respects all prior agreements and understandings relating to the Loan, including, without limitation, the Loan Commitment.

21.    **Successors and Assigns.**

(a)    Borrower may not assign its rights under this Agreement without the prior written consent of Lender. Any such attempted assignment in violation of this Agreement shall be void and of no effect.

(b)    All covenants and agreements in this Agreement shall bind and inure to the benefit of the respective permitted successors and assigns of the parties hereto and any holder or holders of the Note or any portion thereof.

22.    **Waiver of Jury Trial. BORROWER AND LENDER AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY BORROWER OR LENDER ON OR WITH RESPECT TO THIS AGREEMENT OR ANY**

25

OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, BORROWER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT LENDER WOULD NOT EXTEND CREDIT TO BORROWER (AS APPLICABLE) IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS AGREEMENT.

23.    **Releases of Collateral.**

(a)    The Lender may release, regardless of consideration, the obligation of any Person or Persons liable for payment of any of the Obligations secured hereby, or may release any part of the Mortgaged Property or any other collateral now or hereafter given to secure the payment of the Obligations or any part thereof, without impairing, reducing or affecting the obligations of the Borrower or Guarantors under the Loan Documents.

(b)    Within thirty (30) days of Borrower's request, provided: (i) Borrower is not in default hereunder or under any other Loan Document(s); and (ii) no event has occurred which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Document(s), Lender shall release portions of the Mortgaged Property from the lien created by the Mortgage ("Released Property") subject to: (i) Borrower's payment to Lender of the Release Price (as hereinafter defined) for the Released Property and (ii) Borrower's delivery to Lender of documentation evidencing a bonafide arms length transaction for the sale of the Released Property. The Release Price for the Released Property shall be equal to the greater of: (y) (i) One Hundred Twenty percent (120%) of the net sale price of the Released Property (subject to reasonable and customary closing adjustments and sales commissions to be approved by Lender in Lender's reasonable discretion); and (ii) One Hundred Twenty percent (120%) of the gross sale price of the Released Property; or (z) such other minimum Release Price as required by Lender in its sole discretion.

24.    **Publicity.**

(a)    Lender shall have the right to issue news releases, and publicize and/or advertise the fact that it has provided financing with respect to the project and/or the Mortgaged Property and in connection therewith Lender shall have the right to photograph and use pictures of the Mortgaged Property in any such advertisements, brochures, print, media and other copy.

(b)    At Lender's request, Borrower, at Lender's cost and expense, shall erect a suitable sign or signs at the Mortgaged Property in a location which is clearly visible to the public and otherwise reasonably acceptable to Lender. The Sign shall be prepared by Lender and may contain, among other things, that financing for the Mortgaged Property is being provided by Lender or another Person and otherwise publicize Lender's or such Person's role in the financing. Lender shall coordinate the placement and maintenance of such signs on the Mortgaged Property with Borrower.

25.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which

shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

26. **Joint and Several Liability**. Notwithstanding anything contained herein to the contrary, if there is more than one Borrower, each Borrower shall be jointly and severally liable for a breach of any and all covenants, representations, warranties, obligations and liabilities under this Agreement.

27. **Single Purpose Entity/Separateness**. Notwithstanding anything contained herein to the contrary, Borrower represents, warrants and covenants as follows:

(a) Borrower has not owned, does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership or operation of the Mortgaged Property.

(b) Borrower has not engaged and will not engage in any business other than the ownership, management and operation of the Mortgaged Property and Borrower will conduct and operate its business as presently conducted and operated.

(c) Borrower will not enter into any contract or agreement with any affiliate of the Borrower, any constituent party of Borrower, any Guarantor of the Loan or any part thereof or any affiliate of any constituent party of Borrower or any Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d) Except as otherwise set forth herein or in the other Loan Documents, Borrower has not incurred and will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Loan. No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Mortgaged Property.

(e) Borrower has not made and will not make any loans or advances to any third party (including any affiliate or constituent party of Borrower, any Guarantor or any affiliate or constituent party of Guarantor), and shall not acquire obligations or securities of its affiliates or any constituent party.

