## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **LEWISBERRY PARTNERS LLC,** | : | **Case No. 21-10327-elf** |
|  | : |  |
| **Debtor.** | : |  |
|  | : |  |

## DEBTOR'S THIRD AMENDED DISCLOSURE STATEMENT
## DATED NOVEMBER 12, 2021

**TABLE OF CONTENTS.**

I.    **INTRODUCTION** ................................................................................................ 1

   A.    Purpose of This Document ........................................................................... 1

   B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..................... 1

     1.    Time and place of the hearing to approve this Disclosure Statement; ..................... 1

     2.    Deadline for voting to accept or reject the Plan; and ............................... 1

     3.    Deadline for objecting to the adequacy of this Disclosure Statement. ..................... 1

   C.    Disclaimer ........................................................................................ 2

II.    **BACKGROUND** ..................................................................................... 2

   A.    Description and History of the Debtor's Business ........................................... 2

   B.    Insiders of the Debtor .......................................................................... 2

   C.    Management of the Debtor During the Bankruptcy ........................................... 3

   D.    Events Leading to Chapter 11 Filing .......................................................... 3

   E.    Significant Events During the Bankruptcy Case ............................................. 4

   F.    Projected Recovery of Avoidable Transfers ................................................... 6

   G.    Claims Objections ................................................................................ 6

   H.    Current and Historical Financial Conditions ................................................. 6

III.    **SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT
     OF CLAIMS AND EQUITY INTERESTS** ................................................... 6

   A.    What Is the Purpose of the Plan of Reorganization? ....................................... 6

   B.    Unclassified Claims ............................................................................. 7

     1.    Administrative expenses, quarterly and Court fees ...................................... 7

DocuSign Envelope ID: 32910565-533D-4D0C-833E-D2316597A8E

Case 21-10527-elf    Doc 200-1    Filed 11/12/21    Entered 11/12/21 15:56:02    Desc
Exhibit A    Third Amended Disclosure Statement    Page 2 of 21

2.      Priority tax claims ............................................................................... 8

C.  Classes of Claims and Equity Interests ................................................ 8

1.      Classes of secured claims .................................................................... 8

2.      Classes of priority unsecured claims ................................................... 9

3.      Classes of general unsecured claims ................................................. 10

4.      Classes of equity interest holders ..................................................... 10

D.  Means of Implementing the Plan ........................................................ 11

1.      Source of payments ........................................................................... 11

2.      Post-confirmation Management ......................................................... 12

E.  Risk Factors ......................................................................................... 12

F.  Executory Contracts and Unexpired Leases ....................................... 12

G.  Tax Consequences of Plan .................................................................. 13

IV.  CONFIRMATION REQUIREMENTS AND PROCEDURES ...................................... 13

A.  Who May Vote or Object ...................................................................... 13

1.      What is an allowed claim or an allowed equity interest? .................... 14

2.      What is an impaired claim or impaired equity interest? ..................... 14

3.      Who is not entitled to vote ................................................................. 14

4.      Who can vote in more than one class ................................................. 15

B.  Votes Necessary to Confirm the Plan ................................................. 15

1.      Votes necessary for a class to accept the plan .................................. 15

2.      Treatment of non-accepting classes of secured claims, general unsecured claims, and interests ................................................................... 15

C.  Liquidation Analysis ............................................................................ 15

D.  Feasibility ............................................................................................ 16

1.      Ability to initially fund plan ............................................................... 16

2.      Ability to make future plan payments and operate without further reorganization . 16

V.  EFFECT OF CONFIRMATION OF PLAN ............................................................... 18

A.  Discharge of Debtor, Releases by Debtor and Enforcing Injunction ........................... 18

B.  Modification of Plan ............................................................................ 18

C.  Waiver of Stay of Confirmation Order and Immediate Effect ..................................... 19

DocuSign Envelope ID: 32910555-533D-4D0C-833E-D2316B597A8E

## I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 bankruptcy case of Lewisberry Partners LLC (the "Debtor"). This Disclosure Statement provides information about the Debtor and the Plan filed on May 10, 2021, as amended (the "Plan") to help you decide how to vote. A copy of the Plan is attached as **Exhibit A**. **Your rights may be affected**. **You should read the Plan and this Disclosure Statement carefully. You may wish to consult an attorney about your rights and your treatment under the Plan.**

The proposed distributions under the Plan are discussed at pages 8-11 of this Disclosure Statement. General unsecured creditors are classified in Class 2, and as described in greater detail herein, are eligible to receive a pro rata percentage of their allowed claims, to be distributed pursuant to this Plan.

### A.    Purpose of This Document

This Disclosure Statement describes: (a) the Debtor and significant events during the bankruptcy case; (b) how the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed); (c) who can vote on or object to the Plan; (d) what factors the Bankruptcy Court will consider when deciding whether to confirm the Plan; (e) why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and (f) the effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. A separate order has been entered setting the following information:

1.    Time and place of the hearing to approve this Disclosure Statement;

2.    Deadline for voting to accept or reject the Plan; and

3.    Deadline for objecting to the adequacy of this Disclosure Statement.

If you want additional information about the Plan or the voting procedure, you should contact Edmond M. George, Esquire, Obermayer Rebmann Maxwell & Hippel LLP, Centre Square West, 1500 Market Street, Suite 3400, Philadelphia, PA   19102, (215) 665-3140, edmond.george@obermayer.com.

