**UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** : | |
| : | |
| : | **Chapter 11** |
| **LEWISBERRY PARTNERS, LLC,** : | |
| : | **Bky. No. 21-10327 ELF** |
| **Debtor.** : | |
| : | |

# O P I N I O N

## I.  INTRODUCTION

Lewisberry Partners, LLC ("the Debtor") is a closely held entity that owns, leases, and

manages residential real property in Lewisberry, PA.  In the ordinary course, the Debtor also

offers to sell some of the properties.  At the outset of this bankruptcy case, it owned thirty (30)

properties.  The Debtor sold five (5) properties during the course of this bankruptcy case (with

court approval), leaving it with twenty-five (25) properties in its portfolio.

The Debtor's principals are Richard Puleo ("Mr. Puleo") and Lorraine Puleo

(collectively, "the Puleos"), who own an 82.237% interest in the Debtor.

Like many entities that own and manage real estate, the Debtor has a primary secured

creditor and a relatively modest number of other, unsecured debts.  The primary secured creditor

in this case is U.S. Bank, N.A. as Trustee of HOF Grant Trust I ("U.S. Bank"), holder of a loan

("the Loan"), secured by the Debtor's properties.  Fay Servicing, LLC ("Fay Servicing") serves

as U.S. Bank's servicer.  (For ease of reference, I will occasionally refer to the secured creditor

as "the Lender").

In 2020, early in COVID-19 pandemic, the Debtor defaulted on its payment obligation to

Fay Servicing.  The parties thereafter negotiated two (2) forbearance agreements but ended up

unable to agree on an ongoing arrangement for future servicing of the loan, leading the Debtor to

seek relief under chapter 11 of the Bankruptcy Code in this court in February 2021.

In seeking to reorganize, the Debtor seeks confirmation of a creative chapter 11 plan

which purportedly provides for a cure of the existing default on the Fay Servicing loan, thereby

reinstating the loan and leaving Fay Servicing unimpaired and deemed to have accepted the plan.

Fay Servicing has objected to confirmation of the plan.

For the reasons stated below, I conclude that the Debtor lacks the funding to effect a cure

of the existing default and the plan is infeasible.  Fay Servicing's objection to confirmation will

be sustained.  Confirmation of the plan will be denied.

## II.  PROCEDURAL HISTORY

The Debtor commenced this bankruptcy case on February 9, 2021.

On February 16, 2021, the Debtor filed an expedited motion for authority to sell three (3)

of its thirty (30) residential real properties.  (Doc. # 15).  On February 19, 2021, after a hearing in

which Fay Servicing fully participated, I granted the Debtor's motion.  (Doc. # 27).

Subsequently, on October 22, 2022, with Fay Servicing's consent, I granted a second motion

authorizing the Debtor to sell two (2) more properties.  (Doc. # 185).

On Debtor's motion (Doc. # 8), I authorized the Debtor's interim use of Fay Servicing's

cash collateral by orders dated February 19, 2021, and March 17, 2021.  (Doc. #'s 28, 54).  On

April 7, 2021, Fay Servicing filed an objection to the Debtor's continuing use of cash collateral.

On April 19, 2021, after a hearing on the objection, I entered a third order authorizing the

Debtor's interim use of cash collateral.  Thereafter, between April 2021 and October 2021, I

entered five (5) additional orders authorizing the interim use of cash collateral, all by agreement.

On October 22, 2021, I entered a final order authorizing the Debtor's use of cash collateral, again by consent.  That final order required, for the first time, that the Debtor make monthly adequate protection payments to Fay Servicing in the amount of $45,000.00.  (Doc. # 180).

On March 29, 2021, Fay Servicing filed a proof of claim, asserting a secured claim in the amount of $8,621,620.14.  Fay Servicing filed an amended proof of claim on April 6, 2021, and a second amended proof of claim on June 17, 2021.  In all three (3) proofs of claim, Fay Servicing asserted that its claim was entitled to secured status.  The last-filed, second amended, proof of claim was in the amount of $9,364,235.24.

On May 10, 2021, the Debtor filed its initial, proposed plan of reorganization accompanied by a proposed disclosure statement and motion to approve the disclosure statement. (Doc. #'s 90-92).  Fay Servicing filed an objection to approval of the disclosure statement.  (Doc. # 114).  By agreement, the hearing on approval of the disclosure statement was continued several times.

On September 8, 2021, the Debtor filed an amended chapter 11 plan and amended disclosure statement, (Doc. #'s 157-58), followed by a second amended chapter 11 plan and second amended disclosure statement, filed on October 26, 2021, (Doc. #'s 189-90).  Fay Servicing filed objections to approval of both amended disclosure statements.  (Doc. #'s 165, 192).

After a lengthy hearing held on November 5, 2021, (see Docket Entry #195 and # 209), and after the Debtor filed a third amended chapter 11 plan and a third amended disclosure statement on November 12, 2021, (see Doc. # 200), I entered an order approving the Debtor's disclosure statement, establishing procedures and deadlines for voting by the creditor classes and

3

scheduling a hearing on confirmation of the third amended plan, to be held on January 13, 2022.

(Doc. # 201).[1]

Consistent with the November 12, 2021 order that established various deadlines in

connection with confirmation, Fay Servicing filed a timely objection to confirmation of the

Debtor's third amended chapter 11 plan on January 5, 2022.  (Doc. # 225).[2]

The Debtor filed its Report of Plan Voting ("the Report") on December 29, 2021.  (Doc.

# 218).  In the Report, the Debtor stated that the only class that it considered to be impaired, the

class of general unsecured creditors, had voted to accept the plan.[3]  The Report also

---

[1]      Fed. R. Bankr. P. 3014 provides that the deadline for a class of secured creditors to make the election permitted by 11 U.S.C. §1111(b) is the conclusion of the disclosure statement hearing or such later time as the court may fix.  On September 24, 2021, Fay Servicing filed a motion requesting an extension of time to make the election provided by 11 U.S.C. §1111(b), in order to provide additional time for the parties to value Fay Servicing's collateral.  (Doc. # 166).  At the November 5, 2021 hearing on the motion to extend the §1111(b) election deadline (held at the same time as the hearing on the disclosure statement), without formally entering an order, I granted Fay Servicing an additional week to make the election (N.T. 11/5/21, at 178-82) (Doc. # 209).  Fay Servicing did not make the election.

[2]      Without going into great detail, it is helpful to quickly summarize the content of the third amended plan.  Doing so will make it easier to follow some of the procedural wrangling that followed.

The third amended plan classified three (3) classes of claims.  Class 1 was Fay Servicing's secured claims.  Class 2 was the class of general unsecured claims.  Class 3 was equity.  The plan designated Classes 1 and 2 as impaired.

Essentially, the Debtor proposed to pay Fay Servicing's claim in full (with 3.5% interest) by refinancing its properties and holding the proceeds in abeyance while the court determined various objections to Fay Servicing's proof of claim and affirmative claims asserted in an adversary proceeding the Debtor commenced against Fay Servicing on June 30, 2021, Adv. No. 21-052 ("the AP").  Interestingly, the plan also stated that "[t]o the extent that the Class 1 claimant is determined to hold an allowed unsecured claim, that claim is a Class 2 claim.  (The significance of this provision will be apparent in a moment, see infra n.4).  As for Class 2, the plan provided for full payment in quarterly payments to be completed one (1) year after the plan's effective date.  The plan defined the effective date as "the day the order confirming the Plan becomes a final order."  Equity (class 3) was unimpaired under the plan.

[3]      The Report referred to three (3) acceptances received from creditors holding claims totaling $21,870.00.

acknowledged that in its purported capacities as the holder of a secured claim and as the holder of an unsecured claim Fay Servicing had voted to reject the plan. In the Report, the Debtor did not count Fay Servicing's vote on the legal theory that Fay Servicing was not entitled to vote either claim.

On December 29, 2021, fifteen (15) days before the scheduled confirmation hearing, Fay Servicing filed a motion for temporary allowance of its $9,364,235.24 claim as a bifurcated claim (partially secured and partially unsecured) — specifically, as a secured claim of $6,539,100.00 and an unsecured claim for the balance of its claim (i.e., $2,825,135.00). The Debtor filed a response in opposition to the motion on January 12, 2022. (Doc. # 230).[4]

---

[4]     As stated earlier, Fay Servicing filed its proof of claim and amended proofs of claim as a secured claim. The Debtor did not file an objection to the proof of claim, but did commence the AP referenced in n.2, supra.

