UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **LEWISBERRY PARTNERS, LLC,** | : | Case No. 21-10327 |
| | : | |
| Debtor. | : | |
| | : | |

**COMBINED MOTION OF LEWISBERRY PARTNERS, LLC, THE REORGANIZED DEBTOR, FOR ENTRY OF AN ORDER (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE;
(II) TO REOPEN CHAPTER 11 BANKRUPTCY CASE PURSUANT TO 11 U.S.C. § 350(b) AND RULE 5010 OF THE FEDERAL RULE OF BANKRUPTCY PROCEDURE;
(III) COMPELLING U.S. BANK TRUST NATIONAL ASSOCIATION TO COMPLY WITH THE LOAN DOCUMENTS, THE SETTLEMENT AGREEMENT AND PLAN;
AND (III) GRANTING RELATED RELIEF**

Lewisberry Partners, LLC, the reorganized debtor (the "Debtor" or "Reorganized Debtor"), hereby files this Motion Expedited Consideration, Shortened Time and Limited Notice, (ii) to Reopen the Debtor's bankruptcy case pursuant to 11 U.S.C. § 350(b); (iii) Compelling U.S. Bank Trust National Association to comply with its obligations under its loan documents, the Settlement Agreement and Plan; and (iv) granting related relief (the "Motion"), and in support thereof, respectfully states as follows:

**I.    BACKGROUND**

1.    On January 4, 2019, the Puleos individually purchased twenty (20) improved townhomes (the "Puleo Properties") on Scully Place in in Lewisberry, York County, Pennsylvania.

2.    Thereafter, on June 26, 2019, the Debtor acquired thirty (30) improved townhomes located on Scully Place and Kingswood Drive in Lewisberry, York County,

4893-1063-4372

Pennsylvania (the "Lewisberry Properties") in the community commonly known as Glenbrook Townhomes at Pleasant View.

3. The Debtor acquired the Lewisberry Properties from Eastern Development & Planning, Inc., for a purchase price of Four Million Dollars ($4,000,00.00).

4. The principals of the Debtor, the Puleos, own 82.237% of the Debtor.

5. On June 26, 2019, and in order to fund the purchase of the Lewisberry Properties, Debtor borrowed funds from Loan Funder LLC, Series 7693 ("Loan Funder") in the original principal amount of Eight Million Twenty Five Thousand dollars ($8,025,000.00) (the "Loan") as memorialized in that certain Commercial Promissory Note (the "Note") and that certain Loan and Security Agreement (the "Loan Agreement") each dated June 26, 2019.

6. As security for the Debtor's obligations, also on June 26, 2019, Debtor, as mortgagor, executed and delivered a Purchase Money Mortgage (the "Lewisberry Mortgage") to Loan Funder, as mortgagee, in which the Debtor granted the Loan Funder a first mortgage on the Lewisberry Properties as well as a security interest, *inter alia*, in and to all of its present and future fixtures, rents, profits, and income from the Lewisberry Properties, and Loan Funder has a first lien position on the Lewisberry Properties and the foregoing assets.

7. In addition to the Lewisberry Mortgage and as additional security for the Debtor's obligation to Loan Funder, and also on June 26, 2019, the Puleos, as mortgagors, executed and delivered a Purchase Money Mortgage to Loan Funder, as mortgagee, in which the Puleos granted a first priority mortgage (the "Puleo Mortgage"), the Puleo Properties, and Loan Funder has a first mortgage on the Puleo Properties.

8. On June 26, 2019, Richard Puleo executed a Guaranty in favor of Loan Funder, which guarantees the obligations of the Debtor under the Note and related loan documents (the

2

"Guaranty", which together with the Note, the Loan Agreement, the Lewisberry Mortgage the Puleo Mortgage and all other loan documents executed in connection with any of the foregoing hereafter collectively, the "Loan Documents").

9. In August 2019, servicing was transferred to a new servicer: Fay Servicing LLC ("Fay").

10. During the pendency of the bankruptcy case, the Loan Documents were assigned to Lender. Lender is the successor to all of Loan Funder's rights and duties under the Loan Documents.

11. The Debtor leases certain of the Lewisberry Properties and offers them for sale from time to time.

12. The Puleos lease certain of the Puleo Properties and offer them for sale from time to time.

13. Under the Loan Documents, the Debtor is expressly permitted to sell or refinance individual units of the Lewisberry Properties.

