# Exhibit F

Case 21-10052-elf    Doc 3226    Filed 07/15/23    Entered 07/15/23 14:59:08    Desc
Exhibit F    Loan and Security Agreement    Page 2 of 48

Page 1 of 47

# LOAN AND SECURITY AGREEMENT

### Between

## LEWISBERRY PARTNERS LLC
**a Pennsylvania limited liability company
as Borrower,**


### AND


## LOAN FUNDER LLC, SERIES 7693


Date:  as of **June 26, 2019**

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP
Loan and Security Agreement

# TABLE OF CONTENTS

**Page**

1. Definitions ................................................................................................. 1
2. The Loan .................................................................................................. 3
3. The Note .................................................................................................. 5
4. Grant of Security Interest ...................................................................... 5
5. Conditions Precedent to Lender's Obligations .................................... 6
6. Representations and Warranties of Borrower ...................................... 6
7. Survival of Representations and Warranties ...................................... 13
8. Affirmative Covenants .......................................................................... 13
9. Negative Covenants of Borrower ......................................................... 17
10. Events of Default .................................................................................. 19
11. Remedies ................................................................................................ 20
12. Payment of Expenses ............................................................................ 21
13. Lender's Right to Assign ...................................................................... 22
14. Default Interest Rate ............................................................................ 22
15. Usury Savings ....................................................................................... 23
16. Notices ................................................................................................... 24
17. No Waiver .............................................................................................. 23
18. Failure to Exercise Rights .................................................................... 23
19. Prohibition Against Exercise of Rights Applicable Only to Individual
    Lenders ................................................................................................... 23
20. Miscellaneous ........................................................................................ 23
21. Successors and Assigns ......................................................................... 25
22. Waiver of Jury Trial ............................................................................. 25
23. Releases of Collateral ........................................................................... 26

## Schedules

Schedule A   - Description of the Collateral
Schedule B   - Representations And Warranties With Respect To Purchased Mortgage
Loans
Exhibit B     - Certain Definitions
Exhibit C     - Exceptions To Representations And Warranties In Section 2
Exhibit D     - Tenant Direction Letter

i

Case 21-10052-elf Doc 3226 Filed 07/15/23 Entered 07/15/23 14:59:08 Desc
Exhibit F   Loan and Security Agreement   Page 4 of 48

Page 1 of 47

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** ("Agreement"), dated as of June 26, 2019, between **LEWISBERRY PARTNERS LLC**, a Pennsylvania limited liability company   having its principal place of business at **27 Nutt Road, Phoenixville, PA 19460** ("Borrower"), and **LOAN FUNDER LLC, SERIES 7693**, a Delaware limited liability company having its principal place of business at **645 Madison Avenue, Floor 19, New York, NY 10022** ( "Lender").

## W I T N E S S E T H

**WHEREAS**, Borrower has requested that Lender make a loan to Borrower in the amount of **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** (the "Loan"), subject to and upon the terms and conditions hereinafter contained, which Loan shall be evidenced by a Promissory Note as of even date herewith from Borrower to Lender (as may be amended, restated or modified from time to time, the "Note");

**WHEREAS**, the Loan is to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Principal Loan Documents and made a part hereof, and payment and performance of the Loan is to be guaranteed pursuant to that certain guaranty of even date herewith from Guarantor (as hereinafter defined) to Lender (as may be amended, restated or modified from time to time, the "Guaranty");

**WHEREAS**, capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents (as hereinafter defined); and

**WHEREAS**, Lender has agreed to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower and Lender hereby agree as follows (all initial capitalized terms used herein, but not defined herein shall have the meaning on Exhibit "B" attached hereto)::

1.    **Definitions.** As used herein:

(a)    "Account" or "Accounts Receivable" means, in addition to the definition of account as contained in the Uniform Commercial Code, the right of Borrower to receive payment for goods sold or leased or for services rendered which are not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

(b)    "Account Debtor" means, in addition to the definition of account debtor as contained in the Uniform Commercial Code, the person or persons obligated to Borrower on an Account, or who is represented by Borrower to be so obligated.

(c)    "Affiliate" of any Person (as hereinafter defined) shall mean any other Person which, directly or indirectly, controls or is controlled by, or is under common control with such Person. For the purposes of this definition, "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(d)      "Business Day" shall mean any day upon which banks located in the State of New York generally are open to conduct regular banking business.

(e)      "Closing Date" shall mean the date on which this Agreement is executed by the parties hereto and the conditions set forth in Paragraph 5 are fulfilled to the satisfaction of Lender.

(f)      the "Collateral" shall mean the Real Property Collateral, the Collateral described in Paragraph 4 hereof, any other collateral described in any Loan Document and any other property of Borrower and/or Guarantor now or hereafter subject to a security agreement, mortgage, pledge, assignment or other document granting Lender a security interest therein and/or securing the Loan.

(g)      the "Default Rate" shall have the meaning ascribed thereto in the Note.

(h)      "Dollar" or "$" or "dollar" or any other terms of similar import shall mean United States Dollars, it being understood and agreed that all advances of the Loan shall be made in U.S. Dollars and repaid or reimbursed in U.S. Dollars without reduction for currency exchange fluctuation.

(i)      "Environmental Laws" shall mean a collective reference when and as applicable to (i) the Comprehensive Environmental Response, Compensation & Liability Act, as amended, 42 U.S.C. Section 9601 et seq., (ii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., and (iii) any and all other federal, state and local statutes, laws, rules, ordinances, regulations and executive orders pertaining to environmental matters applicable to the Borrower's business and/or properties, as the same may be amended or supplemented from time to time.

(j)      "Governmental Authority" or "Governmental Authorities" shall mean any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over Borrower, the Guarantor (as hereinafter defined) or the Collateral.

(k)      the "Guarantor" shall mean **Richard J Puleo.**.

(l)      the "Indemnified Party" and "Indemnified Parties" shall mean Agent and Lender as well as their directors, officers, trustees, partners, employees, agents, attorneys and shareholders.

(m)      "Independent Director" or "Independent Manager" shall mean a Person, acceptable to Lender in its sole discretion, who is not at the time of initial appointment, or at any time while serving as a director or manager, as applicable, and has not been at any time during the preceding five (5) years: (a) a stockholder, director (with the exception of serving as the Independent Director or Independent Manager), officer, employee, partner, member, manager, contractor or attorney of the Borrower or any Affiliate of any of them; (b) a customer, creditor or other person who derives any of its purchases or revenues from its activities with the Borrower or any Affiliate; (c) a Person controlling or under common control with any such stockholder, director, officer, partner, member, manager, contractor, customer, creditor, supplier or other Person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, member, manager, contractor, customer, creditor or other Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

2

(n)    the "Loan Documents" shall mean this Agreement, the Note, the Mortgage (as hereinafter defined), the Guaranty and any other documents or agreements given to Lender by Borrower or the Guarantor in connection with the Loan whether or not specifically set forth herein, as each may be amended, restated or modified from time to time.

(o)    "Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against the Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to the Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Borrower or a substantial part of its property, to make any assignment for the benefit of creditors of the Borrower, to admit in writing the Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

(p)    "Mortgage" shall mean that certain Mortgage and Security Agreement of even date herewith, as may be amended, restated or modified from time to time, given by Borrower (as such term is defined therein), as mortgagor, in favor of Lender, as mortgagee, in connection with the Mortgaged Property, which Mortgage is given as security for the due payment of Borrower's obligations under the Note.

(q)    "Person" or "Persons" shall mean any one or more individuals, partnerships, corporations (including a business trust), joint stock companies, limited liability company, trusts, unincorporated associations, joint ventures or other entities, or a foreign state or political subdivision thereof or any agency of such state of subdivision.

(r)    "Personalty" shall mean all Accounts, Accounts Receivable, Equipment, Inventory, Goods (as such terms are defined in the Uniform Commercial Code) and other personal property of the Borrower, as more particularly described herein.

(s)    "Project" shall mean the project at the Mortgaged Property known as Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA, consisting of townhomes other related improvements and amenities.

(t)    "Real Property Collateral" or "Mortgaged Property" shall mean that certain real property owned or leased by Borrower, situated in York County, Pennsylvania as more particularly described in Schedule A attached hereto and made a part hereof.

(u)    "Uniform Commercial Code" shall mean the Uniform Commercial Code, as enacted in the State of New York and the jurisdiction in which the Mortgaged Property is located, as applicable, as in effect from time to time.

2.    **The Loan.**

(a)    Provided that no default shall have occurred and be continuing hereunder, Lender agrees, subject to the terms and conditions hereinafter set forth, to advance to Borrower up to **Eight Million Twenty Five Thousand and 00/100 dollars ($8,025,000.00)** .

3

(b)    The initial Loan term shall be until June 26, 2049 ("Loan Maturity Date"), such date being three hundred sixty (360) months from the date of Closing.

(c)    Subject to a final closing statement prepared by Lender's counsel and executed by Borrower (the "Closing Statement"), the Loan proceeds shall be disbursed as follows and used only for the following purposes:

(1)    The sum of **One Hundred Thousand Three Hundred Twelve and 50/100 dollars ($100,312.50)** shall be disbursed on behalf of Borrower on the Closing Date and simultaneously paid to Lender as a fully earned, non-refundable fee (the "Fee") in consideration of Lender's commitment to make the Loan on the terms and conditions stated herein. In no event shall the Fee be applied or credited in reduction of any principal, interest or other sum payable hereunder; and

(2)    The sum of **Eight Thousand Nine Hundred Sixteen and 67/100 dollars ($8,916.67)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Prepaid Interest") which shall be credited against interest payments due under the terms of the Note, as such interest payments become due; and

(3)    The sum of **Four Thousand and 00/100 dollars ($4,000.00)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to LaRocca, Hornik, Rosen & Greenberg LLP, in payment of its legal fees; and

(4)    The sum of **Sixteen Thousand Three Hundred Fifty Two and 56/100 dollars ($16,352.56)** shall be disbursed by Lender on behalf of Borrower on the Closing Date and simultaneously paid to Lender (the "Due Diligence Expenses").

(5)    The advance to the Borrower upon closing shall **Seven Million Nine Hundred Twenty Thousand Four Hundred Eighteen and 27/100 dollars ($7,920,418.27).** Payments shall be due from Borrower on the first day of each and every month commencing on August 01, 2019 and running through the Maturity Date of **June 26, 2049** as more particularly set forth in the Note. In the event Borrower fails to make a payment within ten (10) days of the date such payment becomes due, Lender shall have the option, exercisable in its sole discretion, to require interest payments to be paid weekly, in arrears, on the Wednesday of each week during the term of the Loan Payments of interest only, in arrears, on the Principal Amount, shall be due from Borrower on the first day of each and every month commencing on **August 01, 2019**, as more particularly set forth in the Note.    Interest calculations shall be based on a 360 day year.

(d)    The foregoing disbursements may be made, notwithstanding contrary directions from Borrower , and for such purpose Borrower agrees that:

A.    The foregoing constitutes an irrevocable direction or authorization to so disburse the funds (said authorization being coupled with an interest) and no further direction or authorization from Borrower shall be necessary to warrant any such disbursements; and

B.    All such disbursements shall satisfy the obligations of Lender to advance funds to Borrower notwithstanding any other agreement or document to the contrary and shall be secured by the Mortgage as fully as if made by Borrower, regardless of the disposition by the party to whom such disbursements are so made.

4

(e)    Prepaid Interest. So long as no Event of Default and no event which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Documents shall have occurred, Lender shall credit Borrower from Prepaid Interest to the extent of amounts not so credited for payments of interest under the Note, it being understood, however, that the Prepaid Interest does not in any way limit Borrower's obligations to make payments of interest under the Note. Any amounts not so credited from Prepaid Interest on the Maturity Date (as defined in the Note) shall be credited to the payment of the Loan, and any remaining Prepaid Interest after payment in full of the Loan shall be disbursed to Borrower. Upon an Event of Default (as hereinafter defined), the Lender may credit to the extent of amounts not so credited from the Prepaid Interest any amounts then due hereunder and under the Loan Documents.

