**UNITED STATES BANKRUPTCY COURT**
**FOR EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| Lewisberry Partners, LLC | : |
| | : Case No. 21-10327-ELF |
| Debtor. | : |
| | : |

**RESPONSE AND OBJECTION OF HOF GRANTOR TRUST 1, U.S. BANK TRUST, N.A., AND FAY SERVICING, LLC, TO DEBTOR'S MOTION (I) GRANTING EXPEDITED CONSIDERATION, SHORTENED TIME AND LIMITED NOTICE; (II) TO REOPEN CHAPTER 11 BANKRUPTCY CASE PURSUANT TO 11 U.S.C. §350(B) AND RULE 510 OF THE FEDERAL RULES OF VACANCY PROCEDURE; (III) COMPELLING U.S. BANK TRUST NATIONAL ASSOCIATION TO COMPLY WITH THE LOAN DOCUMENTS, THE SETTLEMENT AGREEMENT AND PLAN; AND (IV) GRANTING RELATED RELIEF**

HOF Grantor Trust 1 (the "Trust"), U.S. Bank Trust, N.A. (the "Trustee") and Fay Servicing, LLC ("Fay"; the Trust, the Trustee and Fay, collectively "Lender"), by their counsel, Weber Gallagher, hereby responds and objects to the Debtor's above Motion, as follows:

**I.   COUNTERSTATEMENT OF FACTUAL BACKGROUND**

**A.   THE LOAN DOCUMENTS**

1. On June 26, 2019, Lewisberry Partners, LLC, a Pennsylvania limited liability company ("Debtor"), executed a Loan Agreement in favor of Loan Funder LLC, Series 7693 ("Loan Funder"), a Delaware limited liability company, regarding a loan in the original principal amount of $8,025,000 (the "Loan Agreement").

2. On June 26, 2019, Debtor, executed a Commercial Promissory Note in favor of Loan Funder, in the original principal amount of $8,025,000 (the "Note"). The Note provides that it is solely for business and commercial purposes.

3. The Note is secured in part by a June 26, 2019 Mortgage given to Loan Funder by the Debtor granting Loan Funder a mortgage lien on 30 single-family properties located in

Fairview Township, York County, Pennsylvania (the "Debtor Mortgage"). The Debtor Mortgage was recorded with the York County Recorder of Deeds on July 8, 2019 at Instrument Number 2019028748. The Debtor Mortgage was subsequently assigned to Lender.

4. The Note is also secured in a Mortgage executed by Richard Puleo, the primary owner of the Debtor, and his wife Lorraine, in favor of Loan Funder, which was recorded with the York County Recorder of Deeds at instrument number 2019028470 (the "Puleo Mortgage"). The Puleo Mortgage granted Loan Funder mortgage lien on an additional 20-single family properties located in York County Pennsylvania . The Puleo Mortgage was subsequently assigned to the Lender.

5. The Note is also personally guaranteed by Richard Puleo (the "Puleo Guaranty"). The Note, Debtor Mortgage, Puleo Mortgage, Puleo Guaranty, Loan Agreement and all related documents hereinafter collectively referred to as the "Loan Documents").

6. The loan is being serviced by Fay Servicing, LLC.

7. The Note bears interest at the non-default rate of 8% for the first five years, equating to a monthly payment of $53,066.67, whether or not the loan has been accelerated, then at the default rate of interest is the lesser of 23% per annum or the maximum rate allowed by law. See paragraph 5 of the Note.[1]

---

[1] While the Debtor has never raised a challenge to the propriety of the default interest rate, it is nevertheless allowable under New York law, which governs the Note. "Even where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness and equity. *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir.1992) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous ... nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.") (citation omitted); *In re Johns–Manville Corp.*, 2012 WL 667084, at *10 (S.D.N.Y.2012) *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 171 (2002); *In re Woodmere Invs. Ltd. P'ship,* 178 B.R. 346, 355 (Bankr.S.D.N.Y.1995) ("[W]hen two sophisticated parties enter into a contract calling for an established rate on default, this Court will not disturb the agreement absent persuasive evidence of overreaching.") The requirement that the agreement must be enforced in accordance with its

B. **DEBTOR DEFAULTS UNDER THE LOAN DOCUMENTS, FILES FOR BANKRUPTCY, LAUNCHES FRIVOLOUS LAWSUIT AGAINST LENDER, AND FILES MULTIPLE UNSUCCESSFUL CRAMDOWN PLANS AGAINST LOAN FUNDER**

12. Debtor failed to make the monthly payment due in the month of April, 2020. The Note provides that it is an Event of Default if "Maker fails to pay any installment of principal and/or interest or any other charges due under this Note within five days after the same becomes due and payable." See Exhibit A attached hereto, which is the Promissory Note. Accordingly, from and after April 6, 2020, the loan was in default, and has remained in default ever since.