(f) Borrower: (i) is solvent and agrees to give prompt notice to Lender of the insolvency or bankruptcy filing of Borrower or any general partner, managing member or controlling shareholder of Borrower, or the death, insolvency or bankruptcy filing of any Guarantor; and (ii) will remain solvent.

(g) Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not amend, modify or otherwise change the articles of organization, certificate of formation, certificate of incorporation, articles of incorporation, bylaws or operating agreement or other organizational documents of Borrower.

(h) Borrower will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party of Borrower and Borrower will file its own tax returns. Borrower shall maintain its books, records, resolutions and agreements as official records.

27

(i)     Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Borrower, any constituent party of Borrower, any Guarantor or any affiliate of any such constituent party or Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize separate stationery, invoices and checks.

(j)     Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)     Neither Borrower nor any constituent party of Borrower will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of the Borrower.

(l)     Borrower will not commingle the funds and other assets of Borrower with those of any affiliate or constituent party of Borrower, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person.

(m)    Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party of Borrower, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other Person.

(n)     Borrower does not and will not guarantee, become obligated for or hold itself out to be responsible for the debts or obligations of any other person or entity or the decisions or actions respecting the daily business or affairs of any other person or entity.

(o)     Borrower will not permit any affiliate or constituent party of Borrower independent access to its bank accounts.

(p)     Borrower shall pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

(q)     Borrower shall have at least one (1) Independent Manager or Independent Director, as applicable.

[Remainder of this page intentionally left blank.]

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the day and year first set forth above.

Signed in the Presence of:

Name: WILLIAM B. STULL

Name:

Signed in the Presence of:

Name: WILLIAM B. STULL

Name:

Name: WILLIAM B. STULL

Name:

Signed in the Presence of:

Name:

Name:

BORROWER
**LEWISBERRY PARTNERS LLC**

By: _____
Name:   Richard J Puleo
Title:   Managing Member

Acknowledged and Assented to:

GUARANTOR

_____
Richard J Puleo, individually

_____
Lorraine B Puleo, individually

LOAN FUNDER LLC, SERIES 7693

By: _____
Name: _____
Title:   Authorized Signatory

A-1

STATE OF $P A$          )
                          )ss.:
COUNTY OF $LANCASTER$

     I certify that on June $26$ 2019, Richard J Puleo, came before me in person and stated to my satisfaction that he/she:

     (a) made the attached instrument; and

     (b) was authorized to and did execute this instrument on behalf of and as Managing Member of LEWISBERRY PARTNERS LLC (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and members.



_____
NOTARY PUBLIC

STATE OF $P A$          )
                          )ss.:
COUNTY OF $LANCASTER$   )

<div style="border:1px solid">
Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557
</div>

On June $26$ 2019 before me personally came Richard J Puleo, who being by me duly sworn, did depose and say that he/she signed this instrument as his/her voluntary act and deed.

<div style="border:1px solid">
Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557
</div>



_____
NOTARY PUBLIC

STATE OF $P A$          )
                                        ss.:
COUNTY OF $LANCASTER$

     I certify that on June $26$ 2019, Lorraine B. Puleo came before me in person and stated to my satisfaction that he:

     (a) made the attached instrument; and

     (b) was authorized to and did execute this instrument on behalf of and as Authorized Signatory of Loan Funder LLC, Series 7693 (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and its members.

<div style="border:1px solid">
Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557
</div>

_____
NOTARY PUBLIC

<div align="center">A-2</div>

# Exhibit B

**LEWISBERRY PARTNERS LLC**
**$8,025,000.00**
**June 26, 2019**

### COMMERCIAL PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, **LEWISBERRY PARTNERS LLC**, a Pennsylvania limited liability company having an address at **27 Nutt Road, Phoenixville, PA 19460** ("Maker"), promises to pay to the order of **LOAN FUNDER LLC, SERIES 7693**, a Delaware limited liability company at its principal place of business at **645 Madison Avenue, Floor 19, New York, NY 10022** ("Lender"), or at such other place as the holder hereof may designate, the principal amount of **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)**, with interest on the principal amount of this Note computed from the date hereof, together with all taxes assessed upon this Note and together with any costs, expenses, and reasonable attorneys' fees incurred in the collection of this Note or in protecting, maintaining, or enforcing its security interest or any mortgage securing this Note or upon any litigation or controversy affecting this Note or the security given therefor, including, without limitation, proceedings under the Federal Bankruptcy Code.