### C.    Disclaimer

The Court will consider whether this Disclosure Statement may be approved as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.

## II.    BACKGROUND

### A.    Description and History of the Debtor's Business

Since 2018, the Debtor, a Pennsylvania limited liability company, has been in the business of buying, leasing, and selling single-family residential real property located in Lewisberry, Pennsylvania.  On June 26, 2019, the Debtor acquired thirty (30) improved townhomes located in Lewisberry, York County, Pennsylvania (the "Lewisberry Properties") in the community commonly known as Glenbrook Townhomes at Pleasant View ("Glenbrook").

The Lewisberry Properties are individually identified as follows: Lot 47, 2 Kingswood Drive; Lot 48, 4 Kingswood Drive; Lot 49, 6 Kingswood Drive; Lot 50, 8 Kingswood Drive; Lot 51, 10 Kingswood Drive; Lot 52, 12 Kingswood Drive; Lot 53, 14 Kingswood Drive; Lot 54, 16 Kingswood Drive; Lot 55, 18 Kingswood Drive; Lot 56, 20 Kingswood Drive; Lot 57, 22 Kingswood Drive; Lot 58, 24 Kingswood Drive; Lot 79, 142 Scully Place; Lot 80, 144 Scully Place; Lot 81, 146 Scully Place; Lot 82, 148 Scully Place; Lot 83, 135 Scully Place; Lot 84, 133 Scully Place; Lot 85, 131 Scully Place; Lot 86, 129 Scully Place; Lot 87, 127 Scully Place; Lot 88, 125 Scully Place; Lot 89, 123 Scully Place; Lot 90, 121 Scully Place; Lot 91, 111 Scully Place; Lot 92, 109 Scully Place; Lot 93, 107 Scully Place; Lot 94, 105 Scully Place; Lot 95, 103 Scully Place; Lot 96, 101 Scully Place.

Each of the Lewisberry Properties is a residential dwelling which the Debtor leases to residential tenants.  In addition to leasing the residential dwellings through a management company, the Debtor has also offered certain of the Lewisberry Properties for sale in the ordinary course of its business.

### B.    Insiders of the Debtor

The insiders of the Debtor are the members of the Debtor, including managing member Richard Puleo, his wife Lorraine Puleo, and Joanna Johnson, who also serves in a separate capacity as an independently-contracted property manager for the Debtor, and other members John O'Sullivan, David Kirk, Greg Shawley and Glennbrook Townhomes Inc.

### C.    Management of the Debtor During the Bankruptcy

The Debtor has managed its own assets as a debtor-in-possession during his Chapter 11 proceeding on the same terms utilized prior to bankruptcy.  The Debtor will continue to act in the same capacity post-confirmation.

### D.    Events Leading to Chapter 11 Filing

Debtor acquired the Lewisberry Properties from Eastern Development & Planning, Inc., for a purchase price of Four Million Dollars ($4,000,000.00).  The Lewisberry Properties were approved for development in the Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development, recorded in the Office of the Recorder of Deeds in and for York County, Pennsylvania in Plan Book SS, Page 709.

On June 26, 2019, in order to fund the purchase of the Lewisberry Properties, Debtor borrowed funds from Loan Funder in the original principal amount of Eight Million Twenty Five Thousand dollars ($8,025,000.00) (the "Bridge Loan") as memorialized in that certain Commercial Promissory Note and that certain Loan and Security Agreement each dated June 26, 2019.  The Bridge Loan also assisted Richard and Lorraine Puleo (the "Puleos"), the principal owners of the Debtor, in paying off existing seller financing on twenty (20) improved townhomes located in Lewisberry, Pennsylvania (collectively, the "Puleo Properties" or together with the Lewisberry Properties, the "Properties") also located in Glenbrook, but owned solely in the name of the Puleos. The Puleo Properties are located at Lots 59 through 78 Scully Place, Fairview Township, York County, PA.  In exchange for the Bridge Loan, the Debtor and the Puleos granted mortgages on the Properties as well as assignments of rents.

Pursuant to the terms of the Bridge Loan, the Debtor had a duty to make interest-only payments and keep the Properties insured and all applicable taxes paid.  The Bridge Loan also set mandatory release prices for the transfer of any of the individual Properties equal to one hundred twenty percent (120%) of the allocated loan amount for each of the released properties.

The Bridge Loan was brokered by Roc Capital LLC and originated by Loan Funder LLC, Series 7693 ("Loan Funder"), which may be a related entity to Roc Capital LLC.  Administration of the Bridge Loan was allegedly turned over to a servicer for servicing, but that servicer never successfully established its right to receive and apply payments.  In August 2019, servicing was transferred to a new servicer: Fay Servicing LLC ("Fay").