In the AP, the Debtor asserted various affirmative claims, but also:

(1) objected to Fay Servicing's claim as inflated, see Fed. R. Bankr. P. 3007(b) (a party may include a claims objection in an adversary proceeding); and

(2) asserted that Fay Servicing's secured claim should be bifurcated into secured and unsecured components pursuant to 11 U.S.C. §506(a).

(See Amended Complaint ¶ ¶ 114-139) (Adv. No. 21-052, Doc. # 5).

By December 29, 2021, when Fay Servicing filed the motion seeking temporary allowance of its claim bifurcated into secured and unsecured components, the parties agreed that the aggregate value of the Debtor's remaining twenty-five (25) properties securing Fay Servicing's loan was $6,539,100.00 and therefore, Fay Servicing's claim was undersecured. Nevertheless, the Debtor's third amended plan, purported to treat Fay Servicing's claim as fully secured.

Fay Servicing sought allowance of a substantial (roughly $2.8 million) unsecured claim because doing so would give it control of the class of general unsecured creditors under the third amended plan. See 11 U.S.C. §1126(c) (a class has accepted a plan if such plan was accepted by creditors that hold at least two-thirds in amount and more than one-half in number of allowed claims voting have accepted the plan). Fay Servicing's requested unsecured claim gave it far more than one-third of the allowed unsecured claims in the case. Therefore, by voting its unsecured claim against the plan, Fay Servicing could block confirmation of the plan under 11 U.S.C. §1129(a). See 11 U.S.C. §1129(a)(8).

On January 13, 2022, at the parties' request, to provide them time to discuss a possible

settlement and terms for a consensual chapter 11 plan, I continued the January 13, 2022 hearing

on Fay Servicing's temporary allowance motion and the confirmation hearing, to February 3,

2022.

On February 3, 2022, after a hearing, I granted Fay Servicing's temporary claim

allowance motion and denied confirmation of the Debtor's third amended plan. (Doc. #'s 241,

242).[5]

On February 17, 2022, after a hearing held on the U.S. Trustee's motion to dismiss the

case, I continued the U.S. Trustee's motion and provided the Debtor with a final opportunity to

propose a confirmable plan.  I entered an order requiring that the plan be filed by March 3, 2022,

and that objections be filed by April 21, 2022, with the confirmation hearing scheduled on April

28, 2022.  (Doc. # 246).

---

[5]      Two consequences flowed from the grant of Fay Servicing's motion for temporary allowance of
its bifurcated claim for voting purposes.

First, by allowing Fay Servicing to vote as an allowed unsecured claim, as a practical matter, the
court recognized the bifurcation of Fay Servicing's secured claim into two (2) claims, secured and
unsecured.

Second, the bifurcation of the claim for voting purposes forced the Debtor to revise its
reorganization strategy.  In the third amended plan the temporary allowance of its unsecured claim gave
Fay Servicing the power to block acceptance by the Class 2 unsecured creditor class.  See supra nn. 2, 4.
Aa a result the plan was not confirmable under either 11 U.S.C. §1129(a) or (b) because no impaired class
would accept the plan.  See  11 U.S.C. §1129(a)(10).  So, the Debtor proposed a fourth amended plan, in
which it would separately classify Fay Servicing's unsecured claim and provide treatment which it
claimed would make the class unimpaired (leaving the other class of unsecured creditors as having
accepted the plan, based on the Report of Plan Voting, see supra n.3 & accompanying text).  This strategy
was designed to render Fay Servicing's rejection of the plan as an unsecured creditor meaningless. see 11
U.S.C. §1126(f) (unimpaired class "are conclusively presumed to have accepted the plan"), or at least
give the Debtor a chance to confirm the plan under §1112(b).  Of course, Fay Servicing disputed the
Debtor's analysis at every step.  In any event, given the Debtor's tactical choice to propose a fourth
amended plan, I denied confirmation of the third amended plan on February 3, 2022.  (Doc. # 242).
.

The Debtor filed its fourth amended chapter 11 plan (hereafter, "the Plan") on March 3, 2022. (Doc. # 255). On April 19, 2022, in a hearing held to resolve a discovery dispute, and based on the resolution of that dispute, the parties agreed to continue the April 28, 2022 confirmation hearing to June 2, 2022. (Doc. # 264). Fay Servicing filed its objection to confirmation of the Plan on May 26, 2022. (Doc. # 275).

The confirmation hearing was held and concluded on June 2, 2022. The parties provided the court with a Stipulation of numerous undisputed facts. The Debtor presented one witness, the Debtor's principal Richard Puleo ("Puleo"). Fay Servicing presented three (3) witnesses. The parties agreed to the admission of numerous exhibits.

At the outset of the hearing, the Debtor pointed out the stipulated facts included what it considered a recent, significant development: the Debtor's principals (Puleo and his spouse) had obtained a commitment to refinance their personally owned, non-estate real properties from Reunion Capital. Based in part on the principals' willingness to devote the proceeds of the refinancing to the Debtor (and, in part on other sources for payment), the Debtor asserted that adequate funding exists to cure the existing default on the loan and then resume monthly instalment payments following the cure, consistent with the loan documents.[6]

The Debtor acknowledged at the hearing (and continues to acknowledge) that the Debtor's ability to fund the plan adequately might require the court's determination that some

---

[6]     The Debtor posited, as an alternative to confirmation of a plan providing for the cure of the default to Fay Servicing, that it also could propose a confirmable Plan by providing for the satisfaction of Fay Servicing's entire claim (both secured and unsecured) on the effective date. I permitted the Debtor to put that alternative in writing for consideration by the court, (see Docket Entry # 279), and the Debtor did put the alternative in writing, (see Doc. # 280). However, in the end, the Debtor abandoned the alternative confirmation theory. (See Debtor's Post-Hearing Brief at 1) (Doc. # 281) ("While the Debtor discussed an alternative, amended plan providing for full payment of all claims on the Effective Date, the Debtor presently requests confirmation of the currently-filed Plan curing and maintaining Fay's claim.").

portion of Fay Servicing's is not allowable, i.e., a reduction in the amount necessary to cure the default and the entire claim.[7]

At the conclusion of the confirmation hearing, I deferred setting a post-hearing briefing schedule while the Debtor's principal determined whether Reunion Capital was willing to postpone the June 13, 2022 deadline for closing on the refinancing. (See Ex. Debtor-41). In a conference among the parties held the next day, June 3, 2022, the Debtor advised that Reunion Capital had agreed to push back the deadline for closing on the refinancing transaction for thirty (30) days. I then required the Debtor to file a post-hearing brief by June 10, 2022; and Fay Servicing to file its responsive brief by June 17, 2022. (See Docket Entry # 279).

The parties timely filed their briefs. (Doc. #'s 281, 283). This contested matter is ready for decision.

### III. FACTS

### A. Undisputed Facts

The following facts are undisputed. The recitation is the parties' Joint Stipulation of Facts, with a few minor modifications by the court.

---

[7] As noted earlier, the Debtor included a claims objection in the AP filed against Fay Servicing. See supra n.2. The AP has been dormant while the parties focused their efforts on the confirmation issues. Thus, there has been no resolution of that aspect of the AP that constitutes a conventional objection to Fay Servicing's claim.

At the confirmation hearing, the Debtor presented evidence which it argues established that Fay Servicing's temporarily allowed claim ultimately will be reduced sufficiently so that the funding available to the Debtor will be sufficient to pay Fay Servicing (whether as a cure or complete payoff) and therefore, also sufficient to permit confirmation of the Plan over Fay Servicing's objection. Thus, the confirmation hearing largely resembled a claims objection hearing.

*Background*

1.  On June 26, 2019, the Debtor acquired thirty (30) improved townhomes located in

    Lewisberry, York County, Pennsylvania (the "Lewisberry Properties") in the community

    commonly known as Glenbrook Townhomes at Pleasant View.[8]

2.  The Debtor acquired the Lewisberry Properties from Eastern Development & Planning, Inc.,

    for a purchase price of $4,000,000.00.

3.  The principals of the Debtor, the Puleos, own 82.237% of the Debtor.

4.  The Puleos individually own twenty (20) improved townhomes ("the Puleo Properties") in

    the same development as the Lewisberry Properties.

5.  On June 26, 2019, in order to fund the purchase of the Lewisberry Properties, Debtor

    borrowed funds from Loan Funder LLC, Series 7693 ("the Lender") in the original principal

    amount of $8,025,000.00 ("the Loan") as memorialized in that certain Commercial

    Promissory Note ("the Note") and that certain Loan and Security Agreement ("the Security

    Agreement") each dated June 26, 2019.