14. Pursuant to Section 2.21(d)(vii) of the Lewisberry Mortgage, the release price for the transfer of any of the individual Lewisberry Properties equals one hundred twenty percent (120%) of the allocated loan amount for each of the Released Properties identified on Exhibit "C" to the Lewisberry Mortgage. A copy of the Lewisberry Mortgage is attached here as Exhibit A and incorporated herein.

15. Prepetition, the Debtor entered into agreements of sale for three (3) of the Lewisberry Properties (the "Real Properties").

16. The Debtor needed confirmation of the release prices to close, but Fay would not provide such confirmation.

17. Frustrated by Fay's failure to communicate or comply with the terms of the Loan Documents, the Debtor went so far as to calculate the release prices for the Real Properties and send them to Fay for confirmation:

    a. 2 Kingswood Drive - $223,177.57;

    b. 8 Kingswood Drive - $218,714.01; and

    c. 16 Kingswood Drive - $223,177.57.

18. Because of Fay's unlawful actions, the closings on the Lewisberry Properties had to be canceled, and the Debtor had to negotiate to extend closing dates.

19. Because of the Lender's repeated delays and breaches of the Loan Documents, on February 9, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and throughout the bankruptcy case, the Debtor continued in possession of its property and is operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

20. No creditors' committee was appointed in this Chapter 11 case by the United States Trustee. No Trustee or examiner has been sought or appointed in the Debtor's Chapter 11 case.

21. After the Petition Date, the Debtor obtained Court approval to sell the Real Properties.

22. On June 30, 2021, the Debtor filed an adversary complaint in the Bankruptcy Court against Loan Funder, Lender, and Roc Capital Holdings LLC, commencing Adversary Case No. 21-52 (ELF) (the "Adversary Proceeding").

23. On June 29, 2021, Lender filed a foreclosure complaint against the Puleos in the Court of Common Pleas of York County, Pennsylvania, commencing Case No. 2021-SU-001374 (the "Foreclosure Proceeding").

24. On March 28, 2022, the Puleos filed counterclaims and cross-claims in the Foreclosure Proceeding.

25. On June 29, 2021, Lender filed a civil action in the Lancaster, Pennsylvania Court of Common Pleas against Richard Puleo seeking recovery on account of his personal Guaranty, commencing Case No. CI-21-04315 (the "Guaranty Proceeding").

26. During the pendency of the bankruptcy case, the Debtor has paid Lender certain adequate protection payments exceeding $400,000.00 (the "Adequate Protection Payments").

27. During the pendency of the bankruptcy case, the Debtor sold five (5) of the Lewisberry Properties pursuant to 11 U.S.C. §363(f). These sales generated $1,060,007.47 in contractual release prices (the "Release Price Proceeds"), which were transferred to Lender.

28. The Debtor proposed a Fourth Amended plan of reorganization (the "Plan") on March 3, 2022. (DI #255). The Plan classified Lender's claim into Class 1 (secured) and Class 2 (unsecured) classes.

29. The Plan also altered the treatment of Class 3 general unsecured creditors, changing their treatment from full payment within a year to full payment within two years.

30. Lender objected to the confirmation of the Plan. The Debtor and Lender participated in a contested confirmation hearing for the Plan on June 2, 2022. On July 1, 2022, the Bankruptcy Court denied confirmation of the Plan.

31. Following the denial of confirmation, the Parties engaged in settlement negotiations entered into a settlement agreement (the "Settlement Agreement"), the terms of

5

which are embodied in the Plan (defined below). A copy of the Settlement Agreement is attached hereto as Exhibit B and incorporated herein.

32. On August 4, 2022, the Bankruptcy Court entered an Order confirming (the "Confirmation Order") the Plan of Reorganization of the Debtor dated March 3, 2022, as amended by the Confirmation Order (the "Plan"). A copy of the Plan is attached hereto as Exhibit C and incorporated herein.

33. The Confirmation Order became a final order, and the Plan's Effective Date occurred, on August 18, 2022, and on November 3, 2022, the Bankruptcy Court entered a final decree closing the case.

34. The Plan and the Settlement Agreement further permitted the Debtor and the Puleos to sell the Lewisberry Properties and the Puleo Properties free and clear of the lien of the Lender's liens pursuant to § 363(b) and (f) of the Bankruptcy Code and without further Bankruptcy Court approval.