3.    **The Note.** The obligation of the Borrower to repay all monies advanced by Lender to Borrower in connection with the Loan shall be evidenced by this Agreement and the Note. The Loan shall bear interest at the rate(s) set forth in the Note and shall be payable as provided in the Note with final payment due on the Maturity Date. All of Borrower's obligations hereunder and under the Note are secured by the Mortgage and the other Loan Documents. Should the principal of or interest on the Loan become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

4.    **Grant of Security Interest.**

(a)    Borrower hereby assigns and pledges to Lender, and hereby grants to Lender a security interest in all property of the following types, wherever located and whether now owned or hereafter owned or acquired by Borrower, whether or not affixed to the Mortgaged Property, in all proceeds (including, without limitation, amounts payable under any policies of insurance with respect thereto), and Products (as such term is defined in the Uniform Commercial Code) thereof in any form, in all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions thereto or therefor, and in all increases or profits received therefrom:

(1)    all Accounts, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(2)    all Equipment (as such term is defined in the Uniform Commercial Code), and in all of Borrower's machinery and equipment of every kind, nature and description, as well as trucks and vehicles of every kind and description, including, but not limited to, trailers, cranes and hoisting equipment, whether presently owned by Borrower or hereafter acquired, and wherever located to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(3)    all Inventory (as such term is defined in the Uniform Commercial Code);

(4)    all General Intangibles (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property;

(5)    all deposit accounts of Borrower with Lender, now or hereafter existing, and all money, instruments, securities, documents, chattel paper, credits, claims, performance bonds, payment bonds, all other forms of surety to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, and other property of Borrower now or hereafter in the possession or custody of Lender or any of its agents;

5

(6)    all Chattel Paper (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Chattel Paper now or hereafter left in the possession of Lender for any purpose;

(7)    all Instruments (as such term is defined in the Uniform Commercial Code), including any negotiable instruments or a securities, or any other writing which evidences a right to the payment of money and is of the type which is, in the ordinary course of business, transferred by delivery with any necessary endorsement or assignment whether presently owned by Borrower or hereafter acquired, to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property, including, but not limited to, all such Instruments now or hereafter left in the possession of Lender for any purpose;

(8)    all Documents (as such term is defined in the Uniform Commercial Code);

(9)    all Goods (as such term is defined in the Uniform Commercial Code), to the extent that the same relate to the Mortgaged Property and/or the operations at the Mortgaged Property whether presently owned by Borrower or hereafter acquired; and

(10)    all books and records, including, without limitation, customer lists, credit files, computer programs, print-outs and other computer materials and records of Borrower pertaining to all of the Collateral.

(b)    Borrower will perform any and all steps requested by Lender to create and maintain in Lender's favor a first and valid lien on and security interest in the Collateral or pledges of Collateral, including, without limitation, the execution, delivery, filing and recording of financing statements and continuation statements, supplemental security agreements, notes, filings with federal government offices and any other documents necessary, in the opinion of Lender, to protect its interest in the Collateral which liens shall be exclusive except for those liens expressly permitted elsewhere herein. Lender and its designated officer are hereby appointed Borrower's attorney-in-fact to do all acts and things which Lender may deem necessary to perfect and continue perfected the security interests and Liens provided for in this Agreement, including, but not limited to, executing financing statements on behalf of Borrower.

5.    **Conditions Precedent to Lender's Obligations.**  Lender shall not be obligated to make the Loan hereunder unless Lender shall have received the following, all in form and substance satisfactory to the Lender in all respects:

    i.    the Note, duly executed by Borrower;

    ii.    the  Mortgage(s), duly executed by Borrower; one as to Lots 47 through 58 and Lots 79 through 96 with Lewisberry Partners LLC as the mortgagor; and one as to Lots 59 through 78 with Richard J. Puleo and Lorraine B. Puleo as the mortgagor:

    iii.    this Agreement, duly executed by Borrower;

    iv.    the Guaranty, duly executed by the Guarantor;

6

v.     the Collateral Assignment of Leases and Rents on the Premises, duly executed by Borrower;

vi.    the Collateral Assignment of Contracts, Plans, Permits, & Approvals on the Premises, duly executed by Borrower;

vii.   the Environmental Indemnity Agreement on the Premises, duly executed by Borrower and Guarantor;

viii.  the Document Re-Execution Agreement, duly executed by Borrower and Guarantor;

ix.    the Closing Statement, duly executed by Borrower;

x.     certificates of insurers, or other evidence satisfactory to Lender, indicating that Borrower and Guarantor have obtained the policies of insurance as are required under the terms of the Mortgage(s);

xi.    a paid title insurance policy (without survey exception) in the full amount of the Loan issued by a title insurance company acceptable to Lender ("Title Insurance Company") and insuring the Mortgage(s) as a valid first lien on the Premises, with such endorsements as Lender shall require and subject to the permitted exceptions identified in the Mortgage(s);

xii.   UCC-1 financing statements required to evidence or perfect Lender's security interest in the personal property affixed to the Premises;

xiii.  an appraisal of the Premises;

xiv.   intentionally deleted.

xv.    evidence of a search of the public records which discloses no conditional sales contracts, chattel Mortgage(s), leases of personality, financing statements or title retention agreements filed or recorded against the Borrower or the Premises;

xvi.   if requested by Lender, a survey of the Premises prepared in accordance with the "Minimum Standard Detail Requirements for ALTA and ACSM Land Title Surveys" jointly established by ALTA and ACSM in 2011, as updated, and certified to Lender by a registered land surveyor acceptable to the Lender ("Survey");

xvii.  copies of all permits or approvals required by any governmental authorities to such date with respect to Borrower or the Premises, to the extent the same are necessary and appropriate to operate and develop the Premises;

xviii. if requested by Lender, an environmental audit of the Premises (Phase I and, if necessary Phase II);

xix.   if the Borrower is a legal entity, operating agreement of Borrower certified by the Executive Manager of Borrower;

xx. if the Borrower is a legal entity, an incumbency certificate of Borrower which shall certify the names and titles of the officers/members of the Borrower authorized to sign, in the name and on behalf of Borrower this Agreement and each other Loan Document to be delivered pursuant to this Agreement by Borrower, together with the true signatures of such officers, upon which certificate the Lender may conclusively rely;

xxi. if the Borrower is a legal entity, resolutions/consents of the Borrower authorizing the transactions to be entered into by Borrower in connection with this Agreement;

xxii. evidence that the Premises is not located in a federal or state flood hazard area;

xxiii. certification regarding debts and liens, executed by the owner of the Premises;

xxiv. payment of a Loan Origination Fee of **Twelve Thousand Three Hundred Eighty Two and 22/100 dollars ($12,382.22)** and other fees and expenses required to be paid to or on behalf of Lender in connection with the Loan;

xxv. evidence demonstrating current full compliance with all applicable zoning, health, environmental and safety laws, ordinances and regulations (including, without limitation, approval of local, private or public sewage or water utility);

xxvi. certification from Borrower that Borrower is not a party to any existing or pending or threatened litigation, except as previously disclosed to Lender;

xxvii. evidence demonstrating receipt of all appropriate approvals meeting all applicable requirements of any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction including, but not limited to, subdivision and site plan approvals, potable water supply, sewage discharge and sewage connection, use of septic tanks or alternatives, if any;

xxviii. satisfactory evidence that all roads and utilities necessary for the full utilization of the Premises for its intended purposes have been completed or the presently installed and proposed roads and utilities will be sufficient for the full utilization of Premises for its intended purposes; and

xxix. such other agreements, certificates or other documents as Lender or Title Insurance Company may reasonably request.

xxx. If the Premises is currently leased, evidence that the Premises is occupied by an Eligible Tenant pursuant to an Eligible Lease.

8

6.    **Representations and Warranties of Borrower.**  To induce Lender to make the Loan pursuant to this Loan Agreement, Borrower hereby represents and warrants to Lender as follows:

(a)    By its acceptance of Lender's funds and execution of the Loan Documents, Borrower acknowledges, agrees and confirms that it has no defense, offset or counterclaim for any occurrence in relation to this Loan and Borrower acknowledges that Lender has complied with all of its obligations under the Loan Documents as of the date hereof.

(b)    Borrower is a limited liability company , duly organized under the laws of the State of Pennsylvania and has all requisite power and authority and legal right to own its property, to carry on its business as it is now being conducted, to enter into this Agreement and the other Loan Documents entered into by it and to perform all of its obligations hereunder and thereunder.

(c)    The execution and delivery by Borrower of the Loan Documents, and the performance of its obligations thereunder, have been duly authorized by all necessary action, corporate or otherwise, and do not and will not: (i) require any further action, consent or approval on the part of the Managing Member of Borrower; (ii) violate any provision of law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to Borrower, or the Managing Member of Borrower; or (iii) result in any breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or affected, and the Borrower is not in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument.

(d)    The Loan Documents have been duly executed and delivered by Borrower and are legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms.

(e)    Except as previously disclosed to Lender, there is no material action, suit, proceeding, inquiry or investigation, at law or in equity, or before any court, governmental instrumentality, public board or arbitrator pending or threatened against or affecting Borrower or any of its properties or rights, wherein an unfavorable decision, ruling or finding would (i) to the extent not covered by insurance as to which the insurer has not disclaimed coverage, result in any material adverse change in the financial condition, business, properties or operations of Borrower; (ii) materially or adversely effect the transactions evidenced by the Loan Documents; (iii) materially impair the right of either to carry on its business substantially as now conducted; or (iv) adversely effect the validity or enforceability of the Loan Documents.

(f)    To the best of Borrower's knowledge, Borrower is in compliance with all laws applicable to Borrower or its properties or assets.

(g)    Borrower is a pre-existing corporation/limited liability company and is actively engaged in the operation of its business and has not been created as a vehicle to obtain the Loan.  The proceeds of the Loan will be used by Borrower for the purposes set forth in Paragraph 6(o) in connection with the operation of Borrower's business, and the proceeds of the Loan will not be paid over or diverted by Borrower to any member, manager, officer, director, trustee, shareholder of Borrower, any Guarantor or any other person.

(h)    The following persons constitute the shareholders/members of Borrower and their respective ownership interest in Borrower is set forth opposite their names:

Richard J Puleo

(i)    There has been no material adverse change in the condition, financial or otherwise, of Borrower or the Guarantor since the date of its financial statements furnished to Lender.

(j)    Borrower's properties and assets reflected on its financial statements referred to above, and all such properties and assets are free and clear of all mortgages, pledges, liens, charges or other encumbrances, except as reflected on such financial statements which have been previously provided to Agent.

(k)    Borrower and the Guarantor have each filed all federal, state and other income or franchise tax returns which are required to be filed and have paid all taxes due or which may become due pursuant to such returns or pursuant to any assessment received by it.

(l)    All timely authorizations, permits, approvals and consents of Governmental Authorities which may be required in connection with the valid execution and delivery of this Agreement and the other Loan Documents and the carrying out or performance of any of the activities or transactions required or contemplated hereunder or thereunder have been obtained (and remain in full force and effect).

(m)    All financial statements, information and other financial data furnished by Borrower and the Guarantor to Lender in connection with the Agreement (i) were true, correct and complete in all material respects, as of the date of said financial statements, information and other data, (ii) such financial statements present fairly the financial condition of Borrower and the Guarantor at the respective dates thereof and the results of operations and changes in financial position for the periods to which they apply, and (iii) there have been no material adverse changes in the financial condition of Borrower or any Guarantor since the delivery by Borrower or the Guarantor, as the case may be, to Lender of the most recent financial statements.