15. On February 9, 2021, Debtor filed for Chapter 11 Bankruptcy. The case was assigned to the Honorable Eric L. Frank.

16. On June 30, 2021, Debtor filed a lawsuit against Lender and Fay Servicing, alleging various forms of lender liability. This was the beginning of the hyper-aggressive posture taken by the Debtor towards Loan Funder and Fay Servicing throughout the case, although all of their arguments and all of their cramdown attempts were utterly without merit, as ultimately held by Judge Frank.

17. On July 12, 2021, Judge Frank dismissed the complaint for failure to follow the Federal Rules of Civil Procedure. Thereafter, Loan Funder filed a Motion to Dismiss the

---

terms "has even greater force in the context of real property transactions, where commercial certainty is a paramount concern and where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 634 N.Y.S.2d 669, 658 N.E.2d 715, 717 (1995). A*ccord Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876, 879 (2004). Here, there is no basis in law to disturb the parties' bargain. The Debtor and the Original Lenders were sophisticated parties that entered into an $84 million real estate loan agreement." *In re 785 Partners, LLC*, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012). S*ee also Emigrant Funding Corp. v. 7021 LLC,* 25 Misc.3d 1220(A), 901 N.Y.S.2d 906, (Sup.Ct. Queens Co. Oct. 26, 2009) (enforcing 24% default interest rate where original rate was 7.25%).

3

Complaint and Debtor filed a response thereto. No further action was taken on the lawsuit filed by Debtor.

18. On May 10, 2021, Debtor filed its first cramdown plan against Loan Funder ("First Cramdown Plan") and its first Disclosure Statement.

19. On September 8, 2021, Debtor filed its Amended cramdown plan against Loan Funder ("Amended Cramdown Plan") and its second Disclosure Statement.

20. On October 26, 2021, Debtor filed its Second cramdown plan against Loan Funder ("Second Amended Cramdown Plan") and its third Disclosure Statement.

21. On November 12, 2021, Debtor filed its Third cramdown plan against Loan Funder ("Third Amended Cramdown Plan") and its fourth Disclosure Statement.

22. While all of the specific details of all of the Debtor's cramdown plans are not relevant hereof, suffice it to say that the terms that the Debtor was attempting to impose on Loan Funder were utterly absurd, virtually attempting to wipe out Lender's claim in full and paying a 3% interest rate if in fact the claim was not erased in full. In addition, even though Loan Funder was forced to pay hundreds of thousands of dollars in real estate taxes which the Debtor had not paid, all of the cramdown plans attempted to avoid any responsibility of reimbursement for any of those tax payments.

**C. JUDGE FRANK DENIES CONFIRMATION OF ALL OF DEBTOR'S CRAMDOWN PLANS, FORCING DEBTOR TO ENTER INTO A SETTLEMENT AGREEMENT WITH LOAN FUNDER AND TO PAY ALL OF LOAN FUNDER'S LEGAL FEES**

22. On February 3, 2022, Judge Frank denied Debtor's Third Cramdown Plan.

23. Not deterred, on March 3, 2022, the Debtor filed its Fourth Amended Cramdown Plan. Loan Funder objected to this Fourth Cramdown Plan, just as it had objected to every other Cramdown Plan filed by the Debtor.

4

24. On July 1, 2022, Judge Frank denied confirmation of the Fourth Amended Cramdown Plan and also issued a 38-page decision as to why it was not confirmable. He concluded that the Fourth Amended Cramdown Plan was unconfirmable for a multitude of reasons. Every single one of Debtor's cramdown plans was filed with no prior discussions with the Lender and not the slightest effort to work out a consensual arrangement with the Lender, a strategic decision which would ultimately come back to haunt the Debtor, as it was forced to pay $645,000 in totally wasted legal fees (including $200,000 of Lender's legal fees, and at least $445,000 to the Obermayer firm), all for no benefit to the debtor whatsoever.[2]

25. After denial of the Fourth Amended Cramdown Plan, the parties entered into Settlement Discussions. The result of those settlement discussions resulted in a Settlement Agreement filed with the court on August 3, 2022. A true and correct copy of that Settlement Agreement is attached hereto as Exhibit B.