1. **Payments.** Principal and interest hereunder shall be payable as follows:

    **A.** Interest on the principal amount of this Note shall accrue at the rate of 8% per annum for the period from the date hereof to and including June 30, 2019 and shall be payable at the closing of the Loan.

    **B.** The rate of interest of this Note, which shall remain effective until an Event of Default (as defined below), initially shall be fixed at 8% per annum. Commencing sixty (60) months after the date hereof, on June 26, 2025, the interest rate on this Note is subject to adjustment and shall accrue on the unpaid principal balance of this Note at the rate, determined by Lender, in its sole discretion, equal to the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as most recently published by *The Wall Street Journal* as of the date forty-five (45) days prior to each Interest Rate Change Date (the "LIBOR Rate"), plus five and 57/100 percent (5.57% %), and rounded up to the nearest 1/8th of one percentage point (0.125). The interest rate will be adjusted (each an "Adjusted Interest Rate") every year beginning on June 26, 2026 to reflect a change in the LIBOR Rate (each, an "Interest Rate Change Date"). Notwithstanding the foregoing, the maximum possible interest rate, absent an event of default, shall not exceed the Maximum Rate (as defined below). Additionally, in no event shall the interest rate on this Promissory Note ever be less than eight percent (8%) and in no event shall the interest rate increase or decrease more than two percent (2%) from the rate previously in effect. The foregoing is a reference rate for information and its use by the Lender herein in establishing the actual rates to be charged to Maker and does not necessarily constitute its lowest or best rate. If the Lender determines that no interest rate reporting service presented information to identify the interest rate deferred above, the rate of interest at which deposits in dollars are offered to major banks in the London interbank market for a one-year period on the day that is two business days prior Interest Rate Change Date by any bank reasonably selected by the Lender. The change in the interest rate is effective whether or not Lender gives maker notice of the change. Interest on this Note shall be calculated on the basis of a 30-day month, 360 day year. Interest on this Note is subject to adjustment in accordance with Sections 5 and 6 below.

1

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

**C.** On the date hereof, Maker shall pay interest for the period from the date hereof to and including June 30, 2019. Commencing on **August 01, 2019**, and on the first day of each month thereafter, until **June 26, 2049**, Maker shall make monthly payments of interest only in arrears on the outstanding Principal Amount. Thereafter, Maker shall make payments of principal and interest, with said payments being in an amount amortized so that the Principal Balance is repaid by the Maturity Date. Maker acknowledges that it must repay the entire Principal Amount, together with all accrued unpaid interest thereon, on the Maturity Date. Makers initial monthly payment will be $53,066.67. The amount of the monthly installment of principal and interest payable shall change on each Interest Rate Change Date (each, a "Payment Change Date"). Commencing on the first Payment Change Date, the monthly payment will be based on the applicable Adjusted Interest Rate, the principal amount of the Loan then outstanding, and the Remaining Amortization Period. Remaining Amortization Period shall mean as of the applicable Payment Change Date, the Original Amortization Period minus the number of scheduled monthly installments of principal and interest that have elapsed since the date of this Note prior to the Payment Change Date. The Original Amortization Period shall mean the number of months set forth in the amortization schedule.

**D.** If not sooner paid, the entire principal amount of this Note, together accrued interest and with all other sums due hereunder, shall be due and payable in full on **June 26, 2049** (the "Maturity Date").

**E.** All payments received will be credited first to late charges and costs hereunder, then to interest accrued at the applicable interest rate hereinafter set forth, with the balance on account of principal.