The Debtor's relationship with Fay was rocky from its inception: Fay did not provide appropriate servicing documentation or a payment mechanism to the Debtor until November 2019, several months after it assumed servicing duties.  Fay at various times claimed that the Bridge Loan required the Debtor to escrow funds for taxes, when it actually only required monthly payment of interest.  The Debtor submitted insurance for Fay's approval, and received Fay's approval.  Following that approval, Fay alleged the Properties were uninsured and purchased force-placed insurance.  Fay also sent notifications to all tenants stating that the Properties were uninsured.  Fay has, at various points, pre-paid taxes for some of the Properties but did not inform the Debtor that it was doing so, what provision of the Bridge Loan permitted

3

it to do so when taxes were not yet due, or communicate to the Debtor which taxes for which Properties had actually been paid.

In early 2020, as the coronavirus pandemic caused widespread economic dislocation and eviction moratoriums were put in place, the Debtor's monthly cash flow from rent was severely impacted. The Debtor was at risk of being unable to make the monthly interest payments. The Debtor approached Fay, and these parties agreed to a forbearance agreement that halved the amount of monthly interest payments. Fay never specifically stated when this forbearance would end, but continued to accept the reduced payments through the date the Debtor filed bankruptcy.

In late 2020, the Debtor sought to refinance the Bridge Loan with Orrstown Bank. Orrtown Bank was willing to refinance the Bridge Loan for terms that were better on all accounts than those in the Bridge Loan: lower interest, longer maturity, better amortization. Fay merely needed to confirm the release prices that would satisfy the Bridge Loan. Fay promised to confirm those release prices, but still to this day has not done so. Because Fay would not confirm the contractual release prices, the Debtor would not close on the refinance.

In October 2020, the Debtor, in the ordinary course of its business, also entered into a listing agreement with its realtor, Keller Williams of Central PA and listed the following Lewisberry Properties for sale: a) 2 Kingswood Drive, (Lot 47), (b) 8 Kingswood Drive, (Lot 50), and (c) 16 Kingswood Drive, (Lot 54) (the "Real Properties"). The Debtor entered into agreements of sale for each of the Real Properties and, pursuant to the terms of the Bridge Loan, sought confirmation of the release prices for each of the Real Properties from Fay. As with the attempted refinance, Fay promised to confirm the release prices but never did so.

As the dates for closing on the sales of the Real Properties neared, Fay demanded different release prices much higher than those set forth under the terms of the Bridge Loan. The Debtor realized it would be unable to close on the sales of the Real Properties unless it took some other action. The risk of breaching the existing agreements of sale, the Debtor's inability to get Fay to abide by contractual release prices and the constant lack of clarity regarding the parties' rights and duties under the Bridge Loan caused the Debtor to file the instant bankruptcy.

**E.      Significant Events During the Bankruptcy Case**

On February 9, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and remains in possession of its property and is operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On or about March 25, 2021, the Office of the United States Trustee filed a statement that no creditors' committee has been appointed in this Chapter 11 case and no Trustee or examiner has been sought or appointed in the Debtor's Chapter 11 case. On March 3, 2021 the Bankruptcy Court entered an Order approving the Debtor's retention of Obermayer Rebmann Maxwell & Hippel LLP.

On February 16, 2021, the Debtor filed a motion to sell the Real Properties to the buyers pursuant to the pre-bankruptcy agreements of sale. On February 19, 2021, the Court granted the Debtor's motion and ordered that the Real Properties could be sold and that proceeds equivalent

DocuSign Envelope ID: 32910555-533D-4D0C-833E-D23185D7A8E

to the release prices for those properties would be held in escrow pending the resolution of the dispute between the Debtor and Fay.

On February 12, 2021, the Debtor filed a motion to use cash collateral.  At the hearing on that motion, counsel for Fay alleged that the ownership of the underlying Bridge Loan had been or would be transferred to U.S. Bank as Trustee for the HOF Grantor Trust I ("U.S. Bank").  Fay contested cash collateral on behalf of itself or Loan Funder or U.S. Bank.  On February 19, March 17 and April 19, the Court entered orders authorizing interim use of cash collateral pursuant to a specified budget that allowed the Debtor to continue rental operations.  Notably, in an objection to the April request for cash collateral, Fay alleged that the Bridge Loan fundamentally did not provide release prices and that Fay was never required to release individual units from the Bridge Loan for any reason.

In order to clarify what rights Fay, Loan Funder and U.S. Bank hold or held, on March 26, 2021, the Debtor file a motion for an examination pursuant to Fed. R. Bankr. P. 2004 and served subpoenas upon these entities seeking clarifying documents regarding the ownership of the loan and its payment history.  By its April 7 and April 14, 2021 orders, the Court largely granted the Debtor's motion, requiring Fay to produce most of the requested documents.  Fay has produced some of the requested documents, but key documents substantiating the claimed loan balance have not been provided.