6.  Also, on June 26, 2019, as security for the Debtor's obligations to the Lender, the Debtor, as

    mortgagor, executed and delivered a Purchase Money Mortgage ("the Lewisberry

    Mortgage") to the Lender, as mortgagee, in which the Debtor granted the Lender a first

    mortgage on the Lewisberry Properties as well as a security interest, <u>inter alia</u>, in and to all of

---

[8]       The Lewisberry Properties are individually identified as follows: Lot 47, 2 Kingswood Drive; Lot
48, 4 Kingswood Drive; Lot 49, 6 Kingswood Drive; Lot 50, 8 Kingswood Drive; Lot 51, 10 Kingswood
Drive; Lot 52, 12 Kingswood Drive; Lot 53, 14 Kingswood Drive; Lot 54, 16 Kingswood Drive; Lot 55,
18 Kingswood Drive; Lot 56, 20 Kingswood Drive; Lot 57, 22 Kingswood Drive; Lot 58, 24 Kingswood
Drive; Lot 79, 142 Scully Place; Lot 80, 144 Scully Place; Lot 81, 146 Scully Place; Lot 82, 148 Scully
Place; Lot 83, 135 Scully Place; Lot 84, 133 Scully Place; Lot 85, 131 Scully Place; Lot 86, 129 Scully
Place; Lot 87, 127 Scully Place; Lot 88, 125 Scully Place; Lot 89, 123 Scully Place; Lot 90, 121 Scully
Place; Lot 91, 111 Scully Place; Lot 92, 109 Scully Place; Lot 93, 107 Scully Place; Lot 94, 105 Scully
Place; Lot 95, 103 Scully Place; Lot 96, 101 Scully Place.

its present and future fixtures, rents, profits, and income from the Lewisberry Properties, and

Lender has a first lien position on the Lewisberry Properties and the foregoing assets.

7.    In addition to the Lewisberry Mortgage and as additional security for the Debtor's obligation

to Lender, and also on June 26, 2019, the Puleos, as mortgagors, executed and delivered a

Purchase Money Mortgage to the Lender, as mortgagee, in which the Puleos pledged a first

priority mortgage ("the Puleo Mortgage") on the Puleo Properties, and Lender has a first

mortgage on the Puleo Properties.

8.    The loan covered by the Note, the Security Agreement, the Lewisberry Mortgage and all

other loan documents ("the Loan Documents") was brokered by Roc Capital LLC.

9.    In August 2019, servicing was transferred to a new servicer: Fay Servicing.

10.    During the pendency of the bankruptcy case, the Loan Documents were assigned to U.S.

Bank (as defined in Part I, supra).[9]

11.    Pursuant to the Loan Documents, the loan is an interest-only loan incurring 8% non-default

annual interest, due monthly, in the amount of $53,500.00 per month.

12.    The Note contains a default rate interest provision, but the parties dispute whether the default

rate interest provision applies in this case.  If applicable, the default rate of interest is the

lesser of 23% per annum or the maximum rate allowed by law.

13.    The loan includes contractual release prices, such that the Lender is obligated to release a

property from the lien of the Lewisberry Mortgage if the sale or refinance of that property

generates net proceeds in excess of 120% of the allocated loan amount applicable to that

property.  Section 2.21(d)(vii) of the Lewisberry Mortgage provides in part that "the Release

---

[9]      From this point in this statement of facts, I will use the term "Lender" to refer to U.S. Bank and
Fay Servicing collectively.

Price shall be applied, upon payment and receipt thereof; in reduction of the outstanding

principal amount of the Obligations."

14. Debtor leases certain of the Lewisberry Properties and offers them for sale from time to time.

15. The Puleos lease certain of the Puleo Properties and offer them for sale from time to time.

### *Events During the Bankruptcy*

16. On February 9, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the

United States Bankruptcy Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), and has

continued in possession of its property, and is operating its business as a debtor-in-possession

pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

17. No creditors' committee has been appointed in this Chapter 11 case by the United States

Trustee. No Trustee or examiner has been sought or appointed in the Debtor's Chapter 11

case.

18. Lender filed three (3) proofs of claims on March 29, 2021, April 6, 2021, and June 17, 2021,

each amending the prior proof of claim.

19. During the pendency of this case, the Debtor has paid Lender adequate protection payments

totaling $368,500.00.

20. During the pendency of this case, the Debtor sold five (5) of the Lewisberry Properties pursuant

to 11 U.S.C. §363(f).

21. These sales generated $1,060,007.47 in Release Prices.

22. By agreement between the parties, as set forth in the order granting Debtor's motion to sell

(Doc. # 185), the Debtor transferred the $1,060,007.00 to Lender, with both Debtor and Lender

reserving their rights as to the proper allocation of these funds ("the Release Price Payments").[10]

23. The value of the Lewisberry Properties, as of June 2, 2022, is $6,539,100.00.

24. Lender is undersecured as to the Debtor.

25. Pursuant to an order of this Court, Lender's secured claim was estimated for voting purposes at $6,539,100.00.

26. Lender's unsecured claim was estimated for voting purposes at $2,844,365.00.

27. The Plan classifies Lender's Class 1 (secured), and Class 2 (unsecured) claims as unimpaired.

28. Lender purported to cast votes on these claims to reject the Plan.

29. All creditors classified in Class 3 (general unsecured claims) that voted, voted to accept the Plan.

30. On May 12, 2022, the Puleos obtained a binding commitment letter from Reunion Capital for $2,000,000.00 in refinance lending secured by the Puleo Properties.

31. Reunion Capital is ready, willing, and able to close this loan on or before June 13, 2022, so long as the loan proceeds are sufficient to pay the remaining claim owed to Lender.

32. The Lender has advanced $448,828.29 towards real estate taxes on the Lewisberry Properties and the Puleo Properties.

### *Uncontested Elements Of 11 U.S.C. §1129(a)*

33. The Debtor has filed all reports, schedules, and budgets necessary and has complied with all applicable cash collateral orders.

---

[10]     The actual amount of the Release Price Payments was $1,060,007.47.  For ease of reference, I am ignoring the $0.47.

34. The Debtor has complied with all applicable provisions of the Bankruptcy Code.  11 U.S.C.
    §1129(a)(2).

35. The Debtor will pay professionals for services incurred in connection with this case only
    after approval by the Court.  11 U.S.C. §1129(a)(4).

36. The plan accurately discloses the fact that current management will be retained, and that this
    retention is consistent with creditor and equity interests.  11 U.S.C. §1129(a)(5).

37. The Debtor does not need governmental approval for any rate changes.  11 U.S.C.
    §1129(a)(6).

38. Each impaired class of claims has either accepted the Plan or will receive or retain under the
    Plan on account of such claim or interest property of a value, as of the effective date of the
    Plan, that is not less than the amount that such holder would so receive or retain if the debtor
    were liquidated under chapter 7 of this title on such date.  11 U.S.C. §1129(a)(7).  The parties
    dispute whether the Lender is impaired under the Plan.

39. The Debtor has two (2) creditors entitled to administrative priority: Walters Appraisal
    Service and Obermayer Rebmann Maxwell & Hippel LLP.

40. The Debtor has sufficient funds on hand to pay Walters Appraisal Service its $10,000.00 in
    full on the effective date.

41. Obermayer Rebmann Maxwell & Hippel LLP has agreed that it may be paid after the
    effective date.

42. The Plan complies with 11 U.S.C. §1129(a)(9).

43. All fees payable under section 1930 of title 28 have been paid or the plan provides for the
    payment of all such fees on the Effective Date.  The Debtor has sufficient cash on hand to

pay any outstanding fees due to the United States Trustee on the Effective Date.  11 U.S.C.

§1129(a)(12).

44. The Debtor does not provide retiree benefits.  11 U.S.C. §1129(a)(13).

45. The Debtor owes no domestic support obligations. 11 U.S.C. §1129(a)(14).

46. The Debtor is an entity, not an individual, so 11 U.S.C. §1129(a)(15) does not apply.

47. The Debtor is a for-profit business so 11 U.S.C. §1129(a)(16) does not apply.


### *Other Facts Developed at the Confirmation Hearing*

48.  In April 2020, the Debtor defaulted on the Loan.

49. In May 2020, through an exchange of several e-mails, the Debtor entered into a forbearance

agreement with Fay Servicing.