35. Over the past year, the Debtor and the Puleos have endeavored to and in fact, have sold six units for a combined sales price of $1,682,000.00, the most recent of which, the sale of the Puleo Property, 130 Scully for a sale price $270,000.00, closed the week prior to the filing of this motion.

36. The Debtor and the Puleos have marketed the Lewisberry Properties and the Puleo Properties; however, were ultimately unable to pay off the Lender's loan by the Maturity Date, August 31, 2023.

37. The Debtor and the Puleos have paid, or will timely pay, all property taxes on the Lewisberry Properties and the Puleo Properties.

38. Pursuant to the Plan and Settlement Agreement, the Debtor and the Puleos gave the Lender fully executed deeds in lieu to all of the remaining properties. In the event of a default under the Settlement Agreement, the Lender has the ability to record as many of the deeds in lieu as is necessary to pay the loan balance in full.

39. The Lender also has the right under the Settlement Agreement to pursue uncontested foreclosure actions to pay off the loan in full. See Exhibit B at section 15.3.

40. Finally, the Settlement Agreement allows the Lender to exercise any right under the Loan Documents. See Exhibit B at section 16.1.

41. To that end, in the event that the parties are unable to fix the amount owed and the value of the Lewisberry Properties and Puleo Properties by agreement, the Settlement Agreement permits the Lender to file a Fair Value Motion in order to establish the value of the Lewisberry Properties and Puleo Properties for the purpose of fixing the number of properties the Lender is entitled to record to satisfy the loan balance. See Exhibit B at 15.2.

42. In connection with attempts to refinance and/or sell the properties in order to repay the debt, the Debtor has requested payoff statements from the Lender on a number of occasions, and on each of those occasions, the Lender, in violation of the Plan, the Settlement Agreement and the Loan Documents, has failed to provide timely and or accurate payoff statements, to the Debtor's detriment.

43. By way of example, which the Debtor will supplement at the hearing on this Motion, after receiving a request for a payoff, the Lender's counsel indicated on October 18, 2023, that a payoff would be transmitted shortly.

44. The payoff requested was not received until more than a month later on November 30, 2023.

45. The Settlement Agreement requires that the Lender must transmit a payoff statement to the Debtor and the Puleos within five (5) days of the request. See Exhibit B at section 11.5.

46. The payoff received by the Debtors was misleading and contained inconsistent statements, leading to further confusion as to what amount was necessary to pay off the loan or whether loan proceeds had been applied to the principal balance of the loan. See Payoff Statement dated November 30, 2023, attached hereto as Exhibit D and incorporated herein.

47. First, the November 30 payoff sets the maturity date as August 1, 2023, a month prior to the actual maturity date set in the Settlement Agreement as August 31, 2023. Upon information and belief, the Lender was charging default rate interest for a month before it could have even called a default. See Exhibit B at section 6 and Exhibit D.

48. In addition, according to the payoff statement the Lender is charging both regular interest at 8% and has a separate line item for default rate interest, which is equal to 23% pursuant to the Loan Documents and the Settlement Agreement. See Exhibit B at section 10.

49. The Lender admitted in the past that it had failed to properly apply proceeds of the sale of one of the properties to the loan balance and that it would correct the error and issue a new statement that showed "the breakdown of how the interest rate and default rate are calculated." See October 6, 2023, e-mail from Lender attached hereto as Exhibit E and incorporated herein.

50. The Lender is now taking the position that it can sit back and do nothing while allowing default interest to accrue, while the Debtor is demanding, and the Plan and Settlement Agreement permit, the Lender to take back a sufficient number of the Lewisberry or Puleo Properties to satisfy the entire indebtedness in full.

51. The value of the properties can be readily established through an appraisal (which the Debtor is in the process of securing) and utilizing the numerous recent sales of nearly identical Puleo and Lewisberry Properties.

52. The Lender is resisting taking any action in bad faith solely to artificially maximize the accrual of default rate interest, all to the great detriment of the Debtor.

53. The Lender has offered no excuse for not taking any action to liquidate its collateral, other than it elected not to record the deeds in lieu the debtor and the Puleos provided to the Lender in accordance with the Settlement Agreement.