(n)    Borrower's assets, at a fair valuation, exceed Borrower's liabilities (including, without limitation, contingent liabilities). Borrower is paying its debts as they become due and Borrower anticipates the continuing ability to pay its debts as they become due. Borrower has capital and assets sufficient to carry on its business.

(o)    Proceeds from the Loan shall be used only as set forth in this Agreement, the Closing Statement, and for other proper corporate/limited liability company purposes. No part of the proceeds of the Loan shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of Regulation U of the Board of Governors of the Federal Reserve System. In particular, without limitation of the foregoing, no part of the proceeds from the Loan are intended to be used to acquire any publicly-held stock of any kind. As used in this subparagraph (o), the terms "margin stock" and "purpose of purchasing or carrying" shall have the meanings assigned to them in the aforesaid Regulation U, and the term "publicly-held," in respect to securities, shall have the meaning assigned to it in Section 220.7(a) of Regulation T of the Board of Governors of the Federal Reserve System.

(p)     Borrower is not in violation of or in default under (nor on the Closing Date is there any waiver in effect which, if not in effect, would result in a violation or default under) any provision of Borrower's bylaws/operating agreement, or under any provision of any agreement, indenture, evidence of indebtedness, loan or financing agreement, certificate, lease or other instrument to which it is a party, or by which it is bound, or of any law, governmental order, rule or regulation, in any such case under this subparagraph (p) so as to affect adversely in any material manner its business, assets or financial conditions.

(q)     All statements, representations and warranties made by Borrower or any other person in this Agreement, any other Loan Document and any other agreement, document, certificate or instrument previously furnished or to be furnished by said person to Lender under this Agreement or in connection with the Loan: (i) are and shall be true, correct and complete in all material respects at the time they were made and, in the case of those made prior to the Closing Date, on and as of the Closing Date, (ii) do not and shall not contain any untrue statement of a material fact at the time made, and (iii) do not and shall not omit to state a material fact at the time made necessary in order to make the information contained herein or therein not misleading or incomplete.  Borrower understands that all such statements, representations and warranties shall be deemed to have been relied upon by Lender as a material inducement to provide the Loan.

(r)     No person is entitled to receive from Borrower any brokerage commission, finder's fee or similar fee or payment in connection with the consummation of the transactions contemplated by this Agreement except as provided in Section 2 of this Agreement.  No brokerage or other fee, commission or compensation is to be paid by Lender by reason of any act, alleged act or omission of Borrower with respect to the transaction contemplated hereby.

(s)     Borrower has no knowledge of any of the following:

(i)     The release or threatened release of any hazardous substance, pollutant or contaminant as each such term is presently defined in any applicable Environmental Laws resulting from any activity by or on behalf of Borrower or any predecessor in interest to the Mortgaged Property, including, without limitation, the generation, handling, storage, treatment, transportation or disposal of any hazardous substance, pollutant or contaminant at any of the past or present business locations and facilities of Borrower; or

(ii)     Any past or future action taken or to be taken by any federal, state, county or municipal Governmental Authority or by any other person under any applicable Environmental Laws concerning the release of any hazardous substance, pollutant or contaminant into the soil, air, surface or subsurface water or the environment in general from any of the past or present business locations and facilities of Borrower; or

(iii)     Any claims or actions brought or which are threatened to be brought by any Person against Borrower for damages occurring at or outside of any of the past or present business locations and facilities of Borrower resulting from the alleged release or threatened release of any hazardous substance, pollutant or contaminant by Borrower or any predecessor in interest, including, without limitation, claims for health effects to Persons, property damage and/or damage to natural resources.

(t)     (A)     Borrower's address set forth above is the location of Borrower's chief executive office, and is the only location where Borrower keeps its records concerning its Accounts, and its inventory and equipment.  (B) Within four (4) months of the date of this Agreement, none of

11

Borrower's assets have been moved from any jurisdiction or other locations than the present location of assets set forth above except for inventory or equipment purchased or sold by Borrower in the ordinary course of business from persons or entities customarily selling such inventory or equipment. (C) As of the date hereof, no inventory is now stored with a bailee, warehouseman or similar party. (D) As of the date hereof, Borrower does not hold any goods belonging to third parties or in which other parties have an interest, including any goods sold on a bill and hold basis. (E) Borrower does not presently purchase or otherwise hold goods on a consignment basis. (F) None of Borrower's inventory is of a nature that contains any labels, trademarks, trade names, or other identifying characteristics which are the properties of third parties, and the use of which by Borrower is in violation of the rights of such third parties or under license, royalty or similar agreements with any third parties. (G) No persons hold any goods of Borrower. (H) Borrower has not purchased any inventory or equipment except in the ordinary course of business for value and from persons customarily in the business of selling such inventory or equipment. (I) Borrower does not hold any instrument or chattel paper connected with any Account. (J) Borrower does not own any trademarks, trade names, patents or copyrights. (K) No surety bonds have been issued on behalf of Borrower with respect to any contracts or purchase orders out of which Accounts Receivable have arisen or are expected to arise.

(u)    Borrower is the owner and the operator of the Mortgaged Property.

(v)    There is an adequate supply of public utilities (including, without limitation, water, sewer and electric) to support the Project and the Project has access to such public utilities.

(w)    Cross-Default and Cross-Collateralization. Borrower hereby acknowledges and agrees that a default under the terms and conditions of any other loans, obligations, liabilities, or indebtedness of Borrower (whether now existing or hereafter arising) with Lender or any other lender shall be deemed to be a default under the terms and conditions of the Note and this Agreement. Without limited to foregoing, Borrower acknowledges that this Loan is cross-defaulted and cross-collateralized with the Loans identified on Exhibit "A-1", attached hereto, as the same may be updated and amended from time to time by Lender.

(x)    Leasing of the Premises. As of the closing, each Premises shall be either (a) leased by Borrower to an Eligible Tenant pursuant to an Eligible Lease (the "Eligible Lease") that is in full force and effect and is not in default in any material respect or (b) in lease ready condition, meaning that the Premises have been cleaned, no renovations or repairs to the Premises are needed and the Premises is immediately available to be leased to an Eligible Tenant pursuant to an Eligible Lease no later than 120 days after the loan closing (the "120 Day Lease Date"). No Leases (the "Lease") (written or oral) exist for any Premises except for Eligible Leases previously delivered to Lender. No Person (other than Borrower) has any possessory interest in any Premises or right to occupy the same except for the Tenants (the "Tenants") under and pursuant to Eligible Leases. Borrower has delivered to Lender true and complete copies of all Leases, and there are no material oral agreements with respect thereto. No rent for any Premises has been paid more than sixty (60) days in advance of its due date and no right to free rent, partial rate, rebate of rent or other payments, credits, allowances or abatements have been given or are required to be given to any Tenant. To Borrower's knowledge, (a) each Premises is being used exclusively as residential rental property and (b) to Borrower's knowledge, no illegal activity has taken place at the Premises. Borrower shall not permit to exist any Lease (including any renewal or extension of any existing Lease) for any Premises unless such Lease is an Eligible Lease with an Eligible Tenant. Borrower shall, in a commercially reasonable manner, perform the obligations of the lessor under all Leases, and enforce the obligations of the Tenants under such Leases. Borrower shall not collect any Rent more than sixty (60) days in advance of its due date; provided, that the foregoing restriction will not prevent the Borrower from

12

collecting both the first and last month's rent contemporaneously with the execution of the Lease in accordance with customary residential leasing practices.

(y)    Additional Representations. In addition, Borrower makes all representations and warranties to Lender as set forth on Schedule "B" attached hereto.

7.    **Survival of Representations and Warranties.**  The foregoing representations and warranties shall survive the execution of this Loan Agreement and the closing of the Loan.

8.    **Affirmative Covenants.**    To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding hereunder, Borrower shall comply with the following covenants:

(a)    Borrower shall keep and maintain complete and accurate books, accounts and records.  Borrower shall permit access thereto and examination thereof by Lender and any authorized representatives of Lender, at all reasonable times and places during normal business hours (including the right to make copies thereof at the cost and expense of Borrower).

(b)    Borrower shall comply in all material respects with all applicable federal, state, county and municipal laws, rules, regulations and orders of any Governmental Authority having jurisdiction over Borrower, subject to the limitations expressly set forth in the Mortgage, except to the extent contested in good faith and by proper proceedings or where the failure to so comply would not have a material adverse effect on Borrower, including, without limitation, all Environmental Laws and health and safety laws.

(c)    Borrower shall promptly notify Lender of the occurrence of any Event of Default or an event which, with the giving of notice or passage of time or both, would constitute an Event of Default and of the occurrence of any event or the commencement of any action, suit or proceeding which, if adversely determined, would adversely affect the condition, financial or otherwise, of Borrower or Guarantor.

(d)    Borrower shall indemnify, protect, defend and save harmless the Indemnified Parties from and against (i) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims, or demands, by third parties including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loan and the transactions contemplated herein, and (ii) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any environmental sampling or cleanup relating to any properties or assets owned or otherwise used by Borrower in the operation of its business, or mandated by any Environmental Law; provided, however, Borrower shall not be obligated to indemnify, protect, defend and save harmless an Indemnified Party, if the loss, damage, expense or liability was caused by or resulted from the gross negligence or willful misconduct of that Indemnified Party. In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought, shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement. Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at the Indemnified Party's cost and expense. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if

13

there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment. The provisions of this subparagraph (d) shall survive the termination of this Agreement and the final repayment of the Loan.

(e)     Leasing Covenant. Borrower shall lease the Premises to Eligible Tenant's at the Loan Closing or by the 120 Day Lease Date in accordance with Section 6 of the Note.

(f)     **Premises Management Covenants.**

a. *Management Agreements*. No Person has any right or obligation to manage, lease or collect rent from any of the Premises except the Existing Manager pursuant to the Existing Management Agreement. Borrower has delivered a true and complete copy of the Existing Management Agreement to Lender. All fees and other compensation due and payable for services performed under the Existing Management Agreement have been paid in full.

b. *Premises Management*. Borrower at all times shall provide competent and responsible management for the Properties by a Qualified Manager (the "Qualified Manager") pursuant to the Existing Management Agreement or a Replacement Management Agreement. Without Lender's prior written consent both as to the form of the Management Agreement and the identity of Manager, Borrower shall not enter into, modify, amend or terminate any Management Agreement, or permit any change in the management of the Premises; provided Lender's consent as to the Manager shall not be necessary for any Qualified Manager. Each Management Agreement shall provide (i) that the compensation to the Manager during any calendar month shall not exceed 10% of all Rent collections (unless Lender otherwise approves in writing greater compensation) and (ii) that the Management Agreement shall be terminable at Borrower's option without penalty or premium (including without any transition or termination fees or expenses) on thirty (30) days' notice or if required pursuant to the Loan Documents. Any action or inaction of Manager within the scope of the rights and obligations of Borrower that are delegated to Manager under the Management Agreement shall be deemed attributed to Borrower for purposes of determining compliance with the Loan Documents. Borrower shall (x) in a commercially reasonable manner, perform all of its obligations and enforce all obligations of the Manager under each Management Agreement and (y) promptly notify Lender of any default under any Management Agreement of which it is aware. (b) Lender shall have the right to terminate any Management and require Borrower to replace the Manager and enter into a Replacement Management Agreement with a Qualified Manager selected by Lender if any of the following occurs: (i) an Event of Default, (ii) any default by the Manger under the Management Agreement beyond any applicable cure period, (iii) in connection with any of the Premises, Manager is grossly negligent or commits any act of fraud or willful misconduct, misappropriates funds or violates any criminal law, or (iv) an Event of Bankruptcy occurs with respect to the Manager. Borrower shall enter into a Replacement Management Agreement within the replacement Qualified Manager within thirty (30) days of Lender's demand to replace the Manager. At the time of the Replacement Management Agreement is executed, Borrower shall cause (and Lender shall have the right to cause) the Qualified Manager to execute and deliver any documents as Lender shall require to substance satisfactory to Lender. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest to take the foregoing actions and enter into the foregoing agreements and documents on behalf of Borrower if Borrower fails to do so within five (5) business days of written demand by Lender.