26. The Settlement Agreement provided in relevant part as follows:

a. The amount of the debt owed to Lender under the Loan Documents at that time was $8,880,413, which was due and owing without defense, counterclaim or offset.

---

[2] Approximately $200,000 of this was legal fees incurred by Loan Funder in opposing both the lawsuit filed by Debtor, as well as the Debtor's multiple absurd cramdown plans, as result of which the Debtor agreed to pay all of Lender's Legal fees. In addition, Debtor's counsel later filed its own fee application for $445,000 which was granted by this court on September 12, 2022. <u>This means that, by taking the nuclear attack approach against Loan Funder since day one of the bankruptcy, rather than ever trying to resolve this matter with Loan Funder, the Debtor was forced to pay $645,000 in legal fees both to its own counsel and to counsel for Loan Funder</u>. (Of course, the amount for which Debtor will be liable has increased substantially since then as result of Debtor's default under the Settlement Agreement as discussed further herein, not only with respect to the further incurrence of fees by its own at counsel, but with respect to the legal fees of Loan Funder and Fay Servicing as well.)

b.     The Debtor gave deeds-in-lieu of foreclosure to the unsold mortgaged properties. Because there had been five properties sold during the bankruptcy, there were still 45 unsold properties at the time of the Settlement Agreement

c.     Under the Settlement Agreement, the Debtor was given a full additional year, or until August 31, 2023 to attempt to sell the mortgaged properties. See paragraph 6 of the Settlement Agreement. Each of the mortgaged properties had to be sold for at least the release prices which were attached as Exhibit A to the Settlement Agreement.

d.     All of the Loan Documents including the Puleo Guaranty, remain in full force and effect.

e.     So long as the debtor was not in default of the Agreement, all net sales proceeds would be applied to reduce the principal owing on the Debt. However "if the Debtor or Puleo's are in default, any Sale Proceeds or Refinance Proceeds shall be applied consistent with the Lender's application of payment clauses in the Loan Documents." See paragraph 11.7. The Note in turn provided that "all payments received will be credited first to late charges and costs hereunder, then to interest accrued at the applicable interest rate hereinafter set forth, with the balance on account of principal." See Exhibit A attached hereto, which is the Promissory Note, at paragraph 1E.

f.     The most relevant portions of the Settlement Agreement for purposes of Debtor's present Motion are here quoted in full. <u>Tellingly, Debtor never bothers to quote any of the following language in its Motion</u> likely because it is absolute cause to deny Debtor's Motion.

<u>Deeds-in-Lieu and Uncontested Foreclosures.</u>

15.1 Deeds-in-Lieu. On the Effective Date, the Debtor and Puleos shall prepare and transmit to Lender deeds for each of the Puleo Properties and Lewisberry Properties. Unless the Puleos or Debtor are in default of this Agreement, Lender shall not record these deeds.

15.2 Determination of Fair Value. ***IF LENDER ELECTS TO RECORD DEEDS-IN-LIEU OR SEEK AN UNCONTESTED JUDGMENT FOR FORECLOSURE,*** the Parties shall make a good faith effort to fix the amount owed and the value of the Lewisberry Properties and Puleo Properties by agreement. If the Parties cannot agree, Lender shall move to enforce this Section before the Bankruptcy Court and to fix the amount owed pursuant to this Agreement and the fair net market value of the Lewisberry Properties and Puleo Properties pursuant to the legal standard in 42 Pa.C.S.A. §8103 (a "Fair Value Motion"). The Debtor and Puleos have sixty (60) days from the date of the filing of a Fair Value Motion to obtain an appraisal to be presented as evidence in the hearing on the Fair Value Motion. Lender may, at its option, obtain its own appraisal. The Bankruptcy Court shall fix the amount owed and the fair market value of the Lewisberry Properties and Puleo Properties. Lender may then, in its sole discretion, seek judgment in foreclosure pursuant to Section 15.3 of this Agreement or record the deeds-in-lieu or for any Puleo Properties or Lewisberry Properties. Upon the recording of a deed-in-lieu or entry of a foreclosure judgment with respect to a property, Lender shall credit 90% of the value of that property, as determined by the Fair Value Motion, to reduce the Debt Amount. If Lender credits an amount equal to the amount due pursuant to this Agreement, it shall release or satisfy the mortgage as to all properties not taken by deeds-in-lieu or subject to a judgment in foreclosure pursuant to this Section. ***NOTHING HEREIN SHALL REQUIRE THE LENDER TO RECORD DEEDS IN LIEU OF FORECLOSURE OR TO SEEK JUDGMENT FOR FORECLOSURE IF THERE IS AN EVENT OF DEFAULT HEREUNDER***, and Lender's options if there is an uncured Event of Default include, but are not limited to, foreclosure on any of the Lewisberry Properties or Puleo Properties or pursuing its rights under the Guaranty. Notwithstanding anything herein, nothing shall preclude Lender from filing a Fair Value Motion to value some or all of the Lewisberry Properties or Puleo Properties if any amount remains owing under this Agreement. 15.3 Uncontested Foreclosure. The Parties agree that upon a default or Event of Default hereunder or under the Loan Documents, Lender has the right, but not the obligation, to foreclose on any of the Lewisberry Properties or Puleo Properties then owned by Lewisberry or the Puleos, and in such event, the amount owed under this Agreement and the values of the properties are preclusively determined by the outcome of a Fair Value Motion for the purposes of this Section. If Lender elects to seek judgment in foreclosure pursuant to this Section, the Debtor and Puleos waive all defenses to the entry of a foreclosure judgment and consent to the entry of an uncontested judgment in foreclosure consistent with Section 15.2 of this Agreement.