**F.** At no time shall the interest rate exceed the Maximum Rate permitted by the usury statutes governing this Note, if any. If, by application of the above interest rate formula, the interest rate would exceed and violate such usury statutes, interest shall accrue at the Maximum Rate as contemplated in Section 16 below.

2. **Closing and Loan Disbursement.** The Closing of the Loan and disbursement of the Loan proceeds will be made in accordance with the terms of the Loan Agreement of even date.

3. **Security.** This Note is secured by a first priority Commercial Mortgage(s) (the "Mortgage(s)") on those certain parcel(s) of real property known as **Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA**, being more specifically described in the Loan Agreement and Mortgage(s).

4. **Default.** If any of the following events occur (which is an "Event of Default"), Lender may declare the entire outstanding principal balance hereof, together with any other amounts that Maker owes to Lender, to be immediately due and payable:

   a. Maker fails to pay any installment of principal and/or interest or any other charges due under this Note within five (5) days after the same becomes due and payable;

   b. Maker defaults in any other obligations, liabilities, or indebtedness with Lender (whether now existing or hereafter arising) set forth in the Loan Agreement, Mortgage(s), Assignment(s) of Leases and Rents or other Loan Documents;

   c. Maker sells, leases, or otherwise disposes of all or substantially all of its property, assets, or business in violation of the Mortgage and Loan Documents, or if Maker ceases any of its business operations, dissolves, or commences reorganization;

2

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

**d.** Maker makes or takes any action to make a general assignment for the benefit of its creditors or becomes insolvent or has a receiver, custodian, trustee in Bankruptcy, or conservator appointed for it or for substantially all or any of its assets;

**e.** Maker files or becomes the subject of a petition in Bankruptcy or upon the commencement of any proceeding or action under any Bankruptcy laws, insolvency laws, relief of debtors laws, or any other similar law affecting Maker, provided, however, that Maker shall have sixty (60) days from the filing of any involuntary petition in Bankruptcy to have the same discharged and dismissed;

**f.** Upon the failure by Maker to observe or perform, or upon default in, any covenants, agreements, or provisions in the Mortgage, Loan Agreement or in any other instrument, document, or agreement, executed and/or delivered in connection herewith or therewith;

**g.** Any representation or statement made herein or any other representation or statement made or furnished to Lender by Maker was materially incorrect or misleading at the time it was made or furnished;

**h.** In the event of any material adverse change in the financial condition of Maker or any guarantor of the loan; or

**i.** Upon the death of any guarantor of the loan.

5. **Default Rate.** After the occurrence of an Event of Default (whether or not the Loan has been accelerated), interest will accrue at the lesser of **(i) 23%** per annum or **(ii)** the Maximum Rate (as defined in Section 16 below) allowed by applicable law. Interest will continue to accrue at the default rate after judgment until the Note is paid in full.

6. **Leasing Covenant.** Borrower shall lease the Mortgaged Properties to Eligible Tenants at the Loan Closing or by the day which is 30 days after the closing (the "30 Day Lease Date") (as defined in Section 2.12 of the Loan Agreement). If Borrower provides Lender evidence to Lender in its sole discretion that Borrower has (a) leased the Mortgaged Property to (b) an Eligible Tenant, (c) pursuant to an Eligible Lease by (d) the 30 Day Lease Date, then Borrower will have complied with this Section. If Borrower fails to comply with (a) through (d) above, then Borrower's interest rate shall be increased two hundred (200) basis points above the applicable note contract rate until the Mortgaged Properties are leased in accordance with this Section 6.

7. **Prepayment.** Provided that Maker is not in default hereunder, except as provided herein, Maker may prepay all or any portion of the unpaid principal balance of this Note at any time. All prepayment shall be applied first to any costs or charges due hereunder, then to interest due and owing hereunder, and then to principal then outstanding, in inverse order of maturity. Should Borrower need to repay the loan prior to the Maturity Date, Lender will permit Borrower to repay and Borrower will be charged a prepayment premium (whether by sale of the Mortgaged Properties or refinance) of 1.5% of the allocated loan amount for the twelve properties attached hereto on Exhibit "A". The remaining thirty-eight properties are subject to a prepayment lockout for six (6) months, with no penalty thereafter.