On May 5, 2021, the Debtor filed an application to employ Christopher L. Zellman, CPA, CFP as accountant for the Debtor.  This application was granted on July 2, 2021.

Contemporaneously with the filing of the initial Disclosure Statement, the Debtor filed a motion to set the deadline to file proofs of claims.  That motion was granted on May 12, 2021, setting the bar date for June 18, 2021 for non-governmental creditors.

The Debtor is pursuing refinancing as its main reorganizational goal.  The Debtor is currently exchanging terms with several potential refinance lenders.  All term sheets offered by these lenders would result in the payment in full of any allowed secured claim, plus reduced interest and lower monthly payments due from the Debtor.  This refinance will result in much higher net income from operations, allowing the Debtor to pay creditors in this Plan.

On June 30, 2021, the Debtor filed a complaint in the Bankruptcy Court for the Eastern District of Pennsylvania seeking recovery from Fay, Loan Funder and/or U.S. Bank for their failure to abide by the terms of the Bridge Loan, disallowance of the secured claim filed by one or more of these parties, bifurcation of the undersecured claim and other related relief, commencing Lewisberry Partners LLC v. Loan Funder LLC Series 7693 et al., Adversary No. 21-52-elf.  This Suit was dismissed without prejudice by the Bankruptcy Court on July 12, 2021.  An amended complaint was filed on July 15, 2021.  The defendants filed a motion to dismiss and the Debtor responded; that motion is pending. Any net recovery from the Suit will be paid to creditors in the Plan.  A true and correct copy of the current complaint in the Suit is attached as **Exhibit B.**

4860-3756-3138

By agreement with Fay, the Debtor obtained authorization to sell two (2) additional properties, 133 and 144 Scully Place, by an order entered October 22, 2021.

The Puleos own the Puleo Properties, and intend to market and sell several such properties pursuant to this Plan and contribute the proceeds to the Debtor in order to ensure complete performance of the Plan. The Puleos shall also be bound by the Plan to contribute net revenue derived from the Puleo Properties to the Debtor to the extent necessary to fund the Plan. This New Value Contribution by the Puleos will ensure increased Debtor cash flow from operations. The Debtor and the Puleos intend to sell no more than five (5) properties each per year during 2021 and 2022.

### F.    Projected Recovery of Avoidable Transfers

The Debtor has investigated whether a postpetition transfer of $870.69 to Handyside Inc. may be avoidable pursuant to 11 U.S.C. §549. Pursuing avoidance of this transfer, even if avoidable, would be uneconomical given the costs to pursue the cause of action. Aside from this transfer, does not believe that any preference, fraudulent conveyance, or other avoidance actions exist.

### G.    Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims and shall file objections on or before sixty (60) days from the Effective Date of the Plan.

### H.    Current and Historical Financial Conditions

The identity and reasonable market value of the estate's assets are listed in **Exhibit C** (a copy of the Debtor's Schedule A/B). The Debtor's assets consist of the Lewisberry Properties, escrowed proceeds from the sales of the Real Properties, and cash from operations. Based on the sale prices of the five (5) Lewisberry Properties sold during this bankruptcy case, and the fact that all Lewisberry Properties are substantially similar to each other, the Debtor avers that each Lewisberry Property's current fair market value is approximately $250,000.00.

The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in **Exhibit D**.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    What Is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of

claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.     Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. Therefore, the Plan Proponent has not placed the following claims in any class:

### 1.   Administrative expenses, quarterly and Court fees

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under §503(b) of the Code. Administrative expenses include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition, and compensation for services and reimbursement of expenses awarded by the court under §330(a) of the Code. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. The Code also requires that fees owed under 28 U.S.C. §1930, including quarterly and court fees, have been paid or will be paid on the effective date of the Plan.

The following chart lists the Debtor's estimated administrative expenses, and quarterly and court fees, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date. | None. | Any ordinary course administrative expenses not paid according to cash collateral orders shall be paid in full on the effective date. |
| Professional Fees, as approved by the Court. | Counsel fees and expenses of the Debtor's counsel as of October 21, 2021 are approximately $300,000.00. Debtor's counsel and accountants for the Debtor have agreed to receive the full amount of this administrative claim over time as Plan funding becomes available. | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan. |
| Clerk's Office Fees | None | Paid in full on the effective date of the Plan. |
| Office of the U.S. Trustee Fees | $0.00 | Paid quarterly with any outstanding balance paid in full |

| | | on the effective date of the Plan. |
|---|---|---|
| Total: | Approximately $300,000.00 | |

### 2.    Priority tax claims

Priority tax claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Code. Unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim pursuant to 11 U.S.C. §511, in regular installments paid over a period not exceeding 5 years from the order of relief.

There are no §507(a)(8) priority tax claims.

### C.    Classes of Claims and Equity Interests

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

### 1.    Classes of secured claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under §506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following charts list all of the Debtor's consensual secured prepetition claims and their proposed treatment under the Plan:

| Class | Description | Impairment | Treatment |
|---|---|---|---|
| Class # 1 | U.S. Bank as trustee of the HOF Grantor Trust I | Yes | Class 1 is the Secured Claim of U.S. Bank as Trustee of HOF Grantor Trust I. The treatment to be provided to Class 1 shall be in full and final satisfaction of the Note underlying the Secured Claim. Debtor has objected to this claim in the Suit, seeking, among other things, bifurcation, and/or equitable subordination as well as state law created causes of action. The Puleos shall grant the holder of the Class 1 claim an assignment of rents in the Puleo Properties, and shall record the same on the Effective Date. Pursuant to the Mortgage granted by the Puleos on the Puleo Properties, the Class 1 claimant has demanded, on November 11, 2021, that payment of all rents henceforth received from the Puleo Properties be paid to the to the Class 1 Claimholder. Upon any sale pursuant to this Plan, Debtor shall retain the |

DocuSign Envelope ID: 3291055F-539D-4D0C-833E-D2316B5D7A8E

Case 21-10327-elf    Doc 200-1    Filed 11/12/21    Entered 11/12/21 15:56:02    Desc
Exhibit A    Third Amended Disclosure Statement    Page 11 of 21

|  |  |  | net proceeds of the sale, and all liens, claims, and encumbrances related to any allowed Class 1 claim shall attach to the proceeds up to the Release Price for each property, which shall be held in escrow pending the outcome of the Suit.

Upon any refinancing pursuant to this Plan, Debtor shall escrow loan proceeds equal to the Release Price for each refinanced property, which shall be held in escrow pending the outcome of the Suit. Class 1 claimant shall take all actions reasonably necessary to permit any refinancing lender to clear title and close the refinance loan including satisfying any document of record that would encumber title to a refinanced property and releasing any relevant lien or assignment of rents.

Pending the resolution of the Suit, the Reorganized Debtor shall escrow payments representing 3.5% present value interest upon the Secured Claim.

Class 1 has not elected treatment under 11 U.S.C. 1111(b). To the extent that Class 1 is determined to hold an allowed Secured Claim, this Class retains its liens on property of the Reorganized Debtor. The Reorganized Debtor shall pay the allowed Secured Claim in equal quarterly payments on a 30-year amortization at 3.5% interest. To the extent that the Class 1 claimant is determined to hold an allowed unsecured claim, that claim is a Class 2 claim.

Upon resolution of the Suit by settlement or Final Order, Debtor shall distribute escrowed payments to the extent that Class 1 claims are allowed secured claims and are not equitably subordinated. To the extent this Class is subordinated, Class 1 claims shall receive no distribution under this Plan. |
|--|--|--|--|

2.   Classes of priority unsecured claims

The Code requires that, with respect to a class of claims of a kind referred to in 11 U.S.C. §§ 507(a)(1), (4), (5), (6), and (7), each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment or the class agrees to deferred cash payments.

There are no claims under §§ 507(a)(1), (4), (5), (6), and (7) of the Code.

DocuSign Envelope ID: 3291055F-533B-4D0C-833E-D2316B597A8E

3. Classes of general unsecured claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under §507(a) of the Code.

The following chart identifies the Plan's proposed treatment of class 2, which contains general unsecured claims against the Debtor. Holders of Class #2 Claims may also examine Section IV.D.3 below for an illustration of the treatment they can expect.

### A.    General Unsecured Creditors:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class  #2 | General Unsecured Creditors; aggregate amount of claims is approximately $101,592.05 as reported on the Debtor's Schedule E/F. | Yes | Once administrative expense claims are paid in full, Debtor will make quarterly payments to Class 2 on a pro rata basis over a one (1) year period commencing in the quarter in which the Effective Date falls, and each subsequent quarter as Plan funding becomes available pursuant to Article VII. The Debtor anticipates administrative claims will be paid in full from the proceeds of a refinance on or soon after the Effective Date. |

4. Classes of equity interest holders

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company (LLC), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

DocuSign Envelope ID: 32910555-5339-4D0C-833E-D23195597A8E

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class #3 | Richard and Lorraine Puleo: 82.237%<br>John O'Sullivan: 10.669%<br>David Kirk: 3.467%<br>Greg Shawley: 2.489%<br>Joanna Johnson: 1.067%<br>Glennbrook Townhomes Inc.: 0.071% | No | Class 3 is unimpaired by this Plan. All equity holders shall retain their equity post-confirmation on account of the New Value Contribution. |

## D.    Means of Implementing the Plan

### 1.  Source of payments

Payments and distributions under the Plan will be funded by one or any of the following:

i.      **Sales:** Confirmation of this Plan authorizes the Debtor and the Puleos to market and sell some or all of their real property, in the exercise of their business judgment, free and clear of all liens and interests pursuant to 11 U.S.C. §363(b), (f) without further court approval, provided that the consideration exceeds the mandatory Release Price and the consideration is sufficient to pay all other liens and associated closing cost in full. Confirmation of this Plan constitutes a finding that the lien associated with the Class 1 claim is subject to a bona fide dispute and applicable nonbankruptcy law permits these sales free and clear of that lien. After payment of all other liens and closing costs, the Debtor shall escrow an amount equivalent to the Release Price consistent with Article IV of this Plan, and any additional proceeds shall be distributed in accordance with the Plan. Any such sale necessary to fund this Plan shall be made pursuant to this Plan and exempt from transfer or stamp taxes pursuant to 11 U.S.C. §1146.

ii.      **Refinance:** Confirmation of this Plan authorizes the Debtor and the Puleos to refinance some or all of their real property, in the exercise of their business judgment, without further court approval, provided that the consideration exceeds the mandatory Release Price for all refinanced properties. The Debtor shall escrow an amount equivalent to the Release Prices consistent with Article IV of this Plan, and any additional proceeds shall be distributed in accordance with the Plan. The Debtor already has a term sheet for a refinance from Orrstown, attached as **Exhibit E**, demonstrating that the Debtor qualifies for market refinance terms. Upon approval by Orrstown's management, these same terms may be extended to a refinance loan in the amount of $8.6 million – such approval is forthcoming and the Debtor expects that it will be granted if the Plan is confirmed.

iii.      **Operations:** Net income from the rental properties including those properties subject to leases assumed under Article 6.01(a) of the Plan.

iv.      **Litigation:** Net recoveries from the Suit after payment of counsel fees and costs incurred in the Suit.

v.        **Collections:** Recoveries from the Debtor's preconfirmation accounts receivable, if any.

vi.        **New Value Contribution:**    On the Effective Date or as soon thereafter as is reasonably practicable, the Puleos shall grant the holder of the Class 1 claim an assignment of rents in the Puleo Properties and record the same.  The Puleos may market and sell up to five (5) Puleo Properties per year pursuant to Article VII.1 of this Plan, and shall contribute the net proceeds to the Debtor to be disbursed pursuant to this Plan.  Also, pursuant to the Plan, the Puleos shall contribute the net rental proceeds of the Puleo Properties to the Debtor to the extent necessary to fund the Plan.  Pursuant to the Mortgage granted by the Puleos on the Puleo Properties, the Class 1 claimant has demanded, on November 11, 2021, that payment of all rents henceforth received from the Puleo Properties be paid to the to the Class 1 claimant.  This contribution of net rents and of net sale proceeds from the Puleo Properties to fund this Plan are contributions of money or money's worth reasonably equivalent to the unimpaired equity interests retained pursuant to this Plan and necessary to the performance of this Plan.

Richard Puleo shall serve as Disbursing Agent for the Debtor, and shall make monthly or quarterly disbursements of funds from the above sources to the Classes entitled to receive them pursuant to this Plan.  The Disbursing Agent shall not be paid for his efforts as Disbursing Agent and no bond is required.

2.    Post-confirmation Management

The Post-Confirmation Management of the Debtor will remain with current management, mainly Richard Puleo, the current Managing Member.

E.        **Risk Factors**

The proposed Plan has the following risks:

Risks inherent in any attempt to sell residential real estate, including the inability to find buyers for appropriate prices and the inability of those buyers to close on agreed-upon sale.

Risks inherent in the business of renting residential real estate, including inability to find tenants for vacant or to-be-vacated properties, inability to collect rents from existing tenants and inability to evict tenants for non-payment under the current eviction moratoriums.  The Debtor expects current eviction moratoriums to end or be substantially modified by the end of 2021, reducing this particular risk

F.        **Executory Contracts and Unexpired Leases**

The Plan in Article 6 lists all executory contracts and unexpired leases that the Debtor will assume, and if applicable assign, under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Article 6 provides that the Debtor will file a list of all such executory contracts and leases prior to the confirmation hearing. This list will enumerate how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.  The Debtor does not intend to reject any unexpired leases

for which the tenant has made a security deposit, so no tenants will have claims entitled to priority pursuant to 11 U.S.C. §507(a)(7).

If you object to the assumption, and if applicable the assignment, of your unexpired lease or executory contract under the Plan, the proposed cure of any defaults, the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.  All executory contracts and unexpired leases that are not listed in Article 6 or the filed list or have not previously been assumed, and if applicable assigned, or are not the subject of a pending motion to assume, and if applicable assign, will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

The deadline for filing a Proof of Claim based on a claim arising from the rejection of a lease or contract is thirty (30) days after entry of an order authorizing the rejection of the lease or contract.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G.    Tax Consequences of Plan

**Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.**

The Debtor is not aware of any tax consequences as a result of confirmation of the Plan. Nevertheless, there may be tax consequences to the Debtor and creditors as a result of any discharge, or in connection with the receipt of plan consideration after confirmation.

### IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §1129 of the Code. These include the requirements that: (1) the Plan must be proposed in good faith; (2) if a class of claims is impaired under the Plan, at least one impaired class of claims must accept the Plan, without counting votes of insiders; (3) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and (4) the Plan must be feasible.  These requirements are not the only requirements listed in §1129, and they are not the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Except as stated in Part IV.A.3 below, a creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

DocuSign Envelope ID: 32910F5F-533F-4D0C-833E-D2318597A8E

In this case, the Plan Proponent believes that <u>Classes 1 and 2 are impaired.</u> Holders of allowed claims in those classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that <u>Class 3 is unimpaired</u>, is thus deemed to accept the Plan and is not entitled to vote.

    1.   What is an allowed claim or an allowed equity interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either: (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.

When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was June 18, 2021.***

    2.   What is an impaired claim or impaired equity interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in §1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

    3.   Who is not entitled to vote

The holders of the following five types of claims and equity interests are not entitled to vote:

i.      holders of claims and equity interests that have been disallowed by an order of the Court;

ii.     holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

iii.   holders of claims or equity interests in unimpaired classes;

iv.   holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

v.    holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

vi.   administrative expenses.

**Even if you are not entitled to vote on the plan, you have a right to object to the confirmation of the Plan and to the adequacy of the Disclosure Statement.**

DocuSign Envelope ID: 32910556-5389-4D0C-833E-D2316B5D7A8E

4.    Who can vote in more than one class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless: (1) all impaired classes have voted to accept the Plan; or (2) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and the Plan is eligible to be confirmed by "cram down" of the non-accepting classes, as discussed later in Section B.2.

1.    Votes necessary for a class to accept the plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than 1/2 of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least 2/3 in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

2.    Treatment of non-accepting classes of secured claims, general unsecured claims, and interests

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan upon the request of the Plan proponent if the non-accepting classes are treated in the manner prescribed by §1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a cram down plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of §1129(a)(8) of the Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a cram down confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

### C.    Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation on the Effective Date.

The Plan treats all creditors at least as well as they would be treated in a chapter 7 liquidation on the effective date. If the Debtor were liquidated on the effective date, the administrative claims of Debtor's counsel and accountants would be paid in full first, for over $300,000.00. After that, the chapter 7 trustee performing this liquidation would be paid its own fees as an administrative claim. Only after that would secured claims be entitled to payment. The Debtor's assets are all encumbered by a security interest in the purported amount in excess of $8

DocuSign Envelope ID: 3291055F-5339-4D0C-833F-D2316B5D7A8E

Case 21-10327-elf    Doc 200-1    Filed 11/12/21    Entered 11/12/21 15:56:02    Desc
Exhibit A    Third Amended Disclosure Statement    Page 18 of 21

million, but are worth approximately $7 million. As such, in a liquidation the secured creditor would be entitled only to the value of its collateral and unsecured creditors would receive nothing. Instead, the Plan provides that the secured creditor will receive the value, as of the Effective Date, of its allowed secured claim, plus a potential for payment on a portion of any deficiency claim. Other unsecured creditors will receive their pro rata share of net income from ongoing operations and other funding sources, instead of receiving nothing in a liquidation.

### D.    Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

#### 1.    Ability to initially fund plan

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. The only administrative claim is that of Debtor's counsel, who have agreed to receive full payment over time to the extent necessary to allow the Debtor to perform the Plan.

#### 2.    Ability to make future plan payments and operate without further reorganization

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business.

The Plan Proponent has provided historical financial information via its monthly operating reports, which show an ever-increasing cash balance. The Debtor has prepared financial projections, attached as **Exhibit F**, demonstrating its ability to fund the Plan.

Pursuant to the New Value Contribution, the Puleos will contribute the net rental proceeds from the Puleo Properties to the Debtor, as well as any net sale proceeds from any sales. These rental units are managed in the same manner and by the same management company as the Debtor's units, and are of substantially similar quality and profitability. These contributions will lead to higher cash flow for the Debtor, ensuring that the Debtor will have enough cash over the life of the Plan to make Plan payments and maintain operations.

#### 3.    Illustrative Description of Reorganization

In order to allay any concerns that Plan performance is not feasible and describe the recovery that Class #2 general unsecured creditors can expect, the Debtor provides the following description for illustrative purposes only.

The Debtor is pursuing a refinancing as the primary means of reorganizing. The Debtor has obtained a term sheet from Orrstown, attached as Exhibit E, showing that it has the ability to pay down the first $7 million of any allowed secured Class 1 claim by refinancing the majority of the Properties. Upon approval by Orrstown's management, these same terms may be extended to a

DocuSign Envelope ID: 32910555-533B-4D0C-833E-D2316B5D7A8E

refinance loan in the amount of $8.6 million – such approval is forthcoming and the Debtor expects that it will be granted if the Plan is confirmed.  If the Debtor refinances on these or similar terms, the monthly loan payments on the Debtor's secured debt will be reduced to approximately $26,000.00.  This decrease in expenses alone will provide sufficient free cash flow to pay all other claims in this Plan.

The Plan also provides that the Debtor and Puleos may sell individual units so long as the sale generates proceeds sufficient to pay the applicable release price plus associated sale costs. Each unit sold generates the approximately $200,000.00 necessary to meet the applicable release price, plus tens of thousands of dollars of additional net profits above sale costs. The Plan further provides that the Debtor and Puleos will use the cash flow from the Properties to pay any obligations under the Plan that are not paid out of refinance or sale proceeds.

The extent of Secured Creditor's Class #1 claim is disputed, and will be resolved by the Suit.  If the Secured Creditor's claim is fully-secured then the Secured Creditor's entire claim will belong in Class #1 and will be paid in accordance with the treatment of that class.  In this scenario, Class #2 claimants will be paid from available refinance proceeds, sale proceeds or cash flows, and will receive 100% of the value of their claims.

If a portion of the Secured Creditor's claim is determined to be unsecured, that portion of the claim will belong in Class #2.  In this scenario, the unsecured portion of the Secured Creditor's claim will share pro rata with other Class #2 creditors.  The Debtor anticipates that the Orrstown refinance plus Release Prices from sales will be sufficient to pay administrative expenses and the Class #1 secured claim in full.  The Debtor's projections estimate that $295.335.84 from cash flows and excess sale proceeds will be available for Class #2 creditors.  See Ex. F.  If the unsecured portion of the Secured Creditor's claim is $2,000,000.00 and the remaining unsecured creditors' claims total $50,000.00, then those remaining unsecured creditors will receive 14.4%[1] of the amount of their claims.   If the unsecured portion of the Secured Creditor's claim is $1,000,000.00, the remaining unsecured will receive 28.1%[2] of their claim.  The Debtor will disburse funds to the unsecured creditor quarterly, as shown in the projections. See Ex. F. These disbursements will continue until all Class #2 claims are paid in full, or one year elapses after the Effective Date, whichever occurs first.  Any unpaid amount owed to a Class #2 claimant at the end of one year will be discharged without payment.

The Plan also proposes that, if the Debtor cannot refinance, the allowed secured Class 1 claim will be restructured via the Plan into a fully-amortized 30-year loan at current market rates. The Debtor's financial projections show that the Debtor will have sufficient cash flow to make payments on this restructured debt while completing all other obligations under this Plan.

Each of these paths to reorganization is feasible regardless of the outcome of the Suit, since any of these mechanisms can satisfy the Debtor's obligations to Classes 1, 2 and 3 if the Class 1

---

[1]        (Projected Funding for Unsecureds of $295,335.84)/(Total Amount of Unsecured Claims of $2.05 million) = 14.4% payment.

[2]        (Projected Funding for Unsecureds of $295,335.84)/(Total Amount of Unsecured Claims of $1.05 million) = 28.1% payment.

DocuSign Envelope ID: 32910565-533B-4D0C-833E-D23168597A8E

claim is allowed in full.  To the extent that the Debtor is successful in reducing the Class 1 claim or obtaining affirmative recovery, the Debtor will be able to perform the Plan even more easily.

## V.   EFFECT OF CONFIRMATION OF PLAN

### A.   Discharge of Debtor, Releases by Debtor and Enforcing Injunction

This Plan provides that upon confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before Confirmation, pursuant 11 U.S.C. §1141.  However, any liability imposed by the Plan will not be discharged.  If Confirmation of this Plan does not occur, the Plan shall be deemed null and void. In such event, nothing contained in this Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or its estate or any other persons, or to prejudice in any manner the rights of the Debtor or its estate or any person in any further proceeding involving the Debtor or its estate. The provisions of the Plan shall be binding upon Debtor, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest Holders are impaired or whether such parties accept this Plan, upon Confirmation thereof.  The discharge and injunction provided for in this Plan does not discharge any obligation of the Puleos or any other non-debtor parties to any creditors.

In consideration of their contributions to the reorganization of the Debtor and performance of the Plan, on the Effective Date of the Plan, the Debtor releases current Equity Interest Holders from any claims the Debtor possessed against them prior to the Effective Date.

**The discharge of debts and the releases by the Debtor are enforced by an injunction such that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any person that does not comply with or is inconsistent with the provisions of the Plan.**

### B.   Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before

the completion of payments under the Plan, to: (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C.    Waiver of Stay of Confirmation Order and Immediate Effect

The performance of the Plan depends upon the prompt consummation of sales and transfers of real estate, including the New Value Contribution. This constitutes cause to waive the 14-day stay of a confirmation order pursuant to Fed. R. Bankr. P. 3020(e). The waiver of this stay will permit the Debtor and Puleos to complete the transactions necessary to perform the Plan as expeditiously as possible.

Dated: 12 November 2021                 By: _____
                                            Richard Puleo, Managing Partner
                                            Lewisberry Partners LLC, Plan Proponent



OBERMAYER REBMANN MAXWELL & HIPPEL LLP


Dated: October 21, 2021                 By:    /s/ Edmond M. George
                                               Michael D. Vagnoni, Esquire
                                               Edmond M. George, Esquire
                                               Centre Square West
                                               1500 Market Street, Suite 3400
                                               Philadelphia, PA  19102
                                               Telephone: 215.665.3140
                                               Facsimile: 215.665.3165
                                               Edmond.george@obermayer.com
                                               Counsel for the Debtor