50. The May 2020 forbearance agreement required the Debtor to make payments of one-half

(i.e., $26,750.00) of the regular, contractual installment ($53,500.00) for three (3) months:

June, July and August 2020, "with the remainder of the balance due after this 3-month

period."  The forbearance was conditioned on the Debtor paying in full the April 2020

delinquent amount in two installments, one-half on May 28, 2020, and the other half of June

2020.  (Ex. Fay Servicing-10).

51. As part of the May 2020 forbearance, the Lender expressed its willingness to "review" the

Debtor's "liquidity position" and discuss "a payment plan to bring the loan current from

thereon" at the end of the forbearance period.  (Id.).

52. The Debtor made some, but not all, of the payments required by the May 2020 forbearance

agreement.  (Ex. Fay Servicing-9).

53. On October 20, 2020, Fay Servicing sent a demand letter to the Debtor that stated: "In order to pay off the loan, you must pay \$9,182,856.98 (good through November 30, 2020).  In order reinstate the loan, you must pay \$872,746.73 (good through November 30, 2020)." (Ex. Fay Servicing-11).

54. The reinstatement amount in the October 20, 2020 demand letter calculated the payoff and cure amounts based on the default rate of interest under the Note.  (Ex. Fay Servicing-12).

55.  In October 2020, a Fay Servicing representative orally granted the Debtor a second forbearance for the months of October and November 2020, permitting the Debtor to make one-half payments in those months and to "catch up" in December 2020.  (Notes of Testimony ("N.T."), 6/2/22, at 138-39).

56. The Debtor made one-half payments of \$26,750.00 on October 1, 2020, October 30, 2020, and November 30, 2020.  (Ex. Fay Servicing-9).

57. On January 19, 2021, Fay Servicing sent a second demand letter to the Debtor.  This letter demanded \$9,464,412.60 to payoff the Loan or \$1,224,584.00 to cure the default.  (Ex. Fay Servicing-13).

58. Like the October 20, 2020 demand letter, the January 19, 2021 demand letter calculated the payoff and cure amounts based on the default rate of interest under the Note.  (Ex. Fay Servicing-14).

59. In addition to sending the October 20, 2020 and January 19, 2021 demand letters, Fay Servicing sent monthly statements to the Debtor in the period January 2020 through January 2021.  (Ex's. Debtor-15-24, Debtor-36).  All of these monthly statements provided the Debtor with an amount currently due (i.e., the amount in default) and calculated that amount

at the non-default rate, even though Fay Servicing's position is that, during that entire time period, interest was running at the default rate.[11]

60. The automated system used by Fay Servicing to generate the monthly statements sent to the Debtor uses the contractual non-default rate in calculating the amount currently due. Following a default, this system is not capable of calculating the amount currently due based on the contractual default rate.  (N.T. 6/2/22, at 155-56 and Ex. Debtor-38).

61. Between June 8, 2020 and April 4, 2022, Fay Servicing made disbursements on account of real estate taxes owed on the Debtor's real properties in the net amount of $448,578.29.  (Ex. Fay Servicing-17).[12]

62. On March 29, 2021, Fay Servicing, through counsel, filed a proof of claim in this bankruptcy case.  ("Claim No. 3-1").

63. Claim No. 3-1 calculated Fay Servicing's claim based on interest at the non-default rate.  It stated that the total claim was $8,621,021.14 and the amount necessary to cure was $805,547.18.

64. Fay Servicing filed a second amended proof of claim on June 17, 2021.  ("Claim No. 3-3").

---

[11]       The Debtor also moved into evidence Ex. Debtor-36.  That exhibit is the monthly statement Fay Servicing sent the Debtor in May 2022.  Like the other monthly statements, the amount currently due included unpaid interest at the non-default rate.

       All but the first two (2) of these statements were sent after the Debtor commenced this bankruptcy case.  None of the statements include a disclaimer that the amounts referenced are provided solely for informational purposes and not as an attempt to collect a debt.  Therefore, Fay Servicing may have violated the automatic stay by sending them.  See 11 U.S.C. §362(a).  Other than sending these notices, Fay Servicing took no overt action to collect the prepetition debt.  Presumably then, the Debtor treated the notices as provided for informational purposes only.

[12]       In this calculation, I have excluded $250.00 in charges found on Ex. Fay Servicing-17 for payments made to a tax vendor.  (See N.T. 6/2/22, at 185-86).

65. Claim No. 3-3 increased the amounts of the prior filed proofs of claim[13] by including, <u>inter alia</u>, additional amounts for interest at the default rate and for reimbursing the Lender for amounts advanced to pay real estate taxes, resulting in a total claim of $9,364,235.24 and an amount necessary to effect a cure of $1,118,213.35.[14]

66. As of June 2, 2022, the Debtor had approximately $147,000.00 in its account.  (N.T. 6/2/22, at 75) (Doc. # 282).

67. As of June 2, 2022, the Puleos had approximately $37,000.00 in the separate account they maintained for operating and managing the Puleo Properties.  (<u>Id.</u>).[15]

68. The Reunion refinancing transaction is conditioned upon the satisfaction of the Fay Servicing mortgage on the Puleo Properties.  (Ex. Debtor-41).

---

[13]    In the interim, on April 6, 2021, Fay Servicing filed an amended proof of claim (Claim No. 3-2). Like Claim No. 3-1, the payoff and cure amounts were based on interest assessed at the non-default rate.

[14]    Other than for the fact that Claim No. 3-3 included a demand for payment of interest at the default rate of 23% and reimbursement of real estate tax payments advanced, the precise amounts of the total claim and cure claim set forth in the proof of claim are not especially relevant.  The proof of claim properly calculated these amounts as of the bankruptcy petition date, almost sixteen (16) months before the confirmation hearing.  For the Debtor to effect a cure, the Debtor also must pay all amounts that fell due under the Loan postpetition, an amount hotly disputed by the parties.  The dispute is further discussed in Part V., <u>infra</u>.

[15]    Mr. Puleo testified that these amounts totaled $215,000.00.  Based on his testimony regarding the amounts in each account, it appears that the amounts total only approximately $185,000.00.  (N.T. 6/2/22, at 74).  The difference probably is immaterial.

## IV.   THE FOURTH AMENDED PLAN

As filed on March 3, 2022, the Plan has four (4) classes of claims.

Class 1 is Fay Servicing's secured claim of $6,539,100.00.  The Plan provides for Class 1 very simply: the Debtor will surrender to Fay Servicing all of the real properties that secure the claim in full satisfaction of the secured claim.

Class 2 is Fay Servicing's bifurcated, unsecured claim of $2,844,365.00.  According to Fay Servicing's proof of claim, the amount necessary to cure the alleged default is $1,118,213.35.  The Plan states that the cure amount is disputed.  But once determined, the Plan provides that the default will be cured by:

- applying the amounts paid to U.S. Bank during the pendency of this bankruptcy ("the Postpetition Proceeds"); and

- if the Postpetition Proceeds are insufficient to effect the cure, the Debtor or the Puleos will complete the cure.

Further, after the cure has been effected, the Debtor will continue to make payments as set forth in the Note on the outstanding balance at the non-default 8% rate.

Class 3 consists of allowed general unsecured claims (other than Fay Servicing's unsecured claim).  Like the third amended plan, the Plan provides for full payment of Class 3 claim.  But compared to the third amended plan, the Plan modifies the treatment of Class 3 by increasing the term of the payout (in quarterly payments) from one (1) year to two (2) years.[16]

---

[16]     None of the parties commented on this change in treatment.  Arguably, it is a material change that precludes confirmation of the Plan without further disclosure and re-voting.  I suspect that if the Plan were otherwise confirmable, the Debtor would offer to amend it to revert to the treatment in the third amended plan.  Since the Plan cannot be confirmed, this issue need not be considered further.

## V.  THE DEBTOR'S POSITION

The Debtor contends that its proposed treatment of Fay Servicing's claims comports with

the requirements of the Bankruptcy Code and therefore, the Plan is confirmable.

### A.  The Proposed Cure

### 1.  effecting the cure: two (2) scenarios

Fay Servicing asserts that the amount necessary to cure the existing default, as of May

16, 2022, is $3,219,363.97.  (Ex. Fay Servicing-16).[17]  Fay itemizes this amount as follows:

| | |
|---|---|
| Interest at non-default rate: | $1,012,695.64[18] |
| Default interest: | $1,858,529.08[19] |
| Tax advances: | $  448,828.29[20] |

---

[17]    Fay Servicing asserts that the total claim, as of May 16, 2022, is $10,148,658.50, itemized as follows:

| | |
|---|---|
| Principal balance | $6,904,742.53 |
| Interest at non-default rate | $1,037,247.64 |
| Default rate interest | $1,858,529.08 |
| Tax advances | $  448,828.29 |
| Corporate advances, including legal fees | $  200,647.60 |
| Late charges | $      5,350.00 |
| Prepayment charges | $      8,313.36 |
| Unapplied funds (credit) | $  315,000.00 |
| **Total** | **$10,148,658.50** |

[18]    The Debtor breaks this figure down into its prepetition ($390,549.27) and postpetition ($622,146.37) components.  (Debtor Post-Hearing Brief at 3-4) (Doc. # 281).

[19]    The Debtor breaks this figure down into its prepetition ($631,968.75) and postpetition ($1,226,560.33) components.  (Id.).

[20]    The Debtor breaks this figure down into its prepetition ($329,547.62) and postpetition ($119,280.67) components.  (Id.).

| | |
|---|---|
| Corporate advances: | $ 200,647.60[21] |
| Late charges: | $   5,350.00 |
| Prepayment penalties | $   8,313.36 |
| Unapplied funds (credit) | $   315,000.00 |
| **TOTAL:** | **$ 3,219,363.97** |

The Debtor contends the cure amount is much less because several components in Fay Servicing's itemization should not be allowed.  The Debtor then presents two (2) alternative cure scenarios to carry out the treatment proposed in the Plan.  As explained below, the amount necessary to effect the cure differs, depending on which scenario is carried out.

In the first scenario, the Debtor will reallocate the Release Price Payments in satisfaction of the existing default, rather than having the payments applied to the principal as provided in the Mortgage.  See Finding of Fact No. 13.  Then, using the default date of August 2020 (and assuming that the Plan becomes effective in July 2022), the Debtor posits that there are twenty-three (23) monthly payments in default and calculates the amount necessary to cure as $1,230,500.00 (23 months x $53,500.00).[22]  If reallocation of the Release Price Payments is permitted, the Debtor calculates that the adequate protection payments made to Fay Servicing ($368,500) plus the Release Price Payments ($1,060,007.00), which total $1,428,507.00, are more than enough to cure the $1,230,500.00 default, leaving money left over to reduce the

---

[21]     The Debtor calculates that most of this amount ($192,105.00) represents postpetition corporate advances, mostly for attorney's fees.  (Id.).

[22]     Debtor made half-payments of $26,750 during the two forbearance periods.  Upon receipt of payments that totaled a contractual monthly payment of $53,500.00, Fay Servicing advanced the default date one month.  Upon completion of the forbearance periods, Fay Servicing determined the default date was then August 2020. (See (Ex. Fay Servicing-9; Debtor's Post-Hearing Brief at 7 n.1).

remaining principal on the loan. The Debtor calculates that this principal reduction is approximately $243,000.00. (Debtor's Post-Hearing Brief at 5).

In describing a second scenario, which is necessary if the court accepts Fay Servicing's position that the Release Price Payments must be applied to reduce principal (as stated in the Mortgage) and may not be reallocated to effect the cure, the Debtor points out that the principal reduction resulting from the application of the Release Price Payments to loan principal reduces the monthly payments of the loan that are in default. The Debtor then calculates that the monthly payment is $46,031.62 per month, based on the non-default interest rate. This reduces the amount necessary to cure to $1,058,727.26 (23 months x $46,031.62 per month).[23] Using the adequate protection payments (which the Debtor states amounts to $413,500.00, including the June 2020 payment, unpaid as of the confirmation hearing),[24] the present funds in the Debtor's

---

[23]    To some degree, in calculating the default in this fashion, the Debtor is painting with a broad brush. Fay Servicing did not receive the Release Price Payments at the very beginning of the default. The properties were sold at two (2) distinct points in time, months after the default. Thus, there are a number of months in the default period in which the monthly payment required by the Note exceeded $43,061.62. I presume that the Debtor maintains that the proceeds from the Puleo Properties refinancing contributed to the Debtor by the Puleos can make up the difference.

Fay Servicing makes this same point in its post-hearing brief. Fay Servicing asserts that the amount necessary to cure, $1,170,752.90, is calculated as follows:

|  |  |
|---|---|
| August, 2020 -- October, 2021:<br>(i.e. 15 months times $53,500.00 per month). | $ 802,500.00 |
| November, 2021 - June-2022:<br>(i.e. 8 months times $46,031.62 per month) | $ 368,252.96 |
| **TOTAL** | **$1,170,752.90** |

(Fay Servicing Brief at 41-44).

[24]    Fay Servicing asserts that the amount is overstated by $53,500.00 because it (erroneously) applied $53,500.00 payment made on February 21, 2021, to the principal. Fay Servicing states that if the payment is reallocated as an adequate protection payment, then the outstanding principal would have to increase by a corresponding amount. (Fay Servicing Brief at 41-42).

and the Puleos' accounts (between $185,000.00 and $215,000.00, see Finding of Fact Nos. 66-

67 & n.15, supra) and some portion of the proceeds expected to be generated by the refinancing

of the Puleo Properties, the Debtor maintains that there is more than enough money to cure the

default.

Quite conspicuously, the Debtor's cure analysis posits that Fay Servicing is entitled to

receive neither the default rate of interest provided in the Note ($1,858,529.08), reimbursement

of real estate taxes that it advanced ($448,828.29), nor attorney's fees Fay Servicing has incurred

(approximately $190,000.00).  The confirmability of the Plan depends on a Debtor-favorable

resolution of the dispute regarding these issues, to be discussed in Part VII, infra.


## 2.   performance after the cure

The Debtor accurately points out that if the existing default is cured, the Plan provides for

the Debtor to continue to perform its payment obligations under the Note.  To evaluate the

feasibility of this approach, it is necessary to determine the unpaid balance of the debt after the

cure has been effected because, (as an "interest only loan"), the unpaid principal balance,

determines the ongoing monthly payment and the income sources available to service the debt.

The Debtor contends that once the cure is effected, it has the ability to perform its

obligations under the Note — even though it will have surrendered all of its income producing

assets.

In its analysis, the Debtor starts by providing its calculation of the principal balance

following a cure of the existing default under both cure scenarios.

Under the first cure scenario (i.e., reallocation of the Release Price Payments), the Debtor

asserts that the adequate protection payments plus Release Prices will pay the cure amount in

full, with $243,007.47 left over to pay down the principal.  The Debtor calculates that this additional principal reduction, along with a credit for the surrender value of the Lewisberry Properties, leaves a remaining claim of $1,242,892.58.

Under the second payoff scenario, (where the Release Price Payments are not reallocated and the cure is funded in another way), the Debtor maintains that the application of the Release Price Payments to loan principal reduces Fay Servicing's claim to $821,791.80.  The Debtor reduces this amount further by $413,500.00 in adequate protection payments (including the June 2022 payment, unpaid as of the confirmation hearing), resulting in a remaining balance of $408,291.80.

Following the cure, the Debtor posits that at the reduced principal, payable at the non-default 8% interest rate, even the higher unpaid loan balance of $1,242,892.58 requires a monthly interest payment of only $8,285.95.[25]  The Debtor contends that the net income projections of the Puleo Properties, offered as a "new value" contribution to the Debtor,[26] easily can support this level of debt service.  (See Debtor Ex. 24; N.T., 6/2/22, at 68-70).


**B.      Reduction of the Amount Necessary to Cure the Default**

The Debtor disputes its obligation to pay three (3) components of the amount that Fay Servicing asserts must be paid to effect a cure of the existing default: default interest,

---

[25]      The Debtor did not provide the calculation, but if the unpaid balance of the loan is $408,291.80, the monthly interest payment would be $2,721.95.

[26]      The "new value" concept, a term of art, sometimes is employed when a debtor seeks to confirm a plan under 11 U.S.C. §1129(b).  For a general discussion of "new value", see Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444-54 (1999); In re Haskell Dawes, Inc., 199 B.R. 867, 871–79 (Bankr. E.D. Pa. 1996).

reimbursement for taxes advanced by Fay Servicing and payment of Fay Servicing's attorney's fees.[27]  I discuss each dispute below.

### 1.  Default Interest

The Debtor offers three (3) arguments in support of its position that it is not required to pay interest at the default rate in curing the existing default

First, the Debtor cites 11 U.S.C. §1124(2) and some supporting case law for the propositions that the Code section: (a) allows the debtor to be placed in its pre-default status for all purposes under the contract; (b) the consequences of default for purposes of cure are not limited to acceleration; and (c) the cure nullifies all consequences of default, including default penalties such as higher interest.  See, e.g., In re Se. Co., 868 F.2d 335, 338 (9th Cir. 1989); Brody v. Geared Equity, LLC, 2014 WL 4090549, at *3 (D. Ariz. Aug. 6, 2014).

Next, the Debtor contends that Fay's own loan administration policies support the Debtor's position.  The Debtor interprets the testimony of one of Fay Servicing's witness to mean that when late payments are made, they are applied to advance the due date and eliminate default interest due for that month.

Third, the Debtor argues that Fay Servicing has waived or is estopped from demanding default interest based on its prior conduct — specifically, sending monthly statements and filing two (2) proofs of claim that did not demand default interest.

---

[27]     There is a fourth dispute regarding a prepayment penalty.  But the amount involved is relatively de minimis: $8,313.36.

## 2. Reimbursement for Taxes Advanced by Fay Servicing

The Debtor's primary argument that it has no obligation to reimburse Fay Servicing for the $448,828.29 in real estate taxes Fay Servicing advanced is based on the terms of the Mortgage.[28]

Based on §2.10 of the Mortgage, the Debtor contends that the loan is a non-escrow loan in which the Debtor is responsible for payments of taxes and Fay Servicing may make the tax payments and demand reimbursement only if the taxes are fifteen (15) days past the date they may be paid without penalty.[29]   The Debtor suggests that the record demonstrates that Fay Servicing only advanced taxes prior to this contractually-allowed date and having acted in contravention of its contractual rights, it has no right to demand reimbursement.

## 3. Fay Servicing's Attorney's Fees

The Debtor does not dispute that the Loan Documents obligate the Debtor to reimburse the Lender for attorney's fees the Lender incurs in enforcing its rights after a default.  The Debtor nonetheless contends that Fay Servicing has not established its entitlement to allowance of the amounts requested.

---

[28]    The Debtor also argues that it does not have an obligation to make this payment because the duty to reimburse is found in the Mortgage, not the Note.  Little discussion is required to reject this argument. Based on the record presented, I find that the various documents comprising the Loan Documents were all executed as part of single loan transaction.  This is clear from a fair reading of the parties' Loan and Security Agreement, which references both the Note and the Mortgage.  (Ex. Fay Servicing-1).  It follows that all of the Loan Documents should be given their effect.  See generally In re Green Goblin, Inc., 470 B.R. 739, 753 (Bankr. E.D. Pa. 2012), aff'd, 2014 WL 5800601 (E.D. Pa. Nov. 6, 2014) (where a writing refers to another document, that other document, is to be interpreted as part of the writing).

[29]    Section 2.10 of the Mortgage establishes escrow procedures, but then states that the Lender will not invoke this provision so long as the loan is not in default.

Initially, the Debtor points out that Fay Servicing's supporting exhibit (Ex. Debtor-40) has time records for only $155,507.50 in attorney fees and costs, even though Fay Servicing's payoff statement (Ex. Fay Servicing-16) demands in excess of $200,000.00 for corporate advances.  The Debtor's view is that all amounts above $155,507.50 are not supported by any evidence.

The Debtor then challenges the allowability of the attorney's fees because the time records:

- document the requested attorney's fees by "block billing," (i.e., single time entries describing multiple tasks performed);

- contain redactions that the Debtor asserts make it impossible to assess the reasonableness of the fees requested; and

- include services that are not reimbursable (postpetition acceleration of the Note in connection with collection efforts against the Puleos as guarantors, in violation of the automatic stay).

## VI. FAY SERVICING'S POSITION

Throughout this case, Fay Servicing has tolerated and participated, grudgingly, in the ongoing reorganization effort.  Now that the case finally has reached the confirmation stage, Fay Servicing vigorously objects to confirmation of the Debtor's plan.

Fay Servicing asserts that the Debtor's reorganization theory is factually and legally flawed for a host of reasons that may be summarized as follows.

- The proposed cure is grossly understated because the various arguments advanced by the Debtor are legally or factually flawed and the proposed cure fails to provide payment of:

  - accrued interest at the default rate;

  - reimbursement for the real estate tax payments advanced by Fay Servicing; and

26

- attorney's fees incurred by Fay Servicing;[30]

- The proposed cure impairs Fay Servicing within the meaning of 11 U.S.C. §1124(2) (thereby providing Fay Servicing with a right to vote against the Plan).

- The Class 3 unsecured creditor class has been artificially impaired, in order to create an accepting impaired class as required for confirmation by 11 U.S.C. §1129(a)(10).

- The Plan provision reallocating the Release Price Payments from reduction of principal in order to effect the cure is inconsistent with the Mortgage, in violation of 11 U.S.C. §§1123(d) and 1124(2)(E);

- The Plan cannot be confirmed under §1129(b) because Fay Servicing, in its unsecured class status, rejected the Plan and the proposed new value contribution is invalid;[31]

---

[30]    Fay Servicing also references the failure to provide for payment of the de minimis prepayment penalty. See n.27, supra.

[31]    After the cure is effected, the Debtor's continuing performance of its repayment obligations under the Loan requires an ongoing contribution from the Puleos, derived from rents and the net revenue generated by the Puleo Properties. This is the "new value" contribution.

The Debtor's position is that resort to §1129(b) is unnecessary because Fay Servicing's claims are unimpaired and that, even if Fay Servicing's unsecured claim is impaired, the Plan may be confirmed under §1129(b) over Fay Servicing's rejection of the Plan (as an unsecured creditor) based on the Puleos' "new value" contribution.

Under the §1129(b) scenario, Fay Servicing argues that the Puleos have already assigned the rents from the Puleo Properties to Fay Servicing by absolute assignment, (see Ex. Fay Servicing-6) and that Fay Servicing has taken steps to enforce the assignment, (see Ex. Fay Servicing-8). Thus, Fay Servicing contends that the Puleos lack the authority to contribute rents to the Debtor. Fay Servicing also argues that because the rents already belong to Fay Servicing there is no "new" value being provided to Fay Servicing. Finally, Fay Servicing argues that, because the Debtor is not providing any consideration to the Puleos in return for the contribution, the transaction would be avoidable as a fraudulent transfer.

At the confirmation hearing, I asked whether Fay Servicing would be obliged to reverse the enforcement of the rent assignment, enabling the Puleos to make the proposed contribution to the Debtor, after a cure of the default has been effected through the Plan. (N.T. 6/2/22, at 26-27). The Debtor did not address the issue in its post-hearing brief. Fay Servicing did, taking the position, not surprisingly, that a cure would not affect the continuing validity and effect of the perfected rent demand based on the absolute assignment.

As I decide this matter on other grounds, I do not reach this issue.

- The Plan was not filed in good faith.

## VII.  DISCUSSION

### A.  Introduction

As the lengthy recitation above illustrates, the parties have thoughtfully debated a host of issues under both bankruptcy and non-bankruptcy law.  Also, the confirmation analysis is complicated by a couple of forks in the road, depending upon whether the Debtor may reallocate the Release Price Payments from reduction of principal to cure the default and whether Fay Servicing's unsecured claim is considered impaired or not impaired.

In the end, however, my ruling on the confirmability of the Plan turns on whether the Debtor can establish that the cure amount asserted by Fay Servicing — $ 3,219,363.97 — is vastly overstated and that the correct amount is (or, at least is much closer to) $1,230,500.00 (if the Release Price Payments are reallocated to effect the cure) or $1,058,727.26 (if the Release Price Payments are not reallocated).  The Debtor has not put forward any argument that there is a viable path to confirmation otherwise.

As explained below, I conclude that Fay Servicing's $3.2 million cure demand is supported by the parties' agreement, the law, and the factual record.  There is no valid basis to reduce the cure demand to the roughly $1.0 million or $1.2 million the Debtor proposes to pay to cure the default.  The Debtor has not presented any evidence to suggest that it can fund payment of the amount necessary to cure the default.  Consequently, the Debtor lacks the funding needed to effectuate the Plan, the Plan is infeasible and cannot be confirmed.[32]

---

[32]   While I do not reach the other grounds raised in Fay Servicing's objection to confirmation, there is another aspect of the plan's infeasibility that precludes confirmation, at least in connection with one (1)
*(Footnote continued next page)*

### B. Interest at the Default Rate

### 1. the Bankruptcy Code provisions

As stated earlier, the Debtor has cited some case law for the proposition that, because the purpose of a cure under 11 U.S.C. §1124(2) is to restore the Debtor to the status quo before the default, the amount tendered to effect the cure need not include the default interest triggered by the default.

After reviewing the case law cited by Fay Servicing in its response, I find Fay Servicing's position to be correct. A debtor must cure the default based on the terms of the contract that are in effect after the default has taken place and at the time the cure is tendered. In this case, that means that interest at the default rate has been running since the default occurred. This legal principle is expressed in 11 U.S.C. §1123(d), which states, in pertinent part: that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."

Thus, §1123(d) addresses **how a cure is effected**, i.e., by following the terms of the parties' contract and applicable nonbankruptcy law, while §1124(2) governs **the effect of a cure**,

---

of the proposed paths to confirmation. This flaw was discussed briefly at the confirmation hearing, (N.T. 6/2/22, at 10-18), but was not discussed in the briefs.

If the Release Price Payments are not reallocated to effect the cure, the cure is dependent upon the Debtor using  some of the Reunion refinancing transaction proceeds from the Puleo Properties. Such a cure will leave a balance owing on the debt (which is why the Puleos are contributing the net rents from the Puleo Properties to the Debtor, allowing the Debtor to pay the balance of the debt over time).

The flaw in this approach is that the cure will leave a balance owing on the Loan. With the Loan not fully paid, Fay Servicing will have no obligation to release its collateral mortgage on the Puleo Properties. That will preclude the refinancing from taking place because the refinancing transaction is conditioned upon the satisfaction of the Fay Servicing mortgage on the Puleo Properties. See Finding of Fact No. 68.

In other words, if the Release Price Payments are not reallocated, the cure cannot be affected because the Debtor requires proceeds from the refinancing of the Puleo Properties and that refinancing cannot take place without full satisfaction of the Loan on the effective date of the Plan.

i.e., the reinstatement of the account by reversing the acceleration of the debt and reinstating the original, contractual maturity date of such claim.  Reading these two (2) provisions together, I fail to see a federal bankruptcy right to modify a creditor's contractual right to collect default interest otherwise collectible under the parties' loan contract.

As Fay Servicing points out, all of the cases cited by the Debtor are from the Ninth Circuit and are based on a 1988 Court of Appeals decision, Great Western Bank v. Entz-White Lumber Supply, 850 F.2d 1338 (9th Cir. 1988), and that decision is no longer good law, even in the Ninth Circuit.  See In re New Invs., Inc., 840 F.3d 1137, 1141 (9th Cir. 2016) ("The plain language of §1123(d) compels the holding that a debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure").

Further, as Fay Servicing also points out, there are a number of reported decisions holding that a debtor curing a prepetition default must pay interest at the default rate provided in the parties' contract.  See In re Sagamore Partners, Ltd., 620 Fed. Appx. 864, 869 (11th Cir. 2015); In re Moshe, 567 B.R. 438, 444–45 (Bankr. E.D.N.Y. 2017); In re 1 Ashbury Court Partners, L.L.C., 2011 WL 4712010, at *4-5 (Bankr. D. Kan. Oct. 5, 2011); In re Moody Nat'l SHS Houston H, LLC, 426 B.R. 667, 674-76 (Bankr. S.D. Tex. 2010).

I do not see any reason to deviate from the prevailing view on the issue.

Finally, there is some case law suggesting that, notwithstanding 11 U.S.C. §1123(d), in some circumstances, a bankruptcy court might disallow some or all the default interest provided by the parties' contract.  For example, in In re 1111 Myrtle Ave. Grp., LLC, 598 B.R. 729, 736 (Bankr. S.D.N.Y. 2019) (collecting cases), the court observed that the allowance of default rate of interest can be adjusted based on equitable considerations.  But the court cautioned that the court's equity power should be exercised sparingly and limited to situations where the secured

creditor is guilty of misconduct.  If such equitable power exists, nothing in the record before me

warrants its use and, in my discretion, I decline to do so.

### 2.    equitable estoppel

The Debtor's argument that Fay Servicing should be estopped from asserting its claim for

default interest is unconvincing.

The Debtor invokes the doctrine of equitable estoppel.[33]

A party may be estopped from pursuing a claim or defense where: (1) the party to be

estopped makes a misrepresentation of fact to the other party with reason to believe that the other

party will rely upon it; (2) the other party reasonably relies upon it; (3) to his or her detriment.

See, e.g., Richetti v. Saks Fifth Ave., 2013 WL 3802476, at *8 (W.D. Pa. July 18, 2013) (citing

United States v. Asmar, 827 F.2d 907, 912 (3ᵈ Cir.1987)); see also Gibbs ex rel. Gibbs v.

Carnival Cruise Lines, 314 F.3d 125, 133 (3ᵈ Cir. 2002).

Based on the evidence, I conclude that the Debtor has not established elements (2) or (3).

Undoubtedly, Fay Servicing sent monthly statements to the Debtor that incorrectly

indicated that ordinary interest (8%) was running on the delinquent account.  Also, while the

October 20, 2020 and January 19, 2021 demand letters calculated the delinquency and payoff

based on the default interest rate, nothing in those letters made that explicit.

---

[33]     There are different estoppel doctrines, such as promissory estoppel, judicial estoppel and
equitable estoppel.  See R.J. Longo Const. Co. v. Transit Am., Inc., 921 F.Supp. 1295, 1305, 1312-13
(D.N.J. 1996).  There is also collateral estoppel (issue preclusion), which clearly is not relevant here.

In support of its argument, the Debtor has cited Kosakow v. New Rochelle Radiology Assocs.,
P.C., 274 F.3d 706, 725 (2d Cir. 2001), a case primarily involving the application of equitable estoppel in
federal court.  Thus, I understand the Debtor to be asserting an equitable estoppel defense against Fay
Servicing's claim for default interest.

Nevertheless, the best that can be said is that the Debtor received two (2)

communications from Fay Servicing in January 2021.  One of them (the monthly statement)

stated that the delinquency was $475,013.97, (Ex. Debtor-15), and the other (the January 21,

2021 demand letter) stated that the delinquency was $1,224,584.00, (Ex. Fay Servicing-13).  If

nothing else, this contradiction put the Debtor on some kind of inquiry notice regarding the status

of the account.

In this regard, it is telling that the Debtor failed to offered any evidence of any action (or

inaction) it took in reliance on the monthly statements or any prejudice that it suffered.

Nor do I find it significant that Fay Servicing's first two (2) proofs of claim filed in the

bankruptcy case neglected to include default interest.  The right of a creditor to amend a proof of

claim is well established.  In re Hibble, 371 B.R. 730, 736-37 (Bankr. E.D. Pa. 2007); In re

Oscar, 2005 WL 6522763, at *5-6 (Bankr. E.D. Pa. Apr. 14, 2005).

At most, the right to amend is subject to the doctrine of laches, a legal "cousin" to

equitable estoppel  and a doctrine that also requires a showing of prejudice.  See, e.g., E.E.O.C.

v. Great Atl. & Pac. Tea Co., 735 F.2d 69, 80 (3$^{d}$ Cir. 1984).

Here, as early as June 2, 2021, Fay Servicing's counsel acknowledged the existence of

the dispute regarding the assessment of interest at the default rate in open court.  (See N.T.,

4/8/21, at 10-11) (Doc. # 273).  It seems more likely than not that the subject was discussed by

the parties even before that date.  Thus, it is difficult to understand how the Debtor relied on or

was prejudiced by filing of the first two (2) proofs of claim.[34]

---

[34]     In a related argument, the Debtor invokes the doctrine of quasi-estoppel.  Under both New York
and federal law, that doctrine precludes a party from asserting a position that is inconsistent with a
previously-held position.  It does not necessarily require a showing of prejudice but is invoked only to
prevent an unconscionable result.  See 631 N. Broad St., LP v. Commonwealth Land Title Ins. Co., 778
Fed. App'x 164, 166 n.4 (3$^{d}$ Cir. 2019) (citing Sheehan v. Mellon Bank, N.A., 1996 WL 571779, at *6
*(Footnote continued next page)*

### 3.  waiver

The Debtor contends that, under applicable law, a right is prospectively waived after a course of conduct that is so inconsistent with a contract right as to leave no opportunity for a reasonable inference to the contrary. A sufficient deviation from the contract rights, even if it does not meet this exacting standard, can serve to waive retrospective rights.[35]

This argument fails for the same reason as I discussed in connection with the Debtor's equitable estoppel argument.  Given the issuance of the two (2) demand letters, one (1) in October 2020 and the other in January 2021, I do not perceive a course of conduct inconsistent with the terms of the written contract between the parties.

### 4.  Fay Servicing's servicing practices

The Debtor contends, based on the testimony of a Fay Servicing witness, Michael Paterno, that, based on Fay Servicing's servicing practices, default interest need not to be paid. The Debtor interprets Mr. Paterno's testimony to mean that "when incremental payments are made to Fay, they are applied to advance the due date and eliminate default interest due for that

---

(E.D. Pa. Oct. 3, 1996)); In re Nw. Bay Partners, LTD., 2021 WL 1658019, at *11 (Bankr. N.D.N.Y. Apr. 27, 2021); In re Price, 361 B.R. 68, 78-79 (Bankr. D.N.J. 2007).

In the circumstances presented here, I do not find that the allowance of default interest to Fay Servicing would be an unconscionable result.

[35]    The Debtor appears to assume, without explaining why, that the parties' contract is governed by the law of the State of New York and cites Kamco Supply Corp. v. On the Right Track, LLC, 149 A.D.3d 275, 283-84, 49 N.Y.S.3d 721, 728-29 (App. Div. 2017) and Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37 (N.Y. 1917) for the propositions cited in the text.

Based on a cursory review of the Loan Documents, the Debtor is likely correct about the applicability of New York law as the Loan Agreement, the Note, and Mortgage all contain choice of law provisions designating New York.  In any event, Fay Servicing does not appear to dispute this point.

month." (Debtor's Post-Hearing Brief at 13). Thus, according to the Debtor, upon payment of the cure amount, the due date is advanced to the present and all default interest is eliminated.[36]

Fay Servicing responds that the Debtor has mischaracterized Mr. Paterno's testimony. I agree.

As I understood the testimony, Mr. Paterno explained that when payments are made *during a forbearance period*, the payments advance the due date without the imposition of default interest for payments made during that period. However, once the forbearance period is over, unless the loan was fully reinstated during the forbearance period, all interest, including default rate interest, is then owed.

This testimony does not support the conclusion that Fay Servicing's actual practices deviated from the parties' contract so substantially as to preclude Fay Servicing from demanding payment of the default interest that has accrued while the Loan has been in default under any theory of contract. See nn.34 and 36, supra.

## C. Reimbursement of Fay Servicing's Tax Advances

As stated earlier, relying on §2.10 of the Mortgage, the Debtor contends that the loan is a non-escrow loan in which the Debtor is responsible for payments of taxes and Fay Servicing may make the tax payments and demand reimbursement only if the taxes are fifteen (15) days past the

---

[36]    Without saying so explicitly, the Debtor may be arguing that Fay Servicing's alleged conduct should be employed in determining the meaning of the parties' contract. See Restatement (Second) of Contracts § 202(g) (1981). Or perhaps, the Debtor is arguing that the contract was modified by subsequent conduct. See, e.g., Kaplan v. Old Mut. PLC, 526 F. App'x 70, 72 (2d Cir. 2013) (Under New York law, "parties may modify a contract by another agreement, by course of performance, or by conduct amounting to waiver or estoppel.") (citations omitted); Penn Mut. Life Ins. Co. v. Bank of New England Corp., 756 F. Supp. 856, 858 (E.D. Pa. 1991) (applying Pennsylvania law); In re Seegrid Corp., 560 B.R. 93, 101 (Bankr. D. Del. 2016) (Pennsylvania contract law recognizes that a contractual arrangement may be modified by subsequent conduct ).

date the taxes may be paid without penalty.  The Debtor contends that Fay Servicing advanced taxes prior to their due date, leaving it without any right to demand reimbursement.

Fay Servicing responds by arguing that: (1) the Mortgage clearly authorizes Fay Servicing to demand reimbursement of the taxes it advanced in this case; (2) the Debtor is incorrect in suggesting that all of the tax payments were made prior to their due date (relying on documents attached to its brief as to which it requests that the court take judicial notice); and (3) it would be inequitable to permit Debtor to retain the benefit (a windfall, as depicted by Fay Servicing) of Fay Servicing's tax advances without repayment.

I need only consider the first of these arguments.  I conclude that, under the express terms of the Mortgage, the Debtor is obliged to reimburse Fay Servicing for the tax advances made in this case.

All of the tax advances were made after April 2020, after the loan went into default. (See Ex. Fay Servicing-16).  Section 3.01(a)(ii) of the Mortgage states, in pertinent part, that upon default, the Lender:

> may institute an action of mortgage foreclosure against the Property, or take such other action at law or in equity for the enforcement of this Mortgage and realization on the mortgage security or any other security herein or elsewhere provided for, as the law may allow  .  .  . including all sums which may have been loaned by Mortgagee to Mortgagor after the date of this Mortgage, **and all sums which may have been advanced by Mortgagee for Taxes**, payments on Liens, insurance premiums, utilities or repairs to the Property and other sums which Mortgagee is permitted to advance pursuant to the terms of this Mortgage  .  .  .  .

(See Ex. Fay-Servicing-3).

As Fay Servicing correctly points out, this provision, which is located in the "Remedies" section of the Mortgage and governs the rights of the parties after a default, authorizes the Lender to demand payment of all amounts advanced for payment of taxes without regard to the

taxes' due date.  In effect, this provision gives the Lender the discretion, after a default, to pay real estate taxes without regard to the other provisions of the Mortgage.

### D.  Fay Servicing's Attorney's Fees

Fay Services has included as part of the cure demand $200,547.60 in corporate advances. This amount includes attorney's fees incurred by Fay Servicing since May 2020 in connection with this bankruptcy case.  (See Fay Servicing Ex. 22).  Although the Debtor depicts the supporting evidence provided by Fay Servicing as documenting only $155,507.50 in attorney's fees, the Debtor has not acknowledged the invoice dated May 23, 2022, included in Ex. Fay Servicing-22.  Taking that invoice into account the documented attorney's fees total $184,335.00.

While there may be a gap of roughly $15,000.00 between the total corporate advances, I note that the time records in Ex. Fay Servicing-22 run only through April 28, 2022.  In light of Fay Servicing's counsel's necessary preparation time for the all-day June 2, 2022 confirmation hearing, his carefully researched and detailed post-hearing brief, and his reasonable hourly rate ($325/hour), I have no doubt that the attorney's fees incurred since April 28, 2022 make up or exceed that $15,000.00 gap.  Thus, I am satisfied that the amount of the corporate advances included in Fay Servicing's cure demand are satisfactorily documented.

I also reject the Debtor's other arguments (i.e., block billing, undue redactions, non-reimbursable services) against allowance of the attorney's fees as part of Fay Servicing's cure claim.

In other contexts, these objections may have some force.  But in this case, which has been hotly contested, with numerous in-court hearings that have given me the opportunity to regularly

observe the work product of Fay Servicing's counsel, I am satisfied that none of the asserted

deficiencies prevent an assessment regarding the reasonableness of the fees.  The time records

are sufficiently detailed and permit me to evaluate whether the time expended for particular

matters was reasonable, even though tasks are "lumped together" on the time records.  Further,

viewed holistically, my experience presiding in this case leads me to conclude that, in the

aggregate the time expended was reasonable and necessary to conduct discovery, resolve pretrial

disputes, prepare objections to confirmation, prepare for trial, conduct the trial and draft the post-

hearing brief required by the court.

In this case, considerable sums were at stake and several arguably novel legal issues were

implicated. Taking all of these considerations into account, I see no basis to reduce the attorney's

fees being shifted to the Debtor. See In re RGN Group Holdings, Inc., 2022 WL 494154, at *4

(Bankr. D. Del. Feb.17, 2022).


## VIII.   CONCLUSION

For the reasons stated above, I find that the Debtor has failed in its effort to show that Fay

Servicing's payment demand for a cure of the existing default of the Loan is materially

overstated.  The viability of the Plan was dependent on the success of that effort.  Therefore, I

conclude that the Debtor lacks the ability to cure the existing default on Fay Servicing's claim as

proposed in the Plan.  The Plan is not feasible.  Consequently, I will sustain Fay Servicing's

objection to confirmation and deny confirmation of the Plan.

An appropriate order will be entered.

**Date:  July 1, 2022**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**