54. Most recently, the Lender has wrongfully delayed the sale of the Puleo Property, 130 Scully Place by, *inter alia*, refusing to give the Puleos credit for taxes they paid on that property applicable to the post closing period. The Lender, presumably realizing it was acting in bad faith, ultimately relented, and allowed the Puleos to be reimbursed at closing.

55. However, the Lender has refused to reveal how the loan proceeds from the sale of 130 Scully would be applied.

56. For the foregoing reasons, this Court should open the Bankruptcy Case and compel the Lender to comply with the terms of the Plan and Settlement Agreement.

## II. RELIEF REQUESTED

### A. Opening of the Bankruptcy Case

57. Pursuant to 11 U.S.C. § 350(b), "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." See 11 U.S.C. § 350(b). "A case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the code." Fed. R. Bankr. P. 5010.

58. It is well established that a bankruptcy court has broad discretion in deciding whether to reopen a case. In re Zinchiak, 406 F.3d 214, 223 (3d Cir. 2005); see also Judd v. Wolfe, 78 F.3d 110, 116 (3d Cir. 1996); In re Chalasani, 92 F.3d 1300 (2d Cir. 1996).

59. There are various considerations used by courts when exercising discretion to reopen a case:

> (1) [the] length of time that the case was closed;
>
> (2) whether a non-bankruptcy forum, such as state court, has the ability to determine the issue sought to be posed by the debtor;
>
> (3) whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the parties' rights, post-bankruptcy;
>
> (4) whether any parties would be prejudiced if the case were/were not reopened;
>
> (5) [the] extent of the benefit which the debtor seeks to achieve by reopening; and
>
> (6) whether it [is] clear at the outset that the debtor would not be entitled to any relief after the case was reopened.

In re Janssen, 396 B.R. 624, 634-35 (Bankr. E.D. Pa. 2008) (citation omitted).

60. The decision is generally based upon the circumstances and equities presented by each individual case. In re Antonious, 373 B.R. 400, 405 (Bankr. E.D. Pa. 2007); In re Otto, 311 B.R. 43, 47 (Bankr. E.D. Pa. 2004).

61. The moving party has the burden of demonstrating circumstances sufficient to warrant reopening a case. Antonious, 373 B.R. at 405; Otto, 311 B.R. at 47.

62. Because a bankruptcy court is well suited to interpret and enforce its own order, a bankruptcy court has jurisdiction to reopen a case for these purposes. In re Lazy Days RV Ctr., 724 F.3d 418, 423 (3d Cir 2013).

63. Reopening a bankruptcy case does not grant the movant substantive relief but does provide the movant the opportunity to seek additional relief. Chalasani, 92 F.3d at 1307-08.

64. Here, the Debtor's case has only been closed for a little more than a year and there is no non-bankruptcy forum, such as state court, currently pending that could resolve this dispute.

65. Reopening the Debtor's bankruptcy case to permit this Court to determine whether the Debtor's Motion to Compel is within the Court's jurisdiction.

66. The Bankruptcy Court implicitly retained jurisdiction to "to determine any and all disputes arising under or in connection with the Plan, including, but not limited to, any default remedies granted herein, and the sale of any of the Debtors' assets, collection or recovery of any assets" [see Exhibit "C" at section 8.07] and "retained exclusive jurisdiction to . . . enforce [the Settlement] Agreement and the Parties consent[ed] to the jurisdiction of the Bankruptcy Court over the enforcement of the provisions of [the Settlement] Agreement and the Amended Plan" [see Exhibit "B" at ¶ 22].

67. Here, the Debtor will be severely prejudiced if the Lender is not compelled to comply with and take some action under the Plan and Settlement Agreement.

68. There is nothing in the record that would indicate that the Debtor should not be entitled to any relief after the case was reopened.

69. For the foregoing reasons, this case should be reopened so the Court can hear the Debtor's motion to compel.

**B. The Lender Must be Compelled to Comply with the Settlement Agreement and Plan.**

70. Pursuant to the Loan Documents, New York law applies.

71. It is a settled principle of New York law, under which the Loan Documents are construed, every contract implies a covenant of good faith and fair dealing in the course of performance. This duty encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included and which are not inconsistent with the contract. Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (citing and quoting Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)).

72. "The covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " See Id.

73. To establish a claim for breach of the duty of good faith and fair dealing: "(1) [the] defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2)[the] defendant must breach that duty; and (3) the breach of duty must proximately cause [the] plaintiff's damages." Schwartzco Enterprises LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 364 (E.D.N.Y. 2014) (quoting Champagne v. United States, 15 F.Supp.3d 210, 221 (N.D.N.Y.2014)); In re Tremont Sec. Law, State Law, & Ins. Litig., No. 08–CV–11117 (TPG), 2013 WL 5393885, at *8 (S.D.N.Y. Sept. 26, 2013); Great Lakes Reinsurance (UK) SE v. Herzig, 413 F. Supp. 3d 177, 183 (S.D.N.Y. 2019); Washington v. Kellwood Co., No. 05 Civ. 10034 (DAB), 2009 WL 855652, *6 (S.D.N.Y. Mar. 24, 2009); Boyd v. Univ. of Ill., No. 96 Civ. 9327 (TPG), 2001 WL 246402, *10 (S.D.N.Y. 2001).

74. Under the Settlement Agreement, upon an event of default, the Lender had the option to (i) record a sufficient number of Deeds in Lieu of foreclosure granted in connection with the Settlement Agreement, and in the Lender's possession to pay the indebtedness, (ii) seek

uncontested judgments for foreclosure for a sufficient number of Puleo or Lewisberry Properties to satisfy the indebtedness, or (iii) exercise its rights under the Loan Documents. See Exhibit "B" at section 15 and 16.

75. The remedies under the Loan Documents include, acceleration, foreclosure, the right to setoff or retain a sufficient number of the Puleo and/or Lewisberry Properties to satisfy the indebtedness, among others. See the Loan and Security Agreement between the Lender and Debtor, attached as Exhibit F at ¶ 11 and Exhibit A at ¶ 3.01.

76. However, one remedy not available to the Lender, is sitting idly by for the sole purpose of allowing default rate interest, in this instance, at the usurious rate of 23% in order to increase its profit to the detriment of the Debtor.

77. It has now been over three (3) months and since the Maturity Date and the Debtor has engaged the Lender on numerous occasions in an attempt to pay the indebtedness and the Lender has either rejected the Debtor's overtures or responded with a proposal that contained unwarranted and oppressive monetary terms and time constraints which it knew or should have known would not be possible for the Debtor to accept.

78. The Settlement Agreement also contains a provision that requires the Lender to:

> provide the Debtor and Puleos with an itemized payoff statement as of a date certain, with a calculation of per diem interest, within five (5) days of a written request. The Puleos and Debtor may request a payoff statement of the amount necessary to satisfy the lien against some or all unsold properties.

See Exhibit "B" at ¶ 11.5.

79. While the Lender, to the Debtor's knowledge, has never sent a default letter, it is now purporting to charge default interest on the loan and is content to simply sit back and allow default interest to accrue at a rate of $4,892.03 per day.

13

80. According to the payoff statement received from the Lender, it started accruing default interest on August 1, 2023, a month prior to the August 31, 2023, maturity date of the loan.

81. "'In an action of an equitable nature, the recovery of interest is within the court's discretion. The exercise of that discretion will be governed by the particular facts in each case, including any wrongful conduct by either party' " Deutsche Bank Nat'l Tr. Co. v. Ould-Khattri, 201 A.D.3d 701, 703 (2022) (quoting BAC Home Loans Servicing, L.P. v Jackson, 159 A.D.3d 861, 862 (2018)); Onewest Bank, FSB v Kaur, 172 AD3d 1392, 1394 (2019); see CPLR 5001(a); U.S. Bank N.A. v Haughton, 189 A.D.3d 1305, 1307 (2020).

82. The tolling of the accrual of interest is necessary where there is an "unexplained delay in prosecuting the action" by the party collecting the interest. Deutsche Bank Nat'l Tr. Co. v. Ould-Khattri, 201 A.D.3d at 703 (tolling interest for the periods of time where there was an unexplained delay by the plaintiff in prosecuting the action by failing to promptly move for relief after the denial of its first and second motion for an order of reference).

83. In order for interest to be tolled, the party requesting the tolling must show: (1) that the opposing party engaged in some wrongdoing, and (2) that the opposing party "engaged in any lengthy unexplained delay in prosecution that would warrant the limitation of interest." Bank of New York Mellon v. George, 186 A.D.3d 661, 664 (2020) (citing Danielowich v PBL Dev., 292 AD2d 414, 415 (2002)).

84. Here, the Bankruptcy Court is a court of equity; "[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity" and "appl[y] the principles and rules of equity jurisprudence." Pepper v. Litton, 308 U.S. 295, 304 (1939) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934); Young v. United States, 535 U.S. 43,

50 (2002); Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 567 (3d Cir. 2003) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934)); In re TS Emp., Inc., 597 B.R. 494, 543 (Bankr. S.D.N.Y. 2019).

85. Indeed, "[o]nce equity is invoked, the court's power is as broad as equity and justice require" Deutsche Bank Nat'l Tr. Co. v. Ould-Khattri, 201 A.D.3d at 703 (quoting Onewest Bank, FSB v Kaur, 172 AD3d at 1394).

86. The Lender has engaged in wrongdoing by (a) improperly refusing to take any action against its collateral despite multiple remedies available to it to effectuate the payment of the loan balance in full, and instead permitting default interest to accrue for over three months, eroding the Debtor and the Puleo's equity in the Lewisberry Properties and the Puleo Properties; (b) providing late, inaccurate, misleading payoff statements to the Debtor; and (c) improperly delaying closings on the Lewisberry Properties and the Puleo Properties.

87. Those actions also constitute violations of the Lender's duty of good faith and fair dealing.

88. The Lender has offered no explanation for its delay in prosecuting its rights under the Plan, the Settlement Agreement, or the Loan Documents. The Lender's failure to act is particularly egregious in light of the fact that the Settlement Agreement set forth an agreed upon mechanism to value the properties and the Lender is in possession of executed deeds in lieu for each of the remaining Properties, which could be recorded to satisfy the loan balance in full.

89. The Lender is holding the Debtor's equity hostage, and rather than take action under the Plan, the Settlement Agreement, or the Loan Documents, it is intentionally letting that equity erode by electing to do nothing other than collect default interest, all to its sole benefit and to the Debtor's great detriment.

15

90. The Lender's actions are tantamount to committing waste and are a breach of the Lender's duty of good faith and fair dealing.

91. Based upon the above facts, this Court should terminate or suspend interest accruing on the loan balance and compel the Lender to exercise its rights under the Plan, Settlement Agreement and/or the Loan Documents.

### III. REQUEST FOR EXPEDITED CONSIDERATION

92. In accordance with L.B.R. 5070-1(f), and 9014-1, the Debtor seeks expedited consideration of the Motion. The Debtor requests approval of the request for expedited consideration pursuant to L.B.R. 9014-2.

93. Pursuant to L.B.R. 5070-1(f)(3), this request for expedited consideration may be stated as part of the Motion.

94. The Debtor respectfully submits that expedited consideration of the Motion is required because the Debtor is improperly being charged default interest at a rate of $4,892.03 per day.

95. In addition, on December 11, 2023, the undersigned sent an e-mail to counsel to the Lender and the Office of the United States Trustee pursuant to L.B.R. 5070-1(f)(1). The Lender's counsel indicated that the Lender would not consent to expedited consideration. The Lender's refusal to take any action to exercise its rights against its collateral to satisfy the loan balance and instead allowing default interest to run has necessitated this request for expedited consideration. The Office of the United States Trustee does not oppose the request for expedited consideration.

96. The Debtor further believes that an expedited hearing will not prejudice any of the Debtor's creditors and is in fact in the best interest of the creditors.

16

97. The Debtor is seeking to shorten notice of this Motion such that it will be heard on the earliest date available on the Court's calendar.

98. Furthermore, the Debtor also requests (a) that this Court permit notice of the hearings to be served facsimile, hand delivery, next day mail or by electronic means upon (i) the Office of the United States Trustee; (ii) to the Lender; and (iii) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly. The Reorganized Debtor believes that such notice is sufficient under the circumstances for the expedited hearing.

99. Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c)(2) and the rules listed therein.

## V. **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Reorganized Debtor prays this Honorable Court enters an Order (1) Reopening the Bankruptcy case, (2) tolling the accrual of interest from August 1, 2023 until the Lender takes appropriate action under the Plan, the Settlement Agreement or the Loan Documents; (3) compelling the lender to take appropriate action against its collateral under the Plan, the Settlement Agreement or the Loan Documents to pay the loan balance in full; and (4) any such other relief that this Court deems just and reasonable.

Respectfully submitted,

Date: December 12, 2023    By: */s/ Edmond M. George*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
*Counsel to the Debtor*