14

c. *Security Deposits.* Borrower shall maintain one or more Eligible Accounts for the safe keeping of security deposits in accordance with applicable Legal Requirements and shall maintain all security deposits therein. Upon Lender's written request during an Event of Default or upon any foreclosure of any Premises or transfer in lieu thereof, Borrower shall deliver (or cause to be delivered) all security deposits to Lender for safe-keeping, and not for application against the Debt, except to the extent any security deposits are forfeited by the applicable Tenant pursuant to the terms of the applicable Lease.

(g)     Cash Management Arrangements.

a. *Lockbox.* After the occurrence of an Event of Default, at Lender's option, in addition to all other rights and remedies available to Lender: (i) Lender may require that Borrower deliver to Lender all Collections received by Borrower and Manager within two (2) business days of receipt thereof; (ii) Lender shall be entitled to collect and receive all of the Rents and Other Receipts of the Premises directly from the Tenants thereof; (iii) Lender may require that Borrower direct each current and future Tenant via an instruction letter in the form of Exhibit "D" (a "Tenant Direction Letter") to send all payments of Rent and Other Receipts (whether by cash, check or electronic means) directly to an Eligible Account designated by Lender (a "Lockbox Account"); and (iv) Lender shall be entitled to have a receiver appointed to take possession of and manage the Premises and collect the Rents and Other Receipts derived from the Premises without any showing as to the inadequacy of the Premises as security. Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents and Other Receipts actually received. Neither Borrower nor Manager shall, (i) directly or indirectly, interfere with the collection of Rents and Other Receipts by Lender or any judicially appointed receiver or (ii) without Lender's prior written consent, terminate, amend, revoke or modify any Tenant Direction Letter in any matter whatsoever or direct or cause any Tenant to pay any amount in any matter other than as provided in such Tenant Direction Letter, whether or not an Event of Default is continuing. Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, to execute and deliver to on a daily basis into the Cash Management Account and applied and disbursed in accordance with this Agreement and the Cash Management Agreement. Lender shall be permitted to apply all Rent and Other Receipts received by the Lockbox reserves account in any manner Lender sees appropriate.

(h)     Investment of Funds in Cash Management Account, Reserves; Expenses. Lender shall have the right to direct Cash Management Account Bank to invest sums on deposit in the Cash Management Account and the Reserves in Permitted Investments. Borrower shall pay for all expenses of opening and maintaining the Cash Management Account and the Lockbox Account.

(i)     Security Interest. As security for the Obligations, Borrower hereby grants to Lender a first-priority security interest in the Cash Management Account, each Reserve, each Rent Deposit Account, the Security Deposit Account and any Lockbox Account and all amounts at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest therein, including executing and delivering to Lender deposit account control agreements and filing UCC-1 financing statements and continuations thereof.

(j)     Tax Funds. Borrower shall escrow Property Taxes in accordance the Mortgage.

(k)      Insurance Funds. Borrower shall escrow Insurance Premiums in accordance with the Mortgage.

(l)      All proceeds of any Account(s) and inventory and other Collateral which are delivered to or otherwise received by Lender for application to the Loan provided for herein shall be deemed received as of the date of actual receipt by Lender, and shall be applied by Lender on account of the Obligations upon Lender's receipt of same; provided, however, that no checks, drafts, or other Instruments received by Lender shall constitute payment to Lender unless and until such item of payment has actually been collected by Lender. For the sole purpose of calculation of interest due to Lender from Borrower, all such proceeds and other payments on account of the Loan provided for in this Agreement, irrespective of the type or form of payment thereof shall not be considered applied on account of the Obligations until actual clearance of such funds.

(m)      Borrower shall maintain all of its property in good working condition, ordinary wear and tear excepted (including obsolete and abandoned property).

(n)      Borrower shall, within ten (10) days of the end of each month, deliver to Lender an aging of its Accounts and report of its inventory, and an aging of its accounts payable in such form as may be reasonably acceptable to Lender, and within thirty (30) days of the end of each month, a duly completed accounts receivable reconciliation report in such form as may be reasonably acceptable to Lender.

(o)      Borrower will continue to hold all necessary licenses and permits for the operations of their business, including but not limited to contract vendor registrations and account numbers.

(p)      Lender (by any of its officers, employees and agents) shall have the right, at any time or times during Borrower's usual business hours (provided reasonable prior notice is given except if an Event of Default has occurred and is continuing), to inspect the Collateral, all records related thereto (and to make extracts from such records) and the premises upon which any of the Collateral is located, to discuss Borrower's affairs and finances with any person and to verify the amount, quality, quantity, value and condition of, or any other matter relating to, the Collateral.

(q)      (A)      Lender shall have the right at any time and from time to time, without notice, to notify Account Debtors to make payments to Lender, to endorse all items of payment which may come into its hands payable to Borrower, to take control of any cash or non-cash proceeds of Accounts and of any returned or repossessed goods; to compromise, extend or renew any Account or deal with it as it may deem advisable, and to make exchanges, substitutions or surrenders of Collateral, to notify the postal authorities, after an Event of Default, to deliver all mail, correspondence or parcels addressed to Borrower to Lender at such address as Lender may choose. (B) Borrower herewith appoints Lender or its designee as Attorney-in-Fact to endorse Borrower's name on any checks, notes, acceptances, drafts or any other instrument or document requiring said endorsement and to sign Borrower's name on any invoice or bills of lading relating to any Account, or drafts against its customers, or schedules or confirmatory assignment on Accounts, or notices of assignment, financing statements under the Uniform Commercial Code, and other public records, and in verification of Accounts and in notices to Account Debtors. (C) Lender shall have no obligation to preserve any rights against any Person obligated on any Account, chattel paper, instrument or other item of Collateral. Lender shall not be permitted to exercise the rights granted to it under the foregoing clauses (A) and (B) prior to an Event of Default.

16

(r)     Borrower will furnish Lender with at least ten (10) days' prior written notice of any change in location of or addition to its chief executive office, the office where it keeps its records concerning its Accounts, its location of Inventory, Equipment and other assets, and other business locations.

(s)     Pay and discharge, and require its subsidiaries to pay and discharge, when due, all taxes, assessments or other governmental charges imposed on them or any of their respective properties, unless the same are currently being contested in good faith by appropriate proceedings and adequate reserves are maintained therefor.

(t)     Operate its properties, and cause those of its subsidiaries to be operated in compliance with all applicable orders, rules and regulations promulgated by the jurisdictions and agencies thereof where such properties are located and duly file or cause to be filed such reports and/or information returns as may be required or appropriate under applicable orders, regulations or law.

(u)     Permit the Lender's representatives and/or agents full and complete access to any or all of the Borrower's and its subsidiaries' properties and financial records, to make extracts from and/or audit such records and to examine and discuss the Borrower's properties, business, finances and affairs with the Borrower's officers and outside accountants.

(v)     Obtain lien releases and lien waivers, in a statutory standard form, as and when Borrower pays contractors, materialmen, laborers providing labor, equipment, or materials to the Mortgaged Property and submit copies of the same to Lender.

(w)     Borrower shall, within ten (10) days of the end of each month, deliver to Lender a report of the Borrower's assets, including without limitation, a report on the status of any development or construction on the Mortgaged Property, in such form as may be acceptable to Lender in its sole discretion.

9.     **Negative Covenants of Borrower.**  To induce Lender to make the Loan pursuant to this Agreement, Borrower hereby covenants and agrees that so long as the Loan shall remain outstanding, Borrower shall not:

(a)     Except for Permitted Encumbrances as set forth in the Mortgage, at any time: (i) create, incur, assume or suffer to exist any mortgage, deed of trust, pledge, security interest, encumbrance, lien or charge of any nature upon or with respect to Borrower's assets and properties or (ii) sign or file under the Uniform Commercial Code of any jurisdiction a financing statement which names Borrower as a debtor or (iii) sign any security agreement authorizing any secured party thereunder to file such financing statement.  Borrower further covenants and agrees not to grant any similar negative pledge to any other lender.

(b)     Except as to the sale or disposition of assets which are obsolete or worn out and are no longer used or useful in the conduct of its business, convey, sell, lease, assign, transfer, hypothecate or otherwise dispose of any of its now or hereafter acquired property, business or assets.

(c)     Create, incur, suffer to exist, assume, guaranty, endorse, become a surety, or otherwise become liable for the debt or other obligations of any other Person whether directly or indirectly, or make or incur any advance, purchase commitment, other obligation or loan for the direct or indirect purpose of paying or discharging any such obligations.

17

(d)     Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in any Person.

(e)     Enter into any merger or consolidation or liquidate or wind-up or dissolve itself (or suffer any liquidation or dissolution) or convey, sell, lease, assign, transfer or otherwise dispose (directly or indirectly) of all or substantially all of its property, business or assets or make any material change in its present method of conducting business or permit any corporate guarantor to do any of the foregoing.

(f)     Materially change, amend, alter or modify the bylaws/operating agreement or other governing documents of Borrower or permit any corporate guarantor to do any of the foregoing.

(g)     Enter into or permit any Guarantor to enter into any transaction, including, without limitation, the purchase, sale or exchange of property or the rendering of any service, with any officer, director, shareholder or partner of Borrower or any Guarantor or Affiliate of any of the foregoing.

(h)     Declare or pay any dividends on, distributions on or make any payment on account of, or set apart assets or a sinking fund for the purchase, redemption, defeasance, retirement or other acquisition of, any interest, shares or any class of stock or any warrant or option to purchase any such stock whether now or hereafter outstanding or make any other distribution in respect thereof, directly or indirectly whether in cash or property or obligations.

(i)     Create, incur, suffer to exist any indebtedness, except (i) indebtedness in respect of the Loan; and (ii) indebtedness, if any, outstanding as of the date of this Agreement and shown on the financial statements previously delivered to Lender.

(j)     Transfer, sell, lease or otherwise convey (directly or indirectly) any interest or shares of capital stock or membership or ownership interest in any guarantor.

(k)     Purchase any Inventory or Equipment except in the ordinary course of business from persons customarily in the business of selling such Inventory or Equipment.

(l)     Without prior written consent of Lender, remove the Collateral from its present location, except for the removal of Inventory upon its sale.

(m)     Sell or transfer any Inventory to any Affiliate or subsidiary of Borrower except on arms length terms in the ordinary course of business.

(n)     Sell, lease or transfer any of its equipment (except for abandoned or obsolete equipment) or other assets without the prior written consent of Lender except for sales of inventory in the ordinary course of business to good faith purchasers for value.

(o)     Allow its existence of as a corporation/limited liability company to be other than in good standing and will not, without the prior written consent of Lender, dissolve or liquidate, or merge or consolidate with or acquire or affiliate with any other business entity or form any subsidiary.

(p)     Change its name without furnishing to Lender at least ten (10) days' prior written notice thereof.

18

(q)    Utilize any trade name, and will not in the future utilize any trade name without furnishing to Lender at least ten (10) days prior written notice thereof.

(r)    Change the nature of its business.

(s)    Sell, assign, transfer or dispose of any of its accounts or notes receivable, with or without recourse, except to the Lender.

(t)    Except after notice to Lender and with Lender's prior written consent, partition or subdivide the Mortgaged Property.

(u)    take any Material Action without the prior written consent of the Independent Manager (or Independent Director, as applicable).

10.    **Events of Default.**  The occurrence of any of the following shall constitute an "Event of Default" hereunder:

(a)    failure of Borrower to make any payment of any installment of principal or interest when due under the Note;

(b)    failure of Borrower to pay any other sum when due hereunder or under the Note or any other Loan Document;

(c)    any representation or warranty of Borrower or the Guarantor made herein or in any other Loan Document or in any other writing given to Lender in connection with the Loan shall have been incorrect in any material respect as of the time when the same shall have been made or is nor accurate when a further disbursement is to be made to Borrower;

(d)    the occurrence of an Event of Default under the Mortgage or any other Loan Document;

(e)    the sale, conveyance, assignment, transfer or other disposition or divestiture of Borrower's title to any of the Collateral, or the mortgage or other conveyance of a security interest in, or other encumbrance on any of the Collateral or any interest therein, whether voluntary or involuntary, except as provided herein;

(f)    any merger, consolidation, liquidation or dissolution, or the sale or transfer of all or substantially all of the assets, of the Borrower;

(g)    the transfer (directly or indirectly ) of any of the stock or other ownership interest of Borrower;

(h)    any default in the performance or observance of any term, covenant or agreement to be performed by Borrower or Guarantor in this Loan Agreement or in any Loan Document;

(i)    the use of proceeds of the Loan for any purpose other than the purpose described in Paragraph 6(o);

(j)      any Loan Documents for any reason shall cease to be in full force and effect, the liens on the Collateral purported to be created thereby shall cease to be or are not valid and perfected liens having priority over all other liens except any encumbrances specifically permitted under such Loan Documents, or any Guarantor shall assert that it has no liability under the Guaranty to which it is a party;

(k)      one or more judgments or decrees shall be entered against Borrower or any Guarantor (not paid or fully covered by insurance) and all such judgments or decrees shall not have been vacated or discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(l)      if Borrower or any Guarantor becomes insolvent;

(m)      if Borrower or any Guarantor generally does not pay its debts as they become due and Borrower has failed to make any payment to Lender required by the Loan Documents;

(n)      if Borrower or any Guarantor makes an assignment for the benefit of creditors;

(o)      if Borrower or any Guarantor calls or causes to be called a meeting of creditors for the composition of debts;

(p)      if there shall be filed by or with the consent or authorization of Borrower or any Guarantor a petition in bankruptcy for liquidation or for reorganization, or a custodian, receiver or agent is appointed or authorized to take charge of its properties, or Borrower or any Guarantor authorizes any such action;

(q)      if there shall be filed against Borrower or any Guarantor a petition in bankruptcy, for liquidation, or for reorganization, or a custodian, receiver, or agent is appointed or authorized to take charge of its properties and Borrower or any Guarantor, as the case may be, has not consented to or authorized such action and such action is not dismissed within sixty (60) days; and

(r)      if any license, permit, registration, vendor account or other approval required for the normal operation of Borrower's business or any of the Collateral shall be suspended or shall cease to be in full force and effect.

11.   **Remedies.**

(a)      Upon the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, in addition to any remedies available to Lender under applicable law, Lender may take one or more of the following remedial steps in any order of priority:

(i)      Declare immediately due and payable the outstanding principal balance of the Note, together with all accrued and unpaid interest, fees and other sums or expenses payable thereunder and hereunder and accordingly accelerate payment thereof without presentment, demand, notice of intention to accelerate, notice of acceleration or notice of any other kind, all of which are expressly waived;

(ii)      Take any action at law or in equity against Borrower or the Guarantor (a) to collect the payments then due and thereafter to become due under the Loan Documents, or (b) to enforce performance and observance of any obligation, agreement or covenant of Borrower or such other parties under the Loan Documents;

(iii)     Exercise any and all rights and remedies provided for in the other Loan Documents as they relate to Borrower or any Guarantor.

(iv)     Proceed with or without judicial process to take possession of all or any part of the Collateral provided for herein not already in the possession of Lender and Borrower agrees that upon receipt of notice of Lender's intention to take possession of all or any part of said Collateral, Borrower will do everything reasonably necessary to assemble the Collateral and make same available to Lender at a place to be designated by Lender. Borrower hereby waives any and all rights it may have, by statute, constitution or otherwise to notice from Lender, for Lender to obtain possession, by Court proceedings or otherwise, of the Collateral provided for in this or in any other agreement with Lender;

(v)     So long as Lender acts in a commercially reasonable manner, assign, transfer and deliver at any time or from time to time the whole or any portion of the Collateral or any rights or interest therein in accordance with the Uniform Commercial Code, and without limiting the scope of Lender's rights thereunder, Lender may sell the Collateral at public or private sale, or in any other manner, at such price or prices as Lender may deem best, and either for cash or credit, or for future delivery, at the option of Lender, in bulk or in parcels and with or without having the Collateral at the sale or other disposition. Lender shall have the right to be the purchaser at any public sale. Lender shall have the right to conduct such sales on Borrower's premises or elsewhere and shall have the right to use Borrower's premises without charge for such sales for such time or times as Lender may see fit. Lender is hereby granted license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral and Borrower's rights under all licenses and franchise agreements shall inure to Lender's benefit. Borrower agrees that a reasonable means of disposition of Accounts shall be for Lender to hold and liquidate any and all Accounts. In the event of a sale of the Collateral, or any other disposition thereof, Lender shall apply all proceeds first to all costs and expenses of disposition, including reasonable attorneys' fees, and then to the Obligations of Borrower to Lender;

(vi)     Elect to retain the Collateral or any part thereof in satisfaction of all Obligations due from Borrower to Lender upon notice of such proposed election to Borrower and any other party as may be required by the Uniform Commercial Code; and

(vii)     Lender shall have the right immediately, and without notice or other action to set-off against any of any Borrower's Obligations to Lender any sum owed by Lender in any capacity to any Borrower whether due or not, and Lender shall be deemed to have exercised such right of set-off and to have made a charge against any such sum immediately upon the occurrence of an Event of Default, even though the actual book entries may be made at some time subsequent thereto.

(b)     No remedy conferred in this Agreement or the other Loan Documents is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or equity or by statute or otherwise.

12.     **Payment of Expenses.**

(a)     Borrower agrees that it shall pay, within five (5) days after demand, all out-of-pocket expenses incurred by Lender in connection with this transaction including, without limitation, fees and expenses for any title searches required hereunder, recording and filing fees, and reasonable attorneys' fees incurred by Lender in connection with the Loan (including any amendments and

waivers), the preparation of the Loan Documents, the administration of the Loan, inspection of the Mortgaged Property during the course of the Project and the enforcement Lender's rights and remedies under the Loan Documents.

(b)      If Borrower should fail to perform or observe, or to cause to be performed or observed, any covenant or obligation under this Agreement or any of the other Loan Documents, then the Lender, may (but shall be under no obligation to) take such steps as are necessary to remedy any such nonperformance or nonobservance and provide for payment thereof, if any (which shall include, without limitation, steps necessary to cure any defaults of Borrower under any lease).

(c)      All amounts expended or advanced by the Lender pursuant to this Paragraph 12 shall become part of the outstanding principal balance of the Loan and the Note, shall be secured by, among other things, the Mortgage, shall become due and payable by the Borrower upon demand by Lender, and shall bear interest at the Default Rate (such interest to be calculated from the date of such advance by Lender to the date of repayment thereof by Borrower).

13.    **Lender's Right to Assign**.  Lender shall have the right to sell, assign, participate, transfer or dispose of all or any part of its interest in the Loan without the consent or approval of Borrower or Guarantor.

14.    **Default Interest Rate.**  All sums advanced and all expenses incurred by Lender pursuant to any provision of this Agreement or of the other Loan Documents which are not paid when due shall bear interest at the Default Rate set forth in the Note from the date such sum was due until such sum is paid in full and shall be secured by the Mortgage.

15.    **Usury Savings.**  Notwithstanding anything to the contrary contained herein, under no circumstances shall the aggregate amount paid or agreed to be paid hereunder or under the Note exceed the highest lawful rate permitted under applicable usury law (the "Maximum Rate") and the payment obligations of Borrower under this Agreement and the Note are hereby limited accordingly.  If under any circumstances, whether by reason of advancement or acceleration of the maturity of the unpaid principal balance hereof or otherwise, the aggregate amounts paid hereunder or under the Note shall include amounts which by law are deemed interest and which would exceed the Maximum Rate, Borrower stipulates that payment and collection of such excess amounts shall have been and will be deemed to have been the result of a mistake on the part of both Borrower and Lender or the holder of the Note, and the party receiving such excess payments shall promptly credit such excess (only to the extent such payments are in excess of the Maximum Rate) against the unpaid principal balance hereof and any portion of such excess payments not capable of being so credited shall be refunded to Borrower.

16.    **Notices.**  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, and by telecopier (with answer back acknowledged), addressed as follows (or at such other address and a person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

If to Lender:            LOAN FUNDER LLC, SERIES 7693,
                         645 Madison Avenue, Floor 19,
                         New York, NY 10022

22

With a copy to:        LaRocca, Hornik, Rosen, & Greenberg
                       83 South Street
                       Freehold, New Jersey 07728
                       Attention: Jonathan L. Hornik, Esq.
                       Facsimile No.: (201) 409-0350


If to Borrower:        LEWISBERRY PARTNERS LLC
                       27 Nutt Road
                       Phoenixville, PA 19460


With a copy to:

    A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a business day; or in the case of expedited prepaid delivery and telecopy, upon the first attempted delivery on a business day.

    17.   **No Waiver.** No course of dealing between Borrower and Lender or any failure or delay on the part of Lender in exercising any rights or remedies hereunder shall operate as a waiver of any rights or remedies of Lender and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder. In the event any agreement contained in this Agreement or the other Loan Documents should be breached and thereafter waived by Lender, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder or thereunder.

    18.   **Failure to Exercise Rights.** Nothing herein contained shall impose upon Lender any obligation to enforce any terms, covenants or conditions contained in this Agreement and the other Loan Documents. Failure of Lender, in any one or more instances, to insist upon strict performance of any terms, covenants or conditions of this Agreement and the other Loan Documents, shall not be considered or taken as a waiver or relinquishment by Lender of its right to insist upon and to enforce in the future, by injunction or other appropriate legal or equitable remedy, strict compliance with all the terms, covenants and conditions of this Agreement and the other Loan Documents. The consent of Lender to any act or omission by Borrower shall not be construed to be a consent to any other or subsequent act or omission or a waiver of the requirement for Lender's consent to be obtained in any future or other instance.

    19.   **Prohibition Against Exercise of Rights Applicable Only to Individual Lenders.** Borrower is hereby prohibited from exercising against Lender or Agent any right or remedy which it might otherwise be entitled to exercise against any one or more (but less than all) of the individual parties constituting Lender, including, without limitation, any right of set-off or any defense.

    20.   **Miscellaneous.**

    (a)   Choice of Law. **THE LOAN WAS NEGOTIATED IN THE STATE OF NEW YORK, THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, WAS EXECUTED AND DELIVERED BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL**

RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.  THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CHOICE OF LAW CONSIDERATIONS, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED IN THE REAL PROPERTY COLLATERAL UNDER THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE JURISDICTION IN WHICH THE REAL PROPERTY COLLATERAL IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH JURISDICTION, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS, AND THE DEBT OR OBLIGATIONS ARISING HEREUNDER.

(b)    Jurisdiction.    AT LENDER'S ELECTION, TO BE ENTERED IN ITS SOLE DISCRETION, ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER OR LENDER ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT AN AUTHORIZED AGENT TO RECEIVE AND FORWARD ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED IN THE MORTGAGE, SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (1) SHALL GIVE PROMPT NOTICE TO THE LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (2) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (3) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(c)    Borrower and/or Guarantor (as applicable) agrees if Borrower and/or Guarantor is required to make any deduction or withholding of foreign taxes (or taxes imposed because Borrower and/or Guarantor is a foreign person or entity) from any payment due to Lender herein, then the amount payable to Lender upon which such deduction or withholding is based, shall be increased to the extent necessary to ensure that, after all deductions or withholdings, Lender is paid a net amount equal to the amount Lender would have been paid in the absence of such deduction or withholding. At Lender's request, Borrower and/or Guarantor shall provide Lender with documentation adequate to demonstrate payment of such deduction or withholding by Borrower and/or Guarantor under this provision.

24

(d)     The parties hereto agree that, notwithstanding anything contained herein to the contrary, there shall be required the consent of the Agent, Borrower and Lenders holding Fifty Percent (50%) of the outstanding balance or commitment to lend under the Loan to do any of the following:

(1)     Amend or modify the terms of the Note, this Agreement, the Mortgage and the other Loan Documents or execute any waiver of any material event of default under this Agreement or the other Loan Documents.

(2)     Consent to or permit any substitution, withdrawal or release of any collateral, any Guarantor or any other security securing the payment of the Loan except in accordance with the terms of the Note, this Agreement and the Loan Documents.

(e)     Any condition of this Agreement or any other Loan Document which requires the submission of evidence of the existence or non-existence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts, and Lender shall, at all times, be free independently to establish to its reasonable satisfaction and in its absolute discretion such existence or non-existence.

(f)     Borrower and each Guarantor, as the case may be, shall execute and deliver, or cause to be executed and delivered to Lender, all other instruments, certificates and agreements as Lender or Lender's counsel may reasonably require, including, but not limited to, estoppel certificates stating that the Loan is in full force and effect and that there are no defenses or offsets thereto, to effect, confirm or assure the rights, remedies and liens intended to be granted or conveyed to Lender under this Agreement or any other Loan Document.

(g)     A determination that any portion of this Agreement or any of the Loan Documents is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provisions of this Agreement or any Loan Document to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provisions it may apply to other persons or circumstances.

(h)     Without the consent of, or notice to Borrower, Lender may add one or more additional co-agents to this Loan.

(i)     This Agreement supersedes in all respects all prior agreements and understandings relating to the Loan, including, without limitation, the Loan Commitment.

21.     **Successors and Assigns.**

(a)     Borrower may not assign its rights under this Agreement without the prior written consent of Lender. Any such attempted assignment in violation of this Agreement shall be void and of no effect.

(b)     All covenants and agreements in this Agreement shall bind and inure to the benefit of the respective permitted successors and assigns of the parties hereto and any holder or holders of the Note or any portion thereof.

22.     **Waiver of Jury Trial. BORROWER AND LENDER AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY BORROWER OR LENDER ON OR WITH RESPECT TO THIS AGREEMENT OR ANY**

OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, BORROWER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT LENDER WOULD NOT EXTEND CREDIT TO BORROWER (AS APPLICABLE) IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS AGREEMENT.

23.    **Releases of Collateral.**

(a)    The Lender may release, regardless of consideration, the obligation of any Person or Persons liable for payment of any of the Obligations secured hereby, or may release any part of the Mortgaged Property or any other collateral now or hereafter given to secure the payment of the Obligations or any part thereof, without impairing, reducing or affecting the obligations of the Borrower or Guarantors under the Loan Documents.

(b)    Within thirty (30) days of Borrower's request, provided: (i) Borrower is not in default hereunder or under any other Loan Document(s); and (ii) no event has occurred which with the passage of time and/or the giving of notice would constitute a default hereunder or under any other Loan Document(s), Lender shall release portions of the Mortgaged Property from the lien created by the Mortgage ("Released Property") subject to: (i) Borrower's payment to Lender of the Release Price (as hereinafter defined) for the Released Property and (ii) Borrower's delivery to Lender of documentation evidencing a bonafide arms length transaction for the sale of the Released Property. The Release Price for the Released Property shall be equal to the greater of: (y) (i) One Hundred Twenty percent (120%) of the net sale price of the Released Property (subject to reasonable and customary closing adjustments and sales commissions to be approved by Lender in Lender's reasonable discretion); and (ii) One Hundred Twenty percent (120%) of the gross sale price of the Released Property; or (z) such other minimum Release Price as required by Lender in its sole discretion.

24.    **Publicity.**

(a)    Lender shall have the right to issue news releases, and publicize and/or advertise the fact that it has provided financing with respect to the project and/or the Mortgaged Property and in connection therewith Lender shall have the right to photograph and use pictures of the Mortgaged Property in any such advertisements, brochures, print, media and other copy.

(b)    At Lender's request, Borrower, at Lender's cost and expense, shall erect a suitable sign or signs at the Mortgaged Property in a location which is clearly visible to the public and otherwise reasonably acceptable to Lender. The Sign shall be prepared by Lender and may contain, among other things, that financing for the Mortgaged Property is being provided by Lender or another Person and otherwise publicize Lender's or such Person's role in the financing. Lender shall coordinate the placement and maintenance of such signs on the Mortgaged Property with Borrower.

25.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which

shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

26. **Joint and Several Liability**. Notwithstanding anything contained herein to the contrary, if there is more than one Borrower, each Borrower shall be jointly and severally liable for a breach of any and all covenants, representations, warranties, obligations and liabilities under this Agreement.

27. **Single Purpose Entity/Separateness**. Notwithstanding anything contained herein to the contrary, Borrower represents, warrants and covenants as follows:

(a) Borrower has not owned, does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership or operation of the Mortgaged Property.

(b) Borrower has not engaged and will not engage in any business other than the ownership, management and operation of the Mortgaged Property and Borrower will conduct and operate its business as presently conducted and operated.

(c) Borrower will not enter into any contract or agreement with any affiliate of the Borrower, any constituent party of Borrower, any Guarantor of the Loan or any part thereof or any affiliate of any constituent party of Borrower or any Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d) Except as otherwise set forth herein or in the other Loan Documents, Borrower has not incurred and will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Loan. No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Mortgaged Property.

(e) Borrower has not made and will not make any loans or advances to any third party (including any affiliate or constituent party of Borrower, any Guarantor or any affiliate or constituent party of Guarantor), and shall not acquire obligations or securities of its affiliates or any constituent party.

(f) Borrower: (i) is solvent and agrees to give prompt notice to Lender of the insolvency or bankruptcy filing of Borrower or any general partner, managing member or controlling shareholder of Borrower, or the death, insolvency or bankruptcy filing of any Guarantor; and (ii) will remain solvent.

(g) Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not amend, modify or otherwise change the articles of organization, certificate of formation, certificate of incorporation, articles of incorporation, bylaws or operating agreement or other organizational documents of Borrower.

(h) Borrower will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party of Borrower and Borrower will file its own tax returns. Borrower shall maintain its books, records, resolutions and agreements as official records.

(i)      Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Borrower, any constituent party of Borrower, any Guarantor or any affiliate of any such constituent party or Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize separate stationery, invoices and checks.

(j)      Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)      Neither Borrower nor any constituent party of Borrower will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of the Borrower.

(l)      Borrower will not commingle the funds and other assets of Borrower with those of any affiliate or constituent party of Borrower, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person.

(m)      Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party of Borrower, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other Person.

(n)      Borrower does not and will not guarantee, become obligated for or hold itself out to be responsible for the debts or obligations of any other person or entity or the decisions or actions respecting the daily business or affairs of any other person or entity.

(o)      Borrower will not permit any affiliate or constituent party of Borrower independent access to its bank accounts.

(p)      Borrower shall pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

(q)      Borrower shall have at least one (1) Independent Manager or Independent Director, as applicable.

[Remainder of this page intentionally left blank.]

**IN WITNESS WHEREOF,** the undersigned have executed this Loan and Security Agreement as of the day and year first set forth above.

Signed in the Presence of:

Name: WILLIAM B. STULL

Name:

BORROWER
**LEWISBERRY PARTNERS LLC**

By:
Name: Richard J Puleo
Title: Managing Member

Signed in the Presence of:

Name: WILLIAM B. STULL

Name:

Name: WILLIAM B. STULL

Name:

Acknowledged and Assented to:

GUARANTOR

Richard J Puleo, individually

Lorraine B Puleo, individually

Signed in the Presence of:

Name:

Name:

LOAN FUNDER LLC, SERIES 7693

By:
Name:
Title: Authorized Signatory

A-1

STATE OF PA        )
                      )ss.:
COUNTY OF LANCASTER )

I certify that on June 26 2019, Richard J Puleo, came before me in person and stated to my satisfaction that he/she:

(a) made the attached instrument; and

(b) was authorized to and did execute this instrument on behalf of and as Managing Member of LEWISBERRY PARTNERS LLC (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and members.

_____
NOTARY PUBLIC

Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557

STATE OF PA        )
                      )ss.:
COUNTY OF LANCASTER )

On June 26 2019 before me personally came Richard J Puleo, who being by me duly sworn, did depose and say that he/she signed this instrument as his/her voluntary act and deed.

Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557

_____
NOTARY PUBLIC

STATE OF PA      )
                             ss.:
COUNTY OF LANCASTER )

I certify that on June 26 2019, Lorraine B. Puleo came before me in person and stated to my satisfaction that he:

(a) made the attached instrument; and

(b) was authorized to and did execute this instrument on behalf of and as Authorized Signatory of Loan Funder LLC, Series 7693 (the "Company"), the entity named in this instrument, as the free act and deed of the Company, by virtue of the authority granted by its operating agreement and its members.

Commonwealth of Pennsylvania - Notary Seal
William B. Stull, Notary Public
Lancaster County
My commission expires November 18, 2019
Commission number 1162557

_____
NOTARY PUBLIC

A-2

## SCHEDULE A

## DESCRIPTION OF THE COLLATERAL

ALL THOSE CERTAIN TRACTS of land situated in Fairview Township, York County, Pennsylvania, known and numbered as Lots 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77 and 78 on a final plan of lots for Phases 2 & 3 of Revised Pleasant View Planned Residential Development recorded in the Office of the Recorder of Deeds in and for York County, Pennsylvania in Plan Book SS, Page 709, more particularly bounded and described as follows:

LOT 59, 100 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 59 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 60, South 81° 28' 30" West a distance of 115.00' to a point; thence, along Tract #3R, North 8° 31' 30" West a distance of 41.00' to a point; thence, along the same, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way, South 8° 31' 30" East a distance of 41.00' to a point and the place of BEGINNING.

CONTAINING: 4,715 square feet, more or less (0.11 acres)

ACCOUNT NO. ▮▮▮▮▮▮▮▮

LOT 60, 102 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 60 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along the Lot 61, South 81° 28' 30" West a distance of 22.00' to point; thence, along the Lot 59, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 8° 31' 30" East a distance of 22.00' to a point, the place of BEGINNING.

CONTAINING: 2,530 square feet, more or less (0.06 acres)

ACCOUNT NO. ▮▮▮▮▮▮▮▮

LOT 61, 104 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 61 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 62, South 81° 28' 30" West a distance of 115.00' to a point; thence, along Tract #3R, North 08° 31' 30" West a distance of 22.00' to a point; thence, along Lot 60, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 08° 31' 30" East a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,530 square feet, more or less (0.06 acres)

ACCOUNT NO. ▮▮▮▮▮▮▮▮

LOT 62, 106 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 62 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 63, South 81° 28' 30" West a distance of 115.00' to a point; thence, along Tract #3R, North 08° 31' 30" West a distance of 22.00' to a point; thence, along Lot 61, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 08° 31' 30" East a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,530 square feet, more or less. (0.06 acres)

ACCOUNT NO ███████

LOT 63, 108 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 63 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 64, South 81° 31' 30" West a distance of 22.00' to a point; thence, along Lot 62, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, S 08° 31' 30" East a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,530 square feet (0.06 acres)

ACCOUNT NO. ███████

LOT 64, 110 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 64 as shown on the "Final Subdivision Plan for Phase 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Tract #3R, South 81° 28' 30" West a distance of 115.00' to a point; thence, along the same, North 08° 31' 30" West a distance of 41.00' to a point; thence, along Lot 63, North 81° 28' 30" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 08° 31' 30" East a distance of 41.00' to a point and the place of BEGINNING.

CONTAINING: 4,715 square feet, more or less (0.11 acres)

ACCOUNT NO. ███████

LOT 65, 114 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeast corner of Lot 65 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 66, North 81° 35' 58" West a distance of 122.46' to a point; thence, along Tract #3R, North 07° 22' 17" East a distance of

4

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

34.42' to a point; thence, along the same, North 81° 28' 30" East a distance of 22.63' to a point; thence, along the same, North 81° 35' 58" West a distance of 96.78' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way, by a curve to the right with a radius of 275.00' with a length of 41.30', and a chord bearing South 01° 56' 13" West a distance of 41.26' to a point and place of BEGINNING.

CONTAINING: 4,890 square feet (0.11 acres)

ACCOUNT NO.

LOT 66, 116 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 66 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 67, North 81° 35' 58" West a distance of 122.01' to a point; thence, along Tract #3R, North 07° 22' 17" East a distance of 22.00' to a point; thence, along the Lot 65, South 81° 35' 58" East a distance of 122.46' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way, by a curve to the right with a radius of 275.00' with a length of 22.01', and a chord bearing South 08° 31' 54" West a distance of 22.00' to a point and place of BEGINNING.

CONTAINING: 2,692 square feet, more or less (0.06 acres)

ACCOUNT NO.

LOT 67, 118 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 67 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 68, North 81° 35' 58" West a distance of 120.04" to a point; thence, along Tract #3R, North 07° 22' 17" East a distance of 22.00' to a point; thence, along Lot 66, South 81° 35' 58" East a distance of 122.01' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way, by a curve to the right with a radius of 275.00' with a length of 10.63', and a chord bearing South 11° 55' 55" West a distance of 10.63' to a point; thence, along said right-of-way line, South 13° 02' 23" West a distance of 11.43' to a point and the place of BEGINNING.

CONTAINING: 2,664 square feet, more or less (0.06 acres)

ACCOUNT NO.

LOT 68, 120 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 68 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 69, North 76° 57' 37" West a distance of 115.00' to a point; thence, along Tract #3R, North 07° 22' 17" East distance of 47.01' to a point; thence, along Lot 67, South 81° 35' 58" East a distance of 120.04' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 13° 02' 23" West a distance of 56.49' to a point and the place of BEGINNING.

CONTAINING: 6,069 square feet, more or less (0.14 acres)

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

ACCOUNT NO. ████████████

LOT 69, 122 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 69 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 70 North 76° 57' 37" West a distance of 115.00 to a point; thence, along Tract #3R, North 13° 02' 23" East a distance of 48.64' to a point; thence, along Lot 68, South 76° 57' 37" East a distance of 115.00 to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 13° 02' 23" West a distance of 48.64 to a point and the place of BEGINNING.

CONTAINING: 5,594 square feet, more or less (0.13 acres)

LOT 70, 124 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 70 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 71, North 76° 57' 37" West a distance of 115.00' to a point; thence, along Tract #3R, North 13° 02' 23" East a distance of 22.00' to a point; thence, along Lot 69, South 76° 57' 37" East a distance of 115.00 to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 13° 02' 23" West a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,530 square feet, more or less (0.06 acres)

ACCOUNT NO. ████████████

LOT 71, 126 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 71 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 72, North 76° 57' 37" West a distance of 115.00' to a point; thence, along Tract #3R, North 13° 02' 23" East a distance of 22.00' to a point; thence, along Lot 70, South 76° 57' 37" East a distance of 115.00 to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 13° 02' 23" West a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,530 square feet, more or less (0.06 acres)

ACCOUNT NO. ████████████

LOT 72, 128 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 72 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 73,

6

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

North 76° 57' 37" West a distance of 115.59' to a point; thence, along Tract #3R, North 13° 02' 23" East a distance of 22.00' to a point; thence, along Lot 71, South 76° 57' 37" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way line, South 13° 02' 23" West a distance of 2.46' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way, by a curve to the left, with a radius of 325.00 a length of 19.55, with a chord bearing South 11° 18' 59" West a distance of 19.55' to a point and the place of BEGINNING.

CONTAINING: 2,534 square feet, more or less (0.06 acres)

ACCOUNT NO. ███████████████

LOT 73, 130 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 73 as shown on the "Final Subdivision Plan for Phase 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 74, North 76° 57' 37" West a distance of 117.67' to a point; thence, along Tract #3R, North 13° 02' 23" East a distance of 22.00' to a point; thence, along Lot 72, South 76° 57' 37" East a distance of 115.59' to a point on the western right-of-way line of Scully Place; thence, along said right-of-way by a curve to the left, with a radius of 325.00 a length of 22.10, with a chord bearing South 07° 38' 41" West a distance of 22.10' to a point and the place of BEGINNING.

CONTAINING: 2,563 square feet, more or less. (0.06 acres)

ACCOUNT NO. ███████████████

LOT 74, 132 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 74 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 75, South 88° 32' 06" West a distance of 122.41' to a point; thence, along Tract #3R, North 11° 54' 18" West a distance of 16.25' to a point; thence, along the same, North 13° 02' 23" East a distance of 55.78' to a point; thence, along Lot 73, South 76° 57' 37" East a distance of 117.67' to a point on the western right-of-way line of Scully Place; thence along said right-of-way, by a curve to the left, with a radius of 325.00 a length of 40.62, with a chord bearing South 02° 06' 57" West a distance of 40.60' to a point and place of BEGINNING.

CONTAINING: 6,802 square feet, more or less (0.16 acres)

ACCOUNT NO. ███████████████

LOT 75, 134 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 75 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 75, South 78° 05' 42" West a distance of 115.38' to a point; thence along Tract #3R, North 11° 54' 18" West a distance of 65.39' to a point; thence along Lot 74, North 88° 32' 06" East a distance of 122.41' to a point on the western right-of-way line of Scully Place; thence along said right-of-way, by a curve to the left having a radius of

7

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

325.00' a length of 43.53' and having a chord bearing South 05° 18' 06" East a distance of 43.50' to a point and the place of BEGINNING.

CONTAINING: 6,407 sq. feet (0.15 acres) more or less.

Account Number ██████████

LOT 76, 136 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 76 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D.)"; thence, along Lot 77, South 78° 05' 42" West a distance of 115.00' to a point; thence along Tract #3R, North 11° 54' 18" West a distance of 22.00' to a point; thence along Lot 75 North 78° 05' 42" East a distance of 115.38' to a point on the western right-of-way line of Scully Place; thence long said right-of-way, by a curve to the left having a radius of 325.00' a length of 15.69', and having a chord bearing South 10° 31' 18" East a distance of 15.69' to a point on the western right-of-way line of Scully Place; thence along said right-of-way line, South 11° 54' 18" East a distance of 6.32' to a point and the place of BEGINNING

CONTAINING: 2,532 sq. feet (0.06 acres) more or less.

Account Number ██████████

LOT 77, 138 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 77 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D)"; thence along Lot 78, South 78° 05' 42" West a distance of 115.00' to a point; thence along Tract #3R, North 11° 54' 18" West a distance of 22.00' to a point; thence along Lot 76 North 78° 05' 42" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence along said right-of-way line South 11° 54' 18" East a distance of 22.00' to a point and the place of BEGINNING.

CONTAINING: 2,350 sq. feet (0.06 acres) more or less.

Account Number ██████████

LOT 78, 140 SCULLY PLACE

ALL THAT CERTAIN tract of land situated in Fairview Township, York County, Pennsylvania, more particularly bounded and described as follows:

BEGINNING at a point said point being the southeastern corner of Lot 78 as shown on the "Final Subdivision Plan for Phases 2 & 3 of Revised Pleasant View Planned Residential Development (P.R.D)"; thence along Tract #3R, South 78° 05' 42" West a distance of 115.00' to a point; thence along the same, North 11° 54' 18" West a distance of 41.00' to a point; thence along Lot 77, North 78° 05' 42" East a distance of 115.00' to a point on the western right-of-way line of Scully Place; thence

CONTAINING: 4,715 sq. fee (0.11 acres) more or less.

Account Number ██████████

Property commonly known as: Lots 47 through 96 located in Phase 2 & 3 of the P Lewisberry, PA

8

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

## SCHEDULE B

## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO PURCHASED MORTGAGE LOANS

Borrower represents and warrants that:

(a)    No Outstanding Charges. Except for Permitted Encumbrances, as set forth on Schedule B of Lender's title policy, all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents, in each case, which may become a lien on the Premises, which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet delinquent.

(b)    No Defenses. The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Mortgage Note, the Mortgage or any other related Loan Document, or the exercise of any right thereunder, render either the Mortgage Note, the Mortgage or any other related Loan Document unenforceable, in whole or in part and no such right of rescission, set-off, counterclaim or defense has been asserted in writing with respect thereto, and no Mortgagor in respect of the Mortgage Loan was a debtor in any state or Federal bankruptcy or insolvency proceeding on the Closing Date of the Mortgage Loan.

(c)    Compliance with Applicable Laws. Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with.

(d)    Location and Type of Premises. The Premises consists of real property with a detached single family residence erected thereon, or a two- to four-family dwelling, including condominium units. No portion of the related Premises shall be used (i) for commercial purposes (other than the general rehabilitation of the Premises by the Mortgagor in the ordinary course of the Mortgagor's business), (ii) as the Mortgagor's primary residence or in any other manner that would cause the Premises to be considered an owner-occupied Premises or (iii) for any other personal or household purposes.

(e)    Valid First Lien. The Mortgage is a valid, subsisting, enforceable and perfected first priority lien and first priority security interest on the real property included in the Premises, including all buildings on the Premises and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing, subject only to Permitted Encumbrances as set forth in Schedule "B" of the Lender's title policy. Any security agreement, chattel Mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting and enforceable first lien and first priority security interest on the property described therein (subject to Permitted Encumbrances). The Premises was not, as of the Closing Date of the Mortgage Loan, subject to a Mortgage, Mortgage, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage.

9

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

(f)    <u>Validity of Mortgage Documents</u>.  The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor or guarantor, if applicable, in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms.  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan.  Seller or Seller's attorney has reviewed all of the documents constituting the Mortgage File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

(g)    <u>Doing Business</u>.  Borrower and all other parties which have had any interest in the Mortgage Loan, whether as Trustee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Premises is located, and (ii) to the extent required under the laws of such state, either (A) organized under the laws of such state, (B) qualified to do business in such state, (C) a federal savings and loan association, a savings bank or a national bank having a principal office in such state, or (D) not doing business in such state.

(h)    <u>No Mechanics' Liens</u>.  Except for Permitted Encumbrances, there are no mechanics' or similar liens or claims which have been filed for work, labor or material affecting the Premises which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage.

<u>**EXHIBIT "B"**</u>

10

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

### Certain Definitions

*"Award"* means any compensation paid by any Governmental Authority in connection with a Condemnation in respect to all or party of the Premises.

*"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. Section 101 et seq., as the same may be amended from time to time. And any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

*"Capital Expenditures"* means, for any period, amounts expended for repairs, replacements and alterations to any Premises.

*"Cash Management Account"* means an Eligible Account at the Cash Management Account Bank.

*"Cash Management Account Bank"* means the Eligible Institution selected by Lender to maintain the Cash Management Account.

*"Cash Management Agreement"* means the Cash Management Agreement among Borrower, Cash Management Bank and Lender, providing for the exclusive Control of the Cash Management Account by Lender, in the form reasonably acceptable to Lender.

*"Collections"* means, with respect to any Premises, all Rents, Other Receipts, Insurance Proceeds, Awards, Transfer Proceeds and all other payments received with respect to such Premises and all "proceeds" (as defined in the UCC of the State of the Premises) of such Premises.

*"Condemnation"* means a temporary or permanent taking by any Governmental Authority in the exercise of the right of condemnation or eminent domain, of all or any part of the Premises, or any interest therein or right accruing thereto, including any right of access thereto.

*"Control"* means the possession, directly or indirectly, of the power to direct or cause the management and policies of a Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled and Controlling shall have correlative meanings.

*"Eligible Account"* means a separate and identifiable account from all other funds held by the holding institution that is an account (or a subaccount thereof) maintained with an Eligible Institution. An Eligible Account shall not be evidenced by a certificate of deposit, passbook or other instrument.

*"Eligible Institution"* means a federal or state-chartered depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) whose long-term senior unsecured debt obligations are rated at least an "A" by S&P or "A3" by Moody's (or equivalent ratings by another rating agency approved by Lender if not rated by S&P or Moody's) or (ii) such other banking institution as is approved by Lender.

*"Eligible Lease"* means, unless otherwise approved by Lender, a written Lease that (i) is executed by an Eligible Tenant and Borrower (or, in the case of a Lease existing on the Closing Date, such Lease has been assigned to Borrower), (ii) has a rental rate and terms consistent with existing local market rates (iii) either (A) as of the date the Lease was executed, the Lease had a term of at least one (1) year and not more than three (3) years, or (b) is on a month-to-month basis and at the Closing Date the tenant under

11

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

such month-to-month lease has been in continuous occupancy of the applicable unit for at least six full calendar months, (iv) complies with all applicable Legal Requirements in all material respects and includes all disclosures required by applicable Legal Requirements, (v) covers 100% of the square footage of the applicable Premises (or a unit therein) and (vi) does not include any purchase option, right of refusal, right of first offer or other similar interest in any Premises in favor of any Tenant or other Person.

*"Eligible Tenant"* means a bona fide third-party lessee of a Premises who satisfies each of the following criteria: (i) Borrower verifies, based on bona fide written documentation, that the Tenant has sufficient financial resources to satisfy its obligation under the lease for the Premises, (ii) the Tenant is not subject to an ongoing bankruptcy proceeding as such date of initial screening (or if not so initially screened, as of the funding date of the Loan) and (iii) the Tenant is not a Relevant Party or director, officer, affiliate or immediate family member (spouse, lineal descendant, ancestor) of a Relevant Party

*"Event of Bankruptcy"* means, with respect to any Person: (i) such Person shall (a) fall generally to pay its debts as they come due, (b) make a general assignment for the benefit of creditors, (c) institute any case or other proceeding by such Person seeking to adjudicate it as bankrupt or insolvent, (d) seek liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of its debts or any similar action under the Bankruptcy Code or (e) take any action to authorize any of such actions or (ii) a case or other proceeding shall be commenced, without the application or consent of such Person in any court seeking liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestrator or the like for such Person or all of such Person under the Bankruptcy Code, and (x) such case or proceeding shall continue dismissed, or unstayed and in effect, for a period of sixty (60) consecutive days or (y) an order for relief in respect of such Person shall be entered in such case or proceeding or a decree or order granting such other requesting relief shall be entered.

*"Existing Management Agreement"* means for any Existing Manager other than the Borrower or an Affiliate of Borrower, an agreement or agreements to manage the Mortgage Properties on commercially reasonable market terms. There is no requirement for a written agreement if the Existing Manager is the Borrower or an Affiliate of Borrower.

*"Existing Manager"* means the current manager of the Premises which may be the Borrower or an Affiliate of Borrower or a 3rd party approved by Lender in its sole discretion.

*"Governmental Authority"* means any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, commonwealth, county, district, municipal, city, foreign or otherwise) whether now or hereafter in existence.

*"Improvements"* means the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on any Premises.

*"Insurance Proceeds"* means property and business interruption insurance proceeds paid or payable to Borrower or Lender in connection with damage to or destruction of a Premises.

*"Legal Requirements"* means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Loan, any Secondary Market Transaction with respect to the Loan, a Relevant Party or a Premises or any part thereof or the use or operating thereof, whether now or hereafter enacted.

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

*"Loan Documents"* means, collectively, this Agreement, the Note, the Guaranty, each collateral agreement and all other agreements, instruments and documents delivered pursuant thereto or in connection therewith.

*"Material Adverse Effect"* means a material adverse effect on (a) the property, business, operations or financial condition of any Relevant Party, (b) the use, operation or value of a Premises, (c) the ability of any Relevant Party to satisfy its obligations under the Loan Documents when due, or (d) the enforceability or validity of any Loan Document, the perfection or priority of any lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document.

*"Management Agreement"* means a commercially reasonable agreement pursuant to which any Person has any right or obligation to manage, lease or collect rent from any of the Premises. The only Management Agreements permitted hereunder are the Existing Management Agreement and any Replacement Management Agreement as to which the requirements herein have been satisfied.

*"Manager"* means Existing Manager or, if the context requires, a Qualified Manager who is managing one or more of the Premises in accordance with the terms and provisions of this Agreement pursuant to a Management Agreement.

*"Premises"* means, individually, and *"Premises"* means, collectively, the property encumbered by the Mortgages; the Premises include the Improvements now or hereafter erected or installed thereon and other personal property owned by Borrower located thereon, together with all rights pertaining to such real property, Improvements and personal property.

*"Obligations"* means, collectively, each and all obligations of the Relevant Parties under the Loan Documents, including (i) Borrower's obligations for the payment of the Debt including, without limitation, interest that accrues after any Event of Bankruptcy, regardless of whether such interest is allowed or allowable in any proceeding relating to such Event of Bankruptcy; and (ii) payment of all operating expenses and capital expenditures necessary for the operating of the Premises as required by this Agreement.

*"Other Receipts"* means collections by Borrower in respect of the Premises from sources other than Rents.

*"Payment Date"* means the 10th day of each calendar month until payment in full of the Debt, commencing at the Loan closing.

*"Permitted Investment"* means the investments described in clause (i) below, subject to qualifications set forth in clause (ii) below:

(i)    (a) obligations of, or obligations guaranteed as to principal and interest by, the United States government or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States; (b) federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 365 days of any bank, the short-term debt obligations of which are A-1+ (or the equivalent) by each of the Rating Agencies, it being understood that the A-1+ benchmark rating and other benchmark ratings in this Agreement are intended to be the ratings, or the equivalent of ratings, issued by S&P; (c) deposits that are fully insured by the Federal Deposit Insurance Corp.; (d) debt obligations that are rated AA (or equivalent) by each of the Rating Agencies and (f) investment in money market funds rated AAAm or AAA-G (or the equivalent) by each of the Rating Agencies.

13

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

(ii)      Notwithstanding the forgoing, "Permitted Investments" shall (a) exclude any security with the S&Ps "r" symbol (or any other Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any Mortgage(s)-backed securities and any security of the type commonly known as "strips"; (b) not have maturities in excess of one year; (c) be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; and (d) exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment. Interest may either be fixed or variable interest must be tied to a single interest rate which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity. All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase or (y) the business day preceding the day before the date such amounts are required to be applied hereunder.

*"Person"* means any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

*"Property Documents"* means each agreement relating to a Premises, each permitted lien affecting a Premises and each other instrument binding on Borrower or any Premises, including any reciprocal easement agreement, declaration of covenants, conditions and restrictions and any condominium or home owner's association governing documents, rules and regulations.

*"Property Taxes"* means any real estate and personal property Taxes, assessments, water charges, sewer rents, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto now or hereafter levied or assessed or imposed by a Governmental Authority against Property, any collateral, any part of either of the foregoing, or Borrower.

*"Qualified Manager"* means (i) Existing Manager or (ii) a reputable professional property manager that (a) has at least two (2) years' experience in the management of at least the same number of and types of properties which secure the Loan as of the Closing Date, and (b) is not subject to an Event of Bankruptcy,

*"Relevant Party"* means Borrower and any Guarantor (and, collectively, "Relevant Parties").

*"Replacement Manager"* means an (i) Existing Manager, or (ii) a Qualified Manager, or (iii) another Manager approved by Lender in its sole discretion.

*"Rents"* means, with respect to each Property, all rents and rent equivalents and any fees, payments or other compensation from any Tenant.

*"Replacement Management Agreement"* means a Management Agreement other than the Existing Management Agreement between Borrower and a Qualified Manager, which agreement satisfied the requirements set forth herein and is in form and substance approved by Lender.

*"Reserves"* means collectively, the Insurance Reserve and the Tax Reserve each of which shall, individually be a "Reserve."

*"Tenant"* means any Person obligated by contract or otherwise to pay monies under any Lease now or hereafter affecting all of any part of the Premises.

14

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

*"Transfer"* means any transfer of any kind (including any gift, conveyance, lease, sublease, sale or Lien) with respect to all or any part of or any interest (whether direct or indirect, ownership, beneficial or otherwise, and irrespective of the number of tiers of parties having interests) in any Collateral or Borrower, or direct or indirect constituent of Borrower, whether voluntarily or involuntarily and whether directly or indirectly, by operating of law or otherwise. Without limitation, "Transfer" includes (i) an installment sales agreement wherein by which the Premises or any part thereof is to be sold for a price to be paid in installments; (ii) an agreement for the leasing of all or a substantial part of a Premises for any purpose other than the actual occupancy by a Tenant thereunder; (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iv) if any direct or indirect constituent is a corporation; the voluntary or involuntary sale, conveyance or transfer of such corporation's stock, or the creation or issuance of new stock, or entering into any agreement to do any of the foregoing; (v) if Borrower or any direct or indirect constituent is a partnership, limited liability company , or other change of control of any partner, member, or other interest holder, or the issuance of any new partnership, membership or other entity interest, or entering into any agreement to do any of the foregoing; (vii) granting or sufferance of any purchase option, right of first refusal, right of first offer or other similar rights in favor of any Tenant or other Persons.

*"Transfer Expenses"* means, with respect to the Transfer of any Premises, the reasonable expenses of Borrower incurred in connection therewith not to exceed six percent (6.00%) of all gross accounts realized with respect thereto, for any of the following: (i) third party real estate commissions, (ii) the closing costs of the purchaser of such Premises actually paid by Borrower and (iii) Borrower's miscellaneous closing costs, including title, escrow and appraisal costs and expenses.

*"Transfer Proceeds"* means, with respect to the Transfer of any Premises, the gross sales price for such Premises (including any earnest money, down payment or similar deposit included in the total sales price paid by the purchaser), less Transfer Expenses.

15

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

**EXHIBIT "C"**
**EXCEPTIONS TO REPRESENTATIONS AND WARRANTIES IN SECTION 2**

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP

## EXHIBIT "D"
## FORM OF TENANT DIRECTION LETTER

Date

[Tenant]

Re: [Describe Lease] (the "Lease")

To Whom It May Concern:

Please be advised of new Lease payment instructions for your home effective immediately. All payments due under the Lease should be delivered as follows:

(i) If by check, money order, or its equivalent, please mail such items to:

**[INSERT LOCKBOX ACCT. INFO]**

_____

_____

_____

Attn:
Facsimile No.

**[INSERT LOCKBOX ACCOUNT INFO.]**

Payee:            _____
ABA Routing #:    _____
For Account:      _____
Account #:        _____
Bank Contact:     _____

This payment direction may not be rescinded or altered, except by a written direction signed by [INSERT ORIGINATOR], its successors and/or assigns or its agent. The foregoing payment direction is irrevocable, except with the written consent of our Mortgage(s), [INSERT ORIGINATOR] (or its successors or assigns) notwithstanding any future contrary request or direction from the undersigned or any other person (other than [INSERT ORIGINATOR] (or its successors or assigns)).

Thank you for your cooperation.

Very truly yours,

[BORROWER NAME], LLC
[a/an Entity Jurisdiction and Type]

By: _____
Name:
Title:

17

Copyright 2019 LaRocca, Hornik, Rosen & Greenberg LLP