16. Remedies; No Waiver

16.1 If there is an Event of Default, (a) the Default Rate shall go into effect as of said date on the amount then owing hereunder or under the Loan Documents, as the same may be modified in connection herewith, (b) ***LENDER SHALL HAVE THE OPTION, BUT NOT THE OBLIGATION TO RECORD ANY OF THE DEEDS IN LIEU,*** (c) Lender may exercise all of its rights and remedies against the Debtor or the Puleos as set forth in the Loan Documents as the same may be modified in connection herewith, including without limitation, the Note, the Lewisberry Mortgage, the Puleo Mortgage and the Guaranty, and (d) Lender may directly demand and receive rents from the tenants and occupants of the Puleo Properties pursuant to the Puleo Rent Demand and may directly demand and receive rents from tenants and occupants of the Lewisberry Properties, all of the foregoing rights and remedies which may be exercised without bankruptcy court approval and without needing to obtain relief from the automatic stay.

7

16.2 The remedies provided pursuant to this Agreement are cumulative. The exercise of any remedy by Lender does not constitute waiver of other available remedies. (emphasis added)

27. The Settlement Agreement, as well as a Fourth Amended Plan which embodied the terms of the Settlement Agreement, were approved by Judge Frank on August 4, 2022. In addition, the Order entered by Judge Frank specifically provides: "In the event of any inconsistency between the Settlement Agreement, Amended Plan or Motion with respect to the treatment of the claim(s) of U.S. Bank, as Trustee of HOF Grantor Trust I, the terms of the Settlement shall control."

### D. DEBTOR DOES VIRTUALLY NOTHING DURING THE ONE-YEAR EXTENSION AND THEN DEFAULTS UNDER THE SETTLEMENT AGREEMENT

27. At the time the bankruptcy was filed in February, 2021, as discussed above, there were a total of 50 properties which were mortgaged on the loan, 30 of which belonged to the Debtor and 20 of which belonged to Mr. Puleo and his wife.

28. During the entire bankruptcy, and until August, 2022, the Debtor only sold five of the 50 properties.

29. Then, during the additional one-year period which the Debtor was given to pay off the remaining balance on the loan (i.e. until August 31, 2023), the Debtor only sold three additional properties.

30. Accordingly, of the original 50 properties, the Debtor is still holding on to 42 of those properties. Moreover, upon information and belief, Debtor has none of those 42 properties currently listed for sale, or at most only a tiny handful.

31. It is therefore no surprise that Debtor did not come even close to paying off the Loan on the August 31, 2023 maturity date. The Debtor therefore defaulted under the Settlement Agreement and this is an undisputed fact in the case. In fact, because the Debtor

8

bothered to sell so few properties between the August 3, 2022 Settlement Agreement Date and the August 31, 2023 maturity date, the principal balance owed under the loan has not appreciably reduced from what it was on the settlement date, even aside from accrual of interest.

33. Shortly after the default under the Settlement Agreement, the Debtor, through counsel, took the position that Loan Funder was <u>obligated</u> to either come to agreement with Loan Funder as to the value of each of the Mortgaged Properties or to file a Motion to Fix Fair Market Value and record deeds in lieu a foreclosure in the process, then crediting the debtor for the value of those properties, whether or not the parties had to litigate over those values. That is of course the <u>exact same position</u> that Debtor is now taking in its Motion, namely <u>that Loan Funder should be forced to record deeds in lieu at this time, notwithstanding the fact that this is directly contrary to the terms of the Settlement Agreement, which of course the Debtor never bothers to quote from in its Motion</u>.

33. In fact, the Debtor specifically concedes in its Motion, as it must, that Loan Funder is not obligated to record deeds in lieu of foreclosure: Uunder the Settlement Agreement, upon an event of default, the Lender had the **option** to (i) record a sufficient number of Deeds in Kapalua foreclosure granted in connection with the Settlement Agreement, and in the Lender's possession to pay the indebtedness, (ii) seek uncontested judgment for foreclosure for a sufficient number of Puleo or Lewisberry Properties to satisfy the indebtedness or (iii) exercise its rights under the Loan Documents." See Motion at paragraph 74 (emphasis added).

E. **LENDER OFFERS TO EXTEND THE MATURITY DATE BY AN ADDITIONAL YEAR**

30. In its Motion, the Debtor repeatedly alleges that Lender is doing nothing after Debtor's default, while allowing default interest to accrue, and indeed, this is the basis for its request for equitable relief. For example, in paragraph 50, Debtor alleges that Lender is

9

"sit[ting] back and doing nothing. Similarly, in paragraph 76, Debtor alleges that lender is "sitting idly by." Again, in paragraph 89, debtor alleges that the Lender is "doing nothing." In fact, it is this repeated allegation of "doing nothing" that is the basis of Debtor's arguments regarding good faith and fair dealing.

31. All of the foregoing allegations are patently false. While it is not necessarily appropriate or necessary to disclose the exact details of the back-and-forth discussions, in this case, due to all of the Debtor's allegations to the effect that Loan Funder is allegedly "doing nothing", and that this active idleness is the basis for equitable relief, under the circumstances of this case, it is important to disclose the general outline what Loan Funder has offered to the Debtor, and which the Debtor has refused, because it is central to this Motion.

32. More specifically, Loan Funder offered the Debtor a full additional year to pay off the loan, and not only that, Lender offered to do so without default rate interest so long as the Debtor remained in compliance with the agreement. However, Debtor refused that offer. In fact, the irony here is that the Debtor accuses Loan Funder of "doing nothing," when in fact it is the Debtor who is doing nothing by failing or refusing to sell hardly any of the 50 mortgaged properties. As noted above, upon information and belief, either none of the remaining 42 properties are listed for sale now, or very few of them at most.

33. One of the back-and-forth emails which was sent by the undersigned to counsel for the Debtor is attached hereto as Exhibit C. Because Debtor is attempting to make Loan Funder's conduct after the loan default the central issue in its Motion (e.g. the alleged lack of good faith and fair dealing), and more specifically the alleged inaction of, or lack of an offer from, Loan Funder, and because the points made in the attached email are the same points made in this pleading, and because we are not disclosing Debtor's position in settlement discussions, it is

appropriate to quote that email herein. It was sent on October 31, 2023. It provides in relevant part as follows

Michael— Please note the following: …

    My client is certainly not "sitting back and doing nothing while collecting default rate interest." In fact, we have made you an offer which allows your client a full year to sell the properties and/or satisfy the loan balance by other means, <u>without default rate interest</u>, but your client apparently has rejected that. In addition, I note that your client had a full additional year already to pay off this loan, and during that year, he chose to sell only a small fraction of the 45 or so properties which he owns, and thus the principal balance of the loan was hardly reduced at all., That is not my client's fault.  Your client was always aware (and specifically agreed in the Settlement Agreement) that if the loan balance was not paid off by August 31, then default rate interest would begin accruing. It sounds like your client doesn't care to take the time or trouble to make the effort to sell the properties himself.

    [Next], with respect to "compelling" my client to litigate with your client regarding the values of the properties, the terms of the Settlement Agreement are perfectly clear. More specifically, the Agreement is clear that the fair market value litigation process only occurs <u>if we elect to record the deeds in lieu of foreclosure</u>. I have already notified you that my client does not so elect. Even beyond that, the Settlement Agreement specifically provides that nothing in the Agreement shall require the lender to record the deeds in lieu of foreclosure or seek judgment for foreclosure if there is an Event of Default. Thus, the language of the Settlement Agreement could not be any clearer. Moreover, even aside from the unambiguous language of the Settlement Agreement, it simply makes more sense to see what the properties go for in the real world, rather than relying on the vagaries and uncertainties resulting from a battle of the appraisers, if that were to ensue. Your client is also undoubtedly in the best position to maximize the actual sale prices. Finally, even if there were no dispute at all as to the values of the properties, my client does not choose to take a whole bunch of properties into REO at this time. In fact, our awareness of this possibility was the very reason that the Settlement Agreement specifically provides that the fair market value process only applies if the Lender elects to record the deed in lieu and why it further specifically provides that nothing in the agreement shall require it to record the deeds in lieu.

    Finally, with respect to your filing of an "expedited" Motion, first, this is not an emergency situation. Default interest started accruing two months ago.  Moreover, your client knew for a full year before that that default rate interest would begin accruing if the loan balance was not paid off by August 31, and yet only chose to sell off a very small number of properties during that time. Second, as noted above, we specifically offered your client significant additional time to sell the properties or to satisfy the loan balance by other means, *without default interest*, and that was rejected by your client. I also note that it took a full nine days just to say no our proposal.

11

II. **ARGUMENT**

A. **THIS MATTER IS GOVERNED BY THE CLEAR AND UNAMBIGUOUS TERMS OF THE SETTLEMENT AGREEMENT**

Quite simply, the Debtor is attempting to request this court to rewrite the clear and unambiguous terms of the Settlement Agreement. More specifically, the Debtor is seeking to compel Loan Funder to value the properties (voluntarily or involuntarily), and then to record the Deeds in Lieu of Foreclosure and credit the value of those properties against the remaining loan balance in so doing. However, the Settlement Agreement could not be any clearer that Loan Funder is not obligated to do either one of these things. The fact is that the Debtor struck a very clear deal with Loan Funder after its final cramdown plan was denied by Judge Frank, that Settlement Agreement was approved by Judge Frank, and the Debtor is now asking the court to rewrite that Agreement.

Section 15.1 of the Settlement Agreement begins with: "*If* Lender elects to record deeds-in-lieu or seek an uncontested judgment for foreclosure, the Parties shall make a good faith effort to fix the amount owed and the value of the Lewisberry Properties and Puleo Properties by agreement." In other words, the process of attempting to fix the fair market value for the properties only applies if the Lender elects to record the deeds in lieu of foreclosure or to foreclose. However, if Lender elects not to record the deeds in lieu of foreclosure or to foreclose, the valuation process is irrelevant and not to be imposed on Lender.

In addition, if that was not explicit enough, Section 15.1 goes on to provide: ***Nothing herein shall require the Lender to record deeds in lieu of foreclosure or to seek judgment for foreclosure if there is an event of default hereunder***. Similarly, when there is an event of default under the Settlement Agreement, such as exists now, then Section 16.1 again provides

unequivocally: "***Lender shall have the option, but not the obligation, to record any of the Deeds in Lieu.***"

How much clearer can the Settlement Agreement be to the effect that the Lender is under no obligation to either value the properties or to record the Deeds in Lieu of Foreclosure? In fact, it is no doubt this exact clarity which explains why, even though the Debtor is seeking to compel compliance with the Settlement Agreement, it doesn't quote a single word of the Settlement Agreement relating to these issues.

Presumably recognizing that the clear terms of the Settlement Agreement itself utterly negate what the Debtor is here trying to accomplish, the Debtor in its Motion instead attempts a different tack, which is to request this Court to completely ignore the clear and unambiguous language of the Settlement Agreement and instead to rewrite that agreement via an overlay of good faith and fair dealing. However, as discussed in the following sections, not only does this doctrine not exist in Pennsylvania where there is a contractual arrangement between the parties, but it is also the Debtor who was doing nothing in this case, and instead rejecting a very reasonable settlement offer made by the Lender.

**B. PENNSYLVANIA DOES NOT RECOGNIZE AN INDEPENDENT CAUSE OF ACTION FOR BREACH OF GOOD FAITH AND FAIR DEALING WHERE THERE IS A CONTRACTUAL ARRANGEMENT BETWEEN THE PARTIES**

The gist of the Motion is to allege that Lender has violated in alleged duty of good faith and fair dealing by failing to record the deeds in lieu of foreclosure and credit the Debtor with the values of those properties, regardless of whether or not those values are disputed. See, e.g. paragraphs 71, 73, 87 and 90. As a threshold matter, Debtor is flatly incorrect when it states that New York law applies to this matter. See Debtor's Motion at 70-71 (which is not to say that a different result would obtain under New York law). Rather, the Debtor's motion arises under the Settlement Agreement, and not the Loan Documents, and the Settlement Agreement

13

specifically provides that the validity, interpretation and performance of the Agreement shall be construed and interpreted in accordance with Pennsylvania law. See paragraph 25.

To be clear, as discussed herein, the Debtor is not alleging that the Lender has breached any portion of the Settlement Agreement. In fact, as noted, at no point does the Debtor's Motion ever even suggest any such breach, much less point to any specific provision of the Settlement Agreement that was allegedly breached. Rather, the Debtor is arguing that this court should rewrite the contract and/or circumvent the Settlement Agreement to impose new terms on the Lender which do not now exist.

Pennsylvania law is clear that there is no independent cause of action in Pennsylvania for a violation of a covenant of good faith and fair dealing, especially in the face of a fairly negotiated contract between the parties approved by the court. As held in a recent case:

> Pennsylvania law, however, does not recognize an independent cause of action for breach of an implied covenant of good faith and fair dealing. *McCabe v. Marywood University*, 166 A.3d. 1257-1261, n.2 (Pa. Super. 2017); *see also Carter P. v. Pook & Pook, LLC*, No. 14 Civ. 5715 (LFS), 2017 WL 6497340, at *6 (E.D. Pa. Dec. 19, 2017) ("[A] breach of the covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith.") (citation omitted); *Gentex Corp. v. Helicopter Helmets, LLC*, 17 Civ. 1136 (MWB), 2018 WL 827539, at 3 (M.D. Pa. Feb. 12, 2018) (same). Rather, "the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations." *Hanaway v. Parkesburg Grp., LP*, 132 A.3d 461, 471–72 (Pa. Super. 2015), *aff'd in part and rev'd in part on other grounds*, 641 Pa. 367, 168 A.3d 146 (2017). "Under Pennsylvania law, the covenant attaches to existing contractual obligations; it does not add new contractual duties." *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 583 (W.D. Pa. 2017). Accordingly, absent breach of an underlying contract, there is no basis to claim breach of a covenant implied in that contract. *See Gentex Corp.*, 2018 WL 827539, at 3. Seibel v. National Union Fire Company, 2023 WL 196690 (S.D.N.Y. 2023) (emphasis added)

Similarly, as stated in *Cessna v. REA Energy Coop., Inc.*, 258 F. Supp. 3d 566, 583 (W.D. Pa. 2017):

> A plaintiff cannot maintain an action for breach of the implied covenant of good faith and fair dealing where an "adequate remedy exists under ... [a] claim for breach of contract." *Geesey v. CitiMortgage, Inc.,* 135 F.Supp.3d 332, 346 (W.D. Pa. 2015) (citation omitted); *see also Hudgins v. Travelers Home and Marine Ins. Co.,* No.

14

11-cv-882, 2013 WL 3949208, at 5 (E.D. Pa. July 31, 2013) ("[T]he claim for breach of the implied covenant of good faith and fair dealing is subsumed by the breach of contract claim"); *Cummings v. Allstate Ins. Co.*, 832 F.Supp.2d 469, 473 (E.D. Pa. 2011) ("Under Pennsylvania law, there is no separate cause of action for breach of the duty of good faith and fair dealing and ... such a claim is subsumed within a breach of contract claim." *McHale v. NuEnergy Group,* 2002 WL 321797, at *8 (E.D. Pa. Feb. 27, 2002)

In this case, if the Debtor believed that the Lender had breached the Settlement Agreement, it would have a right to file a Motion with this court to accuse the Lender of such a breach of contract. However, because of the absolute clarity and unambiguous nature of sections 15.2 and 16.1 of the Settlement Agreement, quoted above, the Debtor has not and cannot do that. In other words, <u>Debtor is not even bothering to argue that there has been a breach of the actual terms of the Settlement Agreement</u>, and in fact, there is no reference at all in Debtor's Motion to an alleged breach of the Settlement Agreement itself.

In addition, a court may not rewrite a contract on equitable grounds, again in the face of a fairly negotiated contract approved by the court. See, e.g. <u>Gillis v. Respond Power, LLC</u>, 2018 WL 3427636 (E.D.Pa. 2018) "<u>courts should not write a better contract for the parties than the one they themselves negotiated and executed</u>." citing <u>ConiMortgage Corp. v. Mortg. Am.</u>, Inc., 47 F. Supp. 2d 575, 577 n.1 (E.D. Pa. 1999) (emphasis added); <u>Matarazzo v. Czenge Advisory Group</u>, 2020 WL 2992493 (E.D. Pa. 2020). Yet, <u>that is exactly what the Debtor is asking this court to do: rewrite the contract to compel Loan Funder to record the deeds in lieu of foreclosure and apply the values of those properties to the loan balance</u>.³

---

³ Even though Debtor mistakenly argues that New York law applies to this matter, the role result would be <u>exactly the same</u> under New York law. See, e.g. <u>CORE Group Marketing LLC v. One Wall Street Acquisition LLC</u>, 213 A.D.3d 444, 184 N.Y.S.3d 13 (2023) (claim of breach of covenant of good faith and fair dealing cannot be used to rewrite the terms of a contract); <u>Transit Funding Assoc., LLC v. Capital One Equip. Fin. Corp.</u>, 149 A.D.3d 23, 29, 48 N.Y.S.3d 110 [1st Dept. 2017)(same); <u>Commercial Lubricants LLC v. Safety-Kleen systems LLC</u>, 2021 WL 4311053 (E.D.N.Y. 2021) (contract was product of arm's-length negotiation and "I cannot rewrite that contract to substitute a bilateral covenant for a unilateral one under the rubric of good faith and fair dealing.")

For all of the foregoing reasons, and because of the clear and unambiguous language of the arm's-length Settlement Agreement, the doctrine of good faith and fair dealing simply does not apply to this case and this Court should not abide by Debtor's attempts to force the contract to be rewritten or to add new terms which do not presently exist in the contract.

C. **EVEN THOUGH THERE IS NO INDEPENDENT OBLIGATION OF GOOD FAITH AND FAIR DEALING, THE EQUITIES LIE WITH THE LENDER AND NOT WITH THE DEBTOR**

As discussed above, the Settlement Agreement is abundantly clear that, once there is a default by the Debtor under the Agreement (which is not disputed here), the Lender is not required to either record any deeds in lieu of foreclosure or to foreclose on the properties. See sections 15.2 and 16.1 of the Settlement Agreement, quoted above. Moreover, even the Debtor itself admits this in the Motion. See paragraph 74 which states that recording deeds in lieu of foreclosure or foreclosing on the subject properties is no more than an option given to the Lender. Moreover, because this contract exists between the parties, there is no overlying doctrine of good faith and fair dealing.

Even just focusing on the equities however, it is not the Lender who is "sitting idly by" (paragraph 76) or "doing nothing" (paragraphs 50 and 89). Rather, it is the Debtor who is doing nothing. More specifically, as described above, the Lender specifically made an offer to the Debtor that can only be described as extremely generous, namely to give the Debtor yet another year to continue to try to sell the properties with a waiver of default rate interest so long as Debtor remain in compliance with the terms of the deal. See Exhibit C attached hereto. In fact, we already know that the Debtor already previously agreed to a one-year extension of the maturity date in order to payoff the Loan in full, namely until August 31, 2023. Therefore, given that it already agreed to such a one-year extension, there is no reason that it should not agree to a further one-year extension. Yet, without giving any explanation whatsoever, the Debtor

16

steadfastly refused this generous offer, without giving any explanation whatsoever, other than arguing that the Lender is obligated to record the deeds in lieu and credit the value of those properties against the loan balance.

Why would the Debtor refuse such a generous offer? The most plausible explanation may be that the Debtor is simply being lazy, just as it has apparently been lazy not only during the 19 months of the bankruptcy period, selling only five properties, but also in the 15 months since the Settlement Agreement was approved in August 2022, selling only three additional properties. Nothing is stopping the Debtor from selling the remaining 42 properties, just as nothing has stopped the Debtor from doing so for the last three years. It appears however, based upon an Internet search that <u>the Debtor has few if any of the remaining 42 properties listed for sale with a broker. So in reality, it is the Debtor who is "doing nothing."</u>

In short, even though it is impermissible to rewrite the arm's-length contract agreed to by the parties embodied in the Settlement Agreement or to impose an overlay of good faith and fair dealing, even if such a doctrine were to apply, it is clear that the Lender has acted in total good faith throughout this matter after the debtor defaulted under the Settlement agreement by not making the maturity payment on August 31, 2023.

WHEREFORE, for the foregoing reasons, Lender respectfully requests that the Debtor's Motion be DENIED in its entirety and for such other relief as this Court deems just.

**WEBER GALLAGHER**

By: _/s/Peter E. Meltzer_
PETER E. MELTZER, ESQUIRE
2000 Market Street, 13th Floor
Philadelphia, PA  19103
(267) 295-3363
Attorneys for HOF Grantor Trust 1, U.S.
Bank Trust, N.A. and Fay Servicing, LLC

17