8. **Late Charge.** It is further agreed that the holder hereof may collect a late charge equal to the greater of five percent (5%) of any payment required hereunder or One Hundred Dollars ($100.00)

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

including without limitation the final payment, or any other payment required under any security agreement, mortgage, or any other instrument, document, or agreement executed and/or delivered in connection herewith which is not paid within ten (10) days of the due date thereof. This late charge is to cover the extra expenses involved in handling delinquent payments and is not to be construed to cover other costs and attorneys' fees incurred in any action to collect this Note or to foreclose the mortgage securing the same. This provision shall not affect or limit the holder's rights or remedies with respect to any Event of Default.

9. **Lien/Set Off.** Maker hereby gives the holder hereof a lien and right of set off for all of Maker's liabilities to the holder hereof or Lender upon and against all deposits, credits, and other property of Maker now or hereafter in the possession or control of the holder hereof, or in transit to it, excepting however, funds held in trust by Maker. All payments shall be made in lawful currency of the United States of America in immediately available funds, without abatement, counterclaim, or set-off, and free and clear of, and without any deduction or withholding for, any taxes or other matters.

10. **Purpose of Loan.** Maker represents and warrants that the proceeds of this Note are to be used solely for business and commercial purposes and not at all for any personal, family, household, or other noncommercial or farming or agricultural purposes. Maker acknowledges that Lender is making this loan to Maker in reliance upon the above representation by Maker. The above representation by Maker will survive the closing of this loan and repayment of amounts due to Lender hereunder.

11. **Other Obligations.** To the extent that the outstanding balance of this Note is reduced or paid in full by reason of any payment to Lender by an accommodation maker, endorser, or guarantor, and all or any part of such payment is rescinded, avoided, or recovered from Lender for any reason whatsoever, including, without limitation, any proceedings in connection with the insolvency, bankruptcy, or reorganization of the accommodation maker, endorser, or guarantor, the amount of such rescinded, avoided, or returned payment shall be added to or, in the event this Note has been previously paid in full, shall revive the principal balance of this Note upon which interest may be charged at the applicable rate set forth in this Note and shall be considered part of the outstanding balance of this Note and all terms and provisions herein shall thereafter apply to the same.

12. **Waiver. MAKER (AND EACH AND EVERY ENDORSER, GUARANTOR, AND SURETY OF THIS NOTE) ACKNOWLEDGES THAT THE LOAN EVIDENCED BY THIS NOTE IS A COMMERCIAL TRANSACTION, AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVES THE RIGHT TO NOTICE AND HEARING UNDER APPLICABLE NEW YORK GENERAL STATUTES, OR ANY SUCCESSOR STATUTE OF SIMILAR IMPORT, WITH RESPECT TO ANY PREJUDGMENT REMEDY AS DEFINED THEREIN, AND FURTHER WAIVES DILIGENCE, DEMAND, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT, PROTEST AND NOTICE OF PROTEST AND NOTICE OF ANY RENEWALS OR EXTENSIONS OF THIS NOTE, AND ALL RIGHTS UNDER ANY STATUTE OF LIMITATIONS, AND AGREES THAT THE TIME FOR PAYMENT OF THIS NOTE MAY BE CHANGED AND EXTENDED AS PROVIDED IN SAID MORTGAGE OR ANY SECURITY AGREEMENT, WITHOUT IMPAIRING MAKER'S LIABILITY THEREON, AND FURTHER CONSENTS TO THE RELEASE OF ALL OR ANY PART OF THE SECURITY FOR THE PAYMENT HEREOF, OR THE RELEASE OF ANY PARTY LIABLE FOR THIS OBLIGATION WITHOUT AFFECTING THE LIABILITY OF THE OTHER PARTIES HERETO. ANY DELAY ON THE PART OF THE HOLDER HEREOF IN EXERCISING ANY RIGHT HEREUNDER SHALL NOT OPERATE AS A WAIVER OF ANY SUCH**

4

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP